# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

|  |  |
|---|---|
| LESLIE-BURL McLEMORE;<br>CHARLES HOLMES;<br>JIMMIE ROBINSON, SR.; and<br>RODERICK WOULLARD,<br><br>Plaintiffs,<br><br>v.<br><br>DELBERT HOSEMANN, in his official capacity as the Mississippi Secretary of State; and PHILIP GUNN, in his official capacity as the Speaker of the Mississippi House of Representatives,<br><br>Defendants. | Civil Action<br><br>Case No. 3:19-cv-383-DPJ-FKB |

**DECLARATION OF DR. R. VOLNEY RISER**

R. VOLNEY RISER, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a)(2)(B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

**I.      INTRODUCTION AND QUALIFICATIONS**

1.      I have been retained by Plaintiffs in this case to research and describe the history and intent behind the Mississippi 1890 Constitutional Convention's enactment of the state's peculiar method for electing statewide officeholders described in the Article V, Section 140, 141, and 143 of the State Constitution.

2.      I am a historian, and my research focuses on U.S. political and constitutional history. I am currently a Professor at the University of West Alabama, where I have taught History since 2005 and was granted tenure in 2013. From 2008 to 2014, I was the Chair of the Department of History and Social Sciences. At the University of West Alabama, I currently teach or have previously taught courses in U.S. Constitutional History, African American History, the Gilded

Age & Progressive Era, the Jazz Age and Great Depression, and the History of the American South.

3.      I hold two bachelor's degrees from Florida State University (Humanities, 1995 and History, 1998), and an M.A. (2005) and Ph.D. (2005) in History from the University of Alabama.

4.      I have published widely on political and constitutional systems in the Jim Crow-era South. In particular, I have authored two books: *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908* (Louisiana State University Press, 2010; 2nd ed. 2013) and *A Goodly Heritage: Judges and Historically Significant Decisions of the U.S. District Court for the Middle District of Alabama* (Bounds Library Occasional Papers, University of Alabama School of Law, 2010). I have also published articles in the *Alabama Law Review* and the *American Journal of Legal History*, discussing disfranchisement in the American South.[1] I have contributed several entries to reference volumes, including essays on disfranchisement and various landmark episodes in U.S. legal, constitutional, and political history.[2]

---

[1] R. Volney Riser, "Disfranchisement, the U.S. Constitution, and the Federal Courts: Alabama's 1901 Constitutional Convention Debates the Grandfather Clause," *American Journal pf Legal History* 48, no.3, 237-79 (Fall 2006) (evaluating the Alabama Constitution framers concerns that their disenfranchisement provisions might trigger judicial intervention or punitive congressional responses); Riser, "'The Milk in the Cocoanut': Booker T. Washington, Theodore Roosevelt, and the Fear of Conspiracy in Alabama's 1901 Constitutional Ratification Referendum," *Southern Historian* 26, 30-54 (Spring 2005) (discussing prominent conspiracy theories that helped drive ratification of Alabama's "disfranchising" constitution); Riser, "The Burdens of Being White: Empire and Disfranchisement," Alabama Law Review 53, no.1, 243-72 (Fall 2001) (addressing the concurrent public and policy-makers' debates over the relationship between disfranchisement and territorial expansion).

[2] Riser, "Disfranchisement," in *The World of Jim Crow America: A Daily Life Encyclopedia* (forthcoming, ABC-Clio, July 2019); Riser, "NAACP" and "Powell v. Alabama," in the *Encyclopedia of the Supreme Court of the United States* (Gale Group, 2008); Riser, "Convict Leasing" in the *Encyclopedia of Anti–Slavery and Abolition* (Greenwood Press, 2007); Riser, "Joseph Philo Bradley," "William Rufus Day," and "Sanford Ballard Dole" in the *Historical Dictionary of the Gilded Age* (M. E. Sharpe Publishers, 2003); Riser, "Saenz v. Roe," "U.S. v. Butler," "Missouri v. Holland," "Craig v. Boren," "Balanced Budget Amendment," "American Tobacco Case," "Granger Cases," "Ex parte Garland," and "Collector v. Day" in the *Dictionary of American History* (Scribner's, 2002).

