# EXHIBIT 3

Southern Historical Association

Disfranchisement of the Negro in Mississippi
Author(s): William Alexander Mabry
Source: *The Journal of Southern History*, Vol. 4, No. 3 (Aug., 1938), pp. 318-333
Published by: Southern Historical Association
Stable URL: https://www.jstor.org/stable/2191292
Accessed: 16-04-2019 16:05 UTC

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms

*Southern Historical Association* is collaborating with JSTOR to digitize, preserve and extend access to *The Journal of Southern History*

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

# Disfranchisement of the Negro in Mississippi

*By* WILLIAM ALEXANDER MABRY

Political Reconstruction came to an abrupt and violent end in Mississippi in 1875.[1] The "Revolution" of that year placed the control of the state government in the hands of the Democrats—men sworn to preserve the principles of home rule and white supremacy. Proscription of the large Negro vote was the natural result of the white victory. The day of the Carpetbagger and the Scalawag was done, and the leaderless Negroes were prevented by fraud, intimidation, and occasional violence from making their influence felt in politics. A continuous succession of Democratic victories in state elections is ample proof of the effectiveness of these tactics.

For fifteen years it seemed more expedient to control and suppress the Negro vote than to try to reduce it legally. Indeed, the latter course appeared to be impossible. The Fifteenth Amendment forbade any direct political discrimination against the Negroes as a race. The act of Congress readmitting Mississippi to representation included a condition that the electorate of the state, as provided for in the constitution of 1868, should not be restricted. Furthermore, the organic act, framed during Reconstruction, prohibited the imposition of any property or educational qualifications for voting prior to 1885.

Several factors contributed to a change in the prevailing attitude toward the handling of Negro suffrage. For a short time after the overthrow of the Republicans in 1875, some of the leading Democrats, including

[1] This article is based on "The Disfranchisement of the Negro in the South," the author's doctoral dissertation in history at Duke University, accepted by the Graduate School of Arts and Sciences in 1933.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

L. Q. C. Lamar, hoped for a division among the Negroes on political questions. But by 1881 Lamar concluded that the blacks were more estranged from the whites than ever and that they were not able "to assimilate with our political habitude and methods."[2]

Not only was there this general feeling that attempts to divide the Negro vote would continue to be futile but there was also a growing resentment against the low ebb of political morality which was traceable to the illegal suppression of a large percentage of the black vote. White election officials, accustomed to cheating Negroes at the polls, were not above cheating whites as well. The situation was later described in the frankest of terms on the floor of the constitutional convention of 1890 by Judge J. J. Chrisman:

> Sir, it is no secret that there has not been a full vote and a fair count in Mississippi since 1875—that we have been preserving the ascendency of the white people by revolutionary methods. In plain words, we have been stuffing the ballot-boxes, committing perjury, and here and there in the state carrying the elections by fraud and violence until the whole machinery for elections was about to rot down. The public conscience revolted. . . . It required no Solomon to see that the ballot-box-stuffer cannot always be relied on to elect the best man to office.[3]

During the 1880's a movement got under way for a revision of the state constitution, principally with a view to changing the suffrage qualifications. Among other desirable reforms were the election of judges, elimination of excessive private legislation, taxation of corporations, and educational qualifications for jurors. In a general way, too, there was a lingering prejudice against the constitution of 1868 because it was framed not by the group now in control but by Carpetbaggers, Scalawags, and Negroes. To use the language of Judge S. S. Calhoon: "the effrontery of such a collection of irresponsible men undertaking to frame organic law, aroused intense indignation and scorn, which extended beyond the makers to the work and persisted against that constitution as long as it existed."[4]

[2] J. T. Wallace, *A History of the Negroes of Mississippi from 1865 to 1890* (Clinton, Miss., 1927), 148.

[3] Jackson *Clarion-Ledger*, September 11, 1890.

[4] S. S. Calhoon, "The Causes and Events that Led to the Calling of the Constitutional

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 5 of 18

Sentiment favorable to a change in the constitution was sufficiently strong by 1886 to induce the legislature to pass a resolution calling a convention. Governor Robert Lowry, however, vetoed the measure on the grounds that it was then inexpedient to take such a step.

