# EXHIBIT 4

This is a reproduction of a library book that was digitized
by Google as part of an ongoing effort to preserve the
information in books and make it universally accessible.

Google books

https://books.google.com



# PUBLICATIONS

—OF—

# THE MISSISSIPPI HISTORICAL SOCIETY

EDITED BY
FRANKLIN L. RILEY
*Secretary*

VOL. VI.



OXFORD, MISSISSIPPI
PRINTED FOR THE SOCIETY
1902

Digitized by Google

F
336
.M75
?6995
v.6
1902
Copyrighted, 1902
BY THE MISSISSIPPI HISTORICAL SOCIETY

Neither the Editor nor the Society assumes any responsibility
for the opinions or statements of contributors

PRESS OF
HARRISBURG PUBLISHING COMPANY
HARRISBURG, PA.

S

Digitized by Google

# HISTORY OF THE MEASURES SUBMITTED TO THE COMMITTEE ON ELECTIVE FRANCHISE, APPORTIONMENT, AND ELECTIONS IN THE CONSTITUTIONAL CONVENTION OF 1890.

### By J. S. McNeilly.[1]

In asking for a history of "the measures submitted to the committee (of the Constitutional Convention) on elective franchise, apportionment and elections," I have assumed that the State Historical Society had in mind such "measures" as were adopted and formulated into the articles of the Constitution embracing the subjects stated. To a narrative of this nature there belongs an outline, which I shall make as brief as possible, of antecedent political causes and conditions.

The first thought of the men who directed the overthrow of carpet-bag and negro rule in 1875 was a Constitutional Convention to devise an organic law that would guard the State against any possible recurrence of that state of confusion and calamity. But as time passed and the ease of holding what had been won was experienced, apprehensions were lulled and the warning voice of the thoughtful passed unheeded. This sense of satisfaction and security, however, was fleeting and delusive—relegated to "the silence of the covered furrow," the problem incubated a brood of

---

[1] John S. McNeily was born in Wilkinson county, Miss., Nov. 20, 1841. His ancestors settled in Mississippi in the period of Spanish rule. His parents, William and Mary (Seymour) McNeily, were both natives of Wilkinson county. Mr. McNeilly's childhood was spent in Hinds county, Miss. At the outbreak of the war between the States he left school at Jackson, La., and joining the Confederate service, went with a company from Natchez to Pensacola, Fla. A year later he went to Virginia to join his brother, who was an officer in the 21st Mississippi regiment, with which he served during the remainder of the war. At the close of the conflict he was sergeant-major of his regiment, which was under the command of his brother. With the return of peace, Mr. McNeilly located at Woodville, Miss., where he entered upon his career as a journalist. In 1869 he removed to Greenville, Miss., and purchased the Greenville *Times*, which paper he edited a number of years. He is now connected with the Vicksburg *Herald*. He was delegate from the State at large in the Constitutional Convention of 1890. Mr. McNeily has devoted much time to the study of problems effecting the political welfare of Mississippi, and has probably written more extensively on the suffrage clause in the Constitution of 1890 than has any other man in the State.—Editor.

(129)

secondary ills quite as deadly to the Commonwealth as the monstrosity of an unrestricted negro suffrage. In the decade of 1880 to 1890 it became apparent that the "Mississippi plan" of dealing with black majorities would, unless checked, pollute the very sources of representative government. Symptoms of the diseased political condition grew so acute that the demand for suffrage restriction to effect an electorate under which there could be white supremacy through honest elections became quite imperative. The agitation for a Constitutional Convention was revived and grew very urgent. Responding to this sentiment the Legislature, in 1886, adopted a resolution calling such a Convention, which was vetoed by Governor Lowry. In 1888 another resolution was adopted, one inviting discussion of the question in the ensuing campaign for the election of a Legislature and State officers. A Constitutional Convention was therefore made a direct issue in the canvass of 1889. Ex-Governor Stone, a candidate for Governor, declared he would approve a bill for a Convention if passed. In September, Senator George, in a speech at Greenville, declared himself in favor of a Constitutional Convention, and this was followed by a counter declaration at Macon by his colleague, Senator Walthall. The question thus became a pronounced one in our State politics.

