# EXHIBIT 5

# HEINONLINE

Citation:
Laughlin McDonald, The Majority Vote Requirement: Its Use and Abuse in the South, 17 Urb. Law. 429 (1985)
Provided by:
Perkins Coie Library

Content downloaded/printed from *HeinOnline*

Tue May 14 16:05:52 2019

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at https://heinonline.org/HOL/License

-- The search text of this PDF is generated from uncorrected OCR text.

-- To obtain permission to use this article beyond the scope of your HeinOnline license, please use:

*Copyright Information*



Use QR Code reader to send PDF to your smartphone or tablet device

Case 3:19-cv-00383-DPJ-FKB   Document 8-5   Filed 05/30/19   Page 3 of 14

# The Majority Vote Requirement: Its Use and Abuse in the South

Laughlin McDonald
Director, Southern Regional Office, Civil Liberties Union Foundation, Inc.; B.A., Columbia University, 1960; LL.B., University of Virginia, 1965.

## I. Introduction

THE MAJORITY VOTE REQUIREMENT HAS ITS roots in nineteenth century southern white racism, and it frequently operates today to dilute the voting strength of blacks. Despite this, abolition of the requirement would likely have very little beneficial impact on minorities seeking office in majority white jurisdictions, while it could actually work against the election of blacks in many majority black jurisdictions.

Nine southern states, plus Oklahoma, have some type of a rule requiring nomination or election to office by a majority, rather than a plurality, of votes cast.[1] Where the rule applies to party nominations (known as the second primary requirement), if no candidate receives a majority of votes in the regular primary, a second or runoff primary is held between the plurality winner and the candidate with the next highest number of votes.

The use of the majority vote requirement varies from state to state and from jurisdiction to jurisdiction within a state. In Georgia, for example, state law provides that a majority vote is required for all primary and general elections.[2] However, an exception is made for municipalities whose charters or ordinances provide that a candidate may be nominated or elected by a plurality.[3] On the other hand, South Carolina, requires a majority vote only for nomination in party primary elections.[4]

The majority vote requirement is little used outside the South, although a few non-southern jurisdictions require winning candi-

---

1. The southern states are Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina and Texas. CONGRESSIONAL RESEARCH SERVICE, RUNOFF ELECTIONS AND THE VOTING RIGHTS ACT OF 1965, AS AMENDED 2 (1984); NATIONAL MUNICIPAL LEAGUE, COMPILATION OF THE 48 DIRECT PRIMARY STATES (1957).
2. GA. CODE ANN. § 21-2-501(a) (1982).
3. *Id.* § 21-3-407.
4. S.C. CODE ANN. § 7-17-600 (Law Co-op. 1976).

dates to receive a certain percentage of the vote, such as 35 percent (Iowa and South Dakota) or 40 percent (New York City).[5] Additionally, some cities such as Boston have a majority vote requirement for nonpartisan general elections.[6] These exceptions, however, do not alter the basic southern character of the runoff rule.

## II. History and Purpose

Like so many southern institutions, the majority vote requirement is inextricably tied to race. It developed as an essential feature of the white Democratic primary which began locally and informally in the South during the period of black disfranchisement following Reconstruction. According to historian John Hope Franklin, "legal" disfranchisement of blacks after Reconstruction, through implementation of literacy tests, poll taxes and other measures, was "occurring at the same time that another technique, extralegal and presumably not in violation of the Fifteenth Amendment, was developing. This was the white primary."[7]

Direct primaries were adopted during the 1870s in counties in Mississippi and Alabama.[8] Their use spread and by shortly after the turn of the century, every southern state required or permitted use of the direct primary.[9] Blacks were excluded from these pri-

---

5. In Iowa, if no candidate in a county-wide primary receives at least 35 percent of the vote, a subsequent party convention determines the nominee. IOWA CODE §§ 43.52–.97 (1973). In South Dakota, a similar rule applies to candidates for United States senator, congressperson or governor, except that the convention must choose between the two highest vote getters in the primary. S.D. CODIFIED LAWS ANN. §§ 12–5–20, 12–6–51 (1982). New York City requires a candidate for mayor, city council, president, or comptroller to obtain 40 percent of the votes cast in a primary election. In the event no candidate receives 40 percent, a runoff is held between the two candidates with the greatest number of votes. N.Y.[ELECTIONS] LAW § 6–162 (Consol. Supp. 1980). Utah does not require a majority vote, but has a procedure which accomplishes much the same thing. Candidates are nominated by convention and the two with the greatest number of votes then run in the primary. UTAH CODE ANN. §§ 20–3–8, –4–9 (1984).

