**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

LESLIE-BURL McLEMORE;
CHARLES HOLMES;
JIMMIE ROBINSON, SR.; and
RODERICK WOULLARD,

Plaintiffs,

v.

DELBERT HOSEMANN, in his official capacity
as the Mississippi Secretary of State; and PHILIP
GUNN, in his official capacity as the Speaker of the
Mississippi House of Representatives,

Defendants.

Civil Action

Case No. 3:19-cv-383-DPJ-FKB

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION**

## INTRODUCTION

In the aftermath of Reconstruction, the passage of the 15th Amendment, which guaranteed African Americans the right to vote, and ensuing African-American electoral success, Mississippi legislators called a constitutional convention in 1890 to address what many considered a serious threat to the State and white supremacy in general: African-American suffrage. One of the at-large delegates and chief architects of the 1890 Constitution, U.S. Senator James Z. George, warned that the 1900 census would reveal that African Americans outnumbered whites by a 2 to 1 margin and that a new constitution was necessary to guarantee "home government, under the control of the white people of the State." DOROTHY O. PRATT, SOWING THE WIND: THE MISSISSIPPI CONSTITUTIONAL CONVENTION OF 1890 61 (2018); *see also* Declaration of R. Volney Riser ("Riser Decl.") (Ex. 1) ¶ 16. Legislators and delegates spoke openly, and newspapers reported freely, about the discriminatory intent that drove the calls for the convention and the various proposals advanced for accomplishing its goal to restrict African-American political influence. Senator George, for instance, suggested that the legislature, not the people, should elect the governor to ensure "white control." Pratt, *supra*, at 76; *see also* Riser Decl. ¶¶ 20–22. And the President of the Convention, Judge S.S. Calhoon, proposed "a system of electors in which a gerrymandering of counties would provide white governors and legislators." Pratt, *supra*, at 83; *see also* Riser Decl. ¶¶ 27–28.

The challenged provisions at issue in this lawsuit, Article V, Sections 140, 141, and 143 of the Mississippi Constitution (collectively, "Challenged Provisions"), are the outgrowth of the racially-motivated 1890 Convention and were ratified with the specific purpose of diluting African-American voting strength. Under Article V, Sections 140 and 143, a candidate for statewide, state-level office must win a majority of the 122 State House of Representative ("House") districts (the "Electoral-Vote Rule") and obtain a majority of the popular vote statewide

(the "Popular-Vote Rule") in order to be elected. If no candidate satisfies these two conditions, then Article V, Sections 141 and 143 command that the State House of Representatives shall select the winner from the two candidates who received the highest number of popular votes (the "House-Vote Rule").  Together, these provisions diminish African-American voting strength in Mississippi and diminish the potential for African-American voters to elect candidates of choice.

The Challenged Provisions violate the U.S. Constitution, as well as the Voting Rights Act, which prohibit both sophisticated and crude methods of vote dilution and disenfranchisement. Section 140's electoral requirements for statewide office, for instance, have the effect of imposing additional barriers to the election of African-American-preferred candidates, who must obtain a significantly higher percentage of the statewide popular vote (as compared to candidates preferred by white voters) just to win a majority of House districts. In fact, expert analysis shows that under the Challenged Provisions, a white-preferred candidate can win a majority of House districts without even winning a majority of the popular vote, whereas an African-American-preferred candidate must obtain *at least 55 percent of the popular vote* to do the same.

The Electoral-Vote Rule, moreover, ensures that votes in some House districts will either be discarded or afforded unequal weight, notwithstanding the Supreme Court's admonition that "all who participate in the election are to have an equal vote—whatever their race . . . and wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963). And the House-Vote Rule, originally proposed as a fail-safe to prevent African Americans from selecting statewide officials, ensures that members of the House of Representatives elected primarily from majority-white districts will select the statewide elected official if a candidate fails to win either a majority of the popular vote or a majority of House districts.

Mississippi's next general election for statewide offices will take place on November 5,

2019. Absent injunctive relief, votes cast by Plaintiffs (along with other African-American voters in the State) will be diluted; in fact, Plaintiffs may even be denied entirely the opportunity to select their statewide officeholders. Plaintiffs, therefore, seek an order from this Court enjoining Defendants from applying the provisions of Article V, Sections 140, 141, and 143 in the November 2019 general election and request that the Court require Defendants to declare, as the winner of each contest for statewide office, the candidate who receives the highest number of votes statewide.

## BACKGROUND

Before the enactment of the Challenged Provisions in the 1890 Constitutional Convention, Mississippi, like most states, declared the candidate who received the highest number of votes in an election as the winner of that election. MISS. CONST., art. V, § 2 (1868). At the time, Mississippi's Reconstruction-era Constitution, adopted in 1868, extended suffrage to African-American men. *See* MISS. CONST. art. VII § 2 (1868).  The Fifteenth Amendment, which came two years later, protected African Americans' access to the political process. U.S. CONST. amend. XV, § 1. And with the franchise in hand, African-American men at times were able to elect their preferred candidates to statewide office, including an African-American Lieutenant Governor and Superintendent of Education. *See* Christopher Span, *From Cotton Field to Schoolhouse; African American Education in Mississippi* 167 (2009); Byron D'Andra Orey, *Black Legislative Politics in Mississippi*, 30 J. OF BLACK STUDIES 791, 793 (July 2000); *see also* Riser Decl. ¶ 16.

Then came the backlash. Once Reconstruction ended, Mississippi lawmakers sought to eliminate African-American participation in the political process and reclaim control over state government. African Americans in Mississippi "lost their political rights [] through intimidation, fraud, and outright murder, and racial segregation became largely a matter of custom."  David H. Jackson, *Segregation*, in Mississippi Encyclopedia (July 11, 2017) (Ex. 2); *see also* Riser Decl.

