**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**LESLIE-BURL McLEMORE;**                                                            **PLAINTIFFS**
**CHARLES HOLMES;**
**JIMMIE ROBINSON, SR.; and**
**RODERICK WOULLARD**

**VS.**                                              **CIVIL ACTION NO. 3:19-cv-383-DPJ-FKB**

**DELBERT HOSEMANN, in his official capacity**                               **DEFENDANTS**
**as the Mississippi Secretary of State; and PHILIP**
**GUNN, in his official capacity as the Speaker of the**
**Mississippi House of Representatives**

---

**MEMORANDUM OF LAW IN SUPPORT OF RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**FILED BY THE SPEAKER OF THE MISSISSIPPI HOUSE OF REPRESENTATIVES**
**AND THE MISSISSIPPI SECRETARY OF STATE**

---

William Trey Jones, III (MSB #99185)
Cody C. Bailey (MSB #103718)
Jacob A. Bradley (MSB #105541)
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902
Email: cbailey@brunini.com

*Counsel for Defendants Philip Gunn, in his*
*official capacity as the Speaker of the*
*Mississippi House of Representatives, and*
*Delbert Hosemann, in his official capacity as*
*the Mississippi Secretary of State*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTS ....................................................................................................................................3

ARGUMENT ..........................................................................................................................5

I.   Plaintiffs have not established a substantial likelihood of success on the merits of
     their speculative claims...................................................................................................7

     a.   Plaintiffs are not substantially likely to succeed on their claims in Count I
          (14th and 15th Amendments) or Count III (Section 2 of VRA) because
          even if they show discriminatory intent they cannot establish
          discriminatory impact. ...........................................................................................9

          i.    Count I – 14th and 15th Amendments .......................................................9

          ii.   Count III – Section 2 of the VRA ...........................................................11

     b.   Plaintiffs are not substantially likely to succeed on their claim in Count II
          that the "Electoral Vote Rule" violates One-Person, One-Vote. ...........................14

II.  Plaintiffs have not established a "substantial threat" of irreparable harm, as they
     have not established a substantial threat of *any* harm, much less irreparable harm. .........18

III. Plaintiffs are not entitled to a preliminary injunction because they ignore
     Mississippi's, i.e. the public's, interests in the upcoming election...................................22

CONCLUSION......................................................................................................................27

**INTRODUCTION**

Plaintiffs' Motion requests that the Court act now—before the November 5, 2019 election—to enjoin the Challenged Provisions of the Mississippi Constitution and declare that in each race for statewide office the candidate who receives the highest vote total will be the winner.  Plaintiffs do not even attempt to explain why the Court should rush to strike down laws that in nearly 130 years have not been applied to cause the alleged injury to Plaintiffs.  And despite attaching 15 exhibits to their Motion, including declarations, articles, and statistics, Plaintiffs failed to submit any evidence whatsoever to show that there is an imminent, substantial "threat of irreparable harm" in connection with the November 5, 2019 election which outweighs the public's interest in conducting the election in accordance with the Mississippi Constitution.

It is worth emphasizing that the Court should not even consider Plaintiffs' Motion for Preliminary Injunction until it has first resolved Defendants' pending Motion to Dismiss [Doc. 18, 19] and determined that it has jurisdiction and that the Speaker and Secretary are proper parties to this suit.  *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985) ("We hold, therefore, that the district court should not have issued the preliminary injunction against [the defendant] without determining whether it had jurisdiction over the party enjoined.").  That a district court must first determine jurisdiction before ruling on a preliminary-injunction is "inflexible and without exception."  *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–95 (1998) (quotation omitted).

"Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, the <u>most</u> <u>compelling</u> <u>reason</u> in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act."  *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) (emphasis added).  Here, the judicial process will in no way be

rendered futile if the Court does not act before November 5, 2019.  First, based on the undisputed historical and current facts and circumstances here, there is no substantial threat of injury to Plaintiffs from the November 2019 election.  Second, if by chance the exceedingly unique scenario envisioned by Plaintiffs does occur in the November election, which is highly doubtful, there is no reason that the Court could not adjudicate relief after November 5, 2019, and before any elected statewide official takes office in 2020.

The "'possibility that . . . other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'"  *Chisom v. Roemer*, 853 F.2d 1186, 1189 (5th Cir. 1988) (quoting *Sampson v. Murray*, 415 U.S. 61, 70 (1974)).  "[W]e agree with the commentators who suggest that '[o]nly when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief.'"  *Id.* (quoting Wright & Miller, Federal Practice and Procedure § 2948 at 431–34 (1973)).  It is critical to keep in mind that Plaintiffs are not just asking the Court to maintain a *status quo*—they are asking the Court to change Mississippi's election laws in advance of the November 5, 2019 election based on a hypothetical scenario that is anything but "substantially likely."  "Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."  *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

In their Motion, Plaintiffs do not once mention whether the judicial process would be rendered futile unless a preliminary injunction is issued before November 5, 2019.  Instead, they devote all but two pages of their argument to contending that there is "a substantial likelihood" they will "prevail on the merits" of their underlying claims, primarily due to the alleged

motivations behind the 1890-enactment of the Challenged Provisions.  Plaintiffs essentially ignore the other three prerequisites for granting a preliminary injunction, on which they also have the burden:  "(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."  *Canal Auth.*, 489 F.2d at 572.  In considering these prerequisites, "the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion . . . as to all of the four prerequisites."  *Id.* at 573, 576.  As demonstrated below, Plaintiffs have failed to carry their burden on all four *Canal* prerequisites.  For those reasons, and because preliminary injunctive relief is wholly unnecessary to protect the integrity of the judicial process and availability of future relief, the Court should deny Plaintiffs' Motion.

## FACTS

Plaintiffs filed this action against Philip Gunn, in his official capacity as the Speaker of the Mississippi House of Representatives ("Speaker"), and Delbert Hosemann, in his official capacity as the Mississippi Secretary of State ("Secretary"), to declare unconstitutional and enjoin enforcement of Sections 140, 141, and 143 of the Mississippi Constitution of 1890 (the so-called "Challenged Provisions"), each of which relate to Mississippi's procedures for electing governor and other statewide officers.  Doc. 1 at 32.  Neither the Speaker nor the Secretary has the constitutional authority to act in a manner opposite the Mississippi Constitution.  *In re Hooker*, 87 So. 3d 401, 411 (Miss. 2012) ("executive action must fall within the Constitution and laws of the State").

Plaintiffs challenge two requirements of Section 140 of the Mississippi Constitution:  to be elected, a candidate for statewide office must win "a majority of the popular vote" (the

"Popular Vote Rule"); and the candidate must also win "a majority of all the electoral votes" represented by the districts of the Mississippi House of Representatives (the "Electoral Vote Rule").[1]  Plaintiffs also challenge the provision in Section 141 of the Mississippi Constitution which states that if a candidate does not win both a majority of the popular vote and a majority of the electoral vote, then the members of the House of Representatives "shall proceed to choose . . . from the two persons who shall have received the highest number of popular votes" (the "House Vote Rule").[2]  Plaintiffs allege that the Challenged Provisions collectively violate the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act ("VRA") by generally diluting African-American votes and that the "Electoral Vote Rule" separately violates the one-person, one-vote principle.  Doc. 1 at 29-32.  Although Plaintiffs allege "vote dilution" generally, the lawsuit asserts a very specific claim—that application of the Challenged Provisions results in "African-American-preferred candidates" not being able to win statewide elections.  *See, e.g.*, Doc. 1 at 31.[3]  Plaintiffs also request very specific relief—that the Court not only preliminarily and permanently enjoin the Challenged Provisions but also declare as the winner of each contest for statewide office in the November 5, 2019 election the candidate who will receive the highest vote total (i.e., a plurality).  Doc. 8 at 3; Doc. 9 at 3, 24–25.

