**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LESLIE-BURL McLEMORE;
CHARLES HOLMES;
JIMMIE ROBINSON, SR.; and
RODERICK WOULLARD,

                Plaintiffs,

    v.

DELBERT HOSEMANN, in his official capacity
as the Mississippi Secretary of State; and PHILIP
GUNN, in his official capacity as the Speaker of the
Mississippi House of Representatives,

                Defendants.

Civil Action

Case No. 3:19-cv-383-DPJ-FKB

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## INTRODUCTION

An electoral system that allows white voters to elect their candidates of choice with significantly fewer total votes than would be required of African-American voters imposes a clear disadvantage on the ability of African Americans to participate in the political process and elect candidates of their choice. When a state enacts such laws intentionally to diminish African-American voting strength, there can be little doubt that it has violated the constitutional rights of its African-American citizens. It is no defense to suggest, as Defendants do, that the African-American-preferred candidates would have lost anyway—or that the candidate prevailed notwithstanding the discriminatory burden imposed by the State—because the Constitution guarantees all citizens the right to *equal* protection of the law. That includes the right to be free from the effects of state action that places its thumb on the scale of the electoral process with the explicit intent of favoring one racial group over another.

Plaintiffs' Complaint identifies three state constitutional provisions that violate this principle, yet still govern the election of candidates for statewide, state office (hereinafter, "statewide office"), despite extensive evidence that they were enacted in 1890 with the specific intent to disrupt the political gains and diminish the voting strength of African Americans in Mississippi. *See generally* Compl., ECF No. 1. These provisions require candidates for statewide office to win a majority of the popular vote and a majority of Mississippi House of Representative ("House") districts in order to be elected—and if no candidate satisfies both conditions, the House, rather than voters, will decide the election. *Id.* at ¶¶ 1-3, 25-27. To this day, this electoral system operates as the framers intended: it has the effect of minimizing or canceling African American voting strength, and, most glaringly, it requires an African-American-preferred candidate, on average, to obtain at least 55 percent of the popular vote in order to win a majority of House

districts, while a white-preferred candidate can accomplish the same feat with only 45 percent of the popular vote. *Id.* at ¶¶ 6, 38. That is the antithesis of equal opportunity.

Tellingly, Defendants' Motion to Dismiss does not refute any of this. Instead, it misapplies the relevant legal standards, misinterprets (and sometimes ignores) controlling precedent, and commits several legal errors in its analysis of Plaintiffs' Complaint. *First*, Defendants adopt an impermissibly narrow interpretation of the Fourteenth and Fifteenth Amendments and the Voting Rights Act ("VRA") in suggesting that no voters are injured by discriminatory voting laws unless their candidate would have been elected *but for* the unlawful provisions; yet they ignore settled precedent that recognizes Plaintiffs' right to an equal opportunity to participate in the political process regardless of the electoral outcome, and rejects the same theory that Defendants have advanced here.

*Second*, Defendants' jurisdictional argument suggests that African-American voters lack standing to challenge laws that disadvantage African-American voters, which is implausible on its face, and, in any event, has been rejected by multiple federal courts. *Third*, Defendants' attempt to recast Plaintiffs' one-person, one-vote claim as a partisan gerrymandering issue badly misreads the Supreme Court's ruling in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), and their Motion to Dismiss entirely ignores binding Supreme Court precedent, *Gray v. Sanders*, 372 U.S. 368 (1963), which directly controls this case. *Fourth*, Defendants' insistence that they are not proper parties to this lawsuit and that the Attorney General should be named is not credible, as only the Secretary of State ("Secretary") and the Speaker of the House ("Speaker") are tasked with enforcing the challenged provisions, and the Attorney General's authority to defend Mississippi's laws does not render him a proper defendant. *Finally*, Defendants' appeal to sovereign immunity lacks merit because Plaintiffs' constitutional claims plainly seek prospective injunctive relief—

and thus fall under the exception set forth in *Ex parte Young*, 209 U.S. 123 (1908) ("*Ex parte Young* exception")—and Congress abrogated sovereign immunity in passing the VRA. Defendants' Motion to Dismiss, thus, presents no plausible basis for dismissal and should be denied.

## BACKGROUND

Plaintiffs—four African-American voters in Mississippi, Compl. ¶¶ 19-22—challenge the State's multi-step process for electing candidates to statewide office set forth in Sections 140, 141, and 143 of the Mississippi Constitution (the "Challenged Provisions"). Section 140 provides that, to win an election, a gubernatorial candidate must obtain a majority of the popular vote (the "Popular-Vote Rule") and win at least a plurality of the vote in a majority of the districts of the Mississippi House of Representatives (the "Electoral-Vote Rule"). MISS CONST. art. V, § 140; Compl. ¶ 25. Under Section 141, if no candidate satisfies the Popular-Vote and Electoral-Vote Rules, the Mississippi House of Representatives chooses the winner among the two candidates who received the most popular votes (the "House-Vote Rule"). *Id.* § 141; Compl. ¶ 26. Section 143 applies this same multi-step structure to all elections for statewide offices in Mississippi. *Id.* § 143; Compl. ¶ 27.

The Challenged Provisions were devised during Mississippi's 1890 post-Reconstitution Constitutional Convention—where delegates spoke freely and publicly about their discriminatory intent—and were enacted specifically to prevent African-American voters from electing their candidates of choice to statewide office. Compl. ¶¶ 29-37. Whereas the prior constitution only required statewide candidates to obtain a plurality of the vote to be elected, MISS. CONST. art. V, § 2 (1868), the success of African-American candidates in statewide elections—and African-American voters in electing their candidates of choice, Compl. ¶ 30—drove the framers of the

1890 Constitution to adopt a new electoral scheme that required a candidate for statewide office to obtain both a majority of the popular vote *and* a majority of the House districts. *Id.* And because they structured the House to serve "as the basis of white supremacy," the framers knew they could count on that institution to choose the white-preferred candidate in the event that no candidate won majorities of both the popular vote and House districts. *Id.* ¶ 36.

Today, the Challenged Provisions remain a prototypical dilutive device, operating a two-tiered system in which votes cast by white Mississippians go farther in supporting their preferred candidate than votes cast by Plaintiffs and other African-American voters. The Electoral-Vote Rule's dilutive effect depends on the district in which each Plaintiff lives. For Plaintiffs Holmes, Robinson, and Woullard—who live in majority-African-American districts, *id.* ¶¶ 20-22—the power of each of their votes is limited to their respective district, which gives just one electoral vote to Plaintiffs' and African Americans' preferred candidate, regardless of the candidate's margin of victory. And for Plaintiff McLemore—who lives in a district heavily concentrated with white voters, *id.* ¶ 19—the Electoral-Vote Rule eliminates the strength of his vote entirely: despite McLemore's vote for the candidate he and other African-American voters support, the white majority in his district consistently awards an electoral vote to the candidate preferred by white voters and gives *nothing* to McLemore's preferred candidate. *See*, *e.g.*, *id.* ¶¶ 51-55. Because voting in Mississippi remains severely racially polarized, and white voters continue to control the vast majority of House districts, the Electoral-Vote Rule requires Plaintiffs' preferred statewide candidates to obtain a significantly larger share of the popular vote than a candidate preferred by white voters. *Id.* ¶¶ 38-41. The most recent gubernatorial election in 2015 provides a clear example of this inequality. There, while the candidate overwhelmingly preferred by white voters would have won a majority of House districts without even winning a majority of the popular vote, the

candidate overwhelmingly preferred by African-American voters would have needed to obtain *more than 58 percent of the popular vote* to reach the same result. *Id.* ¶ 42.