5.     From July 2012 to July 2017, I was Editor-in-Chief of the *Alabama Review*, an academic journal focused on Alabama state history. I am frequently called upon as an expert reviewer, chiefly for work discussing southern states' legal and constitutional histories. These works have been published by Oxford University Press, McGraw-Hill Higher Education, University of Alabama Press, Louisiana State University Press, the *Journal of the Abraham Lincoln Association*, the *Journal of the Georgia Association of Historians*, the *Journal of Southern History*, *Agricultural History*, the *Florida Historical Quarterly*, and *Southern Studies*. Since stepping back from administrative and editorial work, I have made significant progress toward two forthcoming book manuscripts: the first is *Defending Disfranchisement: Popular Constitutionalism and the Anti-democratic Impulse in Jim Crow's America, 1888-1915*, and the second is a legal biography of Booker T. Washington, *The Litigious Mr. Washington*.

6.     Publications of mine addressing directly the southern states' disfranchisement campaigns include *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908* (Louisiana State University Press, 2010; 2nd ed. 2013); "Disfranchisement, The U.S. Constitution, and the Courts: Alabama's 1901 Constitutional Convention Debates the Grandfather Clause, *American Journal of Legal History* 48, no. 3, 237-79 (2006); "'The Milk in the Cocoanut': Booker T. Washington, Theodore Roosevelt, and the Fear of Conspiracy in Alabama's 1901 Constitutional Ratification Referendum," *Southern Historian* 26, 30-54 (Spring 2005); "The Burdens of Being White: Empire and Disfranchisement," *Alabama Law Review* 53, no. 1, 43-72 (Fall 2001); and "Disfranchisement," in *The World of Jim Crow America: A Daily Life Encyclopedia* (forthcoming, July 2019, ABC-Clio, forthcoming).

7.     The analysis following is based upon my expertise as a historian and researcher. My methodological approach reflects standard professional norms for qualitative historical and

social scientific research. Here, this required textual analyses and objective historical comparisons of official documents, government records, and contemporaneous accounts provided by major state newspapers. The suffrage and elections provisions of Mississippi's 1832, 1868, and 1890 constitutions and those of other states were of greatest immediate interest. Additionally, given the absence of consistent official stenographic records from the 1890 Mississippi Constitutional Convention, I turned instead to the detailed running coverage provided by the state's major daily newspapers, namely, the *Jackson Clarion-Ledger* (which published both daily and weekly editions) and the *Vicksburg Daily Commercial Herald*.[3] I also considered the works of other major scholars of the 1890 Constitution.

8.      I am compensated in this matter at the rate of $150 per hour.

## II.    SUMMARY OF CONCLUSIONS

9.      This report briefly addresses the question of why and for what purpose Mississippi's 1890 Constitutional Convention created its singular method for electing governors and other statewide officeholders. It is my opinion that the delegates to the 1890 Constitutional Convention adopted the current system for electing candidates to statewide office with the specific intention of circumscribing African American voting strength and securing white control of Mississippi.

10.     The 1890 Constitution imposed new requirements for electing candidates to statewide office that remain in effect today. Under Section 140, Mississippi candidates for governor must receive a majority of the popular vote and separately win a majority of Mississippi House of Representatives districts. In the event a candidate fails to meet both of these

---

[3] No complete 1890 run apparently survives for *Daily Clarion-Ledger*, Mississippi's political newspaper of record, which means historians must rely heavily upon the Weekly edition. Complicating matters further, digitized copies are intermingled in searchable databases. Both editions are used here, and my footnote references will, where appropriate, distinguish between *Weekly* and *Daily* them.

requirements, the House members will sit as an "electoral college," and choose from the two candidates who obtained the highest number of votes statewide ("House vote" procedure). Collectively, these requirements are referred to as the "Mississippi Election Requirements." The Mississippi Election Requirements also apply to all other non-federal statewide offices.

11.    The Mississippi Election Requirements were an integral component of a broader effort to restrict African-American voting in Mississippi and guarantee white control of the legislative and executive branches of the State government. The Election Requirements worked hand-in-glove with other disfranchisement measures (such as educational tests and poll taxes) and the legislative apportionment, which, at the time, assigned House of Representative seats to counties rather than citizens and then selectively added extra legislative seats to select counties with an express goal of guaranteeing a white-county legislative majority.[4]

12.    While there was no immediate threat that non-white candidates would be elected to statewide office after 1890—not the least because the State was imposing sweeping new restrictions upon the suffrage—many observers outside the Convention, and a significant number of the delegates, worried the disfranchising measures (i.e. the educational qualifications, Australian ballot, etc.) the Convention adopted could fall at the hands of federal judges or, just as horrifying to their minds, incentivize literacy and citizenship education. Lincoln County judge and