Despite this rebuff, an active group kept urging the necessity of remedying the suffrage abuses. In January, 1889, the president of the Mississippi State Bar Association made a strong speech calling attention to the large Negro majority, "unused to the conduct of civil affairs; incapable of understanding the art of government." The malady was a serious one, he pointed out, but the medicine being used was even more dangerous. "The ignoring of plain constitutional and statutory rights, though necessitated by our present surroundings, must ultimate in greater evils than we now seek to avoid unless some remedy be ascertained and supplied."[5]

The Democratic state convention which met in Jackson on July 16, 1889, nominated for governor John M. Stone, a man who was known to favor the calling of a constitutional convention. Also, the party conclave adopted the following resolution: "We recommend that the question of a convention be made an issue before the people in the coming election, so that they may be enlightened by the discussion, and that the Legislature elected govern itself accordingly."[6]

As the campaign progressed it became increasingly evident that the leaders of the Democratic party were not in agreement on the question of changing the constitution in order to deal with the problem of Negro suffrage. Senator James Z. George came out strongly in favor of constitutional changes which would "enable us to maintain a home government under the control of the white people of the state."[7] On the other hand, Governor Lowry was indifferent, if not antagonistic, toward the idea of a convention. Senator E. C. Walthall likewise objected to a convention as "an unnecessary, expensive, and dangerous experiment."

Convention of 1890," in Mississippi Historical Society, *Publications* (Oxford, etc., 1897-1914; Centenary Series, 1916-1925), VI (1902), 107.

[5] Jackson *Clarion-Ledger,* January 31, 1889.

[6] *Ibid.,* July 18, 1889.

[7] *Ibid.,* October 24, 1889.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 6 of 18



Arguments over a new constitution might simply divide the whites and revive the Negro's interest in politics, which, he felt, was then "largely abated." Like a good many other Democrats from predominantly white counties, he did not want "to restrict the elective franchise by imposing on it any conditions which would strike down tens of thousands of the best white Democrats in Mississippi."[8]

The outcome of the November election may be interpreted as a triumph for the advocates of suffrage reform. Stone became governor of the state and, in February, 1890, the legislature issued a call for a constitutional convention to be assembled in Jackson on August 12 of that year.

The newspaper press had been divided on the issue of calling the convention and was still unable to agree as to the probable outcome of its work. The Jackson *Clarion-Ledger* was an ardent supporter of the constitutional reformers, while the Natchez *Daily Democrat* doubted their sincerity and the likelihood that they would accomplish anything of positive value. A running editorial battle ensued.

While Mississippi was preparing for its constitutional convention, a bill of interest to the entire South was introduced in the national House of Representatives. Henry Cabot Lodge of Massachusetts moved to institute Federal supervision of congressional elections. The reason for such a step is not difficult to deduce. Republican leaders, counting heavily on the Southern Negro support during Reconstruction, had recently witnessed the almost complete loss of that block of votes due to the suppressive tactics of the Southern whites. A solid white South had played an important part in the election of Grover Cleveland in 1884. True enough, the Republicans had won the presidential election of 1888, but their position still was none too secure. The congressional election of 1890 promised to be closely contested.

Southern congressmen protested vigorously against this new threat to home rule but could scarcely deny the charge hurled by their Republican opponents that great numbers of Negroes were being illegally deprived of their right to vote. In defense of his measure Lodge asserted:

> If any State thinks that any class of citizens is unfit to vote through ignorance

[8] *Ibid.*, October 31, 1889.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 7 of 18

it can disqualify them from voting for State officers or for members of this House. It has but to put an educational qualification into its constitution. But the disqualification like the qualification can not recognize color, and that is the reason that legal methods have never been tried. The negro is not thrust from his rights merely because he is ignorant and unfit to use them, as is constantly charged, but because his skin is black. . . . If all is fair and honest and free in Southern elections this law will interfere with no one, but will demonstrate the fact to the people of the United States.[9]

The Lodge "Force Bill" was passed by the House on July 2, 1890, but the opposition in the Senate was too strong. There, the Republicans seem to have bargained with the Democrats, sacrificing the election bill to secure the passage of the tariff measure which was pending.[10]

The threat of Federal intervention in Southern elections seemed to many Mississippians the strongest sort of argument for putting a stop to the illegal tactics used to disfranchise the Negro and for substituting constitutional or statutory provisions to accomplish the same end. Said Judge Calhoon through the columns of the *Clarion-Ledger:*