Just at this time the demand for relief from the intolerable Reconstruction status was intensified from another source. The election of Mr. Cleveland in 1884 by the Solid South and a small group of Northern States had been bitterly resented in the North, almost to the point of a repetition of the Tilden count-out. After the election Mr. Blaine delivered a speech at Augusta, Me., that literally electrified his party. Realizing that the fabric wove of negro suffrage was crumbling away, the defeated candidate sounded the keynote of a further interposition of the Federal power into Southern political affairs. The popular response to his impassioned and powerful appeal to sectionalism was exceedingly ominous to those who looked beyond the exultations of the Democratic victory. They felt that had the Augusta speech opened and shaped the campaign of 1884 instead of closed and echoed it, the result would have been different. And that the wind then sowed would be the whirlwind of 1888. It was not permitted to lull in the interim, and the agitation on sectional lines became acute in

Digitized by Google

that year. On the issue of suppression of the negro vote, of "a free ballot and a fair count," the national campaign was pitched and won—the Republicans declaring for more stringent laws of Federal election contest.

In January, 1889, Mr. Harrison having been elected President, this policy found expression in the Lodge force bill. Its introduction was accompanied by appearances of party favor which indicated its passage upon the assembling of the new Congress. Such an outlook gave rise to the gravest fears and most depressing forebodings of another revival of Reconstruction ills and disorders. The files of current newspaper publications will disclose the wide prevalence of such a belief. Frank Carpenter, a Washington press correspondent of national reputaton, thus related a meeting with Justice Lamar while the force bill was up for debate in the Senate:

"His bad health was not bettered by the gloomy view he takes of the South and its future. He told me he thought Mississippi would eventually be a negro State and the whites forced to emigrate; the influence of the present administration is in favor of the blacks at the expense of the whites, and the whites will not permit black rule. The outlook of the South seems as dark as can be, and what will be the future God only knows."

While this reads in the light of the present like an over-darkened reflection, it did not much exaggerate the then burthens of thought. In a published letter from a citizen of the State to one of its Congressmen, this passage, suggested by the Lodge bill, occurs:

"It is as though the hand of time were set back twenty years. If there is less of heat of passion, there is deeper and more malign intent. Sectional pacification seems drifting away."

Such apprehensions formed a potential influence for State suffrage restrictions. It was urged in Mississippi as the part of wisdom to imbed such restrictions in her organic law before the passage of a "force bill" could be effected, and the State political power again be subverted through act of Congress and military despotism.

Such were the antecedent influences that produced the Constitutional Convention and dictated its action. Succeeding the call of the Legislature, the Democratic State committee ordered a Convention to nominate the fourteen delegates at large to be elected

Digitized by Google

under the law. Like action was taken by the county committees. Nominations were effected harmoniously in the main, especially by the State Convention. In the meantime, between the passage of the act and the meeting of the Convention, there was general discussion by the State press of plans and measures. Divergencies of views were various and quite radical, so much so as to give rise to no little discouragement among promoters of the Convention and predictions from the pessimists that it would dissolve in discord and failure. The gravest obstacles were due to the differences in the social conditions and political elements of the white and black counties. In the former there was not only no correlative urgency for suffrage restrictions, but actual repugnance to any interference with the political equalities in which the white people and their fathers had been reared. In their environments the white people of the black belt had the acute sympathies of their white county brethren. There was, moreover, a profound general appreciation of the evils of the black county political disorders upon the whole State. While these influences won the assent of the white counties to a constitutional convention, there was, nevertheless, strong antipathy to suffrage acts having the effect of white disfranchisements. And the assent stated was coupled with the reservation to, as far as possible, restrict or parry such provisions as to the white voters.

When the Convention was assembled, there was a natural alignment of the delegates according to class of counties—two forces antagonistic upon methods but united in purpose. In this adverse array it was fortuitous that the 134 members were divided between the two classes with substantial numerical equality. Wisely discerning the requisites of such a situation, President Calhoon likewise selected the committee on suffrage and legislative apportionment, half from the black and half from the white counties. This made the task of agreement more arduous, but it necessitated one of common acceptability. Neither class or faction could impose its will arbitrarily upon the other. This was of the first importance—that devices of such grave import and novel character be placed in the organic law of the State by a practically united and common assent. It was with a full realization of this primal duty in the construction of a plan that the committee entered upon the long and arduous labor. The insistence of the black county dele-