6. A. Derfner, The "Second Primary" or "Majority Vote Requirement" (Apr. 12, 1984) (unpublished paper).

7. Franklin, *"Legal" Disfranchisement of the Negro*, 26 J. NEGRO EDUC. 241, 248 (1957). For a general discussion of the black disfranchisement movement, *see* V.O. KEY, SOUTHERN POLITICS IN STATE AND NATION (1949); P. LEWINSON, RACE, CLASS AND PARTY (1932); Derfner, *Racial Discrimination and the Right to Vote*, 26 VAND. L. REV. 523 (1973).

8. L. Sabato, *The Democratic Party Primary in Virginia: Tantamount to Election No Longer* 4 (1977); A. Jones, A History of the Direct Primary in Alabama, 1840–1903, at 144 (1964) (Ph.D. thesis).

9. Marshall, *The Rise and Collapse of the "White Democratic Primary,"* 26 J. NEGRO EDUC. 249 (1957). Statewide primaries, whether mandatory or not, were adopted in South Carolina in 1896, Arkansas in 1897, Georgia in 1898,

maries, first by custom and agreement, and later by rule of law.[10]

The purpose of the direct primary, with its majority vote and runoff features, was to ensure white Democratic political unity and dominance. Nomination by political bosses at a convention or caucus, as well as nomination by a small plurality in a primary, created a considerable risk that the discontented would bolt the party and vote Republican in the general election or leave southern whites split into warring factions and politically impotent.[11] However, the runoff primary system insured that the nominee of the Democratic party had broad-based consensus support. With the demise of two-party politics in the South and the general disfranchisement of blacks, the system further insured that the Democratic nominee, almost always white, would invariably win in the general election.

Politicians in the South openly advocated use of the primary system to secure white rule. Governor Thomas Longino addressed the Mississippi legislature in 1900, asking for passage of a uniform, compulsory primary election law, open only to "qualified" electors, in order to "perpetuate white political union" and supremacy.[12] Outside the South, primaries were often touted simply as good government reform. The progressive Republican Senator Robert LaFollette called for primaries "because each member of the party would know that the candidates had been fairly nominated and were the true representatives of his party principles."[13] But, Justice Thurgood Marshall, commenting upon the white primary, noted that a recurring irony exists in southern politics because the so-called election reforms have been used as devices to eliminate blacks from participating in the government.[14]

---

Florida and Tennessee in 1901, Alabama and Mississippi in 1902, Kentucky and Texas in 1905, Louisiana in 1906, Oklahoma in 1907, Virginia in 1913 and North Carolina in 1915. C. VANN WOODWARD, ORIGINS OF THE NEW SOUTH, 1877–1913, at 372 n.11(1951).

10. Marshall, *supra* note 9, at 249–50. *See also* Grovey v. Townsend, 295 U.S. 45 (1935); Nixon v. Condon, 286 U.S. 73 (1932); Nixon v. Herndon, 273 U.S. 536 (1927); Brown v. Baskin, 80 F. Supp. 1017 (E.D.S.C. 1948); Brown v. Baskin, 78 F. Supp. 933 (E.D.S.C. 1948); Elmore v. Rice, 72 F. Supp. 516 (E.D.S.C.), *aff'd*, 165 F.2d 387 (6th Cir. 1947); King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

11. *See* C. EWING, PRIMARY ELECTIONS IN THE SOUTH 73 (1953).

12. Address to the Mississippi legislature, Regular Session, January, February, March, 1900 (June 16, 1900).

13. Address, Primary Elections for the Nomination of All Candidates by Australian Ballot at Michigan University, Ann Arbor, Michigan (March 12, 1898).

14. Marshall, *supra* note 9, at 250. *See also* City of Mobile v. Bolden, 446 U.S.

Case 3:19-cv-00383-DPJ-FKB   Document 8-5   Filed 05/30/19   Page 6 of 14

The white primary has long since been thrown into the political dust bin, but the majority vote requirement remains an enduring feature of southern elections. In majority white jurisdictions where voting is at large and along racial lines, it continues to have the effect its original advocates intended, that is, to discriminate against the black minority.