¶ 17. Mississippi also convened a Constitutional Convention in 1890, during which delegates openly expressed their desire to disenfranchise African-American voters and otherwise prevent them from electing their candidates of choice. William A. Mabry, *Disenfranchisement of the Negro in Mississippi*, 4:3 J.S. Hist. 318, 320 (1938) (Ex. 3); *see also* Riser Decl. ¶ 17. This resulted in the adoption of Article V, Sections 140, 141, and 143—among other disenfranchising provisions— which introduced a new electoral system for selecting candidates for statewide office in order to ensure that only white Mississippians would decide the outcome of such elections.

## I.      The Challenged Provisions

Sections 140 and 141 of Article V of the Mississippi Constitution introduced a unique, multi-step process for electing non-federal statewide candidates.[1] Section 140 requires candidates for such statewide offices to obtain both a majority of the popular vote (the Popular-Vote Rule) *and* the highest vote total (or a plurality) in a majority of Mississippi's House of Representative districts (the Electoral-Vote Rule) in order to be declared the winner. MISS. CONST. art. V, § 140 ("The person found to have received a majority of all the electoral votes [one of which is assigned to each House district], and also a majority of the popular vote, shall be declared elected."). Sections 141 and 143, in turn, provide that if no candidate satisfies the Popular-Vote Rule and the Electoral-Vote Rule, members of the Mississippi House of Representatives shall determine the winner of the election among the two candidates who received the most popular votes (the House-Vote Rule). *Id.* § 141 ("If no person shall receive such majorities, then the House of Representatives shall proceed to choose a governor from the two persons who shall have received

---

[1] Both Sections 140 and 141 have remained substantively the same since their adoption in 1890.

the highest number of popular votes.").[2]

## II.     The Challenged Provisions Were Enacted with Intent to Diminish African-American Political Influence.

During the 1890 Constitutional Convention, Mississippi delegates openly expressed their desire to disenfranchise African-American voters and otherwise prevent them from electing their candidates of choice. Ex. 3 at 320 (quoting Senator George, who favored a new constitution that would "enable us to maintain a home government under the control of the white people of the state"); *see also* Riser Decl. ¶¶ 17–19. This discriminatory purpose was announced on the first day of the Convention. Judge Solomon S. Calhoon—President of the Convention, member of the Committee on Franchise, Apportionment, and Elections (the "Franchise Committee"), and an architect of the Challenged Provisions—announced that African Americans' control of the government had "always meant economic and moral ruin," compared with a government controlled by white men, which always resulted in "prosperity and happiness to all races." PRATT, *supra*, at 11; *see also* Riser Decl. ¶ 17. Mississippi adopted several devices proposed by the Franchise Committee to prevent African-American citizens from participating equally in the electoral process, including poll taxes, literacy tests, felon disenfranchisement, an "understanding clause"—requiring voters to understand portions of the State Constitution when read to them— and the Challenged Provisions. PRATT, *supra* at 82-83; *see also* Riser Decl. ¶¶ 11–12.

To implement the Challenged Provisions, the delegates first apportioned the legislature such that white individuals, despite being a minority in the State, controlled the House. J. S. McNeilly, *History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections in the Constitutional Convention of 1890*, *in* PUBLICATIONS OF MISS.

---

[2] While Sections 140 and 141 apply only to Mississippi's gubernatorial elections, Section 143 extends the same procedures to all elections for statewide office. MISS. CONST. art. V, § 143 ("All other state officers shall be elected . . . in the same manner as provided for election of Governor.").

HISTORICAL SOCIETY, Vol. VI, 133 (1902) (Ex. 4) (referring to the legislative apportionment plan as "the legal basis and bulwark of the design of white supremacy in a State with an overwhelming and a growing negro majority"); *see also* Riser Decl. ¶¶ 20, 23–24.

Next, "[h]aving provided for complete and lawful security of the legislative department. . . as the basis of white supremacy, the value and advantages of the representative apportionment were then extended to the other two branches of the State government—the executive and the judiciary." Ex. 4 at 135; *see also* Riser Decl. ¶ 26. In doing so, the delegates passed the Challenged Provisions, which transformed the statewide electoral procedure from a simple plurality requirement, MISS. CONST., art. V, § 2 (1868) (directing that the "person having the highest number of votes shall be Governor"), to a multi-step system requiring a statewide candidate to receive a majority of both the popular vote and "electoral votes" corresponding to the House's apportionment, MISS. CONST. art. V, §§ 140, 143 (1890). If any statewide candidate failed to obtain both majorities, the election would be decided by the apportioned House. *Id.* § 141.

Under this system, statewide elections would be decided by the white-controlled House districts, instead of the State's voting population, and the "arrangement thus [gave] to the white constituencies a reserve power of elective control of all the executive offices of the State." Ex. 4 at 135; *see also* Riser Decl. ¶ 26. The Popular-Vote Rule itself "ha[d] its roots in nineteenth century southern white racism." Laughlin McDonald, *The Majority Vote Requirement: Its Use and Abuse in the South*, 17 URB. LAWYER 429, 429 (1985) (Ex. 5); *see also* Riser Decl. ¶¶ 29–30. It was a radical change from the 1868 Constitution, which simply provided that the candidate who garnered the most votes in the gubernatorial race would be elected, MISS. CONST., art. V, § 2 (1868), and "[i]t is generally believed that the motive for the adoption of majority requirements in the eleven southern states in the United States where they are currently used . . . [including] Mississippi . . .

was to reduce the ability of African-American candidates to win elections as African-Americans gained the right to vote." Rebecca B. Morton, *Majority Requirements and Minority Representation*, 63 N.Y. UNIV. ANN. SURV. AM. LAW. 691, 692 (2008) (Ex. 6); *see also* Riser Decl. ¶¶ 29–30. Even if African-American-preferred candidates mustered enough support to win a majority of the popular vote, the Electoral-Vote Rule ensured that white-majority districts would always have the final say. Last, the House-Vote Rule acted as a fail-safe measure, allowing members of the House—elected largely from majority-white counties—to intervene as the ultimate decisionmaker should no candidate satisfy the Electoral-Vote and Popular-Vote Rules.