---

[1] Arizona, Georgia, and Vermont have a similar "Popular Vote Rule" requirement. And Vermont, like Mississippi, requires the legislature to elect the winner in absence of a candidate receiving the majority vote. Further, it cannot be disputed that a majority of states require their legislatures to elect the winner in the event no candidate receives a plurality of the popular vote. In other words, there is nothing unusual, much less unconstitutional, about having a state legislature involved in deciding statewide elections.  *See Fortson v. Morris*, 385 U.S. 231, 234–35 (1966).

[2] Sections 140 and 141 mention only election of the governor.  Plaintiffs also challenge Section 143 because it applies Sections 140 and 141 to the elections of "all other state officers."

[3] According to Plaintiffs, the "African-American-preferred candidates" are the Democratic Party candidates.  *See, e.g.*, Doc. 1 at ¶39.

4

The Challenged Provisions have never been applied, through vote dilution or otherwise, to deprive an "African-American-preferred candidate" of office, nor is there any imminent threat that such will happen on November 5, 2019.  In other words, Plaintiffs have not alleged, nor has there ever been, a circumstance where an "African-American-preferred candidate" obtained a plurality of the vote but did not take office due to application of the Challenged Provisions.  The Mississippi House of Representatives has, likewise, never deprived an "African-American-preferred candidate" of office using the tie-breaker provision in Section 141 (the "House Vote Rule").  It cannot be disputed that the "House Vote Rule" has been used just once since the 1890 Mississippi Constitution was enacted.[4]  In 1999, the Democrat-controlled House voted 86-36 along party lines to elect Ronnie Musgrove as Governor.  Plaintiffs do not allege that Governor Musgrove was not the "African-American-preferred candidate."  Nor did Plaintiffs file suit concerning the Challenged Provisions after that election or at any previous time.  Instead, at the eleventh hour, Plaintiffs ask the Court to enjoin the Challenged Provisions and implement a different law to govern the November 5, 2019 general election in Mississippi.

## ARGUMENT

Plaintiffs have failed to satisfy their burden to show that the Court should preliminarily enjoin the Challenged Provisions.  "A preliminary injunction is a powerful remedy used sparingly in cases with a set of extraordinary circumstances.  Given their nature, injunctions should only be granted when the movant has fully carried his cumulative burden of persuasion on each of the four *Canal Authority* prerequisites."  *Teague v. Attala Cty., Miss.*, 1995 WL 1945387, at *1 (N.D. Miss. Mar. 1, 1995).  The *Canal Authority* test requires the following:

---

[4] In the other two occasions where a candidate for statewide office did not receive both a majority of the popular vote and a majority of the electoral districts, there was likewise no injury to any Mississippi voters as alleged in this case.  In the 1991 and 1995 lieutenant governor races, the two candidates who received the plurality of the popular vote took office after the opposing candidates conceded the race.  In fact, in 1995, the "African-American-preferred candidate" (i.e., the Democrat) took office.

(1) a substantial likelihood that plaintiff will prevail on the merits;

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and

(4) that granting the preliminary injunction will not disserve the public interest.

*Chisom*, 853 F.2d at 1188 (citing *Canal Auth.*, 489 F.2d at 572).

Plaintiffs bear the burden of proof, "and the failure to demonstrate any one of the four is sufficient for the court to deny the issuance of an injunction." *Boddie v. City of Cleveland*, 2001 WL 1523854, at *1 (N.D. Miss. Apr. 21, 2001). Plaintiffs' burden of proof is heavy, requiring caution, especially where, as here, the requested relief goes beyond maintaining the *status quo*. *Martinez*, 544 F.2d at 1243.[5] "The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits." *Canal Auth.*, 489 F.2d at 573 (emphasis added). Importantly, Plaintiffs do not even argue in their Motion that absent a preliminary injunction the Court will be unable to adjudicate meaningful relief after the November 5, 2019 election. In fact, it is just the opposite. Once the election is conducted and the votes are tallied, the Court will then be able to evaluate whether the Challenged Provisions have any chance at all to cause Plaintiffs injury. For this reason alone, the Court should deny Plaintiffs' Motion. Further, as shown below, Plaintiffs have failed to carry their burden under the *Canal Authority* requirements. Accordingly, the Court should deny Plaintiffs' Motion.

---

[5] Even if "movant successfully establishes each of the four *Canal* prongs, the decision whether to grant or deny a preliminary injunction remains discretionary with the court." *Boddie*, 2001 WL 1523854, at *1.

I.     **Plaintiffs have not established a substantial likelihood of success on the merits of their speculative claims.**

Before discussing whether there is "a substantial likelihood" Plaintiffs "will prevail on the merits" of their claims, Defendants note that the Court should assign little weight to this prerequisite because of the overly speculative nature of Plaintiffs' claims, as discussed at length in Defendants' Motion to Dismiss.  Doc. 18, 19.  Regardless of whether Plaintiffs will ultimately be able to prove discriminatory intent behind passage of the Challenged Provisions, Plaintiffs have yet to allege any facts to establish that an injury has been, or ever will be, caused by the Challenged Provisions.  Apart from being detrimental to the Court's jurisdiction, the fact that the Challenged Provisions have never operated to deprive an "African-American-preferred candidate" from being elected to statewide office renders extremely speculative any evaluation of whether there is a substantial likelihood that the Challenged Provisions will operate in such a manner in the imminent future.  Plaintiffs' experts acknowledge that their reliance on "experimental research" to determine whether the Challenged Provisions might ever produce discriminatory results is "controversial" and "[not] a substitute for non-experimental empirical research,"[6] such as would occur if the Challenged Provisions were ever actually applied in a discriminatory manner.  Doc. 8–6 at 3 (citing sources arguing that majority-vote requirements do not have discriminatory effect) and 8.[7]  Based on this admission, any forecast of future "effect" of the Challenged Provisions is unreliable.

---

[6] An experimental study means "an operation or procedure carried out under controlled conditions in order to discover an unknown effect," while an empirical study "rel[ies] on experience or observation alone without regard for system or theory."  *Experiment*, Merriam-Webster Dictionary, online at https://www.merriam-webster.com/dictionary/experiment; *Empirical*, Merriam-Webster Dictionary, online at https://www.merriam-webster.com/dictionary/empirical.