The Popular-Vote and House-Vote Rules similarly dilute the effect of Plaintiffs' votes by making it harder for their candidate of choice to win a statewide election, even when that candidate wins the most votes in the election. Because Plaintiffs and other African Americans are a minority of the State's population, and because voting in Mississippi is severely racially polarized, the most likely scenario in which Plaintiffs' preferred candidate wins the most votes is one in which that candidate wins a plurality of votes. *Id.* ¶¶ 43-44. But just as the framers intended, the Popular-Vote Rule ensures that in such a scenario, Plaintiffs' preferred candidate is not elected. *Id.* Instead, under that scenario, the House-Vote Rule provides that the election is determined by the House, which has always been dominated by representatives from majority-white districts. *Id.* ¶¶ 43, 45-46. Thus, even when Plaintiffs' candidate receives the most votes in an election, the Popular-Vote and House-Vote Rules deny Plaintiffs' preferred candidate victory and instead ensure that the white-preferred candidate is seated.

As set forth in Plaintiffs' Complaint, the Challenged Provisions are unconstitutional and violate Section 2 of the VRA. First, the Challenged Provisions collectively violate Plaintiffs' rights under the Fourteenth and Fifteenth Amendments because they intentionally dilute the strength of votes cast by Plaintiffs and other African-American Mississippians in statewide elections. *Id.* ¶¶ 95-103. Second, the Electoral-Vote Rule violates the Equal Protection Clause's one-person, one-vote principle because, under directly controlling Supreme Court authority, *Gray*, 372 U.S. at 368, it impermissibly assigns different weights to votes in statewide elections based on the House district in which they are cast. *Id.* ¶¶ 104-08. Third, the Challenged Provisions violate Section 2 of the VRA because they have the purpose and effect of diluting votes cast by Plaintiffs and other

African-American Mississippians in statewide elections, thereby abridging the right to vote on account of race. *Id.* ¶¶ 109-14.

## LEGAL STANDARD

When a litigant mounts a facial attack to a court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), as Defendants do here, *see* Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Mot."), ECF No. 19, at 5-21, 24-26, "the court simply considers 'the sufficiency of the allegations in the complaint because they are presumed to be true.'" *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). Similarly, a motion to dismiss under Rule 12(b)(6), which Defendants also assert, *see* Mot. at 21-24, must be denied when the complaint at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not include "detailed factual allegations" to survive a Rule 12(b)(6) motion; rather, it need only "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

Defendants' argument that the Complaint should be dismissed because Plaintiffs have failed to join an indispensable party, *see* Mot. at 24-26, is governed by Federal Rule of Civil Procedure 12(b)(7). A court may exercise its discretion to dismiss a claim under Rule 12(b)(7) only if (1) the party whom the movant wishes to be joined is necessary under Rule 19(a), and (2) it is not feasible to join that absent party to the action. *See* Fed. R. Civ. P. 19(b). If, and only if, those two elements are satisfied, a court then "determine[s] whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* As set forth below, Defendants have failed to meet any of these standards.

**ARGUMENT**

Defendants' Motion commits multiple legal errors and ignores or misreads controlling precedents that foreclose each of their stated grounds for relief. First, Plaintiffs have standing to assert their claims because they have suffered, and will continue to suffer, a concrete and non-hypothetical vote dilution injury by being denied an equal opportunity to elect candidates of their choice. Second, this action is ripe because Plaintiffs' injuries are imminent, as their constitutional right to have their vote counted equally has been violated and will be violated in the upcoming 2019 election, regardless of the outcome. Third, Plaintiffs' claims are justiciable under long-standing Supreme Court precedent that invalidates laws intentionally diluting the voting strength of African Americans or violating the one-person, one-vote principle. Fourth, the Speaker and the Secretary are proper defendants because they are responsible for carrying out the Challenged Provisions, and the Attorney General is neither a necessary nor proper defendant because he is not responsible for any such duties. And, finally, the Eleventh Amendment does not bar Plaintiffs' claims because they each properly invoke the *Ex parte Young* exception, and because Congress abrogated Mississippi's sovereign immunity in passing the VRA. Defendants' Motion to Dismiss should therefore be denied.

**I.     Plaintiffs, as Individual African-American Voters, Have Standing to Challenge Discriminatory Laws That Disadvantage African-American Voters.**

Plaintiffs are African-American voters from Mississippi who filed this lawsuit to eradicate the effects of racially discriminatory voting laws. *See generally* Compl. They allege that the State's electoral system, designed with the specific intent of imposing a barrier to the election of African-American-preferred candidates, places African Americans in Mississippi—like Plaintiffs—at a disadvantage by making it more difficult for them to elect their candidates of choice. Plaintiffs' Complaint clearly outlines the source of their injuries with concrete examples of the discriminatory

burden that the Challenged Provisions impose on Plaintiffs and other African-American voters: for instance, an African-American-preferred candidate must secure, on average, at least 55 percent of the popular vote in order to win a majority of House districts, as is required to be elected without intervention from the House, while the candidates preferred by white voters need only obtain approximately 45 percent of the popular vote to achieve the same result. Compl. ¶¶ 6, 38. The disadvantages that these discriminatory laws impose are clear and will continue in each election until they are enjoined. *Id.* ¶¶ 19-23, 55.

### A. Because the Challenged Provisions Deny Plaintiffs (and Other African-American Voters) an Equal Opportunity to Participate in the Political Process and Elect their Candidates of Choice, Plaintiffs Have Alleged a Cognizable and Imminent Injury.