---

[4] Some historians have dismissed the 1890 apportionment as unnecessary for maintaining white control of Mississippi politics. *See, e.g.*, Dorothy Pratt, *Sowing the Wind: The Mississippi Constitutional Convention of 1890* [Jackson: University Press of Mississippi, 2018]; Albert Kirwan, *Revolt of the Rednecks: Mississippi Politics, 1876-1925* [Lexington: University of Kentucky Press, 1951]; Kirwan, "Apportionment in the Mississippi Constitutional Convention of 1890," *Journal of Southern History*, vol. 14, No. 2 (May, 1948): 234-46;. Yet, this misses the point: Mississippi's disfranchising measures, legislative apportionment, and Election Requirements (especially the electoral college) were not necessarily intended as an immediate guarantee of white supremacy. Instead, they were designed as a backstop against the threat of third-party or Republican fusion candidacies, the threat of a fair application of suffrage requirements, and the danger of some Congressional or federal court intervention that effectively negated the 1890 constitution's disfranchising provisions.

Convention Delegate J. B. Chrisman worried "a man of ordinary capacity can soon learn the difference in the appearance upon the ticket" of candidates' names, and "so without education and without property the ignorant, irresponsible vagabond voter will control the destiny and shape the public policy of the State."[5] Delegate W. S. Featherston denounced the Australian ballot as "new, strange, expensive, and complicated." He predicted that "in a short time every nigger in the state would catch-up to it." In the city of Memphis, Featherston specifically alleged, after Tennessee adopted the Australian ballot "a hundred or more 'schools' were established a few days before the election and the negroes were sufficiently drilled in the programme [sic] to comply with the prescribed educational qualification."[6]

13.     The longer-term practical threat to which Chrisman, Featherston, and others alluded was that African-American voting strength could be used to return white-minority counties' politicians to dominance; that African-American voters could effectively decide contests between rival white factions; or that African-American voters could propel into power some iteration of a fusion government involving Republicans or some renegade faction.[7] The disfranchisement provisions reduced the likelihood of these events occurring, but in the event disaster struck, Mississippi's Election Requirements would stand as a backstop, guaranteeing that politicians representing the State's white minority (at the time), elected by white men, would dominate the legislature and all statewide executive offices. If African Americans managed to surmount the State's new educational and property tests for voting, and if local elections officials registered a sufficient number of African-American men to influence an election, or in the rare chance that standards for voting and conducting elections were fairly and uniformly applied to all voters, the

---

[5] *Jackson Weekly Clarion Ledger*, September 11, 1890.
[6] *Jackson Weekly Clarion-Ledger*, September 18, 1890.
[7] *Jackson Weekly Clarion Ledger*, September 11, 1890; *Jackson Weekly Clarion-Ledger*, September 18, 1890.

Election Requirements ensured that white Mississippians, through the mal-apportioned State House of Representatives (or State House districts), would have the final say.

## III.    HISTORY OF MISSISSIPPI'S ELECTION REQUIREMENTS

14.    The purpose, intent, and immediate effects of Mississippi's 1890 constitution are well-understood and well-documented in both small and large-scale scholarly works. Simply put, Mississippi's Democratic leadership wished to eliminate the African-American vote in state and local elections.[8]

15.    African-American men began voting in Mississippi following the 1867 registration canvas completed as required by the Reconstruction Act, under which Mississippi and ten other former Confederate states were occupied by the U.S. Army. The Act required Mississippi and the other states to elect conventions to draft new state constitutions. Most southern white men refused to participate in the constitutional conventions, and thus did not participate in the conventions or referenda that led to the 1868 Mississippi Constitution. As a result, the 1890 Convention sought to undo much of the gains in African American suffrage that followed the 1868 Constitution. Few were more vocal about the purpose of the Convention than its president, Judge Solomon S. Calhoon. In a 1902 essay entitled "The Causes and Events that Led to the Calling of the