It will not do to familiarize the federal power with supervision of the ballot in the states. Better to disfranchise one or the other of the races at the South at once. . . . There is no politics at the South save the race question. Her people naturally adhere to any national party which is the least threatening to the encouragement of black dominion.[11]

In a similar vein, the *Clarion-Ledger* said editorially:

If the force bill now pending in Congress, passes, it is fortunate for Mississippi that she will be able through her Constitutional Convention soon to assemble to put such restrictions on suffrage as to render it largely nugatory and deprive it of much of its power for evil. Other Southern states are not so favorably situated, but the example set by Mississippi can be followed by them if the measures adopted prove adequate to meet the evil.[12]

As the time for the constitutional convention drew near, abstract discussions of the evils of Negro suffrage and the dangers inherent in the "Force Bill" gave way to concrete proposals for restricting the suffrage in the interest of the white race. Newspaper correspondents vied with

[9] *Congressional Record,* 51 Cong., 1 Sess., 6544 (June 26, 1890).

[10] James Ford Rhodes, *History of the United States from the Compromise of 1850,* 8 vols. (New York, 1920), VIII, 361.

[11] Jackson *Clarion-Ledger,* March 6, 1890.

[12] *Ibid.,* August 7, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

one another in suggesting plans. The principal ones were these: the Australian ballot system; an educational prerequisite for voting; an increased poll tax to be paid before registration; a change in the basis of representation in the legislature, whereby to vest the real governing power in the white counties; a property qualification for voting; plural voting by property holders; woman suffrage; longer residence requirements for voting; and examination and certification of fitness for voting by a commission. One thing was clear at the outset, none of the plans embraced a simple panacea for the state's political ills, and effecting an agreement in the convention was not going to be easy. The *Daily Democrat* branded all the proposals as motivated by "expediency, by which an advantage is to be gained by one class of citizenship of the commonwealth over another."[13]

The Negroes of Mississippi were by no means oblivious to the major purpose for which the convention was called. About the middle of June, Negro Republican delegates from forty counties held a meeting in Jackson, and a committee prepared an address to President Benjamin Harrison protesting against the suppression of the colored vote. A bold indictment of the whites of the state and their motives was made:

> . . . it is not due to an apprehension that the blacks would dominate the whites that fraud and violence are resorted to in popular elections in this state. It is due, however, to a well-formed apprehension, that but for the inauguration and enforcement of such methods the Democratic party would be defeated.[14]

To the Negroes of the state was issued a warning that the Democrats were preparing, through means of the constitutional convention, to shape the election law to their own needs and then "the policy of crushing out the manhood of the Negro citizens is to be carried on to success." The Negroes in all counties were urged to organize and elect delegates to the convention to forestall the plans of the Democrats.[15]

Despite the action taken by the Negro gathering in Jackson, the

[13] Natchez *Daily Democrat,* April 13, 1890.

[14] Jackson *Clarion-Ledger,* July 4, 1890.

[15] J. S. McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections in the Constitutional Convention of 1890," in Mississippi Historical Society, *Publications,* VI (1902), 132.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 9 of 18

Democrats had no difficulty in electing an overwhelming majority to seats in the constitutional convention. Of the 135 men who assembled in Jackson on August 12, 1890, only 2 were genuinely Republican. Both of these were from Bolivar County—G. P. Melchoir (white) and Isaiah T. Montgomery, formerly a slave of Joseph E. Davis, brother of the Confederate president, but now one of the wealthiest Negro planters and business men in the state. Former Governor James L. Alcorn and Judge H. F. Simrall, erstwhile leading Republicans, were elected to the convention by the Democrats. Four delegates were classed as Independents—the rest as Democrats.

Not all of the vast Democratic majority were of one mind. One soon begins to hear of "black belt" Democrats and "white county" Democrats. The two groups agreed in wanting to see the Negroes disfranchised but differed as to method. Delegates from the white counties feared that any drastic suffrage restrictions involving educational tests might deprive a great many unlettered whites, as well as Negroes, of the right to vote. On the other hand, the black belt representatives were willing to sacrifice the illiterate white vote in order to accomplish the major goal—the disfranchisement of the Negro.