gates for drastic restrictions of suffrage, and the tenacity of the white counties against radical infringement upon inherited privileges and white manhood, were met to measure strength on patriotic ground. The inspirations of a common peril commanded the two forces to fuse their antagonisms. This was no easy task. Indeed history presented no like emergency, no parallel condition, for guidance of the Convention assembled to save the State. Urged forward by a vital expediency, there stood in its pathway a cherished fundamental principle. That an agreement under such stress was ever reached—an agreement, too, that effected the great purpose sought—is conclusive testimony to the constructive talent of the leadership of the Convention and the honest and patriotic intent of its membership. The nature of the antagonism as well as the way its apparent irreconcilabilities were finally accommodated, is indicated in the following passage, wherein, many years before, John C. Calhoun was discussinig means of a harmonious legislative apportionment between the South Carolina white and black counties:

> "It is more difficult to give to the government of the States this constitutional form than to the government of the United States, for the same reasons that it is more easy to form a constitutional government for a community divided into classes or orders, than for one purely popular. Artificial distinctions of every description, be they of states or estates, are more simple and strongly marked than the numerous and blended natural distinctions of a community purely popular. But difficult as it is to form such constitutional governments for the separate States,it may be effected by making the several departments, as far as it may be necessary, the organs of the more strongly marked interests of the State, from whatever causes they may have been produced; and such other devices whereby the sense of the State may be taken by its parts, and not as a whole."

The serviceableness of the theory Mr. Calhoun propounded stands revealed in our constitutional settlement of a suffrage problem for a "state of blended natural distinction" of citizens. The first step in its solution was a legislative apportionment creating a majority of white constituencies—the legal basis and bulwark of the design of white supremacy in a State with an overwhelming and a growing negro majority. That achievement would guarantee the law-making branch of government, and place the election of United States Senators above legal or partisan impeachment. The importance attached to such an apportionment will be perceived by all who give thoughtful study to the conditions and environments to be met or mitigated. With

Digitized by Google

truth it was said by the late Senator George, the chief proponent of the plan: "We might stop there with great good secured." As the first motion upon the journal of the committee, the resolution taking up the apportionment is worthy of being quoted:

> "Resolved, That it is the duty of this committee to perform its work in such a manner as to secure permanent, intelligent rule in all the departments of the State government and without doing violence to the true principles of our republican system of government; and to this end the committee, as a basis for their work, will first agree upon the legislative apportionment of the State."

The committee's resolution with the explanation given of the motive of the apportionment refute the idea, quite current once, that the partial departure from a population scale was merely to win the acceptance of the delegates of the white counties, who would, under it, be gainers in legislative representation, to the proposal for suffrage restrictions. It was, in fact, represented and believed by many to be a mere barter of power for principle. In influence and effect this was true, but only incidentally so. At the base of the proposition was a higher motive—a more vital and far-reaching purpose. The fact of a majority of white legislative constituencies was described by the late Senator George and accepted by the committee and the Convention, as "demanded by the fundamental necessity of the situation." So far as the loss and the gain of representation by the two classes of counties, respectively, was involved, he declared his "regret of the need of thus disturbing the political power in different sections of the State, and that he was willing to have these disturbances lowered as far as possible consistent with the efficiency of the plan." It was thus worked out. The shift was not materially objectionable in its extent, and no county's representation was reduced. The end was obtained by increasing the Legislature's representative branch thirteen members, with allotment of the increase to the white counties. The majority thus effected was added to by carving several legislative districts out of white sections of black counties.

Objection to the change in the apportionment was in a measure reconciled by more nearly alloting Senators on the basis of population. Opposition was further appeased by the requirement, in another article of the constitution, of a three-fifths affirmative vote to pass any revenue bill. This was sufficient, and cal-

culated, to afford ample protection against the possibility—a bare one—of any such law that would work sectional unfairness toward the black counties, proportionately the largest revenue producers. It will be recognized as having the effect of helping the apportionment fulfill the Calhoun idea of "making the several departments the organs of the more strongly marked interests of the State."