### III. Impact: Minority Vote Dilution

Blacks can often get pluralities in majority white jurisdictions in elections where several serious white candidates split the white vote. If there is a runoff requirement, often the fragmented white voters merely regroup behind the highest white vote getter and elect that person to office. One often cited example of the discriminatory effect of the majority vote rule is the candidacy of H.M. (Mickey) Michaux in the 1982 Democratic primary for the Second Congressional District of North Carolina. Michaux, a black and former United States attorney, won the primary with 44 percent of the votes. Two white opponents, Tim Valentine and James Ramsey, got 33 percent and 23 percent of the votes, respectively. In the mandatory runoff, Michaux increased his vote to 46 percent, but whites regrouped behind Valentine who received 54 percent of the votes and the party's nomination. Valentine went on to defeat the Republican nominee in the general election.[15]

While there have been virtually no systematic studies of the racial impact of the majority vote requirement, the examples of Michaux and others provide evidence that the runoff rule has the potential for diluting minority voting strength.[16] In Mississippi,

---

55, 70 n.15 (1980)(at-large elections were "universally heralded not many years ago as a praiseworthy and progressive reform of corrupt municipal government"). Whether or not the statement is historically accurate, there is nearly unanimous opinion in the political science literature that at-large elections have been used in the South and Southwest systematically to exclude blacks and Hispanics from equal political participation. MINORITY VOTE DILUTION 37, 65–79 (C. Davidson ed. 1984).

15. Wicker, *The Runoff Issue*, N.Y. Times, May 1, 1984, at A31, col. 1. Other congressional or state-level examples of blacks leading in the first election but losing in a runoff include James Clyburn in the 1978 Democratic primary election for Secretary of State of South Carolina, and Charles Evers in the 1968 special election for the Third Congressional District of Mississippi. A. Derfner, *supra* note 6, at 2.

16. Bullock & Johnson, *Runoff Elections in Georgia* (Feb. 21, 1984)(to be published in J. OF POL., Fall 1985), is not to the contrary. The authors examined only seven black-white runoffs and concluded that any racial impact findings "are

where the records are the best available, it has been estimated that plurality winning blacks have been defeated by white opponents in mandatory runoff elections nearly one hundred times in the past twelve years. Conversely, in only one election, in Madison County in 1984, did a plurality winning white ever lose to a black in a runoff primary.[17] Therefore, it is easy to understand that a majority vote requirement in a racially polarized, majority white jurisdiction is a considerable obstacle to black, but not white, office holding.

After passage of the Voting Rights Act of 1965, and the resulting increase in black voter registration, many jurisdictions with plurality vote requirements suddenly switched to a majority vote rule. The predictable results highlight the discriminatory effect of the runoff rule. For example, in 1964, Frank Burke and Edward Starkey were the first blacks to run for office in Moultrie, Georgia. The city had a plurality requirement and Burke nearly won, coming in fourth out of six candidates for three city council seats. Starky came in last out of three for the city school board. The next year, the city changed to a majority vote requirement. Later, in 1973, John Cross, a black, ran for a council seat and received a plurality. In the runoff election, however, he was soundly defeated by his white opponent.[18]

The city of Americus, Georgia, used a majority vote requirement in a similar manner. Prior to the Voting Rights Act, only 8.2 percent of blacks eligible to vote were registered in Sumter County, of which Americus is the county seat. The county is 44 percent black. Following a sharp post-Voting Rights Act increase in black voter registration, the city adopted a majority vote requirement in 1968. Subsequently, Willie Pascal in 1972, and Raymond Green in 1977, both black, received pluralities in city elections. Both were forced into runoffs and both were defeated.[19]

### IV. Legal Implications

The Supreme Court has never decided a case solely on the basis of the use of a majority vote requirement, but it has consistently acknowledged that such runoff elections tend to dilute minority

---

only suggestive and must await confirmation or rejection once datasets having more numerous blacks are analyzed." *Id.* at 10.
  17. A. Derfner, *supra* note 6, at 1.
  18. McDonald, *The 1982 Extension of Section 5 of the Voting Rights Act of 1965: The Continued Need for Preclearance*, 51 TENN. L. REV. 1, 71–72 (1983).
  19. *Id.* at 73.