This combination of electoral rules served, by design, to "erect an impregnable barrier to any possible organization of the negro majority, by extraneous force or internal faction, for political dominance." Ex. 4 at 135; *see also* Riser Decl. ¶ 26.

**III.    The Challenged Provisions Impair African Americans' Ability to Elect Their Preferred Candidates to Statewide Office.**

The Challenged Provisions impair the African-American vote such that African Americans in Mississippi do not have an equal opportunity to elect their candidates of choice in statewide elections. Each provision independently contributes to this discriminatory result and their collective impact magnifies it.

**A.    The Distribution of African-American and White Voters Throughout the State Requires African-American-Preferred Candidates to Obtain Significantly More Than a Majority of the Popular Vote to be Elected.**

The Electoral-Vote Rule denies African Americans an equal opportunity to elect candidates of their choice and dilutes their vote due to two realities of Mississippi politics: (1) voting in Mississippi is highly racially polarized, such that African Americans and whites in Mississippi usually prefer different candidates; and (2) the racial population distribution among House districts makes it more difficult for African-American-preferred candidates to win a majority of House

districts.

First, voting in Mississippi remains highly racially polarized, just as it was in the years leading up to the 1890 Constitutional Convention. In the two U.S. Senate elections in Mississippi in 2008, for example, African-American voters supported the Democratic candidates by an estimated 90 percent, and white voters supported the Republican candidates by an estimated 81 to 88 percent. Declaration of Jonathan Rodden ("Rodden Decl.") (Ex. 7) ¶¶ 37–38 & tbl. 1. The same trend was observed in statewide elections in 2003, 2007, 2011, and 2015. *Id.* ¶¶ 20–33. In light of this racial polarization, the Electoral-Vote Rule produces a predictable yet formidable disadvantage for African-American-preferred candidates in statewide elections. Out of the 122 House districts, only 42 contain majority total and voting-age African-American populations. *Id.* ¶¶ 6, 45, 49 & fig. 11. Thus, so long as white and African-American voters consistently prefer different candidates, white voters—who control 65 percent of House districts—can almost always block the African-American-preferred candidate from satisfying the Electoral-Vote Rule.

Second, under the current House district configuration, African Americans' preferred candidates must obtain a larger majority of the popular vote than white voters' candidates of choice to win a majority of House districts. As Dr. Rodden explains, even if an African-American-preferred candidate for statewide office receives 54 percent of the popular vote, she is still extremely unlikely to capture enough districts to satisfy the Electoral-Vote Rule. Rodden Decl. ¶¶ 8–9, 13, 51–69. In fact, she would need *at least 55 percent of the popular vote* to have any decent chance of satisfying the Electoral-Vote Rule. *Id.* By contrast, a white-preferred candidate needs only 46 percent of the popular vote to win a majority of electoral votes. *Id.* In the 2015 gubernatorial race, this built-in disadvantage was even more pronounced: to satisfy the Electoral-Vote Rule there, the African-American preferred candidate needed "to surpass 58 percent" of the

popular vote to win a majority of State House districts. *Id.* ¶ 65. In other words, a white-preferred candidate who wins even a bare majority of the popular vote will satisfy the Electoral-Vote Rule; but an African-American-preferred candidate must obtain significantly more votes, i.e. *at least 55 percent*, to achieve the same result.

### B. The Popular-Vote Rule Ensures that African Americans Have Less Opportunity to Elect Their Candidates of Choice Even When the White Vote is Splintered.

A number of federal courts, including the Supreme Court, have recognized the discriminatory impact that majority-vote rules impose on African Americans. *See City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (requiring removal of a majority vote rule for preclearance under Section 5, recognizing that "[i]n the context of racial bloc voting prevalent in [one city], the [majority-vote] rule would permanently foreclose a black candidate from being elected to an at-large seat"); *Jeffers v. Clinton*, 740 F. Supp. 585, 594–95 (E.D. Ark. 1990) (holding unconstitutional Arkansas laws imposing majority-vote rules in municipal and county elections as intentionally discriminatory and noting that the rule "replace[d] a system in which blacks could and did succeed, with one in which they almost certainly cannot"); *see also* Ex. 5 at 433 ("[I]t is easy to understand that a majority vote requirement in a racially polarized, majority white jurisdiction is a considerable obstacle to black, but not white, office holding.").

The Popular-Vote Rule here similarly prevents the election of African-American candidates of choice under the scenario most likely to result in those candidates receiving the highest number of votes: where an independent or third-party candidate participates in the race. If the independent or third-party candidate takes a significant share of the white vote, thereby reducing the vote share for all white-preferred candidates, an African-American-preferred candidate could emerge with a plurality. *See* Ex. 5 at 432 ("Blacks can often get pluralities in majority white jurisdictions in elections where several serious white candidates split the white

vote."). In this scenario, the Popular-Vote Rule would still block the election of the African-American-preferred candidate, and the high levels of racially polarized voting in Mississippi ensure that any split of the white vote is unlikely to result in additional support for the African-American-preferred candidate. Rodden Decl. ¶¶ 11, 77–81.