[7] Plaintiffs attempt to introduce empirical evidence of operation of majority-vote provisions in Mississippi, but those citations do not involve the Challenged Provisions for statewide offices and fail to account for the differences in single-member and multiple-member offices.  Plaintiffs cite secondary

Moreover, the Court should assign little weight to this prerequisite due to Plaintiffs' overt delay in bringing their claims. Armed with experts and extensive experimental research, Plaintiffs ask the Court to "hurry up" and issue a preliminary injunction "and implement any relief that the Court grants in time for the November 5, 2019 general election." Doc. 13 at 1. Such is highly prejudicial to Defendants and the public, and unfair to the Court. Defendants have had no time in which to prepare materials to counter Plaintiffs' experts. In fact, after Defendants requested a mere 30 additional days to respond to the Complaint (and further requested that the Court postpone consideration of any deadline for Defendants' response to the Motion for Preliminary Injunction) Plaintiffs responded: "Furthermore, Plaintiffs request that should the Court grant Defendants' requested 30-day extension, neither the timing of these proceedings nor the proximity to the election should be deemed prejudicial to Defendants or provide any basis to deny Plaintiffs' request for preliminary injunctive relief." *Id.* at 3. Plaintiffs have been preparing to file this action for years, yet they waited to do so just five months before the November 5, 2019 election. As shown by the dates of the exhibits on which Plaintiffs rely, and by the dates of the commentaries and materials cited in the Complaint, there is no reason Plaintiffs could not have filed this action sooner. For good reason, "even where the plaintiffs have demonstrated liability on the merits, or a strong likelihood of prevailing, courts typically

---

sources for the proposition that: "In Mississippi, where the records are the best available, it has been estimated that plurality winning blacks have been defeated by white opponents in mandatory runoff elections nearly one hundred times [between 1973 and 1985]." Doc. 8 at 15 (citing Ex. 5 at 6–7). There is no empirical evidence for the Challenged Provisions because they have never been applied to deprive an African-American preferred candidate of statewide elected office. Further, multiple-member offices are distinguishable from single-member offices where majority-vote requirements are not inherently suspect. *See e.g.*, *Butts v. City of New York*, 779 F.2d 141, 148 (2d Cir. 1985) (finding majority-vote requirements are not unconstitutional for single-member offices as distinguished from multi-member offices and recognizing "in *City of Port Arthur* . . . where the Court struck down a run-off requirement that Port Arthur had appended to its at-large voting system for seats on the multi-member city council, but made no mention of a similar run-off requirement for the election of mayor"). Even where other challenged provisions in other states were actually operative, such as in county-wide or district-wide elections, Plaintiffs' expert admits "it is quite difficult to measure true voter preferences over candidates," which is required to conclusively prove the discriminatory effect of such provisions. *Id.* at 8.

refuse to enjoin elections at the last minute." *Boddie*, 2001 WL 1523854, at *2. Plaintiffs should be estopped by their dilatory conduct from being allowed to pursue a preliminary injunction against the Challenged Provisions at this late stage.

Finally, even if the Court has jurisdiction, Defendants are not immune, and Plaintiffs are not estopped by their delay, and even if they can show discriminatory intent behind passage of the Challenged Provisions, Plaintiffs have offered nothing to demonstrate a substantial likelihood of success on the merits of their claims related to future application of the Challenged Provisions.

### a. Plaintiffs are not substantially likely to succeed on their claims in Count I (14th and 15th Amendments) or Count III (Section 2 of VRA) because even if they show discriminatory intent they cannot establish discriminatory impact.

Despite spending the majority of their Complaint and Motion for Preliminary Injunction discussing the alleged intent behind passage of the Challenged Provisions in 1890, Plaintiffs' Fourteenth Amendment vote-dilution claim in Count I is the only one of Plaintiffs' three claims that requires a showing of discriminatory intent, whereas all of their claims ultimately require a showing of detrimental, discriminatory impact or effect. As to intent, the Speaker and Secretary are loath to defend the motivations of individuals who allegedly acted with racial animus or hatred toward their fellow Mississippians. But even if Plaintiffs are deemed to be substantially likely to succeed on the intent prong of their claim in Count I, Plaintiffs are not substantially likely to succeed in establishing discriminatory impact.

### i. Count I – 14th and 15th Amendments

There are two elements of Plaintiffs' vote dilution claim: discriminatory intent *and* discriminatory effect. *See, e.g., Davis v. Bandemer*, 478 U.S. 109, 127 (1986) ("plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group"); *Harding v. Cty. of Dallas*, 336 F. Supp. 3d 677, 700

(N.D. Tex. 2018) (to obtain relief on vote-dilution claim under Fourteenth Amendment, plaintiffs must "'prove that the purpose *and operative effect*' of the challenged election scheme 'is to dilute the voting strength of [minority] citizens'") (quoting *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 212 (5th Cir. 1980) (emphasis in original)).  It is not enough to state, as Plaintiffs do, that "systems purposefully enacted to dilute a racial group's voting power are unconstitutional."  Doc. 9 at 11; *see Perez v. Abbott*, 253 F. Supp. 3d 864, 942 (M.D. Tex. 2017) ("To prove intentional vote dilution under the Fourteenth Amendment, plaintiffs must show both discriminatory purpose and discriminatory effect.").  Plaintiffs have not shown "effect" because, among other things, they have not established a constitutional injury to Plaintiffs.  *See* Doc. 19 at 8–15.  And Plaintiffs have not shown that the Challenged Provisions have ever been, or will likely ever be, applied to deprive an "African-American preferred candidate" of office.

As stated above, Plaintiffs' experts failed to cite any empirical evidence to establish that the Challenged Provisions have in the past, or might in the immediate future, be applied in a manner harmful to Plaintiffs or that otherwise deprives an "African-American-preferred candidate" of statewide office.  Likewise, the cases cited by Plaintiffs do not establish that the Challenged Provisions have a discriminatory effect.  Mississippi's majority-vote requirement, like all majority-vote requirements, is not "unconstitutional on its face."  *Bond v. Fortson*, 334 F. Supp. 1192, 1193 (N.D. Ga. 1971), *aff'd*, 404 U.S. 930 (1971).  That "features of [an] electoral system, such as the majority vote requirement, tend naturally to disadvantage any voting minority[,] . . . are far from proof" that such schemes are unconstitutional or violations of the VRA.  *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980).  Plaintiffs cite no case where a majority-vote requirement for a single-member, statewide election was held unconstitutional. And Plaintiffs' citations of *Jeffers v. Clinton*, 740 F. Supp. 585, 594–95 (E.D. Ark. 1990), *City of*

*Port Arthur v United States*, 459 U.S 159, 168 (1982), and *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) are inapposite because those cases dealt with multi-member offices or multi-member districts for political subdivisions that were not statewide.

Moreover, the United States Supreme Court has upheld as constitutional an election system that required a gubernatorial candidate to receive "a majority of votes cast in a general election, <u>and</u> . . . if no candidate receives a majority of votes at such election, then a majority of members of the [legislature] shall elect the Governor 'from the two persons having the highest number of votes.'" *Fortson v. Morris*, 385 U.S. 231, 232 (1966) (upholding Georgia's version of the "Popular Vote Rule and "House Vote Rule") (emphasis added).[8]  Because "[t]here is no provision of the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor," none of the Challenged Provisions are *per se* unconstitutional.  *Id.*  In sum, Plaintiffs have not shown that an "African-American-preferred candidate" has been, or is likely to ever be, deprived of office by application of the Challenged Provisions, and therefore, there has been no showing of the requisite discriminatory effect.