Defendants' various challenges to individual African-American voters' standing fundamentally misunderstand the constitutional injuries that result from State action—driven by discriminatory intent—that saddles a specific race with a demonstrable electoral disadvantage. While Defendants rely heavily on the unsourced claim that the Challenged Provisions have never prevented a candidate from taking office,[1] *see* Mot. at 10-11, 14, they ignore controlling Supreme Court precedent that has already expelled this line of reasoning from the standing inquiry. It is well-settled that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former

---

[1] Aside from lacking any supporting analysis or evidence, this claim is also shortsighted because the effects of electoral rules that disadvantage a minority group are not limited to the raw tally of votes on Election Day; they can also affect turnout, registration rates, and even a candidate's willingness to seek elective office. *See, e.g.*, *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1039 (E.D. Mo. 2016) (recognizing that African-American voters may believe their votes are futile in electing their candidates of choice and "registration and turnout rates often improve once a court finds and remedies the § 2 violation"). Notably, since the Challenged Provisions were adopted in 1890, not one African American has ever been elected to statewide office in Mississippi, even though Mississippi has the highest percentage of African Americans of any state in the country. Compl. ¶ 92.

group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (emphasis added) (hereinafter "*Associated Contractors*"). The Supreme Court further explained that the injury suffered by plaintiffs in equal protection cases is "the denial of equal treatment resulting from the imposition of the barrier, not the inability to obtain the benefit," *id.*; thus, in *Associated Contractors*, the plaintiff demonstrated standing by alleging that a discriminatory policy prevented it from bidding on contracts "on an equal basis," and whether the party would have obtained the contract in the absence of the discriminatory policy was irrelevant to the standing inquiry. *See id.*[2]

The legal principles announced in *Associated Contractors* are not limited to the bidding process, nor are the constitutional injuries in that case distinguishable from those asserted by voting rights plaintiffs. Courts around the country have applied these same principles in various contexts, including in election law disputes, to reject the argument Defendants advance here: that a plaintiff challenging a government-imposed barrier to a benefit must allege that she would have obtained the benefit absent the discriminatory rule. *See*, *e.g.*, *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005) (holding tribe had standing to challenge state action that placed it at a disadvantage in seeking state approval for off-reservation gaming, despite contingencies that purportedly prevented harm from materializing, because "the 'injury in fact' [was] the inability to compete on an equal footing"); *Ind. Democratic Party v.*

---

[2] Defendants' reliance on *Gill v. Whitford*, 138 S. Ct. 1916 (2018), to support their standing argument, *see* Mot. at 12-13, is misplaced because that decision delineated the standing requirements applicable to a partisan gerrymandering claim. Because the voter plaintiffs in *Gill* faced district-specific, not statewide, vote-dilution injuries, the Court found that they did not have standing to assert a statewide claim. *See id.* at 1930. In contrast, here, Plaintiffs do not assert a partisan gerrymandering claim, *see* n.6, *infra*, nor are their asserted injuries limited to a specific district.

*Rokita*, 458 F. Supp. 2d 775, 813-14 (S.D. Ind. 2006) (citing *Associated Contractors* and holding voters "can assert an equal protection claim on the grounds that they have been disadvantaged relative to certain classes of voters who possess photo identification or are not required to present photo identification"); *Denis v. N.Y. City Bd. of Elections*, No. 94 Civ. 7077 (KMW), 1994 WL 613330, at *3 n.4 (S.D.N.Y. Nov. 7, 1994) ("Plaintiffs alleging that their right to vote was purposefully abridged because of their race, in violation of the Equal Protection Clause, need not show that the outcome of the election would have been different absent the violation . . . ."); *cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467 (1982) ("[T]he Fourteenth Amendment also reaches 'a political structure that treats all individuals as equals,' yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.") (citations omitted).

In fact, the specific injuries that Plaintiffs assert here—vote dilution and the denial of an equal opportunity to elect their preferred candidates, *see generally* Compl.—have been consistently recognized by courts to confer standing in voting rights cases, and arguments tying standing to electoral success, similar to the one Defendants raised, *see* Mot. at 10-11, 14, have been rejected. In *Rockefeller v. Powers*, for instance, registered Republicans in New York's Tenth, Eleventh, Twelfth, and Fourteenth congressional districts challenged the ballot-access rules for the Republican presidential primary, which required delegate candidates to obtain signatures from the lesser of five percent or 1,250 enrolled Republicans in the delegate's congressional district in order to appear on the ballot. 74 F.3d 1367, 1369-70 (2d. Cir. 1995). Plaintiffs alleged that because fewer registered Republicans resided in their congressional districts, the ballot-access rules' upper limit (1,250) on the number of required signatures allowed candidates from more heavily Republican districts to secure a spot on the ballot with a smaller percentage of signatures from eligible

Republican voters in their districts, resulting in less choice for voters in districts with fewer registered Republicans. *See id.* at 1371. The defendants challenged the voters' standing, raising essentially the same argument that Defendants assert here: that a change in the rules would not have led to more delegates obtaining ballot access in the plaintiffs' districts. *See id.* at 1376. The Second Circuit, however, found the defendants' argument "insupportable in light of [*Associated Contractors*]" and held that the voters "need not establish, absent the current rule, they *necessarily* would see more candidates on their ballot." *Id.*

The Ninth Circuit rejected a similar argument in a lawsuit filed by Latino voters who argued that the boundaries of the Los Angeles County Board of Supervisors districts were drawn deliberately to minimize minority political power. *See Garza v. Cty. of L.A.*, 918 F.2d 763, 766 (9th Cir. 1990). There, the County argued that the districts were lawful because the minority group was not large enough to comprise a majority in a single-member district, and thus, the minority group could not show that it would have formed the requisite majority that would have allowed it to elect its candidate of choice under any alternative plan. *See id.* at 769. The Ninth Circuit reaffirmed that the minority voters were injured nonetheless because the districts' boundaries afforded them "less opportunity than did other county residents to participate in the political process and to elect legislators of their choice," and that such discrimination by itself "violated the Voting Rights Act and the Equal Protection Clause." *See id.* at 771.

Plaintiffs' injuries are even more pronounced here, where: (1) African-American-preferred candidates must obtain a disproportionately higher number (on average, at least 55 percent) of the popular vote to win a majority of the House districts; (2) the Popular-Vote Rule makes it more difficult for African-American-preferred candidates to be elected with consolidated support from the African-American community, even when the white vote is splintered among multiple

candidates; and (3) African Americans have very little influence in the House, which decides the winner of any election for statewide office in which no candidate satisfies the Popular-Vote and Electoral-Vote Rules—all of which demonstrate that African-American voters are disadvantaged by the Challenged Provisions and have less opportunity than white voters to elect their preferred candidates. *See* Compl. ¶¶ 5, 6, 38, 44, 45.

Defendants do not dispute that these disadvantages exist, and thus have raised no plausible argument that a cognizable injury is lacking; rather, they contend that the Challenged Provisions *may* not ultimately decide the next election because candidates who win the popular vote usually win the majority of House districts. *See* Mot. at 11. But this argument misses the point of Plaintiffs' constitutional and voting rights claims, which are grounded in the lack of equal opportunity rather than electoral victories. *See Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate right of § 2 [of the Voting Rights Act] is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); *see also Associated Contractors*, 508 U.S. at 666. The success of an African-American-preferred candidate, for instance, does not demonstrate that African Americans have an equal opportunity to elect candidates of their choice; it simply means that specific candidate was able to overcome the additional hurdles imposed by the Challenged Provisions. *See*, *e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (citing *Associated Contractors* and holding "[a] plaintiff need not have the franchise wholly denied to suffer injury . . . [t]he inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting"). Likewise, African-American voters are no less injured by the denial of an equal opportunity to elect their preferred candidates simply because their preferred candidate may not have prevailed in the end. *See Garza*, 918 F.2d at 766. In either scenario, African-American voters are subjected

to an electoral scheme that places them at a demonstrable disadvantage in terms of their ability to elect their candidates of choice—just as the framers of the Mississippi Constitution intended—which violates their constitutional rights.