---

[8] On the subject of Mississippi specifically, *see, e.g.*, Dorothy Pratt, *Sowing the Wind: The Mississippi Constitutional Convention of 1890* (Jackson: University Press of Mississippi, 2018); Stephen Cresswell, *Rednecks, Redeemers, and Race: Mississippi after Reconstruction, 1877-1917* (Jackson: University Press of Mississippi, 2011); Cresswell, *Multiparty Politics in Mississippi, 1877-1902* (Jackson: University Press of Mississippi, 1995); Albert Kirwan, *Revolt of the Rednecks: Mississippi Politics, 1876-1925* (Lexington: University of Kentucky Press, 1951); Kirwan, "Apportionment in the Mississippi Constitutional Convention of 1890," in *Journal of Southern History*, vol. 14, No. 2 (May, 1948): 234-46. For a more general overview of the disfranchisement movement, *see, e.g.*, R. Volney Riser, *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908* (Baton Rouge: Louisiana State University Press, 2010); Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888-1908* (Chapel Hill: University of North Carolina Press, 2001); J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven: Yale University Press, 1972); C. Vann Woodward, *Origins of the New South, 1877-1913* (Baton Rouge: Louisiana State University Press, 1951); V. O. Key, *Southern Politics in State and Nation* (New York: Vintage, 1949).

Constitutional Convention of 1890," Judge Calhoon described the 1868 constitutional convention as a "nondescript body composed of negroes, mulattoes, and brazen adventurers of the white race from the States recently in arms against us, who came here for plunder."[9] He could find no good in either the intent or effect of Reconstruction, and he felt likewise about the Fifteenth Amendment. Mississippi had been ruined, Calhoon insisted, and the "class of people who were the peers of any in Christendom" were brutalized by formerly enslaved people, "led by a set of vultures whom it would be flattery to denominate as disgusting, men without manhood enough to appreciate their own shame."[10] And for seven years, he bemoaned, white Mississippians endured Reconstruction: "This saturnalia of demons," as he put it.[11]

16.      Reconstruction had brought the enfranchisement of African Americans, but ending Reconstruction did not immediately result in blanket disfranchisement. Large numbers of African Americans in Mississippi and other southern states continued to vote and even hold office. Mississippi famously had at one point sent two black men to the United States Senate (Blanche K. Bruce and Hiram Revels), and John Roy Lynch, the famous black U.S. Representative, represented Mississippi in Congress until 1882. In the 1880 census, Mississippi's population was 57.5% African American.[12] The 1890 census, which was underway during the Mississippi Convention, found the State's demographics essentially unchanged: 57.6% of the population was African American, a ratio matched by no state and exceeded only by South Carolina, with an African-

---

[9] Solomon S. Calhoon, "The Causes and Events that Led to the Calling of the Constitutional Convention of 1890," in Franklin L. Riley, ed., *Publications of the Mississippi Historical Society*, vol. VI, 105-10; 107 (Oxford, Miss.: Mississippi Historical Society, 1902).
[10] Calhoon, "Causes and Events," 108.
[11] *Id.*
[12] "Table 39. Mississippi—Race and Hispanic Origin: 1800 to 1990," in Campbell Gibson and Kay Jung, *Historical Census Statistics on Population Totals By Race, 1790 to 1990, and By Hispanic Origin, 1970 to 1990, For The United States, Regions, Divisions, and States*, Working Paper Series No. 56 (Washington: U.S. Census Bureau, 2002).

American population majority of 59.9%.[13] As late as 1890, black men sat in the Mississippi legislature—five, in fact, and all were Republicans. Those five men owed their seats to fusion arrangements and local-level gentlemen's agreements between Republican leaders and the white Democrats who dominated politics in white majority counties. A by-product of this was that white voters in black-majority counties (and Mississippi had a statewide majority African-American population) had far greater effective legislative power than did white men in white-majority counties.[14]

17.    Sharp tensions arose within State Democratic circles, namely, a conflict between the so-called agrarians and the Bourbons, from which sprang Mississippi's disfranchisement movement. In the 1889 State elections, majority white counties demanded a new constitution that would eliminate black voters and thus diminish black-majority counties' voting strength.[15] In their call for the Convention, Mississippi Democrats hardly bothered to obscure their intent to undermine the Fifteenth Amendment and dilute the African-American majority's voting strength. Indeed, as the 1890 legislature debated the Convention enabling legislation, that body had even gone so far as to debate and give committee-level approval for a resolution that would trigger a formal petition to Congress requesting the Fifteenth Amendment's repeal.[16] We might dismiss that resolution as but a fringe politician's folly, but it captured the mainstream sentiment of Mississippi's ruling class, and the Convention's primary aim was to manufacture an effective barrier against the Fifteenth Amendment's spirit and plain text. Rising for an address marking his