After a close contest between the Democratic factions, Judge Calhoon of Hinds County, in the black belt, was chosen chairman of the convention. His opening address made quite clear his own position and that of his section with respect to Negro suffrage. Said Chairman Calhoon:

> You are confronted by a colossal fact which cannot be obscured by the clouds of maudlin sentiment or pseudo philanthropy. . . . This ballot system must be so arranged as to effect one object, permit me to say—for we find the two races now together, the rule of one of which has always meant economic and moral ruin; we find another race whose rule has always meant prosperity and happiness to all races. What does the instinct of self-protection require us to do? We have been twenty-five long years endeavoring to have strictly homologous political relations between those races. We have failed.[16]

The first practical question which faced the convention was the extent of its powers. Did it have the authority to restrict the suffrage when the act of Congress readmitting Mississippi to the Union specifically pro-

[16] Mississippi Constitutional Convention *Journal,* 1890 (Jackson, 1890), 10.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 10 of 18

vided that no citizen permitted to vote by the state constitution of 1868 should ever be denied that privilege except as punishment for crime? If this act of Congress was constitutional the hands of the convention were tied.

This perplexing problem was submitted to a committee of lawyers headed by Wiley P. Harris. The verdict of the committee was that Congress had exceeded its constitutional powers when it imposed such a condition upon the state of Mississippi. Congress could not exact, even of a new state, any conditions which necessitated a surrender of its rights as a state. The Federal compact had guaranteed the equality of all the states in the Union. The power of regulating the franchise had been given to the states; they had customarily exercised that power without question. Since the adoption of the Fifteenth Amendment, states could no longer disfranchise on grounds of race, color, or previous condition of servitude; otherwise they were free to limit the suffrage as they might choose.[17] The convention accepted the opinion of its advisory committee and proceeded with its work.

But all the obstacles had not been surmounted. How was a suffrage clause to be framed which would effectively disfranchise the majority of Negroes and, at the same time, not violate the Fifteenth Amendment or disqualify large numbers of whites from voting? Furthermore, there was the possibility of having the state's representation in Congress reduced under the operation of the Fourteenth Amendment if the state's electorate were decreased. Such was the difficult task entrusted to the Committee on Elective Franchise, Apportionment, and Elections.

Many believed it impossible to find a legal solution to Mississippi's suffrage dilemma. Of this opinion was the *Daily Democrat:*

> Some are hoping for a new and undiscovered solution of the suffrage question, but these will be disappointed, as time and circumstances have not yet exhumed the key to any solution outside the old Democratic methods—so that the convention can only proceed with the best light it has in purifying and making sure and substantial a consistent adherence to those methods.[18]

[17] Frank Johnston, "Suffrage and Reconstruction in Mississippi," in Mississippi Historical Society, *Publications,* VI (1902), 215-16.

[18] Natchez *Daily Democrat,* August 12, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

The thirty-six members of the Committee on Elective Franchise, Apportionment, and Elections were named equally from the white and black counties, with the chairmanship going to Robert C. Patty of Noxubee (a white county). Senator George and Judge Calhoon essayed to play the rôle of conciliators in the committee sessions.

The question of representation of counties in the legislature was taken up first. The preponderance of power heretofore had lain with the block of counties west of the Illinois Central Railway—the black belt.[19] Representation was based on total population, and the large number of Negroes swelled the population of these counties. But comparatively few Negroes voted, so the whites of the black belt had had more than their proportionate share of power in the state government. This situation the white county delegates were anxious to see changed. Their aspirations fitted in nicely with the plan of Senator George to assure a continuance of white supremacy in the state by giving the predominance in the legislature to the white counties.[20]

The "conscientious objectors" to this gerrymander were naturally the whites of the black belt. Senator George himself said that the reapportionment of representation was not the plan he would approve for a "homogeneous free people, the main body of whom are capable of self-government."[21] He regretted to disturb the legislative apportionment but felt that such a step was " 'demanded by the fundamental necessity of the situation.' "[22] And his influence in the committee was strong enough to overcome black belt objections and secure the inclusion of a provision for legislative reapportionment in the committee report.

Black belt sentiment had originally favored some such certain method of cutting down the Negro vote as the confusing South Carolina "Eight-Box Law"[23] But this type of legislation could not be carried because of the fear of the white counties that white votes also would be sacrificed

[19] Johnston, "Suffrage and Reconstruction in Mississippi," in *loc. cit.,* 221.

[20] Jackson *Clarion-Ledger,* July 10, 1890.

[21] Natchez *Daily Democrat,* July 9, 1890.

[22] McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections," in *loc. cit.,* 134.