Having provided for complete and lawful security of the legislative department and incidentally of the election of United States Senators, as the basis of white supremacy, the value and advantages of the representative apportionment were then extended to the other two branches of the State government—the executive and the judiciary. This was accomplished by the adoption, in the committee of the novel "electoral plan," which was borrowed by the committee from a suffrage scheme introduced in the convention by the Hon. E. Mayes. This plan, which is contained in section 140 of the constitution, confers upon the House of Representatives the final and formal election of Governor and other State officers, according to the popular vote in the counties respectively. That is the election for these officials at the polls is determined according to county, or legislative district, majorities, instead of a State majority. The candidate receiving the highest vote of such political divisions is given the vote of its membership in the representative branch of the Legislature, sitting as an electoral body. This arrangement thus gives to the white constituencies a reserve power of elective control of all the executive offices of the State. And with the appointment of the judges vested in the Governor, the scheme for a State government upon the foundation of white electorates was made lawful, complete and secure.

The design of the legislative apportionment, with its electoral supplement, was to erect an impregnable barrier to any possible organization of the negro majority, by extraneous force or internal faction, for political dominance. They will never, in all probability, be called into operation to that end. But the wisdom of these features of our suffrage plan are to be judged in the light of a period of such extreme and bitter experiences, so hard and humiliating, that "a bond of fate" against its return was demanded. The State was yet under the shadow of Reconstruction, and confronted, moreover, by a pending force bill that directly aimed

Digitized by Google

to revive its actualities. If that bill had been passed through Congress, its operations could not have extended to the legislative apportionment; that would remain though the suffrage devices were annulled as violative of the war amendments. It was aimed to fix the source of our statehood defensible and safe in theory as well as fact—to fulfill the committee's initial resolution for "secure, permanent, intelligent rule in all the departments of the State government and without violence to the true principles of our republican system of government."

The integrity of the State government being effected through the apportionment and the electoral plan, the committee had on its hands the question of limiting the suffrage privilege. For effect upon the county governments this was to the black counties the most pressing consideration of the whole problem. The delegates from those counties generally favored an alternative educational—a reading and writing—or a property qualification. And such a provision was adopted in the committee, but voluntarily rescinded on account of the extreme opposition of the minority membership. In lieu of it the "understanding" clause was adopted—section 244 of the constitution. The suffrage was further restricted by the requirement of an unusually long local residence—two years in the State and one of the two in the election district. None who are delinquent for taxes after the first day of February can exercise the voting privilege. Registration four months prior to any election must be effected. What has proved the most effective instrumentality of negro disfranchisement is the two-dollar optional poll tax pre-requisite, which persons otherwise competent as electors may elect to pay or not according to their desire to qualify for exercise of the voting privilege. These provisions were supplemented by the further one of making registration, to close four months before any election, a condition to voting. And by ordinance a stringent form of the "Australian ballot" method was grafted on the constitutional scheme.

There was a motive in making registration by the officers of the State a qualification of suffrage that is of more importance than appears on the surface of the statement. It had been boldly claimed by leading Republican statesmen that the Federal Government not only had the power to control the registration of vo-

Digitized by Google

ters as to elections for Representatives in Congress, but also as to elections for members of State Legislatures, inasmuch as they in turn elect United States Senators. Hence it was provided in Mississippi's suffrage article that registration under the Constitution and laws of the State, by the proper officers of the State, shall be "an essential and necessary qualification to vote at any and all elections." Section 2, Article 1, of the Constitution of the United States requires that Representatives in Congress shall have the qualifications requisite for electors of the most numerous branch of the State Legislature. These two Constitutional provisions, when taken together, it will be seen, make it impossible for the Federal Government by its own officials to control the registration of voters.

These several suffrage requirements combined were deemed sufficient for the end in view, as they have so proved in even the blackest parts of the State. They have, as they were intended, reduced the negro majorities to a negligible political quantity. While this is true it was not claimed that Mississippi had "solved the negro problem." That is beyond governmental or mortal power—there was simply drawn as much of the blood poison as possible. The problem will abide with us for all time. If wholly disfranchised, the negro would be an evil factor in Southern politics. This would have been so had there never been a fifteenth amendment, as it was true before war and emancipation led up to that most grievous product of purblind partisanship.