voting strength in at-large races. In *White v. Regester*,[20] for example, the Court affirmed a district court's finding that a majority vote requirement in Dallas and Bexar Counties, Texas, while not invidious in itself, "enhanced the opportunity for racial discrimination."[21] In *Rogers v. Lodge*,[22] the Court similarly upheld a finding by the trial court that at-large elections in Burke County, Georgia, were unconstitutional on the grounds, *inter alia*, that a majority vote requirement worked "to submerge the will of the minority" and "deny the minority's access to the system."[23] Most recently, in *City of Port Arthur v. United States*,[24] the Court affirmed a lower court's order approving a combination of at-large and single-member district seats for the city council of Port Arthur, Texas, on condition that the city eliminate its majority vote requirement. The Court found that "[i]n the context of racial bloc voting . . . the [majority vote] rule would permanently foreclose a black candidate from being elected to an at-large seat."[25]

The attorney general, in administering the preclearance provisions of section 5 of the Voting Rights Act, has also recognized the discriminatory effect of runoffs. In fact, one of the most frequent objections under section 5 has been to majority vote requirements—sixty-six objections since 1975.[26]

One lower court, when asked directly to decide the constitutionality of the majority vote requirement on racial grounds, sidestepped the issue. In *Bond v. Fortson*,[27] Julian Bond (now a state senator) and Andrew Young (now mayor of Atlanta) asked a three-judge court to invalidate Georgia's majority vote requirement for members of Congress in the general election on the grounds that it had a discriminatory purpose and effect. The court, however, dismissed the complaint on the grounds that it did not present a justiciable case or controversy. "Plaintiffs . . . seek an advisory opinion as to an abstract situation which *may* occur in the 1972 elections. This Court does not have judicial power to render

---

20. 412 U.S. 755 (1973).
21. *Id.* at 766.
22. 458 U.S. 613 (1981).
23. *Id.* at 627.
24. 459 U.S. 159 (1983).
25. *Id.* at 167.
26. U.S. COMM'N ON CIVIL RIGHTS, THE VOTING RIGHTS ACT: UNFULFILLED GOALS 69 (1981).
27. 334 F. Supp. 1192 (N.D. Ga. 1971).

such an opinion."[28] The Supreme Court affirmed.[29] A suit similar to *Bond v. Fortson*, challenging the Mississippi majority vote requirement, is presently pending in the District Court for the Northern District of Mississippi.[30]

## V. Abolition: Not the Solution

Despite the discriminatory aspect of the majority vote requirement, it is doubtful that its abolition would have a beneficial impact. White communities in jurisdictions which have had to eliminate the runoff requirements or which have never used it, demonstrate an uncanny ability to choose consensus candidates prior to an election, the effect of which avoids fragmentation of the white vote and imposes the functional equivalent of a majority vote requirement.

### A. *Manipulation of the Plurality Vote Requirement*

A striking example of a white community's ability to maintain political unity in the absence of a majority vote requirement occured in the 1974 mayoral race in Thomson, Georgia. Prior to the election, the incumbent announced that he was retiring from office. Two whites and one black declared their candidacy, and the city switched from a plurality rule to a majority vote requirement. The United States Attorney General, however, to whom the new requirement had been submitted as required by section 5 of the Voting Rights Act, objected on the grounds that the majority vote requirement could have a discriminatory effect. After the objection, local whites approached the two white candidates and asked each to choose twelve persons who would vote and "decide which white man was to run."[31] The candidates complied and appointed twenty-four white "electors" who met at city hall. These "electors" selected William Wheller to oppose the black candidate, Luther Wilson, Jr., an assistant school principal. The defeated

---

28. *Id.* at 1194.
29. 404 U.S. 930 (1971). *Cf.* Phillips v. Rockefeller, 435 F.2d 976 (2d Cir. 1970)(rejecting a claim that the seventeenth amendment *required* candidates for the United States Senate to be elected by majority vote).
30. Jackson v. Allain, No. GC 84–42–LS–0 (N.D. Miss.)(case pending).
31. Wells, *Thomson's Mayoral Race Up in Air*, Atlanta Constitution, Oct. 26, 1974, at 14–A, col. 3.

white candidate, E. Wilson Hawes, however, reneged on the agreement and stayed in the race. Wheller then withdrew, issuing a public statement that "[s]omebody had to honor the gentleman's agreement of Tuesday night and since Hawes didn't, I will."[32] The election was held and Hawes, as expected, defeated Wilson.[33]