### C. The House-Vote Rule Removes the Choice of Statewide Elected Officials from Voters and Reinforces the Discriminatory Impact of the Electoral-Vote Rule.

The House-Vote Rule also produces a result that disfavors African Americans. As noted above, 65 percent of the House districts are majority-white. Rodden Decl. ¶¶ 6, 45. Because voting in Mississippi is racially polarized, white-preferred candidates consistently win almost all of the 80 majority-white districts, giving them a clear majority in the House. Rodden Decl. ¶¶ 13, 70–76. Thus, for the same reasons the Electoral-Vote Rule produces a disparate impact on African-American voters, the House-Vote Rule ensures that African Americans have even less influence in the outcome of elections for statewide office.

## ARGUMENT

"A preliminary injunction should issue" once Plaintiffs establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not issued; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendants; and (4) that the injunction will not disserve the public interest. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted); *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 776 (S.D. Miss. 2011).

Here, absent a preliminary injunction, the Challenged Provisions will continue to dilute the votes of Plaintiffs, along with other African-American voters in Mississippi, and will deny African-American voters an equal opportunity to elect candidates of their choice to statewide office in the 2019 election. The Court should therefore declare the Challenged Provisions

unconstitutional and violative of Section 2 of the Voting Rights Act and issue an order requiring Defendants to declare, in each race for statewide elected office, the candidate who received the plurality of votes as the winner of that election. *See* MISS. CONST., art. V, § 2 (1868).

## I.      Plaintiffs Are Substantially Likely to Succeed on the Merits.

Plaintiffs are substantially likely to prevail on their claims that the Challenged Provisions violate the Fourteenth and Fifteenth Amendments to the United States Constitution, along with Section 2 of the Voting Rights Act. The Challenged Provisions were enacted with discriminatory intent and have operated to deny African-American voters an equal opportunity to elect candidates of their choice. Moreover, the Electoral-Vote Rule assigns unequal weight to ballots cast by Mississippi voters, depending on the House district in which the voter resides, which is a clear violation of the one-person, one-vote principle.

### A.      The Challenged Provisions Violate the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

#### 1.      The Challenged Provisions Were Enacted with Discriminatory Intent.

The Challenged Provisions plainly violate the Fourteenth Amendment's Equal Protection Clause, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const., amend. XIV, § 1. It is well-established that systems purposefully enacted to dilute a racial group's voting power are unconstitutional. *See, e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (plurality opinion); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Courts have found such violations where states enacted voting schemes as purposeful devices "invidiously to minimize or cancel out the voting potential of racial or ethnic minorities," *Mobile*, 446 U.S. at 66, even when that intent existed a century earlier, *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (invalidating a nearly *one hundred-year-old* felon-disenfranchisement provision of Alabama's constitution after citing

historical studies establishing that the state's constitutional convention in 1901 "was part of a movement that swept the post-Reconstruction South to disenfranchise blacks").

To show such intentional discrimination, moreover, Plaintiffs are not required "to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. Instead, "[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the Fourteenth and the Fifteenth Amendments to occur." *Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017, 1022 (5th Cir. 1984). The Supreme Court has recognized that "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. The relevant factors are: (1) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," (2) the "specific sequence of events leading up to the challenged decision," and (3) the legislative history of the Challenged Provisions, including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267–68. And "that the law bears more heavily on one race than another" is relevant to the Court's inquiry. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Here, all of these factors lead to the inescapable conclusion that the Challenged Provisions were enacted with discriminatory intent.

The historical background of, and sequence of events leading to, the enactment of the 1890 Constitution demonstrates that the Challenged Provisions are steeped in intentional, hateful discrimination. *See Davis*, 426 U.S. at 242 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts."). As referenced above, before the Challenged Provisions were introduced during the 1890 Constitutional Convention, African Americans—then

the majority of the state's total population—had achieved moderate success in electing candidates of their choice to statewide elected positions. *See* Background Section II, *supra*. The delegates to the 1890 Convention made clear that they wished to enact a new constitution that would stamp out African-American political influence and establish a white-controlled government. *See id.*

Though the Challenged Provisions were not the only racially disenfranchising provisions enacted during the 1890 Convention (e.g., literacy tests and poll taxes were also adopted), specific elements of the Challenged Provisions were identified and proposed by delegates because of their impact on African-American voting strength. Senator George, one of the chief drafters, proposed that the legislature, not the people, should elect the governor in order to ensure "white control," *see* PRATT, *supra*, at 76, and Judge S.S. Calhoon, President of the Convention, proposed "a system of electors in which a gerrymandering of counties would provide white governors and legislators." *See id.* at 83; *see also* Riser Decl. ¶¶ 20–22. Historians have also tied the Challenged Provisions to the delegates' overall scheme to establish white supremacy in the State and "erect an impregnable barrier to any possible organization of the negro majority, by extraneous force or internal faction, for political dominance." Ex. 4 at 135; Riser Decl. ¶ 26; *see also* Compl. ¶¶ 29–37. The historical context of the 1890 Constitutional Convention not only satisfies the *Arlington Heights* factors, it provides direct evidence that the framers enacted the Challenged Provisions with specific intent to quash African-American voting strength and political influence.