### ii.  Count III – Section 2 of the VRA

Plaintiffs are also not substantially likely to succeed on the merits of their claim that the Challenged Provisions violate Section 2 of the VRA.[9]  First, the VRA does not apply here

---

[8] The Court noted the "method [Georgia] chose for [electing its governor] was not unique, but was well known and frequently utilized before and since the Revolutionary War."  *Fortson*, 385 U.S. at 234–35 (citing Mississippi Constitution §§ 140 and 141 as examples of majority-vote and legislative tie-breaker rules and also noting 38 other states provided, in case of a tie vote, the state legislature elects the winner).

[9] Plaintiffs urge that majority-vote rules violate Section 2 of the VRA.  Doc. 9 at 23–24 (citing *Whitfield v. Democratic Party of State of Ark.*, 890 F. 2d 1423 (8th Cir. 1989), and *Ewing v. Monroe Cty.*, 740 F. Supp. 417, 423 (N.D. Miss. 1990)).  First, Mississippi's majority-vote requirement, like all majority-vote requirements, is not "unconstitutional on its face."  *Bond*, 334 F. Supp. at 1193; *Brooks v. Miller*, 158 F.3d 1230, 1238 (11th Cir. 1998) ("First, electoral devices such as at-large elections, or in this case, a majority vote requirement, do not violate § 2 per se."); *Fortson*, 385 U.S. at 234.  The Supreme Court in

because Plaintiffs' challenge is to general elections for statewide, single-member offices. *See* 52 U.S.C. § 10301 (violations occur in connection with abridgement of right to elect representatives). Generally, the VRA is applicable in cases where "electoral arrangements . . . diminish a class's opportunity *to elect representatives in proportion to its numbers*." *Butts v. City of New York*, 779 F.2d 141, 143 (2d Cir. 1985) (emphasis added). In single-member offices, "[t]he concept of vote dilution is effectively rendered meaningless and such offices are inappropriate for section 2 vote dilution challenges." *LULAC No. 4434 v. Clements*, 902 F.2d 293, 313 (5th Cir. 1990) (quoting *S. Christian Leadership Conf. v. Siegelman*, 714 F. Supp. 511, 519 (M.D. Ala. 1989)).[10] The "totality of the circumstances" test under the VRA is unworkable for, and was not intended to be applied to, true single-member, statewide offices where there is no possibility that minority voters will elect a disproportionate "share" of representatives. *See Thornburg v. Gingles*, 478 U.S. 30, 49–51 (1986). Instead, that test is aimed at discriminatory effects caused by election of representatives to offices that do not encompass the entire state.

Second, Plaintiffs cannot establish their VRA claim under *Gingles*. *Bartlett*, 556 U.S. at 11–12; *Gingles*, 478 U.S. at 50–51. Before the totality-of-the-circumstances are considered, Plaintiffs must establish, among other things, that the minority group "is sufficiently large and

---

[footnote] *Thornburg v. Gingles* expressly stated that "electoral devices" identified in the Senate Report on the VRA such as at-large elections and majority-vote requirements "may not be considered *per se* violat[ions] of § 2." 478 U.S. 30, 46 (1986) (citing S. Rep. No. 97-417, p. 27–28 (1982)). Second, Plaintiffs' cited cases do not establish that majority-vote requirements are Section 2 violations, especially in single-member, statewide elections. The Eighth Circuit's decision in *Whitfield* has no precedential effect in the Eighth Circuit (much less the Fifth Circuit) because it was vacated on rehearing *en banc*. 902 F.2d 15 (1990). The case is also distinguishable because it involved primary elections where more than two candidates have a potential to win, and, therefore, the votes are more often split. Here, the political reality is that only two candidates have a realistic chance of winning the general election: the Republican and the Democrat. The *Ewing* case involved redistricting, and the court's passing statement regarding majority-vote requirements was limited to specific circumstances in that county. 740 F. Supp. at 423.

[10] The Supreme Court dismissed a similar "single-member office" theory in *Houston Lawyers Assoc. v. Attorney General of Texas*, 501 U.S. 419, 426–27 (1991), but that case did not involve single-member offices in *statewide* elections. Rather, it involved judges elected to various districts within the state. *Id.*

geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50–51.[11]  The purpose of *Gingles* is to "establish that 'the minority [group] *has the potential to elect a representative of its own choice*' . . . but that racially polarized voting prevents it from doing so . . . because it is 'submerg[ed] in a larger white voting population.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)) (emphasis added).  "Conversely, where the minority group is either too small or insufficiently compact or cohesive to have any real opportunity to elect a candidate of its choice . . . there has been no violation of § 2."  *Harding*, 336 F. Supp. 3d at 694; *Gingles*, 478 U.S. at 50 n.17; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (plaintiffs must establish that they could prevail under "alternative" voting scheme).  In short, Plaintiffs in this case have not shown that an alternative voting scheme would "enhance [their] ability . . . to elect the candidates of their choice."  Even if the Court deems that the VRA applies to single-member, statewide elections, Plaintiffs cannot show that African-Americans "constitute a majority" in Mississippi as required by *Gingles*.[12]

---

[11] The remaining two prerequisites are:  (2) "the minority group must be able to show that it is politically cohesive;" and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed." *Id.* at 51.  All three factors must be proven, notwithstanding Plaintiffs' contentions.  Doc. 9 at 19 n.3.  Because neither the Fifth Circuit nor the Supreme Court have analyzed whether *Gingles* applies to majority-vote requirements for statewide elections, this Court should follow the guidance of the Eleventh Circuit, which held that plaintiffs challenging majority-vote requirements for non-legislative positions must meet the *Gingles* prerequisites.  *Brooks*, 158 F.3d at 1238–39 ("the three prerequisites for the results test set out in *Gingles* are applicable to this case").  "Satisfaction of these three 'preconditions,' is necessary, but not sufficient to establish liability under § 2. Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters."  *LULAC*, 999 F. 2d at 849.

[12] African-American voters in Mississippi are not "sufficiently large and geographically compact to constitute a majority in [Mississippi]."  *Gingles*, 478 U.S. at 50.  The Supreme Court has held that minorities may not rely on cross-over votes to establish this first prong.  *Bartlett*, 556 U.S. at 10–25 ("because they form only 39 percent of the voting-age population . . . African–Americans standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength," therefore, they could not establish a VRA claim under *Gingles*).  The Court in *Bartlett* explained that the first *Gingles* requirement is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district," and "[w]ithout such

13

Further, as stated ad nauseam, an "African-American preferred candidate" has never won a plurality of the popular vote and yet been denied office by the Challenged Provisions.

Finally, as discussed, Plaintiffs cannot prevail under Section 2 of the VRA because the Challenged Provisions have never "result[ed] in a denial or abridgment" of votes to deprive an "African-American-preferred candidate" of office.  52 U.S.C. § 10301(a).  Without such ever occurring, and without showing an imminent future occurrence, Plaintiffs have failed to demonstrate that the Challenged Provisions produce discriminatory results under the VRA. Accordingly, for the reasons set forth above, Plaintiffs have not met their burden to show that they are "substantially likely" to prevail on their claims in Count I and Count III.