### B. Plaintiffs' Injuries Are Sufficiently Concrete and Individualized to Satisfy Article III's Requirements.

Beyond their mischaracterizations of the relevant injuries, what remains of Defendants' objections to standing is their unprecedented assertion that individual African-American voters lack standing to challenge laws that disadvantage African-American voters, or that such voters suffer no individual injury. *See* Mot. at 9, 12. Once again, Defendants cite no legal authority that supports this proposition because courts have roundly rejected the notion that a claim alleging a disproportionate burden on a minority group is a "generalized grievance." *See*, *e.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 907 (S.D. Tex. 2014) (rejecting argument that claim alleging disproportionate burden of S.B. 14 on African-American voters was a generalized grievance or shared by all voters); *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 944 (E.D. Mich. 2016) (rejecting argument that plaintiffs asserted general grievance where African-American voters alleged disproportionate impact of voting law on African Americans); *Black v. McGuffage*, 209 F. Supp. 2d 889, 895 (N.D. Ill. 2002) (same).

As the Supreme Court has made clear, the fact that other individuals (in this case, African-American voters) may share the same injury provides no basis to deny standing. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998). "This conclusion seems particularly obvious where . . . large numbers of individuals suffer the same common-law injury . . . or where large numbers of voters suffer interference with voting rights conferred by law." *Id*. Plaintiffs, who are all African-American voters, have each alleged that the Challenged Provisions have made it more difficult for them to elect their candidates of choice to statewide office. *See* Compl. ¶¶ 19-22. It is

entirely unclear who Defendants believe would be better positioned to assert these claims than the very African-American voters whom the Challenged Provisions were intended to, and do, disadvantage. To hold that Plaintiffs lack standing under these circumstances would effectively insulate discriminatory voting laws from judicial review.

### C. In Accordance with Controlling Supreme Court Precedent, Plaintiffs Have Standing to Challenge the Unequal Weighting of Their Votes Under a One-Person, One-Vote Claim.

Defendants' standing arguments completely unravel when applied to Plaintiffs' one-person, one-vote claim. Plaintiffs allege that the Electoral-Vote Rule is unconstitutional for the independent reason that it fails to count all votes for statewide office equally, as required by the Fourteenth Amendment's Equal Protection Clause. *Gray*, 372 U.S. at 379 ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit."); *see also* Compl. ¶ 49. And as Plaintiffs further explained in their Complaint, the Electoral-Vote Rule discards all votes cast for the losing candidates in each district, while also assigning unequal weight to individual votes depending on the districts in which the voters reside. Compl. ¶¶ 47-55, 106.

It makes little sense to argue that Plaintiffs are not injured by the failure to count their votes equally, or that such injury is only hypothetical, because the Electoral-Vote Rule defines the method by which Plaintiffs' votes are counted in every election, and, thus, violates the Equal Protection Clause every time it is applied. Defendants' Motion neither addresses these allegations—other than to advance a misguided analogy to partisan gerrymandering, *see infra* n.6—nor do they cite anywhere (much less distinguish) controlling Supreme Court precedent that found that a nearly identical electoral scheme violated the Fourteenth Amendment's Equal Protection Clause. *See Gray*, 372 U.S. at 381. *Gray*, like this case, was filed by a voter seeking injunctive relief in advance of an election. *See id.* at 370. At no point did the Supreme Court

suggest that the plaintiff's standing or entitlement to relief was dependent on the prior success of his preferred candidates or the likelihood that the constitutional violation would prevent his preferred candidate from taking office. Such inquiries were simply irrelevant to the Court's analysis in *Gray*, just as they are here.

### D. Plaintiffs' Injuries are Imminent and Ripe for Adjudication Because, Absent Injunctive Relief, the Challenged Provisions Will Continue to Violate Plaintiffs' Constitutional Rights and Deny Plaintiffs an Equal Opportunity to Participate in the Political Process.

The legal errors in Defendants' exceedingly narrow definition of "injury" spill over to their remaining challenges to this Court's jurisdiction, including ripeness, causation, and redressability. Defendants argue, for instance, that Plaintiffs' injuries are not redressable or ripe because enjoining the Challenged Provisions is "unlikely to lead to more statewide victories by Democrats or black candidates," and that an "African-American-preferred candidate must be deprived of statewide office because of . . . the Challenged Provisions" to confer standing. Mot. at 16, 18. Putting aside Defendants' improper attempt to refute Plaintiffs' substantive allegations with other individuals' personal opinions as expressed in the media's coverage of this lawsuit, their argument once again erroneously conflates election outcomes—which cannot be guaranteed by any court ruling—with the constitutionally (and statutorily) mandated equal opportunity that Plaintiffs seek. Just because Plaintiffs' preferred candidates *may* not win future elections does not give the State license to dilute their votes or impose structural barriers that make it harder for Plaintiffs to elect their candidates of choice. *See, e.g.*, *Avery v. Midland Cty., Tex.*, 390 U.S. 474, 481 n.6 (1968) ("[E]qual protection . . . includes an equal opportunity to influence the election of lawmakers, no matter how . . . small the minority who object to their mistreatment.").

Plaintiffs have alleged facts which demonstrate that their asserted injuries are concrete and highly likely to occur in the next election, including specifically that: voting is highly racially

polarized in Mississippi, African Americans in Mississippi are politically cohesive, white voters vote as a bloc against African-American-preferred candidates, and the geographic and electoral concentration of the racial groups interact with the Challenged Provisions such that an African-American-preferred candidate must obtain, on average, at least 55 percent of the popular vote to win a majority of House districts and satisfy the Electoral-Vote Rule. *See*, *e.g.*, Compl. ¶ 38. Defendants' Motion does not dispute any of this.[3] Thus, the rest of Defendants' jurisdictional arguments collapse under the weight of well-established precedent and Plaintiffs' specific allegations that not only explain the disadvantage suffered by African-American voters, but even go so far as to quantify the additional barrier that Mississippi's electoral system imposes on their voting power.

The underlying premise of Defendants' standing arguments is also flawed because, even assuming prior electoral victories were relevant to the standing inquiry (though they are not), Defendants' suggestion that the Challenged Provisions have not prevented an African-American-preferred candidate from being elected, *see* Mot. at 11, omits important historical context. It is true that candidates who have won the popular vote in the past have not been excluded from office, but

---

[3] While Plaintiffs did not, as Defendants point out, list every candidate for statewide office whom they support, *see* Mot. at 5, 19, Defendants fail to identify any legal authority that has ever required voters to identify, months before an election, whom they plan to vote for in order to state a claim under the Equal Protection Clause or the Voting Rights Act. Moreover, the Complaint explicitly alleges that voting in Mississippi is "highly racially polarized," that "white and African-American Mississippians prefer different candidates," and that "African-American voters in Mississippi are politically cohesive." Compl. ¶¶ 75, 112. Based on these facts, it can be inferred that Plaintiffs have supported, and will continue to support, the statewide candidates preferred by African Americans. *See CAP Holdings, Inc. v. Lorden*, 790 F.3d 599, 601 n.2 (5th Cir. 2015) (acknowledging that the court, on a motion to dismiss, "must construe the factual allegations in a complaint, and all reasonable inferences therefrom, in the light most favorable to the plaintiffs") (quoting *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 210 (5th Cir. 2004)). In any event, Plaintiffs have filed, concurrent with this memorandum, an Amended Complaint that explicitly alleges that Plaintiffs have consistently supported, and intend to support in the future, statewide candidates preferred by African Americans.