---

[13] Walter Willcox, "The Negro Population," in Walter F. Willcox and W. E. Burghardt Du Bois, *Negroes in the United States*, Bulletin 8, Bureau of the Census, 11-98, 16 (Washington: n.p., 1904). The 1890 census was destroyed by fire, and for 1890 statistical information we must rely upon contemporaneous government reports and public summaries.
[14] Riser, *Defying Disfranchisement*, 36-38.
[15] *Id.*
[16] Riser, *Defying Disfranchisement*, 38.

election as Convention President, Solomon Calhoon advised his confreres "[t]his ballot system must be so arranged as to effect one object, permit me to say—for we find the two races now together, the rule of one of which has always meant economic and moral ruin; we find another race whose rule has always meant prosperity and happiness, and prosperity and happiness to all races."[17] There would be far more to constitution writing than questions of voter qualifications, to be sure, but "[t]hat is the great problem for which we are called together; that is the great question for you to solve."[18] And echoing those outspoken legislators from earlier in the year, demands arose again during the Convention for outright repeal of the Fifteenth Amendment. The Special Committee on Preamble and Resolutions dealt with these demands, and duly reported back to the Convention a formal resolution "[t]hat we request that the Congress of the United States cause to be submitted to the several States, a proposition to repeal said XV Amendment of the Constitution…"[19]

18.    One of the leading figures behind the movement to call the 1890 Constitutional Convention and stem African American political gains was then-U.S. Senator James Z. George (usually referred to as "J. Z."), the unquestioned leader of the Mississippi Democratic Party. Senator George was elected to the Convention as a delegate from the State-at-large. Between the time the legislature approved the Convention enabling act in the winter of 1890 and the Convention's first day in August 1890, numerous, unofficial, proposed amendments to Mississippi's electoral system appeared in the State press, but no proposal or opinion was accorded the weight of Senator George's. He previewed his plans in two extraordinarily-detailed letters of June 25 and June 27, 1890 to C. E. Wright, Editor of the *Vicksburg Daily Commercial Herald*

---

[17] *Journal of the Proceedings of the Constitutional Convention, of the State of Mississippi, begun at the City of Jackson on August 12, 1890, and Concluded November 1, 1890* 10 (Jackson: E. L. Martin, 1890).
[18] *Journal of the Proceedings of the Constitutional Convention*, 11.
[19] *Journal of the Proceedings of the Constitutional Convention*, 302-304; 304.

(hereafter *Herald*), which the *Herald* published in full on July 4 and July 6, 1890. And Senator George made clear African American voters were the crux of the matter. In the June 25 communication, George declared that Mississippi's aspirations of good government were "impeded by the presence of a race . . . [that has] never yet developed the slightest capacity to create, to operate, or to preserve constitutional institutions."[20]

19.     There is nothing at all surprising about a white, Democratic U.S. Senator complaining about African American political strength in the context of Mississippi in July 1890. What is less appreciated is just how controversial and mysterious disfranchisement was at this time, for no state had yet attempted it on such a scale after the Fifteenth Amendment was ratified, and so no state knew which devices would work best while avoiding any federal intervention.[21] In the June 25 letter to Wright, published in the July 4 *Herald*, Senator George reviewed a number of proposals mentioned to that point: poll taxes, Australian ballots (which doubled as an educational test), plural voting schemes, and more. While he did not offer alternatives, he promised Wright in closing, "I shall in another letter examine another remedy which has also been suggested. That remedy is based on no new or untried principle. . . ."[22] The solution he proposed two days later— the constraint upon African-American political power—was physical.

20.     Senator George's proposal, first revealed in his second letter to Wright, on June 27, 1890, and published in the July 6 *Herald*, was a malapportionment scheme that in his words "[returned] to a spirit of the Constitution of 1832, and on that adjust the political forces of the State, by a political apportionment which will vest the power to control by law the destinies of the

---

[20] J. Z. George to C. E. Wright, June 20, 1890, reprinted in the *Vicksburg Daily Commercial Herald*, July 4, 1890.
[21] The disfranchisement movement in southern politics was only two years old at the time of Mississippi's 1890 Constitutional Convention. To that point only two states, Arkansas and Tennessee, had acted, and those states had only attempted statutory measures.
[22] *Vicksburg Daily Commercial Herald*, July 4, 1890.

people of the State, in constituencies which are capable of self-government."[23] The 1832 constitutional provision to which Senator George referred required an apportionment of the House of Representatives such that each county would receive a minimum of one representative, and the remaining representatives would be apportioned on the basis of the remaining white population in each county in excess of the fixed ratio of white inhabitants per district. *See* Miss. Const. of 1832, Art. III, §§ 8, 9. What Senator George proposed, however, was not exactly the 1832 remainder system. He had described it as the "spirit" of 1832, but it is more accurately cast as a wholesale reimagination. The senator's 1890 "remainder" was not confined by natural population trends but rather a careful, race-driven distribution of specially-created seats, the primary criterion being the presence of a white majority. Thus, Senator George intended to ensure long-term legislative (and, as it turned out, executive branch) control by legislators elected from majority-white districts.