[23] Jackson *Clarion-Ledger,* February 20, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 12 of 18

thereby. A literacy test with the "understanding clause" as a loophole for illiterate whites was proposed by Harris of Hinds County, and accepted by the committee as a compromise.

On September 2 Chairman Patty of the Committee on Elective Franchise, Apportionment, and Elections read his report to the convention. Briefly, it provided that in order to vote one must be at least twenty-one years of age and sane. He must have resided in the state for two years and in the election district one year, must have been registered, and must never have been convicted of bribery, burglary, theft, arson, obtaining money under false pretenses, perjury, forgery, embezzlement, murder, or bigamy. Also, to vote one must have paid a poll tax of two dollars on or before February 1, for the current year and for the year previous. Section five embraced the new compromise plan—the "understanding clause." Qualified voters must be able, on and after January 1, 1896, "to read any section of the state constitution; or to be able to understand the same when read to him, or give a reasonable interpretation thereof." A new registration was to be made after these conditions were applied.[24]

Provision was made that, for future elections, printed ballots be furnished by the state. Voting stalls or tables were to be private, and a maximum of ten minutes was to be allowed for a voter to mark and deposit his ticket. A voter might secure the aid of the election inspector in marking his ballot only if blind or otherwise physically disabled. If more names were marked than there were officers to be elected the vote was to be thrown out.[25]

Exceedingly important was the section dealing with legislative apportionment. The representation of no county was reduced, but the number of representatives in the lower house of the legislature was increased by thirteen. The additional seats were allotted to the white counties, and several legislative districts were organized out of the white sections of the black counties.[26]

Another part of the scheme proposed by the committee was the so-

[24] Mississippi Constitutional Convention *Journal,* 1890, pp. 134-36.
[25] *Ibid.*
[26] *Ibid.,* 136-39.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 13 of 18

called electoral plan, taken largely from the suggestion of Edward Mayes. The benefits of gerrymandering were to be carried to the limit. The governor was not to be elected by direct popular vote, but indirectly by an electoral college scheme. The popular votes cast in each county were to be counted, and the candidate receiving a majority was to be given as many electoral votes as the county had members in the legislature. Also, the governor was empowered to appoint the judges.[27]

The debate in the convention on the committee report was long and sometimes bitter, bringing out into bold relief the sectional feeling which existed in the state. The extreme white county sentiment was expressed in a speech by W. A. Boyd of Tippah County. He was glad to reform the suffrage if not a single white voter was to be sacrificed; political rights were inherent so far as whites were concerned. The convention had no power, he asserted, to disfranchise because of poverty or illiteracy. The black belt was only trying to legislate the state into aristocracy. "You are driving the wedge that shall forever destroy white unity in Mississippi," thundered Boyd.[28]

J. B. Boothe of Panola County, a black belt delegate, answered him with a threat to oppose the apportionment scheme which was clearly advantageous to the white counties. However, he appealed for cooperation and understanding between the sections of the state.

> I want to say for the benefit of my friends in the white counties, that it is not safe for them to quiet themselves and dream of white supremacy, peace, and prosperity, good government, and low taxation, whatever may come of their brethren in the black counties. Their destiny is your destiny. . . .[29]

J. H. McGehee of Franklin County chided his fellow white county delegates for their reluctance to sacrifice a few illiterate white voters. The whites of Mississippi, he said, were like a superior army facing a weaker, yet hesitating to attack for fear of losing a few men. Some members of the convention were simply afraid to disfranchise a few

[27] McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections," in *loc. cit.*, 135.

[28] Jackson *Clarion-Ledger*, September 18, 1890.

[29] *Ibid.*

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB   Document 8-3   Filed 05/30/19   Page 14 of 18

whites because their constituents might say, "I'll vote agin him next time he runs for office."[30]

Numbers of the black belt delegates were dissatisfied with the committee report. W. B. Eskridge of Tallahatchie County feared the proposed plan was not adequate to prevent the Negroes from voting for any considerable length of time. Also, he believed that the "understanding clause" should be rejected because it would only lead to trickery and fraud. "Adopt this qualification and it places in the hands of the officer who is to apply the test the power to defraud and disfranchise."[31] F. K. Winchester of Adams County protested against the apportionment arrangement. Too much advantage was given to the white counties; it appeared to him that all the concessions had to come from his side of the house—the black counties.[32] But there were others like Thomas P. Bell of Kemper County who regretted the expressions of jealousy between the sections. "We are embarked in the same ship of white supremacy, and it is freighted with all our hopes." He approved the committee report—concessions, compromises, and all—because "it places the commonwealth of Mississippi for all time in control of the white race—the only race fit to govern in this country—yet it does no injustice to the other race."[33]