Nor were the framers of the organic law of 1890 unaware that an electoral body so hedged and cramped was foreign and uncongenial to the spirit of popular liberty and representative government. Its proscriptiveness is distinctly and immedicably obnoxious to the traditional and instinctive Anglo-American sentiment of manhood rights and standards. No State legislating for that class of citizens alone would dream of imposing such shackles on their political privileges. Nothing but the imperative call for steering the ship of State away from the destruction of the black Charybdis justified risking the only lesser perils of the alternative Scylla. To particularize, the extraordinary control of the law and the law officers over the registration and qualification of voters is a facility of oligarchy, or ring sway; which is so much subtraction from pure representative, vox populi, politics. The harmful fa-

Digitized by Google

cilities were increased by the inevitable relaxation in political interest, among the best citizens, incident to the relief afforded through negro disfranchisement. The places at the front of those most responsive to demands *pro bono publico*, were quickly filled by many whose zeal was less patriotically inspired. Another secondary evil consequence was that with the negro riddance the value of the constitutional restrictions became obscured in public estimation. Measures irksome in themselves lose the sanctity of law as the vital necessities of their adoption diminish and disappear. Then there comes the demoralization of a commonly violated, a dead letter, law.

Concisely and correctly summed up, of two ills Mississippi chose the lesser. She has exchanged an organic malady for a functional disorder. The Convention substituted a desiccated for a diseased electorate. The ensuing ills of the present State are within the check and correction of the white citizens. There is presented a tax upon their virtue and vigilance that can be met openly and lawfully. Honest politics are, at least, possible—Southern civilization no longer requires evil acts to secure good government. That boon is no longer dependent upon methods that might neither be defended nor discarded. If with such a basis of statehood as our suffrage measures have established there are still election frauds and scandals, there is a representative responsiblility, a jurisdictional public conscience, to appeal to.

What of the negro—the innocent cause of the trouble, the toil and travail, it may be askèd, while the practical annulment of his share in the highest privilege of citizenship was being contrived and consummated? Materially here was the one unalloyed good —he was the gainer by the removal from the distractions of a sphere for which he was neither fit nor needful. The constitution of 1890 brought rest to the plantations—the black people of the black belt are no longer within the volcanic circle of the campaign friction and collision, out of which they always came the sufferers. As to the moral effects, it is to be noted that the fact of disfranchisement was accepted by the masses of the sons of Ham without show of sorrow or sign of resentment. Suffrage had come to them unsolicited, it departed from them unregretted. As a demonstration of the negro's incapacity and unworthiness for the equipment of political equality nothing more need be

Digitized by Google

written—corroborated as the demonstration has been by the fact that the race has flocked to Mississippi since 1890 as never before.

This sketch of the efforts of the Constitutional Convention to lay the foundations for a better political structure in the State, but poorly reflects the arduous quality of its labors. It is little exaggeration to say that no deliberate body was ever set to a graver or more perplexing task—one less illumined by the lamp of precedent or parallel. In addition to the obstacles in the way of an agreement among the delegates upon a plan, as above outlined, was the momentous and underlying question of the State's right of restricting the suffrage as designed, under the war amendments to the Federal constitution. Perfect and enduring relief was not even to be hoped for—this was forbidden by the fifteenth amendment interdict against discriminations on account of color or race. But for that barrier the course suggested in the fourteenth amendment—the option of negro disfranchisement coupled with a proportionate loss of Congressional representation—would have been adopted. But dealing with a condition as it was, the end in view had to be sought on a more perplexing field —through measures that were not only indirect but held to be of questionable validity as well.

Nor was the fifteenth amendment—that evil heritage of war, a veritable Pandora's box to the South—the only lion in the Convention's pathway. There was to be reckoned with, besides, the Mississippi act of re-admission which, as a fundamental condition, interdicted the State from disturbing the suffrage settlement in the alien constitution of 1869. If that act was constitutional the State was helpless for political purgation. Hence the Convention, soon after its organization, adopted a resolution calling on the judiciary committee for a report upon the effect of the re-admission act, in limiting the right of the State to impose certain restrictions on the elective franchise. On that committee were men of the highest law learning and ability. Its chairman was Judge Wiley P. Harris, and the second name to his was that of Judge H. F. Simrall. It was felt to be absolutely safe to accept the judgment of such a body—a confidence abundantly verified by their strong and lucid report. It was emphatic in its demonstration that Congress had exceeded its constitutional powers in aiming to divest Mississippi of "an attribute inherent in her charac-

Digitized by Google

ter as an independent State." But this conclusion was capped by the ominous qualification: "That the committee did not venture to decide what Congress might do by assumed authority." It is to be noted that the Federal Supreme Court has sustained the committee as to the State's right to impose suffrage restrictions. But as to what "Congress may do by assumed authority"—this is still an unsolved question, though with the passage of the years the probabilities that Congress will so draft upon its "assumed authority" diminishes.

Digitized by Google