The manipulation of the plurality vote requirement by the white community is often more subtle than this, but equally as effective. In Moultrie, Georgia, blacks filed suit in 1973 charging that the majority vote requirement adopted in 1965 had never been precleared under section 5 of the Voting Rights Act. The district court ruled in the plaintiff's favor and enjoined use of the unapproved practice.[34] At the next election, a black man, Frank Wilson, ran for a council seat against four whites. Because of the four-way split in the white vote, Wilson received a plurality of the votes and was elected to office. The next year, three of the five seats on the council were up for election. The incumbents qualified for each position. Blacks entered the races for two of the seats, and a white man, Roscoe Cook, qualified for the third seat. Later, a black, Cornelious Ponder, Jr., also qualified for the third seat. Cook then withdrew, leaving black candidates for each seat opposed by a single white. This configuration ensured that no black could be elected by less than a majority of the votes. All the black candidates were defeated by nearly the same number of votes.[35]

Historian J. Morgan Kousser has described the phenomenon of restricted or consensus white candidacy as a "psychological whites primary."[36] If whites in majority white jurisdictions choose or slate a candidate before the election (or have the ability to do so whenever they wish), then it matters little to the election of black officials whether a majority or plurality vote rule is in effect.[37] It

---

32. *Id.*
33. *Sheik Hawes Gallops to Mayor's Chair*, McDuffie Progress, Nov. 7, 1974, at 1, col. 4.
34. Cross v. Baxter, 604 F.2d 875, 878 n.1 (5th Cir. 1979), *cert. granted, vacated and rem.*, 460 U.S. 1065 (1983), *vacated all prior judgments, rem. with instructions for consideration in light of § 2 amendments and Rogers v. Lodge, 458 U.S. 613 (1982)*, 704 F.2d 143 (5th Cir. 1983). The city subsequently submitted the change to the attorney general who objected. Letter from James P. Turner, Acting Assistant Attorney General, to Hoyt H. Whelchel, Jr. (June 26, 1977).
35. McDonald, *supra* note 18, at 72.
36. County Council v. United States, No. 82-9012, slip op. (D.D.C. May 25, 1984) (trial testimony, Feb. 17-18, 1983).
37. The importance and incidence of nonparty candidate selection as a technique of minority vote dilution has received little attention from scholars. *But see* Davidson & Fraga, *Nonpartisan Slating Groups in an At-large Setting*, in MINORITY VOTE DILUTION 119 (C. Davidson ed. 1984).

would be yet another irony of southern politics if abolition of the majority vote rule, undertaken in the name of reform, was to have as its principal effect the modern day equivalent of candidate selection in smoke-filled rooms as has been the norm of the last two centuries. No doubt minorities would participate even less in such candidate selection than they do now in jurisdictions which require a majority vote.

B. *Potential Adverse Effect on Black Majority Districts*

Moreover, abolition of the majority vote rule would have limited ameliorative effect because it is not a barrier to black office holding in those jurisdictions with a substantial black majority. In fact, in those jurisdictions, the abolition of the majority vote requirement would actually hurt the chances of black candidates. For example, in Atlanta (a city with a significant black majority) if several blacks and a consensus white candidate were to seek the office of mayor, it is quite possible that the black vote would be split and the white candidate would get a plurality. Abolition of the majority vote requirement in Atlanta, far from enhancing the opportunities for electing blacks to office, would likely diminish them.

The majority vote requirement is not in the same category of voting practices as the literacy test or the poll tax, which functioned in virtually every situation to discriminate against blacks. Instead, it operates invidiously, primarily in at-large elections in majority white jurisdictions, just as other "enhancing" devices such as numbered posts and staggered terms of office.[38] However, when discriminatory at-large voting is replaced with a fair system of district elections, objections to the runoff rule usually vanish.

The 1984 primary election for Ward 2 (which is predominantly black) of Albany, Georgia, illustrates the sometimes beneficial impact of the majority vote requirement upon black candidacy. Two blacks and one white were in the race. The white candidate won a plurality, but was forced into a runoff because the city has a majority vote requirement. The white won the runoff, but the effect of the majority vote requirement was to give the highest

---

38. For a discussion of the discriminatory effect of numbered posts and staggered terms of office, *see* Graves v. Barnes, 343 F. Supp. 704, 725 (W.D. Tex. 1972), *aff'd sub nom.* White v. Regester, 412 U.S. 755 (1973); City of Rome v. United States, 446 U.S. 156, 183–85 (1980); Rogers v. Lodge, 458 U.S. 613, 627 (1982); Dunston v. Scott, 336 F. Supp. 206 (E.D.N.C. 1972).