### 2. The Challenged Provisions Minimize African-American Voting Strength.

Each Challenged Provision to this day continues to serve its intended purpose by diluting African-American voting strength in Mississippi, in violation of the Fourteenth and Fifteenth Amendments. It is well-settled that an electoral scheme that minimizes or cancels out a minority group's voting strength has a discriminatory effect, and, when that scheme is enacted for a

discriminatory purpose, it violates the Fourteenth and Fifteenth Amendments. *See*, *e.g.*, *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (affirming invalidation of county commission's at-large elections, which had the tendency "to minimize voting strength of minority groups"); *Jeffers v. Clinton*, 740 F. Supp. 585, 594–95 (E.D. Ark. 1990) (invalidating majority-vote rule as intentionally discriminatory because it prevented African-American candidates, who were previously successful, from becoming elected). The Challenged Provisions do just that. Mississippi's majority-minority House districts are heavily concentrated with African-American voters—as are majority-white districts with white voters—and the high levels of racially polarized voting observed in the State ensure that white-preferred candidates for statewide office will, as they have in the past, consistently win nearly all of the 80 majority-white districts. This creates a considerable disadvantage for African-American-preferred candidates: the white candidate of choice can win a majority of the 122 House districts with only approximately 48 percent of the popular vote, but the African-American candidate of choice must significantly outperform that threshold and obtain *at least 55 percent of the popular vote*, in order to satisfy the Electoral-Vote Rule. *See* Background Section III(A), *supra*. Thus, unless enjoined, the Electoral-Vote Rule will continue to diminish African American voting strength and deny African Americans in Mississippi an equal opportunity to elect candidates of their choice in statewide elections.

The House-Vote Rule, moreover, removes the selection of candidates for statewide office from the hands of voters if the African-American supported candidate wins a plurality of the popular vote but not a majority, or wins a majority of the popular vote but not a majority of the Electoral Vote. It requires the members of the House—elected primarily from majority-white districts—to select the winner of each election for statewide office when none of the candidates secure both a majority of the popular vote and House districts. The idea of legislative control over

elections, as previously noted, was proposed by one of the delegates specifically as a means to disenfranchise African Americans. *See* PRATT, *supra*, at 76 (noting that Senator George proposed that the legislature, not the people, should elect the governor to "ensure 'white control.'"); *see also* Riser Decl. ¶¶ 20–22; *Rogers*, 458 U.S. at 622 (holding Fifteenth Amendment was violated when county's at-large voting system "was being maintained for the invidious purpose of diluting the voting strength of the black population"); *cf. White v. Alabama*, 74 F.3d 1058 (11th Cir. 1996) (invalidating proposal to appoint state judges, instead of the prior system of electing them, as a violation of the Voting Rights Act).

The discriminatory effect of majority-vote rules is similarly well-established. *See* Background Section III(B), *supra*; *see also* Ex. 5 at 432–33 ("In Mississippi, where the records are the best available, it has been estimated that plurality winning blacks have been defeated by white opponents in mandatory runoff elections nearly one hundred times [between 1973 and 1985].").  Indeed, several courts, including the U.S. Supreme Court, have recognized the unconstitutional, dilutive effects of majority-vote rules.  *See, e.g.*, *City of Port Arthur*, 459 U.S. at 168 ("In the context of racial bloc voting prevalent in Port Arthur, [a majority-vote] rule would permanently foreclose a black candidate from being elected to an at-large seat."). This is especially true when such a requirement is implemented on the heels of African American electoral success, making "[t]he inference of racial motivation . . . inescapable." *Jeffers*, 740 F. Supp. at 595 (finding that majority vote rules enacted immediately after the election of African-American candidates "represent[ed] a systematic and deliberate attempt to reduce black political opportunity" that was "plainly unconstitutional").

Because the Electoral-Vote, House-Vote, and Popular-Vote Rules have operated, as intended by the framers of the 1890 Constitution, to dilute African American voting strength and

deny African Americans an equal opportunity to elect candidates of their choice, they violate the Fourteenth and Fifteenth Amendments and should be enjoined immediately.

    **B.**    **The Electoral-Vote Rule Fails to Comply with the One-Person, One-Vote Principle and, thus, Violates the Fourteenth Amendment's Equal Protection Clause.**

Compounding its discriminatory effect on African Americans, the Electoral-Vote Rule creates a voting system that discards and assigns unequal weight to votes cast in the same election depending on the House district in which the voter resides. Under this provision, a candidate who obtains the highest popular vote total in a particular House district is awarded one electoral vote for that district, and the losing candidate receives zero electoral votes, regardless of the margin of victory or defeat.

By awarding a district's electoral vote to the winning candidate, and nothing to any other candidate, the Electoral-Vote Rule is functionally indistinguishable from the "county unit" system that the Supreme Court found unconstitutional in *Gray v. Sanders*, 372 U.S. 368, 381 n.12 (1963). There, the Supreme Court invalidated Georgia's "deeply rooted and long standing" system for nominating candidates for statewide offices that assigned units to each county based roughly on their population and declared the candidate who won the most county units as the winner. *Id.* at 371. The Court held that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Id.* at 379; s*ee Angle v. Miller*, 673 F.3d 1122, 1130 (9th Cir. 2012) (explaining that, to avoid these exact effects, one-person, one-vote requires that in "a statewide election, a state must count votes on a statewide, rather than a district-by-district, basis"). The Court found this system inconsistent with the one-person, one-vote principle because it ignored a significant portion of the votes cast in the election. *See Gray*, 372 U.S. at 381 n.12. The system counted an individual's vote *only* if that voter selected the candidate who emerged

victorious in that county: "if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other voters for a different candidate being worth nothing and being counted only for the purpose of being discarded." *Id.* Here, like the county unit system in *Gray*, the Electoral-Vote Rule causes the State either to count or ignore each vote depending on the House district in which it is cast, which is incompatible with the Equal Protection Clause's one-person, one-vote principle.