> **b. Plaintiffs are not substantially likely to succeed on their claim in Count II that the "Electoral Vote Rule" violates the One-Person, One-Vote requirement of the 14th Amendment.**

Plaintiffs argue that the "Electoral-Vote Rule creates a voting system that discards and assigns unequal weight to votes cast in the same election *depending on the House district* in which the voter resides."  Doc. 9 at 16 (emphasis added).  In the Complaint, Plaintiffs state that their alleged injury arises from the "Electoral Vote Rule" "because of the *geographic and electoral concentration of the racial groups among the House districts*."  Doc. 1 at ¶41 (emphasis added).  Therefore, even if Plaintiffs are able to allege some impact arising from how the House districts are drawn, Plaintiffs' claim in Count II related to the "Electoral Vote Rule" amounts to a nonjusticiable, partisan gerrymandering claim which the United States Supreme

---

a showing, there neither has been a wrong nor can be a remedy."  *Id.* at 15 (quotations omitted).  Because the African-American voters could not rely on cross-over white voters to establish that they had the potential to win an election under an alternative system, they could not bring a viable VRA claim. Similarly, Plaintiffs' claims rely on cross-over white votes to establish that minorities might have the potential to elect African-American preferred candidates in Mississippi statewide elections.  Because *Bartlett* precludes such reliance, Plaintiffs have failed to establish a viable VRA claim.

Court has now ruled this Court does not have jurisdiction to resolve.  *See Rucho*, 139 S. Ct. at 2493–2502.[13]  The Supreme Court handed down the *Rucho* decision after this lawsuit was filed.

In other words, Plaintiffs' challenge to the "Electoral Vote Rule" is a general grievance about how "fairly" the House districts are apportioned from a political standpoint.  Plaintiffs argue that the way the House districts are drawn makes it more difficult to elect "African-American-preferred candidates" (i.e., Democrats according to Plaintiffs) than it does to elect "white-preferred candidates" (i.e., Republicans according to Plaintiffs).  *See* Doc. 1 at 12-14, 15-17.  As the Supreme Court stated in *Rucho*, however, "[a]ny judicial decision on what is 'fair' in this context would be an 'unmoored determination' of the sort characteristic of a political question beyond the competence of the federal courts."  139 S. Ct. at 2500.  Accordingly, Plaintiffs' challenge to the "Electoral Vote Rule" is nothing more than a "political question" that is "beyond the reach of federal courts."  *Id.* at 2506–07.[14]

---

[13] It is widely reported that this lawsuit is supported by the National Redistricting Foundation, an affiliate of the National Democratic Redistricting Committee led by former Attorney General Eric Holder, Jr., which describes itself as a "centralized hub for executing a comprehensive redistricting strategy that shifts the redistricting power, creating fair districts where <u>Democrats</u> can compete." *See* https://democraticredistricting.com/about/ (emphasis added); https://thedailybreakingnews.com/lawsuit-accuses-mississippi-election-system-of-diminishing-african-american-vote/.

[14] Plaintiffs' expert as to the alleged discriminatory effects of the Challenged Provisions is Dr. Jonathan Rodden, whose opinions have already been rejected as beyond the jurisdictional reach of federal courts in *Gill v. Whitford,* 138 S. Ct. 1916, 1933 (2018) and *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019). *See* Doc. 8–7 at 6 (stating that Dr. Rodden "worked with a coalition of academics to file an Amicus Brief in the Supreme Court in *Gill* . . . and once again in *Rucho*"). In *Gill*, the Court held that the plaintiffs lacked standing to assert claims of "group political interests, not individual legal rights" related to the composition of voting districts across the whole state, as opposed to their home districts. *Gill*, 138 S. Ct. at 1933. In *Rucho*, the Supreme Court held that partisan gerrymandering claims are political questions that "invariably sound in a desire for proportional representation[, and] our cases . . . clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be." 139 S. Ct. at 2499 (quotations omitted). Here, Dr. Rodden's opinions are based on the same premises rejected in *Gill* and *Rucho*. He states that "analysis based on past patterns of racially polarized voting suggests that black-preferred candidates [i.e., Democratic Party candidates according to Dr. Rodden] would lose the electoral vote even with comfortable majorities of the statewide vote, and would need more than 55 percent of the statewide

Alternatively, to the extent Plaintiffs' challenge of the "Electoral Vote Rule" is construed to be a *per se* challenge to district-based voting systems for statewide elections in general, it also fails because neither the Supreme Court nor any other court has ever held that district-based voting systems for statewide elections are facially unconstitutional.  As noted, Plaintiffs' challenge to the "Electoral Vote Rule" has nothing to do with racial discrimination but is rather premised on "geographic discrimination."  *See Gordon v. Lance*, 403 U.S. 1, 5 (1971).  "The 'one person, one vote' system is the doctrine of equal representation, a constitutional requirement under the Fourteenth Amendment[, which] requires that each person's vote count the same as any other person's."  Francis C. Amendola, *et al*., 16B C.J.S. Constitutional Law § 1428 (2019).  "The idea" behind the one-person, one-vote principle is that no "one group can be granted greater voting strength than another."  *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969).  None of the cases cited by Plaintiffs establish a *per se* prohibition of district-based voting in statewide elections.  Doc. 9 at 16–17 (citing *Gray v. Sanders*, 372 U.S. 368 (1963); *Gordon v. Lance*, 403 U.S. 1 (1971); and *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012)).

The Court in *Gray* held that Georgia's county-unit system violated the Constitution because it "weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties."  372 U.S. at 378.  There, "the result [of the county-unit system] was that the number of votes of persons living in large counties was given no more weight in electing state officers than was given to a far fewer number of votes of

---

vote in order to secure a majority of electoral votes.  Candidates preferred by whites, by contrast, [i.e., Republican Party candidates according to Dr. Rodden] would be able to win the electoral vote without winning a majority of the popular vote."  Doc. 8–7 at 3.  Dr. Rodden is claiming that the Challenged Provisions are unconstitutional because Mississippi's House districts are drawn in a way that favors Republicans over Democrats.  Such claims were rejected as political questions in *Rucho*, and they are likewise ineffectual here.  *See* Brief of Amici Curiae Professors Jonathan Rodden, et. al., *Rucho v. Common Cause*, No. 18-422, 2019 WL 1125802 (U.S. Mar. 8, 2019) (maintaining that political-gerrymandering cases are not political questions).

persons residing in small counties." *Fortson*, 385 U.S. at 233.  Under that system, "counties

having population of one-third of the total in the state [had] a clear majority of the county units."

*Gray*, 372 U.S. at 373.  *Gray* was concerned with prohibiting geographic discrimination between

rural and urban counties and did not hold that electing statewide officers on the basis of

legislative districts is *per se* unconstitutional.  *Id.* at 379.

      Nor does *Gordon* or *Angle* hold that district-based voting schemes for statewide elections

are *per se* unconstitutional.  In *Gordon*, the Court held that a requirement of sixty-percent of the

vote for certain measures did not violate the one-person, one-vote principle because "so long as

[state] provisions do not discriminate against . . . any identifiable class they do not violate the

Equal Protection Clause."  403 U.S. at 7.  In *Angle*, which is nothing more than persuasive

authority in this Court, the Ninth Circuit upheld Nevada's requirement that at least ten percent of

the voting population of each congressional district approve a legislative initiative.  673 F.3d at

1129.  In dicta, *Angle* suggested that a district-based vote "might impermissibly devalue votes

according to *Gray* and *Gordon*," but *Angle* did not hold that district-based voting in statewide

elections is *per se* unconstitutional.  *Id.* at 1130.