this was only by happenstance, not due to any built-in practice or procedure that safeguards Plaintiffs' constitutional rights. In three consecutive general elections in the 1990s, for example, at least one candidate for statewide office won the largest share of the popular vote but failed to win either *the majority* of the popular vote or a majority of House districts. *See* Bobby Harrison, *Jim Hood Could Win the Governor's Race and Not Be Seated, or So Says the Constitution*, MISS. TODAY (Feb. 3, 2019). In the 1991 race for Lieutenant Governor, no candidate satisfied the Popular-Vote and Electoral-Vote Rules, but incumbent Brad Dye voluntarily conceded to top vote-getter, Eddie Briggs, *before* the House could select the winning candidate. *See id*. In the 1995 race, also for Lieutenant Governor, Ronnie Musgrove captured a majority of the popular vote but fell short of the 62 House districts required to satisfy the Electoral-Vote Rule. *See id*. Incumbent Eddie Briggs, who lost the popular vote, conceded to Musgrove before the House could decide the election. *See id.* And in the 1999 Governor's race, Ronnie Musgrove garnered the largest vote share but did not win a majority of the popular vote or House districts. *See id.* The House eventually elected Musgrove as the Governor, though it could just as easily have selected his opponent, Mike Parker, who received fewer votes than Musgrove. *See id.* Ultimately, in each instance, the candidate who won the popular vote was elected, but to suggest that these events demonstrate the absence of any injury, *see* Mot. at 11, 13-14, would subject African-American voters' constitutional rights to the unfettered discretion of candidates (who have no obligation to concede even when they lose the popular vote and have every incentive to seek election through the House) or members of the House (who have no obligation to elect the candidate who won the popular vote), leaving those voters with no protection at all. *See Stoner v. State of Cal.*, 376 U.S. 483, 490 (1964) (holding that a "constitutional protection . . . would disappear if it were left to depend on the unfettered discretion" of a third party).

The most recent general election further demonstrates that Plaintiffs' concerns about the invocation of the House-Vote Rule are anything but conjectural. As noted in the Declaration of Dr. Jonathan Rodden, which accompanied Plaintiffs' Motion for Preliminary Injunction, Attorney General Jim Hood won a significant majority of the popular vote in the 2015 general election, yet he just barely secured a majority of House districts, ECF No. 8-7, ¶¶ 10, 24, such that a swing of only two percentage points would have left him in the very position that Defendants claim is exponentially less likely to occur. *See id.* ¶¶ 10, 66; *see also* Mot. at 14 n.20. Defendants' Motion, meanwhile, cites nothing to support their prediction. In any event, as explained above, Plaintiffs' injury does not depend on the outcome of any one election, but rather on the fairness of an electoral process that imposes a disadvantage on African-American voters and denies them an equal opportunity to elect their preferred candidates in every election for statewide office. That injury is imminent, almost certain to recur absent injunctive relief, and can be remedied by enjoining the enforcement of the Challenged Provisions and declaring the candidate who receives the most votes as the winner of each race for statewide office, as Mississippi did prior to enacting the Challenged Provisions, *see* Compl. ¶ 36.

Finally, this Court should reject Defendants' suggestion that this matter should be litigated *after* the election has occurred, *see* Mot. at 19, because it squarely contradicts Fifth Circuit precedent that "imposes the duty on parties having grievances based on discriminatory practices to bring the grievances forward for pre-election adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). In fact, Defendants appear to propose that Plaintiffs do precisely what the Fifth Circuit warned against, which is to "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id.* (internal quotation marks omitted). The Motion cites no authority to support Defendants' claim that "courts

are rightfully cautious in addressing pre-election challenges," Mot. at 19, nor is there any legal

doctrine or principle that requires Plaintiffs to endure another election under a discriminatory

system that disadvantages African-American voters in Mississippi before seeking relief. Now is

the time to resolve Plaintiffs' constitutional claims.

## II.     Plaintiffs Possess Prudential Standing Because Their Concrete and Individualized Vote-Dilution Injuries Fall Easily Within the Voting Rights Act's "Zone of Interests."

Defendants' attempt to invoke the doctrine of prudential standing rests on several

inherently flawed legal propositions. First, Defendants again mischaracterize Plaintiffs'

allegations, including claims that the Challenged Provisions disproportionately impact African-

American voters, as generalized grievances. *See* Mot. at 22-23. This argument fails as a matter of

law in the Article III standing context, *see* Section I, *supra*, and fares no better here because it

presents the exact same inquiry. As the Supreme Court recently observed, the previously-

recognized "prong" of the prudential standing doctrine regarding generalized grievances is only a

reiteration of Article III's standing requirement. *Lexmark Int'l, Inc. v. Static Control Components,

Inc.*, 572 U.S. 118, 127 n.3 (2014) ("While we have at time grounded our reluctance to entertain

[generalized grievances] in the 'counsels of prudence' . . . , we have since held that such suits do

not present constitutional 'cases' or 'controversies.' They are barred for constitutional reasons, not

'prudential' ones.") (citation omitted). The Complaint explains in detail how the Challenged

Provisions cause African-American votes in statewide elections to be weighted less than those cast

by white voters, *see* Compl. ¶¶ 38, 41-42, 47-48, 52, 55[4] and how the State intentionally adopted

---

[4] Defendants also wrongly suggest that "Plaintiffs are 'asserting the legal rights and interests of third parties' [sic] as opposed to their 'own legal rights and interest.'" Mot. at 22 (quoting *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 460 n.9 (5th Cir. 2001)). But as explained above, Plaintiffs allege that the Challenged Provisions dilute the strength of their votes and make it more difficult for them to elect candidates of their choice to statewide office. It is unclear whose rights Defendants believe Plaintiffs have asserted beyond their own.

electoral rules that would make it harder for African Americans to elect candidates of their choice, *Id.* ¶¶ 2, 4-10, 29-37. And as explained in Section I.B above, courts have repeatedly rejected the notion that African-American voters lack standing to challenge laws that disadvantage African-American voters.