21.     Senator George was extremely careful in all public remarks to affirm the U.S. Constitution, and he cautioned the Convention against excessive candor, specifically, warning them to not describe anything in Mississippi politics as fraud. He had affirmed the Constitution in the June 25 letter, and he would subsequently do so in the Convention, reminding delegates he and they had all taken "a solemn oath to support the Constitution of the United States" and "[t]hat oath he [would] never break, come what may."[24] George's insistence that delegates respect their oaths to support the U.S. Constitution while working to nullify the same cannot but strike a discordant tone for modern ears. Yet, it is clear he and others sensed their work would be safe as long as the new constitution did not explicitly seek African-Americans' disfranchisement. And what he intended was to adopt some versions of Australian ballots, poll taxes, and residency requirements

---

[23] J. Z. George to C. E. Wright, June 27, 1890, reprinted in the *Vicksburg Daily Commercial Herald*, July 6, 1890.
[24] *Jackson Daily Clarion-Ledger*, September 18, 1890.

(and these would decimate the African-American voting population), coupled with the careful malapportionment of the State legislature described above, which Senator George's letter alluded to in harking back to the "spirit of 1832."[25]

22.      Senator George's discussion of executive-branch elections was much more explicit. He suggested to the *Herald* that the delegates might also consider having the legislature select the State's governor. "It is a question worthy of serious consideration," Senator George offered, "whether the convention ought to stop here, merely securing a good and capable legislature without going farther and attempting to secure also—by the same means—[a] good and safe executive."[26] Senator George clearly did not believe any majoritarian system could yield good government, and his attachment to democracy had limits. On the one hand, he conceded, depriving voters a direct say in gubernatorial elections had its drawbacks, but noted "on the other hand, it may be argued that it would be wise[,] in view of the incapacity of a majority of the voters in the State [(referring here to African Americans)], to vest in the Legislature the power to elect the governor."[27] He further suggested that the Convention would decide to "provide for an electoral body chosen by the same constituencies as elect the legislature, and in that body vest the election of governor."[28] Senator George was convinced "incompetent electors" would inexorably increase, and "if the governor be elected by a general vote all over the State, his election will rest with these incapables."[29]  Relative to his consideration of the apportionment and other matters, it is clear that the electoral college proposal had captured much of his attention, and he was favorably inclined toward it.[30]

---

[25] George to Wright, June 27, 1890, reprinted in the *Herald*, July 6, 1890.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*

23.     The draft constitutional articles that addressed suffrage restrictions and proposed a new apportionment (which would later be amended to include the electoral college procedure) were produced by the Committee on Elective Franchise, Apportionment, and Elections. The Committee was composed of thirty-five members, hand-selected by the Convention's President, Judge Calhoon, and they were deeply influenced in their deliberations by Senator George. Following swarms of proposals reported in the popular press during the Committee's deliberations, the initial measures that the Committee presented to the Convention combined the apportionment scheme devised by Senator George, and inspired by the 1832 Constitution, with franchise measures which included cumulative poll taxes, property, and educational qualifications.[31]

24.     The Committee's apportionment constructed the legislature upon a county-based distribution, assigning extra seats to mostly white-majority counties.[32] The application was, at times, seemingly random, but in all cases it bore out Senator George's sentiments expressed in his published correspondence with the *Herald*: the legislature had to be configured such that white-majority counties predominated even though they represented a minority of the State's population.[33] After extended debate and discussion, the Convention assented to the Committee's apportionment proposal on September 22.[34]

25.     The Committee's initial report did not include proposals for the conduct of gubernatorial or other statewide elections. A subsequent Committee proposal introduced to the Convention what would become Mississippi's electoral college, using the reconfigured House of Representatives as its foundation.[35] What they presented originated with Edward Mayes, an at-