Considering such frank expressions from members of the dominant race, it is interesting to note the attitude of Montgomery—the sole Negro member of the convention. In a speech which elicited widespread attention and many favorable comments, he expressed himself as favoring the committee report. In so doing he was not unaware that it would exact "a fearful sacrifice" on the part of his own race. He estimated that the educational test if administered honestly, would disfranchise about 123,334 Negroes and only 11,889 whites, leaving a white voting majority of more than 40,000 in the state instead of the existing 70,000 potential Negro majority. True enough, the Negro majority was already being repressed by "blood-shed, bribery, ballot-stuffing"—a condition at

[30] *Ibid.*
[31] *Ibid.*
[32] *Ibid.*, September 25, 1890.
[33] *Ibid.*, September 11, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

which "the good people of Mississippi stand aghast." He also recognized that the proposed legislative apportionment scheme would give the white counties a majority of at least fourteen members in the House of Representatives and three members in the Senate. These sacrifices he was willing to make in behalf of the Negroes in order "to restore confidence, the great missing link between the two races; to restore honesty and purity to the ballot-box and to confer the great boon of political liberty upon the Commonwealth of Mississippi." Continuing, he said:

> Sirs, we are all well aware that our race has not yet attained the high plane of moral, intellectual and political excellence common to yours, but it is our privilege to press onward and upward. We accord you a generous meed of praise for the assistance you have afforded but you have suffered your prejudice to set the bounds and limits to our progress.

His principal plea was for an impartial application of the new suffrage provisions and for a restoration of confidence and good will between the white and colored races.[34]

During the course of the debate, two amendments were added to the report of the committee. R. H. Taylor of Panola County secured the passage of an amendment to section five to the effect that the educational qualification be put in force January 1, 1892, instead of four years later. This amendment the *Clarion-Ledger* called the "saving clause" in the entire suffrage article. "He has placed in the power of the Democrats to elect their Congressmen without federal interference, and insured Democratic success in Mississippi."[35] Also, a uniform two-dollar poll tax was substituted for a two-dollar tax which might be raised to three at the discretion of the county board of supervisors.[36]

The newspaper press of the state followed closely the handling of the suffrage question by the convention, and much of the criticism was unfavorable. The features of the committee report especially objected to were the legislative apportionment plan and the "understanding clause." The apportionment scheme seemed to the *Clarion-Ledger* to be inherently unfair. The twenty-nine black counties paid two thirds of the

[34] New York *World,* September 27, 1890.

[35] Jackson *Clarion-Ledger,* September 25, 1890.

[36] Johnston, "Suffrage and Reconstruction in Mississippi," in *loc. cit.,* 222.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

taxes, their population was several thousand greater than the remaining forty-six counties; yet they were given sixty-two representatives, while the white counties were to have sixty-eight. Furthermore, the salaries of thirteen new representatives and five new senators would increase the annual legislative expenses some $12,500. "Oh, how the Democrats of the State would howl if the increase in the Senate and the House was done by a Republican convention. It is an unnecessary and expensive measure."[37]

The *Daily Democrat,* too, regarded the apportionment plan as "altogether unnecessary and wrong." However, contrary to its earlier hostile attitude toward the convention, it now characterized the new suffrage requirements and the required use of the Australian ballot system as "fair and liberal, antagonizing no principle, depriving no one unjustly of his rights, and in no respect in violation of the state's Federal relations."[38]

Many editors doubted the wisdom of the "understanding clause." The *Clarion-Ledger* bolstered its own opposition with quotations from a dozen or more local papers. Section five of the franchise article was variously dubbed as the "odious section five," "a shameless fraud," "a legal blot," and "the fly-blown section."[39] Said the Vicksburg *Post:*

> That a lot of politicians, fertile in tricks, could concoct this scheme is not inconceivable; but that a man who aspires to statesmanship, can cheat his conscience and impose the delusion upon his mind, that such a measure can bring anything but mischief and disaster is simply incredible.[40]

Despite the adverse criticisms voiced on the floor of the convention and through the press, the suffrage and apportionment articles were accepted by the Committee of the Whole on September 18, and the completed constitution was ratified by the convention on November 1. Though many members had opposed individual features of the constitution, there was a rather general feeling that the document was the best that could be framed under the circumstances. On the final count only eight negative votes were cast.