black vote getter an additional opportunity to win the election which he would not have had under a plurality vote system.[39]

In Baldwin County, Georgia, the majority vote requirement similarly gave a black candidate a second chance, except that he *won* the runoff. Clarence Simmons, a black, ran in the August 1984, primary for a seat on the county commission from a 58 percent black district. He was opposed by two whites. One of the whites won a plurality but was forced into a runoff against Simmons. At the second primary, Simmons' candidacy stimulated the black vote and he won the nomination. He went on to win the December general election as well.[40]

## VI. Conclusion

A number of politicians have argued that even if abolition of the majority vote were to result in more blacks being nominated in southern Democratic primaries, whites would defect and vote for white Republicans in the general elections. Robert Clark, for example, a black state legislator, ran in the 1982 Democratic primary for the Second Congressional District in Mississippi and won. Although he was the party nominee, and had the backing of then Governor William Winter, he lost to Republican Webb Franklin in the general election. Winning the Democratic party's nomination today is not the same thing as winning the office itself.

Mayor Andrew Young, who opposes the abolition of the majority vote, insists that blacks will likely lose in general elections in the majority white jurisdictions where they can only win in primaries by a plurality. Congressman Ed Jenkins (D.-Ga.), agrees with Young. He says that if the majority vote requirement were repealed, "I think we'd probably elect somewhere between 15 and 25 Republicans [to Congress] and only a couple or three blacks."[41] Congressman Wyche Fowler, (D.-Ga.), predicts that the principal effect of abolition of the majority vote system would be to "build the Republican Party overnight."[42]

To ask whether the majority vote requirement should be repealed is, in a sense, to pose the wrong question. The inquiry

---

39. Whittington v. Mathis, 324 S.E.2d 727 (1985).
40. Simmons v. Torrence, Sup. Ct. of Baldwin County, Georgia (1984).
41. Roberts, *Concern over Jackson Runoff Stand*, N.Y. Times, Apr. 16, 1984, at A18, col. 3.
42. *Id.*

instead should be whether a jurisdiction's basic election system is fair. When Congress amended section 2 of the Voting Rights Act in 1982, it established the statutory standard for the legality of voting practices, which is: Whether their "results" were to discriminate, and whether minorities were provided equal opportunity "to participate in the political process and to elect representatives of their choice."[43] The end Congress sought to achieve was not the use or abolition of any particular electoral rules, but the reality of equal political participation.[44] In some jurisdictions, that reality may be advanced by abolishing the majority vote requirement; in others, it may not.

Given the marginally beneficial impact which abolition of the majority vote requirement would likely have and the adverse effect it could have in majority black jurisdictions, elimination of the rule does not emerge as a priority in the campaign against minority vote dilution. The abolition of at-large elections would be far more beneficial to the political interests of minorities. At-large elections are not only the greatest single structural barrier to minority political participation, but generally it is only in at-large elections where the majority vote requirement is objectionable. If the diluting effect of at-large elections can be remedied in the foreseeable future, objections to the use of the majority vote requirement should gradually fade away.

---

43. 42 U.S.C.§ 1973(b) (1982). For a discussion of amended section 2, see United States v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir. 1984), *cert. denied*, 105 S. Ct. 375 (1984); Gingles v. Edmisten, 590 F. Supp. 345 (E.D.N.C. 1984), *prob. jurisdiction noted*, 105 S. Ct. 2137 (1985); Major v. Treen, 574 F. Supp. 325 (E.D. La. 1983); Parker, *The New Results Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard*, 69 VA. L. REV. 715 (1983).

44. S. REP. No. 417, 97th Cong., 2d Sess. *reprinted in*, 1982 U.S. CODE CONG. & AD. NEWS 177 (1982). Justice Rehnquist, however, in his dissenting opinion in Mississippi Republican Executive Comm. v. Brooks, 105 S. Ct. 416 (1984), takes a contrary view. He suggests, despite the clarity of the legislative history on the broad scope of amended section 2, that the statute should be restricted to at-large voting. "But when we turn from attacks on multi-member districts to attacks on the way lines are drawn in creating five single-member congressional districts, as in the case at hand, phrases such as 'vote dilution' and factors relied upon to determine discriminatory effect area all but useless as analytical tools." *Id*. at 422.