The Electoral-Vote Rule also assigns less weight to a vote cast for a winning candidate who wins a district by *too large* of a margin, which again violates the one-person, one-vote principle. The Supreme Court has identified this defect as a form of unconstitutional "geographic discrimination" that occurs not only when "[v]otes for the losing candidates were discarded solely because of the county where the votes were cast," but also when "votes for the *winning* candidate in a county were likewise devalued, because all marginal votes for [the winning candidate] would be discarded and would have no impact on the statewide total." *Gordon v. Lance*, 403 U.S. 1, 5 (1971) (emphasis added).

Both defects are present here, and the most recent gubernatorial election provides a clear example. In the 2015 election, the residents of Mississippi House District 67 overwhelmingly supported Democratic candidate Robert Gray over Republican candidate Governor Phil Bryant and Reform Party candidate Shawn O'Hara, casting 4,054 out of 5,040 votes for Gray. *See* MISS. SEC'Y OF STATE, *Electoral Vote Assignment: 2015 Statewide General Election* (Ex. 8). Bryant, however, received just 49 more votes than Gray in House District 30: Bryant received 2,349 votes, and Gray received 2,300. *Id.* Although Bryant received only slightly more than half of the number of votes in District 30 that Gray received in District 67, both candidates were awarded just one electoral vote. This means that Mississippi's Electoral-Vote Rule: (1) discarded 2,300 votes cast

for Gray in District 30; and (2) weighed the votes of Bryant's supporters in District 30 nearly twice as heavily as Gray's supporters in District 67. As *Gray* and *Gordon* make clear, that result is incompatible with the one-person, one-vote principle, thus, the Electoral-Vote Rule should be enjoined.

### C.     The Challenged Provisions Violate Section 2 of the Voting Rights Act.

The Challenged Provisions also violate Section 2 of the Voting Rights Act because: (1) they were enacted "with an intent to discriminate" or "produce discriminatory results" by minimizing African American voting strength and influence in elections for statewide office, *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) (citations omitted), and (2) based on the totality of the circumstances, African Americans in Mississippi have less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice. *See Thornburg v. Gingles*, 478 U.S. 30, 46 (1986) (holding Section 2 prohibits standards, practices, or procedures that "result in unequal access to the electoral process."); *see also* 52 U.S.C. § 10301(a).

Plaintiffs easily meet the first criterion for the reasons explained in Background Sections II and III above. The primary purpose of the Challenged Provisions was to stamp out African-American voting strength and limit any opportunity that African Americans may have had to elect candidates of their choice. *See* Background Section II. And the Challenged Provisions make it harder for African-American-preferred candidates to get elected to statewide office. *See* Background Section III.

Plaintiffs have also demonstrated that under the totality of the circumstances, the Challenged Provisions ensure that African American voters have less opportunity than other members of the electorate to elect a candidate of their choice. For this inquiry, courts consider both past and present reality, primarily through the lens of the factors set forth in the Senate Judiciary

Committee Report accompanying the 1982 amendments to Section 2 of the Voting Rights Act (the "Senate Factors").[3] *See Gingles*, 478 U.S. at 45; *Clark v. Calhoun Cty*, *Miss*., 88 F.3d 1393, 1396 (5th Cir. 1996). The factors include:

> [1] [T]he history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the States or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; [7] and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Clark*, 88 F.3d at 1396 (quoting *Gingles*, 478 U.S. at 44–45). "No one factor is dispositive," and Plaintiffs "need not prove a majority of them" to establish their claims. *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991). Rather, the Court must make an overall determination—guided by the relevant factors—whether the minority group has less of an opportunity to participate in the political process and elect candidates of their choice

---

[3] The framework for Section 2 claims set forth in *Gingles* generally requires Plaintiffs to establish three preconditions: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority group's preferred candidate." 478 U.S. at 50–51. But since this lawsuit does not assert a legal challenge to the configuration of a legislative district, "[t]he first *Gingles* [precondition] is simply of no relevance." *Armstrong v. Allain*, 893 F. Supp. 1320, 1328 (S.D. Miss. 1994) (holding plaintiffs in challenge to statute requiring 60 percent majority vote to pass school bond referenda need not satisfy the first precondition). Plaintiffs, moreover, have demonstrated, through Dr. Rodden's analysis, that voting in Mississippi statewide elections is highly racially polarized; that African Americans vote cohesively; and that the white majority votes sufficiently as a bloc to defeat the African American candidate of choice. *See* Rodden Decl. at ¶¶ 19–43.

because of race. *See LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 754–55 (5th Cir. 1993).

The Senate Factors illustrate that the Challenged Provisions violate Section 2 of the Voting Rights Act. Mississippi has a long, judicially-recognized history of voting discrimination against African Americans, which hinders their ability to participate equally in the political process and exacerbates the impact of the Challenged Provisions. *See Jordan v. Winter*, 604 F. Supp. 807, 811–12 (N.D. Miss. 1984) ("That Mississippi has a long history of de jure and de facto race discrimination is not contested."); *see also United States v. Mississippi*, 380 U.S. 128, 131–36 (1965) (detailing the history of racially discriminatory election practices in Mississippi); *Mabus*, 932 F.2d at 402 ("Mississippi has a long history of using voter qualifications and registration procedures to impede black citizens' participation in the political process," including "poll taxes, literacy tests, residency requirements, 'good moral character' tests, a disenfranchising crimes provision, and white primaries."); Background Section II, *supra*; Argument Section I(A)(1), *supra*; Compl. ¶¶ 57–59.