      Further, Supreme Court decisions <u>after</u> *Gray* establish that a state is not required to

decide elections based on popular vote.  *See Fortson*, 385 U.S. at 233.  *Gray*'s admonition

against geographic discrimination applies only to the extent the "state . . . decides to select

persons by popular election."  *Hadley v. Junior College Dist. of Metro. Kansas City*, 397 U.S.

50, 56 (1970).  Under *Gray*, "whenever a state or local government decides to select persons by

popular election to perform governmental functions, the Equal Protection Clause . . . requires

that each qualified voter must be given an equal opportunity to participate in that election."  *Id.*

(emphasis added).  But *Gray* does not disclose the state's ability to choose its statewide officers by means other than popular vote.  *Fortson*, 385 U.S. at 233.

In *Fortson*, the Court upheld Georgia's version of the "Popular Vote Rule" and "House Vote Rule," stating that district court "erroneously relied on *Gray*."  *Id.* at 233.[15]  The Court explained that the constitutional violation in *Gray* resulted from geographic discrimination and not the method the state chose to elect its statewide officeholders.  *Id.*  The Court held that nothing in *Gray* prohibited a state from deciding an election in a manner other than popular vote:

> Not a word in the Court's opinion indicated that it was intended to compel a State to elect its governors or any other state officers or agents through elections of the people rather than through selections by appointment or elections by the State Assembly. It is wrongly cited as having either expressly or impliedly decided that a State cannot, if it wishes, permit its legislative body to elect its Governor.

*Id.*  In fact, "[t]here is no provision of the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor." *Id.* at 234 (recognizing that Mississippi also uses a version of the "House Vote Rule" and citing MISS CONST. art. V, §§ 140 & 141).  For the above-stated reasons, Plaintiffs are not "substantially likely" to succeed on their claims in Count II related to the "Electoral Vote Rule."

## II.     Plaintiffs have not established a "substantial threat" of irreparable harm, as they have not established a substantial threat of *any* harm, much less irreparable harm.

In their cursory treatment of the second and most important[16] factor of the preliminary-injunction test, Plaintiffs fail to establish a "substantial threat" of any harm, much less a

---

[15] The Court dismissed plaintiffs' argument that this system of selecting a governor in a manner other than by popular vote "cannot jibe with a one-person, one-vote concept of democratic self-government," because *Gray* required that "[o]n the state level the electoral college principle cannot be used." Brief of Appellees, *Fortson v. Morris*, 1966 WL 100436 (U.S. Nov. 25, 1966).

[16] *Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 786 (S.D. Miss. 2011) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it

substantial threat of "irreparable" harm.  "Without question, the irreparable harm element must

be satisfied by independent proof, or *no injunction may issue*."  *White v. Carlucci*, 862 F.2d

1209, 1211 (5th Cir. 1989) (emphasis added, citation omitted).  Instead, Plaintiffs erroneously

assert that any *established* constitutional or VRA violation (there is none here) "constitutes

irreparable harm."  *Compare* Doc. 9 at 23 (stating that *actual deprivation* of constitutional rights,

which has not been shown here, "constitutes irreparable harm as a matter of law") *with Chisom*,

853 F.2d at 1188–89 (rejecting "*per se* rule to the effect that if an electoral standard, practice, or

procedure abridges section 2 of the Voting Rights Act it automatically does irreparable injury to

all or a portion of the body politic").

      First, there is no substantial threat of irreparable injury if the Court does not issue the

injunction because Plaintiffs have not established the existence of *any* past or likely future injury.

Again, the Challenged Provisions have never been applied in nearly 130 years to deprive an

"African-American-preferred candidate" of office nor have Plaintiffs shown that it is

substantially likely that such will occur in the future.  For example, Plaintiffs contend that future

injury might occur in the governor's race only if:  (1) the Independent and Constitutional Party

candidates splinter a significant number of votes away from the Republican, as opposed to the

Democrat, which is purely hypothetical; (2) as a result, the Democrat wins a plurality, but not a

majority of the vote; and (3) the Democrat is thereafter prevented from taking office by the

"House Vote Rule."  That scenario has never happened in Mississippi in 130 years, and there has

been no showing of a "substantial threat" that it is going to happen in the 2019 general election.[17]

---

is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be
rendered.") (quotation omitted).

[17] The only other conceivable scenario of harm would be if the Democrat won a majority of the popular
vote but not a majority of the electoral vote, and the Democrat was thereafter prevented from taking office

Moreover, any threatened harm has not "been properly shown to be *irreparable*, in accordance with the usual test for a preliminary injunction." *Canal Auth.*, 489 F.2d at 574 (emphasis added). "Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate." *Id.* Plaintiffs are requesting that the Court issue a preliminary injunction before the November 5, 2019 election and declare that in each statewide office, the candidate who will receive the highest statewide vote total will be the winner. Doc. 9 at 25. Plaintiffs rightly, but fatally however, do not explain in their Motion how the alleged harm would be irreparable after the November 5, 2019 election. That is because the House will not vote, and the candidates elect will not take office, for nearly three months after the election. The Court could take any number of actions between the November 5, 2019 election and a hypothetical House vote. "Where, as here, the possibility of corrective relief at a later date exists, even an established voting rights act violation does not in and of itself merit a preliminary injunction." *Watkins*, 771 F. Supp. at 805 n.16. "The possibility that . . . other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Chisom*, 853 F.2d at 1189 (quoting *Sampson v. Murray*, 415 U.S. 61, 70 (1974)). Plaintiffs do not contend that the Court would be unable to adjudicate relief after the election. Accordingly, Plaintiffs failed to show that any harm would be "irreparable" absent a preliminary injunction being issued before November 5, 2019.[18]

by the "House Vote Rule." That has also never happened in Mississippi, and Plaintiffs have not demonstrated a substantial threat that it is going to happen on November 5, 2019.

[18] Further, Plaintiffs' delay in challenging the 130-year-old laws betrays the existence of an *irreparable* injury. *See Boddie*, 2001 WL 1523854, at *2 ("Federal courts have been particularly wary of enjoining elections when the plaintiffs have delayed filing lawsuits and injunctive motions until the eleventh hour, and *Chisom* is but one in a long line of cases where federal courts in the Fifth Circuit have refused to enjoin state elections when the process is well underway."); *Neel v. Pippy*, 247 F. Supp. 707, 713 (W.D. Pa. 2003) ("Federal courts are particularly loathe to intervene in state elections where the action to enjoin the election is filed within weeks or even months of the scheduled election."); *Banks v. Bd. of*

Finally, Plaintiffs' assertion that a "deprivation of constitutional rights" or "violation of the Voting Rights Act" automatically "constitutes irreparable harm as a matter of law" is incorrect, especially in the election context.  Doc. 9 at 23 (quoting *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 950 (S.D. Miss. 2014) and *United States v. Berks Cty.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003)).  The cases Plaintiffs cite involve scenarios where rights were *already* being violated.[19]  For instance, in *Berks County,* the county had instituted practices that had *already* denied Hispanic voters equal access to the polls.  250 F. Supp. 2d at 540.  On the contrary, in this action Plaintiffs have not established that there has been, or even will be, a deprivation of their constitutional rights or any violations of the VRA, but even if they had, binding Fifth Circuit law holds such does not constitute "irreparable harm."