Defendants next contend that Plaintiffs—African-American voters who have alleged unlawful voting discrimination—fall outside the "zone of interests" that Congress meant to protect in enacting the VRA. Yet, this argument is impossible to square with the language and stated purpose of the statute. *See Lexmark*, 572 U.S. at 128 (explaining that the zone-of-interests inquiry asks whether Plaintiffs "are within the class of plaintiffs whom Congress has authorized to sue under" Section 2, or, "[i]n other words, . . . whether [Plaintiffs] ha[ve] a cause of action under the statute"); *see also* Mot. at 23. In enacting and repeatedly renewing the VRA, Congress unquestionably intended to eliminate laws that dilute African Americans' voting power. *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986) (Section 2 prohibits "*not just* vote dilution," but "all forms of voting discrimination") (emphasis added); *City of Rome v. United States*, 446 U.S. 156, 181 (1980) (in renewing the VRA, Congress intended to keep states from adopting measures "which would dilute increasing minority voting strength") (quoting H.R. Rep. No. 94-196, 10-11 (1975)). In pursuit of that goal, the VRA confers a private right of action to minority voters to challenge laws that dilute the strength of their vote. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 ("[T]he existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.") (quoting S. Rep. No. 97-417, pt. 1, p. 30 (1982)).[5] The

---

[5] In fact, this long-recognized existence of a private right of action has led at least one court to conclude that prudential-standing limitations do not even apply to Section 2 claims. *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (explaining that because Section 3(a) of the VRA envisions suits by "an aggrieved person," 52 U.S.C. § 10302(a), and because "a

Supreme Court has also explained that "[t]he *essence* of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg*, 478 U.S. at 47 (emphasis added). That is precisely the claim that Plaintiffs have asserted here. By imposing a system in which white voters can elect their candidates of choice with *significantly fewer total votes* than African-American voters can, the Challenged Provisions produce a clear inequality between the opportunity of Plaintiffs and other African Americans to elect their statewide candidates of choice, and white voters' ability to do the same. This is precisely what the VRA forbids.

Defendants also wrongly assert that Plaintiffs' challenge to the Popular-Vote Rule falls outside the VRA's zone of interests because "majority-vote requirements . . . are not 'a per se violation of Section 2.'" Mot. at 23 (quoting *Martin v. Allain*, 658 F. Supp. 1183, 1198 (S.D. Miss. 1987)). That argument confuses two entirely different legal concepts. A per se violation "is a violation '[of], in, or by itself, standing alone, without reference to additional facts.'" *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 441 n.12 (6th Cir. 2002); *see also* Black's Law Dictionary (11th ed. 2019). The question that the zone-of-interest inquiry seeks to address is "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). That a majority-vote requirement is not unlawful *per se* says nothing about whether the Popular-Vote Rule violates Section 2 under circumstances outlined in Plaintiffs'

'party who fulfill[s] the injury-in-fact prong of the constitutional standing requirements would also be a "person aggrieved" and would therefore fulfill the plain language of the statute,' this Court need only examine the requirements of constitutional standing with respect to the Voting Rights Act claim") (quoting *Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 88 (3d Cir. 1999)); *cf. Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363-64 (5th Cir. 1999) (Congress intends to "eliminate[]" prudential standing limitations when it provides a private right of action to a "person aggrieved" by unlawful conduct).

Complaint, and it distorts the applicable legal standards beyond recognition to suggest that Plaintiffs' challenge to Mississippi's majority-vote requirement does not fall within the Voting Rights Act's zone of interests. *See*, *e.g.*, *Whitfield v. Democratic Party of Ark.*, 890 F.2d 1423, 1433 (8th Cir. 1989) (holding that elimination of majority vote requirement was "mandated by section 2"); *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1212 (5th Cir. 1989) (noting that "Congress clearly *did* conclude that [majority-vote requirements] could serve to further dilute the voting strength of minorities."); *Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir. 1984) ("The Lubbock majority vote requirement further submerges the political strength of minorities.").

Here, Plaintiffs do not challenge the Popular-Vote Rule under Section 2 simply because it is a majority-vote requirement. Rather, they allege that under the totality of the circumstances of Mississippi's statewide elections, the Popular-Vote Rule, along with the other Challenged Provisions, dilutes the strength of their votes and denies African-American voters an equal opportunity to participate in the political process and elect their preferred candidates. To that end, Plaintiffs' Complaint highlights the pronounced and sustained racial polarization in Mississippi's statewide elections; racial appeals that are recurrent in Mississippi politics; the disproportionate barriers to voting that African-American Mississippians encounter; the persistent socioeconomic disparities between African-American and white Mississippians; Mississippi's notorious history of official discrimination; and the significant underrepresentation of African Americans in Mississippi's government, Compl. ¶¶ 56-94, all of which courts have considered when determining whether a particular majority-vote requirement violates Section 2. *See*, *e.g.*, *Whitfield*, 890 F.2d at 1432.

III.    **Plaintiffs' Intentional Discrimination and One-Person, One-Vote Claims Challenging the Electoral-Vote Rule Are Justiciable Under Longstanding Supreme Court Precedent.**

Defendants entirely ignore binding Supreme Court precedent that rejected a nearly identical electoral rule as violative of the Equal Protection Clause, *see Gray*, 372 U.S. 368, and argue instead that the Supreme Court's recent partisan gerrymandering decision, *Rucho*, 139 S. Ct. at 2484, somehow forecloses lawsuits challenging racial discriminatory voting laws, along with VRA and one-person, one-vote claims. *See* Mot. at 20-21. Not only is Defendants' argument a deeply-flawed interpretation of an entirely unrelated ruling, it improperly assumes that *Rucho* has silently overruled *Gray* and all other decisions enforcing the claims that Plaintiffs have advanced here, which is plainly wrong for multiple reasons.

First, the Supreme Court has previously instructed that: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). That means that even if Defendants' interpretation of *Rucho* had any merit (and it does not), *Gray* is still binding on this Court.[6]

---

[6] Defendants misunderstand the law by incorrectly conflating Plaintiffs' Electoral-Vote Rule challenge with "partisan gerrymandering." In an attempt to support this conflation, Defendants point to Plaintiffs' allegations of "wasted" votes in the Complaint, the assertion that "African Americans' candidates of choice obtain a significantly larger share of the statewide population in order to win a majority of House districts," the timing of the Complaint, and that the National Redistricting Foundation is supporting the lawsuit. Mot. at 2 n.1, 10, 12 n.17, 13 n.18, 14 n.19. But, none of these facts transform Plaintiffs' claim into one for partisan gerrymandering because: (1) Plaintiffs' claims do not meet *Rucho*'s definition of partisan gerrymandering as a "claim[] of excessive partisanship in districting," *Rucho*, 139 S. Ct. at 2491; (2) even Defendants admit that Plaintiffs do not "seek redistricting as a remedy," Mot. at 13, n.18; (3) the Supreme Court distinguished partisan gerrymandering claims from one-person, one-vote claims, *Rucho*, 139 S. Ct. at 2495–96; and (4) no authority supports the assertion that the timing of a complaint or who supports it transforms a lawsuit into a partisan gerrymandering dispute.

Second, even the most expansive interpretation of *Rucho* cannot render Plaintiffs' claims nonjusticiable political questions. In fact, *Rucho* expressly acknowledged that one-person, one-vote and intentional racial discrimination claims *are* justiciable. *See id.* at 2495-96 (explaining that in "one-person, one-vote and racial gerrymandering . . . there is a role for the courts"). This conclusion is in line with long-standing Supreme Court precedent. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 237 (1962) (concluding that malapportionment claims "present a justiciable constitutional cause of action"); *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (finding justiciable a claim that a city boundary was redrawn from a square shape to "a strangely irregular twenty-eight-sided figure" to remove nearly all black voters from the city).