---

[31] *Journal of the Proceedings of the Constitutional Convention*, 134-44.
[32] *Jackson Daily Clarion-Ledger*, September 3, 1890.
[33] George to Wright, June 27, 1890, published in the *Vicksburg Daily Commercial Herald*, July 6, 1890.
[34] *Jackson Daily Clarion-Ledger*, September 23, 1890.
[35] *Jackson Daily Clarion-Ledger*, September 5, 1890.

large delegate and Chancellor of the University of Mississippi, who proposed an electoral scheme for all statewide elections wherein electoral votes would be counted by county, with each county having the number of votes equal to its representation in both houses of the State legislature.[36] In a supplemental report to the Convention, the Committee presented the electoral college system that tracked Mayes' proposal.[37] The Convention adopted the electoral college shortly after following relatively little debate.[38]

26.     Mayes's proposal has been recognized as the effective source of the electoral college the Committee eventually did propose and which Senator George championed.[39] One historian wrote,

> Having provided for complete and lawful security of the legislative department and incidentally the election of United States Senators, as the basis of white supremacy the value and advantages of the representative apportionment were then extended to the other two branches of the State government… This was accomplished by the adoption,[sic] in committee of the novel 'electoral plan,' which was borrowed by the committee from a suffrage scheme introduced in the convention by the Hon. E. Mayes… This arrangement thus gives to the white constituencies a reserve power of elective control of all the executive offices of the State. And with the appointment of the judges vested in the Governor, the scheme for a State government upon the foundation of white electorates was made lawful, complete, and secure.[40]

27.     Although there is little record of any large-scale debate of the Committee proposal that became the electoral college, there was a proxy argument over a similar suggestion from the Convention's President, Judge Calhoon, that featured a thirteen-member electoral college chosen

---

[36] *Journal of the Proceedings of the Constitutional Convention*, 39-41.
[37] "Supplemental Report of Committee on Franchise," in *Journal of the Proceedings of the Constitutional Convention*, 176-77.
[38] *Journal of the Proceedings of the Constitutional Convention*, 228-41.
[39] J. S. McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections in the Constitutional Convention of 1890," in Franklin L. Riley, ed., *Publications of the Mississippi Historical Society*, vol. VI, 129-40; 135 (Oxford, Miss.: Mississippi Historical Society, 1902).
[40] *Id.*

separately from State legislators.[41] Calhoon specifically rejected claims that his proposal would put too much distance between the electorate and elected officials, because the voters (or, as he put it, "people") would participate in nominating contests.[42] And he emphasized the need to harmonize rival Democratic (and white) factions. "Adopt this plan," he intoned, "and we secure white supremacy and we also insure [sic] peace between the races and protection to all."[43]

28.    Judge Calhoon's plan drew significant criticism.   Delegate R. H. Taylor, representing the State at-large, argued that it "would create an oligarchy," and "would break down the great principle of independence of the three departments of government and substitute a conglomerated thing receiving its authority from one-man power."[44] The scheme was "unrepublican and unconstitutional," Delegate S. E. Packwood complained.[45] Concerns about oligarchy and republicanism notwithstanding, delegates never lost sight of what the Convention, the Committee, or Judge Calhoon and his electoral college were about. Delegate Coffey of Jefferson County recognized these proposals were all part of a broader effort to find some way to defeat the Fifteenth Amendment.  As the *Clarion-Ledger* correspondent recording his remarks put it, Coffey had said "the barrier interposed between the object for which the convention was called and a successful termination of its deliberations was the provisions of the Federal Constitution, which forbade a discrimination in the grant of franchise between the races."[46] Coffey "collated" them under "four heads, viz: 1st. To increase the number of white votes by conferring upon women the right of franchise. 2nd. By an Electoral College. 3rd. By arbitrary apportionment as reported by

---

[41] *Jackson Weekly Clarion-Ledger*, September 11, 1890.
[42] *Jackson Weekly Clarion-Ledger*, September 11, 1890; *Vicksburg Daily Commercial Herald*, September 12, 1890.
[43] *Jackson Weekly Clarion-Ledger*, September 11, 1890; *Vicksburg Daily Commercial Herald*, September 12, 1890.
[44] *Jackson Daily Clarion-Ledger*, September 12, 1890.
[45] *Id.*
[46] *Id.*

the Franchise Committee. 4th. By restricting suffrage by suitable and equitable qualifications."[47] Coffey opposed the first, third, and fourth categories and declined comment on the second, that being the electoral college scheme in the committee's supplemental report, as it was "in the course of perfection."[48] The plan that was eventually "perfected," adopted, and currently reflected in Section 140 of the Mississippi Constitution combined elements of Mayes's proposal with the gist of Senator George's apportionment and Judge Calhoon's electors, ensuring that the white population in Mississippi would maintain control—either through their individual votes or their elected representatives—of gubernatorial elections.