[37] Jackson *Clarion-Ledger,* September 25, 1890.
[38] Natchez *Daily Democrat,* September 6, 1890.
[39] Jackson *Clarion-Ledger,* October 9, 1890.
[40] Vicksburg *Post,* quoted in *ibid.,* October 9, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

Case 3:19-cv-00383-DPJ-FKB Document 8-3 Filed 05/30/19 Page 17 of 18

In summing up the work of the convention, Chairman Calhoon said:

> Our mission here has been accomplished as best it could be upon adjustment of the various opinions and interests of the different sections of Mississippi. Restricted by the Federal Constitution, we have tried to secure a more enlightened franchise without discrimination or injustice. . . . There is but one sovereign by divine right. That sovereign is mind. I look in vain for any instance of African contribution to the disclosure of undiscovered truths tending to ameliorate the individual or social condition of man.[41]

The new constitution was not submitted to the electorate for approval but, as had been decided some months earlier, was promulgated by the convention. Though there was ample precedent in the state's history for such a procedure, the *Daily Democrat* could not refrain from commenting that the convention either considered the people "incapable of forming a correct estimate of what they want in the construction of a government" or that it feared popular rejection of its work.[42]

Though the educational test was not to be applied until 1892, almost immediate results from the adoption of the new constitution were evident. White Mississippi had spoken in no uncertain terms; delegates on the floor of the convention had openly proclaimed their intention of disfranchising the Negroes. The moral effect of this was enormous. Three days after the constitution was approved by the convention, the regular state election was held. There were no reported disturbances or charges of intimidation or fraud, yet only about 30 per cent of the normal Negro vote was cast. The *Daily Democrat* ventured the assertion that the Negroes were now "looking after their material interests and domestic betterment and leaving politics alone."[43] That was precisely what the whites of the state hoped they would do and, in fact, intended to make them do.

A survey of the Mississippi constitution of 1890 reveals no direct disfranchisement of the Negro. The Fifteenth Amendment precluded any open discrimination against the blacks as a race. Yet one can scarcely read the debates of the convention and the press discussions without

[41] Mississippi Constitutional Convention *Journal,* 1890, pp. 700-701.
[42] Natchez *Daily Democrat,* September 7, 1890.
[43] *Ibid.,* November 6, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms

concluding that the intention of those in authority was to accomplish by indirect means what the Federal Constitution forbade doing directly. The predominance of power in the legislature was given to the white counties because white control of the state could be assured thereby. Payment of a poll tax was made a prerequisite of voting largely because it was believed that the white man was more apt to pay it than the Negro. A literacy test was imposed because the rate of illiteracy was higher among Negroes than among whites. Then too, registration officials were given wide discretionary powers in determining one's ability to read or understand a section of the constitution. Here was an opportunity for almost unlimited partiality, and a white Democratic official would scarcely be partial to a Republican Negro. One correspondent of the *Clarion-Ledger* wrote that he would be glad to furnish for a dollar a dozen copies of the new constitution "written in French and warranted not to be understood by a Negro."[44] In short, the convention evolved a constitution which discriminated not against the Negro but against his characteristics and his limitations.

The movement to disfranchise the Negro through a revision of the state constitution occasioned considerable friction within the Democratic ranks. This was true not because any considerable group wished to protect the political rights of the Negro, but because Negro suffrage had produced a more acute problem in the black belt than in the section of the state which was predominantly white. Also, the rewriting of the constitution afforded an opportunity for the sections to maneuver for control of the state government through legislative reapportionment. As for the individual members of the convention, it appears that some were sincerely interested in improving the political morality of the state, while others were equally determined to exploit the Negro question for their personal or sectional aggrandizement. Be that as it may, the Mississippi constitutional convention of 1890 had substituted a more orderly and apparently a more legal method of disfranchising the Negro in place of the old system of force and fraud. Other Southern states were soon to do likewise.

[44] Jackson *Clarion-Ledger,* October 9, 1890.

This content downloaded from 198.22.100.222 on Tue, 16 Apr 2019 16:05:09 UTC
All use subject to https://about.jstor.org/terms