In addition, Mississippi has discriminated against African Americans in many facets of social, political, and economic life, from education, employment, and healthcare, to the use of public facilities, and even outright violence, the effects of which are evident today. *See*, *e.g.*, CTR. FOR SOCIAL INCLUSION: A PROJECT OF THE TIDES CTR., EDUCATION INEQUITY IN MISS. (2003) (Ex. 9) (after Reconstruction, African Americans were excluded from factory jobs and were required to remain sharecroppers and tenant farmers); Archives at Tuskegee Institute, *Lynching, Whites & Negroes, 1882-1968* (2010) (Ex. 10) (White Mississippians lynched 539 African Americans Between 1882 and 1968, the largest number in the nation); *see also* Riser Decl. ¶ 17; Compl. ¶¶ 60–74. African-American Mississippians today experience higher poverty rates, higher unemployment rates, lower rates of home ownership, lower educational achievement levels, far

worse health indicators, and they comprise a disproportionately high percentage of incarcerated individuals. *See* Compl. ¶¶ 65–74. These disparities are indicative of the barriers to African-American participation in the political process, which are further exacerbated by the Challenged Provisions. *See Jordan*, 604 F. Supp. at 812 (finding disparities in education, income, unemployment, types of occupation, and quality of housing "probative of minorities' unequal access to the political process").

To make matters worse, Mississippi has a long and well-documented history of racially polarized voting and racial appeals in political campaigns that has continued through even the most recent general election. *See* Background Section III, *supra*; *Jordan*, 604 F. Supp. at 812 (recognizing that "voters in Mississippi have previously voted and continue to vote on the basis of the race of candidates for elective office"); *see also* Rodden Decl. ¶ 19–42. Just last year, a white Republican primary candidate for U.S. Senate, Chris McDaniel, stated that African Americans in Mississippi should stop "begging for federal government scraps." Geoff Pender, *GOP Senate Candidate Tells African-Americans: Stop 'Begging for Federal Government Scraps*,' USA TODAY (Sept. 14, 2018) (Ex. 11). The eventual white Republican Senate nominee, Cindy Hyde-Smith, stated that "[i]f [a friend] invited me to a public hanging, I'd be on the front row." Caleb Bedillion, *Hyde-Smith Deflects Questions About 'Public Hanging' Comments*, DAILY JOURNAL (Nov. 12, 2018) (Ex. 12). And President Donald Trump, when stumping for Hyde-Smith in Mississippi, stated of her African-American challenger, Mike Espy: "How does he fit in with Mississippi? I mean, how does he fit in?," which was viewed as referring to Espy's race. Megan Keller, *Ex-Kasich Aide Accuses Trump of 'Racist' Language About Black Dem Candidate*, THE HILL (Nov. 27, 2018) (Ex. 13). These are just a few recent examples, among the plethora of racial appeals in political campaigns in Mississippi, *see*, *e.g.*, Compl. ¶¶ 75–90, that further diminish African

Americans' already slim chances of electing their preferred candidates to statewide office. *See Gingles*, 478 U.S. at 40 (describing effect of racial animus "is to lessen to some degree the opportunity of [the State's minority populations] to participate effectively in the political processes and to elect candidates of their choice"); *Jordan*, 604 F. Supp. at 813 ("Evidence of racial campaign tactics used [] supports the conclusion that Mississippi voters are urged to cast their ballots according to race," which "operate[s] to further diminish the already unrealistic chance for blacks to be elected in majority white voting population districts.").

African Americans are also grossly underrepresented among elected officials. Not a single African American has been elected Governor, Lieutenant Governor, Secretary of State, Treasurer, Attorney General, Auditor, Insurance Commissioner, or Agriculture Commissioner in *over 130 years*. And outside of statewide office, African Americans are underrepresented as compared to their percentage of the total and voting population in both the State Senate and the House. *See* David Lieb, *Divided America: Minorities Missing in Many Legislatures*, AP (June 16, 2016), (Ex. 14). Most of the African-American elected officials in Mississippi serve not in statewide positions, but in local elected positions in black-majority districts, which were created as a result of the Voting Rights Act, including on "school boards, alderman, election commission, etc.," where they are not in the majority. Jimmie E. Gates, *Black Political Influence in Mississippi Has Slowed Despite Increase in Elected Officials*, CLARION-LEDGER (Aug. 19, 2017) (Ex. 15).

Courts examining election procedures similar to the Challenged Provisions, including majority rule and runoff systems, have held that they violate Section 2 of the Voting Rights Act. In *Whitfield v. Democratic Party of State of Arkansas*, 890 F.2d 1423 (8th Cir. 1989), for example, the court held that a majority runoff requirement violated Section 2 because it "caused blacks in that county to have less opportunity than whites to elect the candidate of their choice." *Id.* at 1432.

Similarly, a Mississippi federal court found that the State's majority-vote rule in primary elections reduced minorities' opportunity to elect representatives of their choice. *Ewing v. Monroe Cty.*, 740 F. Supp. 417, 423 (N.D. Miss. 1990) (holding that "majority vote requirement [] prescribed by statute in Mississippi," MISS. CODE ANN. § 23-15-305, "ma[de] it more difficult" when combined "with little or no white cross-over votes" "for blacks to elect candidates of their choice under the current redistricting plans"); *see also White*, 74 F.3d 1058 (invalidating proposal to appoint state judges, instead of the prior system of electing them). The same is true here of the impact of the Challenged Provisions in Mississippi's general elections for statewide office.

A review of the totality of the circumstances, thus, confirms that the electoral scheme set forth in the Challenged Provisions has achieved its intended effect of ensuring that African-American voters have less opportunity to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act.