"In *Chisom,* the Fifth Circuit held that, even where a violation of § 2 of the Voting Rights Act was established, that statutory infringement does not automatically do irreparable injury." *Watkins*, 771 F. Supp. at 805 n.16.  The Court in *Chisom* stated that plaintiffs "urge a black-letter, *per se* rule to the effect that if an electoral standard, practice, or procedure abridges section 2 of the Voting Rights Act it automatically does irreparable injury to all or a portion of the body politic. Some district courts would agree. <u>We do not</u>."  853 F.2d at 1188–89 (emphasis added).

---

*Educ. of the City of Peoria,* 659 F. Supp. 394 (C.D. Ill. 1987) (collecting cases).  "Months-long to years-long delays in seeking an injunction for offending conduct have been enough for courts to hold against a finding of irreparable injury."  *Solofill, LLC v. Rivera*, 2017 WL 514589, at *4 (S.D. Tex. Feb. 8, 2017) (collecting cases); *Thompson v. Alabama*, 2017 WL 3223915, at *11 (M.D. Ala. July 28, 2017) (in responding to argument that plaintiff voters would be prejudiced by the court's failing to rule before the upcoming election, the court stated that "[a] delay . . . militates against a finding of irreparable harm").

[19] The *Campaign for Southern Equality* case cited *Cohen v. Coahoma Cty.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) for the proposition that "it is well-established that the deprivation 'of constitutional rights constitutes irreparable harm as a matter of law.'"  64 F. Supp. 3d at 950.  In the *Cohen* case, the district court had already determined that there was a "substantial threat that [the plaintiff] will suffer irreparable injury" caused by the prison official's interrogation methods, in part because the prison official testified that he did not believe it was a constitutional violation to coerce information from prisoners.  *Cohen*, 805 F. Supp. at 406.  In other words, "the substantiality of the threat" that there was a constitutional violation and harm had already been determined, and the only question was whether the harm was irreparable.  *Id.*

Here, "Plaintiffs cite district court cases from other jurisdictions where the court concluded that deprivation of voting rights constitutes irreparable injury *but the Fifth Circuit has expressly declined to adopt such a per se rule*."  *Williams v. McKeithen*, 2005 WL 2037545, at *4 (E.D. La. Aug. 8, 2005) (emphasis added).

Even apart from *Chisom*, Plaintiffs' assertion cannot be true because many courts have permitted elections to go forward even with "presumptive[] violation[s]" of the VRA and when challenged laws were "doubtless unconstitutional[]."  *Tucker v. Burford*, 603 F. Supp. 276, 277 (N.D. Miss. 1985) (denying injunction to enjoin election "since the machinery of the election process was already in progress"); *Watkins*, 771 F. Supp. at 807 & 803 ("This court finds that its concerns about the otherwise unacceptable population deviations in certain districts under the 1982 plan are far outweighed by the benefits to the voters in these elections."); *Kilgarlin v. Hill*, 386 U.S. 120, 121 (1967) ("We affirm the District Court's action in permitting the 1966 election to proceed under H.B. 195 although constitutionally infirm in certain respects."); *Chapman v. Meier*, 420 U.S. 1, 24 (1975).  Accordingly, Plaintiffs have failed to show a substantial threat of irreparable harm, and therefore, the Court should not issue a preliminary injunction.

**III.    Plaintiffs are not entitled to a preliminary injunction because they ignore Mississippi's, i.e. the public's, interests in the upcoming election.**

Because Mississippi's interest is indistinguishable from the "public's interest," the final two prerequisites of the *Canal Authority* test are considered together.  Plaintiffs must make a "clear showing" "that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and . . . that granting the preliminary injunction will not disserve the public interest."  *White*, 862 F.2d at 1211; *Chisom*, 853 F.2d at 1188.  In their one-and-a-half pages on these issues, they have failed to make such a "clear showing."  *White*, 862 F.2d at 1211; Doc. 9 at 24–25.  "Elections and lawsuits have consequences."  *Casarez v. Val Verde Cty.*, 967

F. Supp. 917, 920 (W.D. Tex. 1997) (lifting preliminary injunction before election).  Contrary to Plaintiffs' statement that "requested relief here would hardly rise to the level of administrative inconvenience," Mississippi like any other state has significant interests in maintaining its electoral system.  Doc. 9 at 24.  The Court's "analysis begins with the staunch admonition that a federal court should jealously guard and sparingly use its awesome powers to ignore or brush aside long-standing state constitutional provisions, statutes, and practices."  *Chisom*, 853 F.2d at 1189.  The Court should not, as Plaintiffs request, casually "brush aside" Mississippi's "long-standing state constitutional provisions."  *Id.*

Even if success on the merits and irreparable injury were *assumed*, which they are not, the Court may still deny a preliminary injunction when an election is fast approaching, as here. *See, e.g., Chisom*, 853 F.2d at 1189–90 ("assuming *per arguendo* that there has been a prima facie showing of likelihood of success on the merits and irreparable injury" the Fifth Circuit still reversed a preliminary injunction regarding an upcoming election); *Boddie*, 2001 WL 1523854, at *2 ("even where the plaintiffs have demonstrated liability on the merits, or a strong likelihood of prevailing, courts typically refuse to enjoin elections at the last minute").  Plaintiffs have not asked the Court to enjoin the election altogether but rather to intervene now and "declare" a different rule to determine the winner.[20]  "Federal courts have been particularly wary of enjoining elections when the plaintiffs have delayed filing lawsuits and injunctive motions until the eleventh hour, and *Chisom* is but one in a long line of cases where federal courts in the Fifth

---

[20] In addition to the general requirement that courts proceed with caution when issuing injunctions related to elections, the Supreme Court requires further care when issuing preliminary injunctions premised on "racial classifications and race-based predictions."  *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion because Justices Thomas and Scalia maintain Section 2 of VRA does not permit vote dilution claims) ("We must be most cautious before interpreting a statute to require courts to make inquiries based on racial classifications and race-based predictions.").  Indeed, even when there is a near *certainty* of success on the merits, courts deny preliminary injunctions in this area.  *See Chisom*, 853 F.2d at 1190 (citing *Whitcomb v. Chavis*, 396 U.S. 1055 (1970) (order staying preliminary injunction ordered on eve of election even though law was previously found constitutionally infirm in 403 U.S. 124, 163 (1971)).