Third, the Supreme Court in *Rucho* found partisan gerrymandering claims nonjusticiable because it had never recognized "judicially discoverable and manageable standards for resolving" such a claim, *Rucho*, 139 S. Ct. at 2494, 2491 ("This Court has not previously struck down a districting plan as an unconstitutional partisan gerrymander[] and has struggled without success over the past several decades to discern judicially manageable standards for deciding such claims."), but that is not true of Plaintiffs' causes of action. Longstanding Supreme Court precedent sets forth established standards for one-person, one-vote, intentional racial discrimination, and VRA Section 2 claims. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (invalidating districting plan under Section 2's prohibition of laws that, "based on the totality of the circumstances," provide members of a racial group "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice") (quoting 42 U.S.C. § 10301(b)); *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (holding Fifteenth Amendment prohibited county's at-large voting system "maintained for the invidious purpose of diluting the voting strength of the black population"); *City of Mobile v. Bolden*, 446

- 24 -

U.S. 55, 66 (1980) (plurality opinion) (explaining that the Fourteenth Amendment prohibits systems purposefully enacted to dilute a racial group's voting power); *Gray*, 372 U.S. at 381 ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote— . . . wherever their home may be in that geographical unit.").

Fourth, the Supreme Court distinguished racial discrimination and one-person, one-vote claims, which are "relatively easy to administer," *Rucho*, 139 S. Ct. at 2498, 2501, from partisan gerrymandering claims, which are not. For example, one-person, one-vote claims require that "each vote must carry equal weight," which is "a matter of [simple] math," *id.* at 2501, and racial discrimination claims simply ask for the elimination of racial considerations. *See id.* at 2502. In contrast, a partisan gerrymandering claim is difficult to administer because it "ask[s] for the elimination of partisanship," which is either inseparable from redistricting, or is permissible at some level. *Rucho*, 139 S. Ct. at 2502. The same is not true of the Electoral-Vote Rule—i.e., the fact that it was introduced with the intent to discriminate against African Americans and results in the unequal weighting of votes cast for the same office—renders the law unconstitutional. *See id.* at 2497 (while "'a jurisdiction may engage in constitutional political gerrymandering,'" "it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting"). And a system of determining who won an election can be stripped of racist considerations and can easily rely on the equal weighting of votes, including, for instance, by reverting to the plurality system that Mississippi previously adopted.

To read *Rucho* as Defendants suggest would render virtually all election laws unreviewable, even in the presence of explicit racially discriminatory intent and unequal weighting of votes, and would wipe away half a century's worth of Supreme Court precedent. The Court

should reject such an expansive interpretation of a narrow ruling that would do away with *stare decisis* and, in any event, contradicts the Supreme Court's analysis.

**IV.    As the State Officers Responsible for Enforcing the Challenged Provisions, the Secretary and Speaker Are the Only Proper Defendants in this Lawsuit.**

The Challenged Provisions explicitly call for the Secretary and the Speaker, and no one else, to implement their procedures. "Under United States Supreme Court precedent, when a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant." *Am. Civil Liberties Union v. Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) (citing *Diamond v. Charles*, 476 U.S. 54, 64 (1986)); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 713 (S.D. Miss. 2014) (finding that that the Secretary of State was a proper defendant in a suit seeking unredacted voting records due to his responsibility to ensure disclosure of required records as chief election official); *Greater Birmingham Ministries v. Alabama*, No. 2:15-CV-02193-LSC, 2017 WL 782776, at *4 (N.D. Ala. Mar. 1, 2017) (finding that because the Alabama Secretary of State was responsible for implementing the state's voter identification law, he was a proper defendant in a challenge to that law).

As the only officers tasked with enforcing the Challenged Provisions, the Secretary and the Speaker are clearly proper defendants in this action. *See* MISS. CONST. art. V, §§ 140, 141, 143. Section 140 instructs the Secretary to collect and keep the gubernatorial election returns and to deliver them to the Speaker, who then "publish[es] them in the presence of the House of Representatives." *Id.* § 140. Section 143 instructs that the same procedures be followed in all other elections for statewide officials. *Id.* § 143. And the winner of each statewide election, determined by the structure of the Challenged Provisions, is declared based on the publication of those results. *Id.* § 140. Mississippi's statutory law also requires the Secretary to "keep in his office the returns of all elections by the people[] and deliver as received the returns of election of all state officers

to the speaker of the house of representatives on the first day of the next ensuing session of the legislature after the election." M<small>ISS</small>. C<small>ODE</small> A<small>NN</small>. § 7-3-5. Thus, the Secretary and the Speaker are solely responsible for implementing the Challenged Provisions. *See True the Vote*, 43 F. Supp. 3d at 713; *Greater Birmingham Ministries*, 2017 WL 782776, at *4; *Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986) (finding that the Secretary of State is a proper defendant in constitutional challenge to Mississippi's distribution of public school land funds due to his responsibility for general supervision of local school officials); *cf. Wilson v. Hosemann*, 185 So. 3d 370, 378 (Miss. 2016) (finding Secretary of State a proper defendant in action seeking presidential ballot access because injunction against his actions would provide a remedy for the constitutional violation).

Defendants argue that the Mississippi Attorney General is an indispensable party, but, tellingly, fail to explain what role the Attorney General plays in the enforcement of the Challenged Provisions. To be indispensable—and thus warrant dismissal if he cannot be feasibly joined in this action—the Attorney General must be "necessary" to this litigation under Rule 19(a). *United States v. Keathley*, No. C-11-107, 2011 WL 2600552, at *3 (S.D. Tex. June 29, 2011) ("Because these parties are not 'necessary,' the court need not consider whether they are 'indispensable,' and must deny Defendant's motion to dismiss pursuant to Rule 12(b)(7)."). According to Defendants, the Attorney General is necessary here because Mississippi law allows him to "intervene and argue the constitutionality of any statute when notified of a challenge thereto, pursuant to the Mississippi Rules of Civil Procedure." Mot. at 25 (citing M<small>ISS</small>. C<small>ODE</small>. A<small>NN</small>. § 7-5-1). But nothing about section 7-5-1 suggests that Plaintiffs cannot obtain the relief they seek in this suit without the participation of the Attorney General. If the Court orders the Secretary and the Speaker to deliver and publish only the popular vote totals, and declare as the winner of each statewide election the candidate who obtains the highest number of votes, for instance, the injury Plaintiffs describe in the

Complaint will not occur. *See Foster v. Dilger*, No. 3:10-cv-41-DCR, 2010 WL 4320388, at *3 (E.D. Ky. Oct. 22, 2010) (finding, in a suit challenging a Kentucky law limiting financial contributions to school board candidates, that the Kentucky Attorney General was not necessary under Rule 19(a)(1)(A) because relief from the challenged law could be accorded between the plaintiff and the Chairman of the state's election board).