29.     There was an additional significant twist to the Committee's proposal for choosing statewide officers, one that marked a distinct break from past practice. This is the matter of outright majorities themselves. Since the Jacksonian era, plurality voting was the standard in U.S. State elections. It was part of the 1868 Mississippi Constitution, which stated in Article V, Section 2 that the plurality winner would take the office, except in a tie, when the House and Senate would together cast the tie-breaking ballot:

Mississippi Constitution of 1868, Article V, section 2

Sec. 2. The Governor shall be elected by the qualified electors of the State. The returns of every election for Governor shall be sealed up and transmitted to the seat of Government, directed to the Secretary of State, who shall deliver them to the Speaker of the House of Representatives at the next ensuing session of the Legislature, during the first week of which session, the said Speaker shall open, and publish them in presence of both Houses of the Legislature. The person having the highest number of votes shall be Governor; but, if two or more shall be equal and highest in votes, then one of them shall be chosen Governor by the joint ballot of both Houses of the Legislature. Contested elections for Governor shall be determined by both Houses of the Legislature, in such manner as shall be prescribed by law.

---

[47] *Id.*
[48] *Id.*

30.     This provision was not unique to Mississippi. Among southern states, for example, North Carolina, Louisiana, Alabama, South Carolina all had identical provisions in their constitutions. Mississippi's shift to a majority-vote requirement clearly broke with regional tradition. During the Convention, the Committee on the Executive Department proposed preserving the 1868 Constitution's method for electing governors.[49] The proposal (which was reported and tabled) itself effectively confirms things the delegates never said openly about the electoral college proposal: 1) the shift to a majority vote requirement was not simply an afterthought; 2) Convention delegates actively chose to abandon plurality balloting, and most importantly 3) Senator George and his colleagues were carefully erecting as many barriers as practicable to any sort of political movement that challenged established, conservative, Democratic control. Should any fusion combination arise of agrarians, Republicans, or third-party interests, there would remain the electoral college backstop. Just as important, if Mississippi's efforts at disfranchisement failed or were struck down, the electoral college scheme might remain.

31.     At the Convention's conclusion, President Calhoon gave a parting speech in which he continued to attack African Americans.  "[T]he negro race seems unable to maintain even its own imitative acquirements," he complained.[50] President Calhoon further stated that African-American political power "seems to mean, as it has always meant, stagnation, the enslavement of woman, the brutalization of man, animal savagery, universal ruin."[51] Calhoon believed the Convention had solved this perceived problem. In years to come, however, the 1890 Constitution would see no end of scorn from national critics as well as from other southern states that attempted disfranchisement constitutions of their own.[52]

---

[49] *Journal of the Proceedings of the Constitutional Convention*, 151-54.
[50] *Journal of the Proceedings of the Constitutional Convention*, 702.
[51] *Id.*
[52] *See, e.g.*, R. Volney Riser, *Defying Disfranchisement*, 74-111.

## V.      CONCLUSION

32.      After the ratification of the Fifteenth Amendment, guaranteeing the franchise to African-Americans, and the Reconstruction era which saw an increase in African-American political participation and electoral success, the Mississippi Legislature called the 1890 Constitutional Convention with the specific goal of enacting new measures that would undermine African-Americans' voting strength and limit their ability to elect candidates of their choice. First, the delegates adopted several provisions, including education requirements and poll taxes, to prevent African Americans from voting at all. But due to fears that African Americans may overcome these voting qualifications or that the federal government may intervene to overturn the disfranchisement laws, the delegates adopted additional, fail-safe mechanisms to ensure white control of the State government, including the apportionment of the State House of Representatives that ensured control by white-majority counties, and an electoral system that would give white-majority counties or legislative districts (and their elected representatives) the final say in the election of the Governor and other statewide officers. The clear, undeniable goal of the 1890 Constitutional Convention, and the electoral rules it adopted for statewide offices, which are still in effect today under section 140 of the Mississippi Constitution, was to provide white constituencies a reserve power of elective control of all executive offices of the State, and "secure white supremacy."

* * *

19

I reserve the right to continue to supplement my declaration in light of additional facts, testimony and/or materials that may come to light.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information and belief.

Executed on: May 30, 2019

_____
R. VOLNEY RISER