## II.     Plaintiffs Will Suffer Irreparable Injury Absent an Injunction, and the Balance of Harms Favors Plaintiffs.

Absent injunctive relief, African-American voters, including Plaintiffs, will suffer irreparable harm in the form of vote dilution and denial of an equal opportunity to elect candidates of their choice in the upcoming 2019 election, and voters throughout the State will suffer from the violation of the one-person, one-vote principle.

"[I]t is well-established that the deprivation of constitutional rights constitutes irreparable harm as a matter of law." *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 950 (S.D. Miss. 2014) (internal quotation marks omitted); *see also Murphree v. Winter*, 589 F. Supp. 374, 381 (S.D. Miss. 1984) (recognizing threatened injury to plaintiff's fundamental right to vote constituted irreparable harm). Similarly, holding an "election in a manner that will violate the Voting Rights Act constitutes irreparable harm to voters." *United States v. Berks Cty.*, 250 F. Supp. 2d 525, 540

(E.D. Penn. 2003) (citation omitted) (granting temporary restraining order to prevent violation of Section 2); *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) (granting preliminary injunction to prevent violation of Section 2); *Puerto Rican Org. for Political Action v. Kusper*, 350 F. Supp. 606, 611 (N.D. Ill. 1972) (granting preliminary injunction to prevent violation of Section 4(e)).

The balance of hardships also favors Plaintiffs. Having established irreparable harm to Plaintiffs' right to vote and participate equally in the political process absent an injunction, Defendants "need to present powerful evidence of harm to [their] interests to prevent the scales from weighing in the [Plaintiffs'] favor." *Campaign for S. Equal.*, 64 F. Supp. 3d at 950 (citations omitted). In this case, "it is hard to imagine what actual harm the Defendants themselves could suffer," as "[m]ere administrative inconvenience can never justify denial of a constitutional right." *Murphree*, 589 F. Supp. at 382. Indeed, the requested relief here would hardly rise to the level of administrative inconvenience—an injunction that requires Defendants to declare the candidate who obtains the plurality of statewide votes as the winner would not invite any departure from current election administration practices beyond announcing the winner of each race for statewide office. *See Campaign for S. Equal.*, 64 F. Supp. 3d at 950–51 ("The harm that would result from denial of the requested injunction outweighs any harm the injunction might cause the State," when the new administrative burden would be "exactly the same burden" administrators now face.). The relief Plaintiffs seek would in fact alleviate administrative burdens, as Defendants would no longer engage in a multi-step process, which at times may involve intervention by the House, just to identify which candidate will be elected. Rather, consistent with most democratic states, the people of Mississippi will determine the winner of the election based on equally weighted votes.

Finally, the relief Plaintiffs seek—enjoining the enforcement of the Challenged Provisions

and declaring as elected, in each race for statewide office, the candidate with the highest statewide vote total—serves the public interest. It will afford eligible African-American voters an equal opportunity to elect candidates of their choice to statewide office in the 2019 election and prevent vote dilution. "Fifth Circuit precedent instructs that where laws violate a constitutional right, 'the public interest is not disserved by an injunction preventing its implementation.'" *Campaign for S. Equal.*, 64 F. Supp. 3d at 951 (quoting *Opulent Life Church*, 697 F.3d at 298); *see also Murphree*, 589 F. Supp. at 381–82 ("Clearly, the granting of this preliminary injunction will not disserve the public interest," as "[t]he fundamental right to vote is one of the cornerstones of our democratic society," and "[t]he threatened deprivation of this fundamental right can never be tolerated."). And any alleged State interest in "enforcing [its] democratically adopted laws," must "yield[] when the law at issue violates the constitution." *Campaign for S. Equal.*, 64 F. Supp. 3d at 951.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' Motion for Preliminary Injunction and enjoin Defendants from enforcing Sections 140, 141, and 143 of Article V of the Mississippi Constitution.

May 30, 2019                           Respectfully submitted,

                                         /s/ *Robert B. McDuff*
                                         Robert B. McDuff, MSB 2532
                                         Email: rbm@mcdufflaw.com
                                         767 North Congress Street
                                         Jackson, MS  39202-3009
                                         Telephone: (601) 969-0802
                                         Fax: (601) 969-0804

                                         Beth L. Orlansky, MSB 3938
                                         Email: borlansky@mscenterforjustice.org
                                         MISSISSIPPI CENTER FOR JUSTICE
                                         P.O. Box 1023
                                         Jackson, MS  39205-1023
                                         Telephone: (601) 352-2269
                                         Fax: (601) 352-4769

                                         Marc E. Elias*
                                         Email: MElias@perkinscoie.com
                                         Uzoma N. Nkwonta*
                                         Email: UNkwonta@perkinscoie.com
                                         Jacki L. Anderson*
                                         Email: JackiAnderson@perkinscoie.com
                                         K'Shaani Smith*
                                         Email: KShaaniSmith@perkinscoie.com
                                         Daniel C. Osher*
                                         Email: DOsher@perkinscoie.com
                                         PERKINS COIE LLP
                                         700 Thirteenth Street, N.W., Suite 600
                                         Washington, D.C. 20005-3960
                                         Telephone: (202) 654-6200
                                         Facsimile: (202) 654-6211

                                         *Counsel for Plaintiffs*

                                         **Pro Hac Vice* Application Pending

- 26 -

## **CERTIFICATE OF SERVICE**

I certify that the foregoing has been served on the defendants through the Office of the

Attorney General of the State of Mississippi.

/s/ *Robert B. McDuff*
Robert B. McDuff, MSB 2532
Email: rbm@mcdufflaw.com
767 North Congress Street
Jackson, MS  39202-3009
Telephone: (601) 969-0802
Fax: (601) 969-0804