Circuit have refused to enjoin state elections when the process is well underway." *Boddie*, 2001 WL 1523854, at *2; *see also Garza v. Dallas Ind. Sch. Dist.*, 2001 WL 492384, at *2 (N.D. Tex. May 4, 2001) ("A court should not enjoin an election if an injunction would place an unreasonable burden on the political entity"); *Goosby*, 981 F. Supp. at 763 (finding election should go forward based on balance of equities and possibility that special election could remedy any Section 2 violation); *Dillard v. Chrenshaw Cty.*, 640 F. Supp. 1347, 1362 (M.D. Ala. 1986) (not ordering injunction for election three months away even though it was "clear that the existing at-large systems [were] infirm . . . [because] it would be unfair or infeasible to require [the counties] to do so"). "Federal courts are particularly loathe to intervene in state elections where the action to enjoin the election is filed within weeks or even months of the scheduled election." *Neel*, 247 F. Supp. 2d at 713.

"In determining whether a balance of the equities favors the issuance of an injunction, [Courts] [are] 'entitled to and should consider the proximity of a forthcoming election.'" *Goosby*, 981 F. Supp. at 763 (quoting *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). "With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Reynolds*, 377 U.S. at 585. Courts often refuse to enjoin elections when it "would necessarily impose great disruption upon potential candidates, the electorate and the elective process." *Md. Citizens for a Representative Gen. Assembly v. Gov. of Md.*, 429 F.2d 606, 610 (4th Cir. 1970). Mississippi has a powerful interest in avoiding "the confusion that would attend such a last-minute change," a legitimate consideration in the Court's equitable analysis of the *Canal Authority* prerequisites. *Williams v. Rhodes*, 393 U.S. 23, 35 (1968). The Court's

entering an injunction as to the upcoming 2019 election will undoubtedly create confusion which will have a negative impact on voter participation and potentially influence the outcome of the election one way or the other.

It should be emphasized again that Plaintiffs are not simply asking the Court to hold the status quo, which is a common form of preliminary relief.  Rather, Plaintiffs are asking the Court to declare a different rule to govern the upcoming November 5, 2019 election.  Plaintiffs knew when they filed this action that the Court would not have time to adjudicate a ruling on the merits and, if necessary, also permit the Legislature sufficient time to convene and address the Challenged Provisions.  *See Chisom*, 853 F.2d at 1192  ("It is now established beyond challenge that upon finding a particular [state] practice . . . to be contrary to either a federal constitutional or statutory requirement, the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies.").  Had Plaintiffs brought their claims in a timely fashion, the Legislature could have acted on its own, if it deemed such to be necessary, or the Court could have permitted the Legislature to act if necessary after a ruling on the merits.  MISS. CONST. art. 15, § 273.

Mississippi also has "good government reasons" to retain the Challenged Provisions. *Brooks v. Miller*, 158 F.3d 1230, 1236 (11th Cir. 1998).  In *Brooks*, the Eleventh Circuit upheld majority-vote requirements because under a mere plurality vote, elections can result "in a state of chaos."  *Id.*  Such plurality systems invite fraud and "stalking horses" where candidates enter the race to intentionally "split the opposition vote and assure victory to [opposing party] candidates." *Id.* at 1234.  Further, "incumbents [may] attempt[] to 'muddy the water' by getting as many people as possible to run in their races to dilute the opposition vote and win a plurality."  *Id.* at 1236.  The Second Circuit likewise observed that election systems similar to the Challenged

Provisions ensure that the winning candidate "actually represent the views of a majority . . . [of the electorate's] voters." *Butts*, 779 F.2d at 149.[21]  The interest in avoiding a pure plurality was expressed by the Eleventh Circuit as follows:

> As Defendants pointed out, a pure plurality system such as that suggested by Plaintiffs could theoretically result in a candidate's winning with 1% of the vote if enough candidates entered the race. Obviously, this type of result would seriously undermine the legitimacy of the government, and the state has a substantially compelling interest in preventing this from occurring. Particularly when balanced against the average of only one additional [minority candidate being elected] per year statewide over the past twenty-five years that would have resulted from a pure plurality system, the district court could properly conclude that the harm resulting from Plaintiffs' proposed remedy is simply too great to justify ordering such a system.

*Brooks*, 158 F.3d at 1240.  Unlike in *Brooks*, however, where one "African-American-preferred candidate" per year lost their position by operation of a challenged provision, no such candidate in Mississippi has ever been deprived of office as a result of the Challenged Provisions.

The Supreme Court in *Fortson* also explained that there are good government reasons for a "House Vote Rule" when used in conjunction with a "Popular Vote Rule."  385 U.S. at 234. After holding that both majority-vote requirements and legislative tie-breakers like Mississippi's are not unconstitutional in statewide general elections, the Court stated "[i]t would be surprising to conclude that, after a State has already held two primaries and one general election to try to elect by a majority, the United States Constitution compels it to continue to hold elections in a futile effort to obtain a majority for some particular candidate. Statewide elections cost time and money and it is not strange that Georgia's people decided to avoid repeated elections."  *Id.*

Further, the people of Mississippi "have the inherent, sole, and exclusive right to regulate the internal government and police thereof, and to alter and abolish their constitution and form of

---

[21] *Butts* acknowledged the possibility that a majority-vote requirement "may *help* a minority candidate to win nomination." 779 F.2d at 149. The Court cited a specific example of this occurring. *Id.* at 150.

government whenever they deem it necessary to their safety and happiness; Provided, Such change be not repugnant to the constitution of the United States." MISS. CONST. art. 3, § 6. Plaintiffs have not established that the Challenged Provisions are unconstitutional, and therefore, Mississippians have a right to continue to elect officials pursuant to the Challenged Provisions. For these reasons, Mississippi's interest, i.e., the public's interest, precludes a preliminary injunction under the third and fourth prerequisites of the *Canal Authority* test.

For good reason, "'intervention by the federal courts in state elections has always been a serious business,' not to be lightly engaged in." *Chisom*, 853 F.2d at 1189 (quoting *Oden v. Brittain*, 396 U.S. 1210, 1211 (1969)). Even if Plaintiffs' claims ultimately amount to more than mere "political defeat at the polls," which Defendants dispute, Plaintiffs have not met their burden for the requested preliminary injunctive relief. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) (quotations omitted). Accordingly, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

For the reasons discussed above, the Speaker and Secretary respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction. The Speaker and Secretary request such other and further relief as the Court deems appropriate under the circumstances.

Date:  July 29, 2019.

27

Respectfully submitted,

**PHILIP GUNN, IN HIS OFFICIAL CAPACITY
AS THE SPEAKER OF THE MISSISSIPPI
HOUSE OF REPRESENTATIVES, AND
DELBERT HOSEMANN, IN HIS OFFICIAL
CAPACITY AS THE MISSISSIPPI
SECRETARY OF STATE**

By:     */s/ Trey Jones*
        Trey Jones
        One of Their Attorneys

        William Trey Jones, III (MSB #99185)
        tjones@brunini.com
        Cody C. Bailey (MSB #103718)
        cbailey@brunini.com
        Jacob A. Bradley (MSB #105541)
        jbradley@brunini.com
        BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
        The Pinnacle Building, Suite 100
        190 East Capitol Street (39201)
        Post Office Drawer 119
        Jackson, Mississippi 39205
        Telephone: (601) 948-3101
        Facsimile: (601) 960-6902

## CERTIFICATE OF SERVICE

I, Trey Jones, hereby certify that on July 29, 2019, I caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and registered participants.

        */s/ Trey Jones*
        Trey Jones
        One of the Attorneys for the Defendants

28