In fact, the Attorney General would not even be a *proper* party in this litigation. As this Court recently explained, "the duty to defend the state in litigation is not the same thing as the power to enforce" that renders a party a proper defendant. *Campaign for Southern Equality v. Miss. Dep't of Human Serv.*, 175 F. Supp. 3d 691, 702 (S.D. Miss. 2016). And this makes sense, otherwise, under Defendants' theory, section 7-5-1 would automatically make the Attorney General a proper defendant in every single action challenging the constitutionality of Mississippi law.[7] *See id*. Because the Attorney General plays absolutely no role in the operations of the Challenged Provisions, he would be an improper defendant in this case. *Id.*; *see also Munie v. Koster*, No. 4:10-cv-1096-AGF, 2011 WL 839608, at *2 (E.D. Mo. Mar. 7, 2011) (dismissing the Attorney General of Missouri as a defendant in a case challenging a statute pursuant to which the Missouri Department of Transportation issued certificates, as the Attorney General did not have specific enforcement powers related to the statute being challenged); *Advanced Auto Transp. v. Pawlenty*, No. 10-159 (DWF/AJB), 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) ("Nor is the

---

[7] Defendants cite to *Dupree v. Mabus*, 776 F. Supp. 290 (S.D. Miss. 1991), noting that the Attorney General was held to be a proper party as "the chief legal officer and advisor of the state." Mot. at 26 n.30. But that case involved a claim under Section 5 of the Voting Rights Act, which explicitly provided that changes to the state voting law may not be enforced unless they have been submitted by the state's chief legal officer for preclearance. Because Section 5 made the Mississippi Attorney General responsible for enforcement (i.e., seeking preclearance), the Court found that he was the proper defendant. The court never suggested that the Attorney General was a proper defendant merely because of his status of as the chief legal officer for the state.

mere fact than attorney general has a duty to prosecute all actions in which a state is interested enough to make him a proper defendant in every action.") (quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)).

Finally, even assuming that the Attorney General were a proper and necessary defendant, that fact would not support dismissing the Complaint. An action can be dismissed under Rule 19(b) only if a necessary party cannot be feasibly joined in the litigation. *See* Fed. R. Civ. P. 19(b); *HS Res., Inc. v. Wingate*, 327 F.3d 432, 439 (5th Cir. 2003) (describing Rule 19's two-step analysis); *Foster*, 2010 WL 4320388, at *3 (denying motion to dismiss pursuant to Rule 12(b)(7), because, among other reasons, "[t]here is no reason that joinder of the Kentucky Attorney General in this action would not be feasible"). If the Court determines that the Attorney General is sufficiently involved in the implementation of the Challenged Provisions to make him a proper defendant, there is no reason to believe he could not be joined.[8]

## V.      Under the *Ex parte Young* Exception, and Given the Voting Rights Act's Abrogation of State Sovereign Immunity, the Eleventh Amendment Does Not Bar Any of Plaintiffs' Claims.

Plaintiffs' claims are not barred by the Eleventh Amendment, as Defendants contend, *see* Mot. at 24-25, for at least two reasons. First, the exception to Mississippi's sovereign immunity under *Ex parte Young* fully applies here. Under that doctrine, Plaintiffs may seek prospective injunctive relief against a state officer in her official capacity when the officer has "some

---

[8] Like the claims against the Secretary and the Speaker, a suit against the Attorney General—if this Court determined that he was a necessary party—would not be barred by sovereign immunity. *See Okpalobi v. Foster*, 244 F.3d 405, 414-15 (5th Cir.2001) (en banc) ("[S]tate officers c[an] be sued in federal court despite the Eleventh Amendment . . . [if] the officers have 'some connection with the enforcement of the act' in question or [are] 'specially charged with the duty to enforce the statute' and [are] threatening to exercise that duty.") (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)); *Greater Birmingham Ministries*, 2017 WL 782776, at *4 n.9 (explaining that "the same inquiry" governs whether a state officer is a proper defendant and whether that officer can be sued under *Ex parte Young*). There is therefore no basis for dismissing this action due to the Attorney General's absence.

connection with the enforcement of the act in question or [is] specially charged with the duty to enforce the statute' and [is] threatening to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414-15). As explained in the section above, the Challenged Provisions specifically instruct the Secretary and the Speaker to carry out the Electoral-Vote, Popular-Vote, and House-Vote Rules; no other officer is involved in those governmental operations. *See* MISS CONST. art. V, §§ 140, 141, 143; *see also* Section IV, *supra*. Because the injunction Plaintiffs seek alters the way the Secretary and the Speaker carry out their duties under the Challenged Provisions and would prevent the injuries of which Plaintiffs complain, the *Ex parte Young* exception clearly permits Plaintiffs' claims against these State officers. *See Campaign for S. Equal.*, 175 F. Supp. 3d at 709 (officer whose department was "charged with responsibilities affecting the adoption process," and whose official actions "interfered" with plaintiffs' ability to adopt, could be sued under *Ex parte Young*).

Second, the Eleventh Amendment "has no role to play" in Plaintiffs VRA claim because Congress, in enacting the statute, "validly abrogated state sovereign immunity." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). As a result, "the immunity from suit that [Mississippi] and its officials otherwise enjoy in federal court offers it no shield here." *Id.*; *see also Hall v. Louisiana*, 974 F. Supp. 2d 944, 953 (M.D. La. 2013) (because "Congress has abrogated the states' sovereign immunity for claims arising under the Voting Rights Act," plaintiff's "claims against the [state] Legislature under Section 2 of the Voting Rights Act are not proscribed by Eleventh Amendment sovereign immunity"); *Mixon v. State of Ohio*, 193 F.3d 389, 398 (6th Cir. 1999) (permitting Section 2 claim against Ohio because the VRA abrogated state sovereign immunity).

Because the *Ex parte Young* exception to Mississippi's sovereign immunity applies, and

because Mississippi lacks sovereign immunity against Plaintiffs' VRA claims, the Eleventh Amendment does not bar any of Plaintiffs' claims.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion to Dismiss.

July 29, 2019

Respectfully submitted,

/s/ *Uzoma N. Nkwonta*

Marc E. Elias*
Email: MElias@perkinscoie.com
Uzoma N. Nkwonta*
Email: UNkwonta@perkinscoie.com
Jacki L. Anderson*
Email: JackiAnderson@perkinscoie.com
K'Shaani Smith*
Email: KShaaniSmith@perkinscoie.com
Daniel C. Osher*
Email: DOsher@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Robert B. McDuff, MSB 2532
Email: rbm@mcdufflaw.com
767 North Congress Street
Jackson, MS  39202-3009
Telephone: (601) 969-0802
Fax: (601) 969-0804

Beth L. Orlansky, MSB 3938
Email: borlansky@mscenterforjustice.org
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS  39205-1023
Telephone: (601) 352-2269
Fax: (601) 352-4769

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 29, 2019, I filed the foregoing Plaintiffs' Response in Opposition to

Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will

send notification of such filing to all counsel of record.


*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
PERKINS COIE LLP
700 13th St. N.W., Suite 600
Washington, D.C.  20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: UNkwonta@perkinscoie.com
