**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| LESLIE-BURL McLEMORE;<br>CHARLES HOLMES;<br>JIMMIE ROBINSON, SR.;<br>RODERICK WOULLARD;<br>BRENDA BOOTH;<br>JORDAN MALONE; and<br>TYLER YARBROUGH,<br><br>          Plaintiffs,<br><br>   v.<br><br>DELBERT HOSEMANN, in his official capacity as the Mississippi Secretary of State; and PHILIP GUNN, in his official capacity as the Speaker of the Mississippi House of Representatives,<br><br>          Defendants. | Civil Action<br><br><br>Case No. 3:18-cv-383-DPJ-FKB<br><br><br>**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

Plaintiffs LESLIE-BURL McLEMORE, CHARLES HOLMES, JIMMIE ROBINSON, SR., RODERICK WOULLARD, BRENDA BOOTH, JORDAN MALONE, and TYLER YARBROUGH, by and through their undersigned counsel, file this AMENDED COMPLAINT for DECLARATORY and INJUNCTIVE RELIEF against Defendants DELBERT HOSEMANN, in his official capacity as the Mississippi Secretary of State, and PHILIP GUNN, in his official capacity as the Speaker of the Mississippi House of Representatives, and allege as follows:

**NATURE OF THE CASE**

1.     "The concept of 'we the people' under the [United States] Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications." *Gray v. Sanders*, 372 U.S. 368, 379–80 (1963). This mandate of equality extends to "all who participate in the election"—"whatever their race." *Id.* Yet, for far too long, Mississippi's procedures for electing candidates to statewide, state-level office, as set forth in Article V, Sections 140, 141, and

143 of the Mississippi Constitution (the "Challenged Provisions"), have violated this foundational principle and diluted African-American votes.

2.      Ratified in the aftermath of the Civil War and Reconstruction—and following the passage of the Thirteenth, Fourteenth, and Fifteenth Amendments to the U.S. Constitution—the electoral framework devised by the framers of Mississippi's 1890 Constitution introduced a multi-step process for electing candidates to statewide office that intentionally and effectively dilutes African-American voting strength in all such elections. The Mississippi Constitution requires a candidate for statewide office to obtain a majority of the popular vote (the "Popular-Vote Rule") *and* win (with a plurality) a majority of the Mississippi House of Representatives ("House") districts (the "Electoral-Vote Rule"). MISS. CONST. art. V, § 140.

3.      If no candidate satisfies both the Popular-Vote and Electoral-Vote Rules, the House determines the winner of the election (the "House-Vote Rule"). MISS. CONST. art. V, § 141 ("If no person shall receive such majorities, then the House of Representatives shall proceed to choose a governor from the two persons who shall have received the highest number of popular votes.").

4.      The architects of this system for electing candidates to statewide office had one goal in mind: entrench white control of State government by ensuring that the newly enfranchised African-American citizens—who, at the time, constituted a majority of the State's population and some of whom had been elected to statewide offices—would never have an equal opportunity to translate their numerical strength into political power.

5.      The Popular-Vote Rule advances this goal by making it more difficult for African-American-preferred candidates to win elections for statewide, state-level office, even when the white vote in a statewide election splinters between multiple candidates. And the House-Vote Rule—the cornerstone of the scheme—ensures that if disagreements between white voters over

their preferred candidate result in a failure by the electorate to elect any candidate, the House, which was (and still is) dominated by representatives from majority-white districts, would elect the winner, rather than Mississippi voters.

6.     The Electoral-Vote Rule also advances this goal because the vast majority of House districts have a majority-white population that can easily outvote the smaller number of highly concentrated African-American majority districts. And this is true even when the African-American-preferred candidate obtains a majority of the popular vote: the Electoral-Vote Rule creates such a significant disadvantage for candidates preferred by African Americans that they must obtain more than 55 percent of the popular vote to win a majority of House districts.

7.     This discriminatory electoral scheme achieved, and continues to achieve, the framers' goals by tying the statewide-election process to the power structure of the House. So long as white Mississippians controlled the House, they would also control the elections of statewide officials.

8.     To be sure, the framers of the 1890 Constitution included a bevy of other disenfranchising provisions to achieve this goal. The most obvious were overtly discriminatory provisions that prevented African Americans from casting a vote at all, including, but not limited to, a poll tax, literacy test, and understanding clause. *See* MISS. CONST. art. XII, §§ 243, 244 (1890). And the framers succeeded in their goal. Even to the present day, no African American has been elected to statewide office in Mississippi following the enactment of the 1890 Constitution, even though Mississippi currently boasts the highest percentage of African Americans among all states in the nation.

9.     Though, wise to the fact that these obviously discriminatory tactics might someday meet resistance, the framers fashioned the current electoral system for statewide office as a second layer of protection against the voting strength of the new African-American citizens.

10.     The Challenged Provisions ensured that: "under [the electoral system], white supremacy would be guaranteed even though all Negro men were permitted to vote"; it was "the legal basis and bulwark of the design of white supremacy." Albert D. Kirwan, *Apportionment in the Mississippi Constitution of 1890*, 14:2 J.S. HIST. 239 (May 1948).

11.     Mississippi's statewide election procedures are unlike any other in the United States. Even taken individually, each of the three rules is an outlier. Mississippi is the only state in the nation to require its statewide candidates to prevail in a majority of legislative districts (the Electoral-Vote Rule). *See* D. Gregory Sanford & Paul Gillies, *And If There Be No Choice Made: A Meditation on Section 47 of the Vermont Constitution*, 27 VT. L. REV. 783, 789–90 (2003). Only one other state allows its legislature, and not the people, to determine the outcome of its gubernatorial election (the House-Vote Rule). *Id.*; *see* VT. CONST. ch. II, § 47 (instructing that in elections for Governor, Lieutenant-Governor, and Treasurer, if no candidate receives a majority of the popular vote, the "Senate and House of Representatives shall by a joint ballot, elect to fill the office" among the three candidates who received the highest number of popular votes). And just two other states—Georgia and Vermont—require a candidate to obtain a majority of the popular vote to be elected Governor (the Popular-Vote Rule). GA. CODE ANN. § 21-2-501(a)(1); VT. CONST. ch. II, § 47.

12.     Taken together, the Challenged Provisions violate the Fourteenth and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act, because they were passed with the intent to discriminate against African-American voters and have

had the effect of diluting, or outrightly discarding, African-American votes. The Electoral-Vote Rule, moreover, separately violates the one-person, one-vote principle, mandated by the Equal Protection Clause of the Fourteenth Amendment, by causing some votes cast in statewide elections to be weighed more heavily than others.

13.     Absent Court intervention, the Challenged Provisions will continue to infringe upon the constitutional and statutory rights of African-American voters in Mississippi, dilute African-American votes, and violate the one-person, one-vote principle in the upcoming general election and in every statewide election for years to come.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

15.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

16.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities only.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b), because a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district. Mississippi's capitol city, Jackson—where Defendants enforce the Challenged Provisions and where some of the Plaintiffs reside—is located within the boundaries of the Northern Division of the Southern District of Mississippi. 28 U.S.C. § 104(b)(1). Both Defendants reside and work within the boundaries of the Northern Division of the Southern District of Mississippi.

18.     This Court has the authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

19.     Plaintiff LESLIE-BURL McLEMORE is an African-American citizen of the United States and a resident of Lake Cormorant, Mississippi, which is located in DeSoto County. Dr. McLemore has resided in Mississippi for most of his life. When he registered to vote in Mississippi more than 50 years ago, Dr. McLemore was forced to pay a poll tax and pass a literacy test. Dr. McLemore, a long-time voter, resides and votes in Mississippi House of Representatives District 25, which is heavily concentrated with white voters. Dr. McLemore has consistently supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters, and he intends to support statewide candidates preferred by African Americans in upcoming elections. The Challenged Provisions have diluted Dr. McLemore's vote in statewide elections and have made it more difficult for him to elect his candidates of choice to statewide office. Dr. McLemore plans to vote in the 2019 general election in Mississippi, and absent intervention by this Court, Dr. McLemore will again have his vote diluted and his constitutional rights infringed.

20.     Plaintiff CHARLES HOLMES is an African-American citizen of the United States and a resident of Jackson, Mississippi, which is located in Hinds County. Dr. Holmes, a long-time voter, has resided in Mississippi for most of his life, and he was forced to pass an understanding test when he first registered to vote more than 50 years ago. Dr. Holmes resides and votes in Mississippi House of Representatives District 69, which is a majority African-American district. Dr. Holmes has consistently supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters, and he intends to support

statewide candidates preferred by African Americans in upcoming elections. The Challenged Provisions have diluted Dr. Holmes's vote in statewide elections, making it more difficult for him to elect his candidates of choice to statewide office. Dr. Holmes plans to vote in the 2019 general election in Mississippi, and absent intervention by this Court, Dr. Holmes will again have his vote diluted and his constitutional rights infringed.

21.     Plaintiff JIMMIE ROBINSON, SR., is an African-American citizen of the United States and a resident of Jackson, Mississippi, which is located in Hinds County. Mr. Robinson has resided in Mississippi for most of his life. When he first registered to vote more than 60 years ago, Mr. Robinson was forced to pay a poll tax and pass an understanding test. Mr. Robinson, a long-time voter, resides and votes in Mississippi House of Representatives District 70, which is a majority African-American district. Mr. Robinson has consistently supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters, and he intends to support statewide candidates preferred by African Americans in upcoming elections. The Challenged Provisions have diluted Mr. Robinson's vote in statewide elections and have made it more difficult for him to elect his candidates of choice to statewide office. Mr. Robinson plans to vote in the 2019 general election in Mississippi, and absent intervention by this Court, Mr. Robinson will again have his vote diluted and his constitutional rights infringed.

22.     Plaintiff RODERICK WOULLARD is an African-American citizen of the United States and a resident of Hattiesburg, Mississippi, which is located in Forrest County. Mr. Woullard has lived in Mississippi most of his life and has been registered to vote in Mississippi for over 35 years. Mr. Woullard, a long-time voter, resides and votes in Mississippi House of Representatives District 103, which is a majority African-American district. Mr. Woullard has consistently

supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters, and he intends to support statewide candidates preferred by African Americans in upcoming elections. The Challenged Provisions have diluted Mr. Woullard's vote in statewide elections and have made it more difficult for him to elect his candidates of choice to statewide office. Mr. Woullard plans to vote in the 2019 general election in Mississippi, and absent intervention by this Court, Mr. Woullard will again have his vote diluted and his constitutional rights infringed.

23.     Plaintiff BRENDA BOOTH is an African-American citizen of the United States and a resident of Hattiesburg, Mississippi, which is located in Forrest County. Ms. Booth has lived in Mississippi all of her life and has been registered to vote in Mississippi for almost 45 years. Ms. Booth, a long-time voter, resides and votes in Mississippi House of Representatives District 103, which is a majority African-American district. Ms. Booth has consistently supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters, and she intends to support  statewide candidates preferred by African Americans in upcoming elections. The Challenged Provisions have diluted Ms. Booth's vote in statewide elections and have made it more difficult for her to elect her candidates of choice to statewide office. Ms. Booth plans to vote in the 2019 general election in Mississippi, and absent intervention by this Court, Ms. Booth will again have her vote diluted and her constitutional rights infringed.

24.     Plaintiff JORDAN MALONE is a 22-year-old African-American citizen of the United States. Ms. Malone is registered to vote in Madison, Mississippi, which is located in Madison County, and she votes in Mississippi House of Representatives District 58, which is heavily concentrated with white voters. She has been registered to vote in Mississippi since 2015. Ms. Malone plans to vote in the 2019 general election in Mississippi, which will be the first time

she participates in Mississippi's statewide elections. She intends to support statewide candidates preferred by African Americans. Absent intervention by this Court, Ms. Malone will have her vote diluted and her constitutional rights infringed.

25.     Plaintiff TYLER YARBROUGH is a 20-year-old African-American citizen of the United States. Mr. Yarbrough is registered to vote in Clarksdale, Mississippi, which is located in Coahoma County, and he votes in Mississippi House of Representatives District 26, which is a majority African-American district. Mr. Yarbrough has been registered to vote in Mississippi since 2017. He plans to vote in the 2019 general election in Mississippi, which will be the first time he participates in Mississippi's statewide elections. Mr. Yarbrough intends to support statewide candidates preferred by African Americans. Absent intervention by this Court, Mr. Yarbrough will have his vote diluted and his constitutional rights infringed.

26.     Defendant DELBERT HOSEMANN (the "Secretary") is the Secretary of State of Mississippi and is named as a Defendant in his official capacity. The Secretary is Mississippi's chief election officer and serves as the Secretary of the State Board of Election Commissioners. MISS. CODE ANN. §§ 23-15-211(1), 23-15-211.1(a). The Secretary is responsible for keeping the election returns for all state offices and delivering those returns to the Speaker of the House of Representatives. MISS. CONST. art. V, §§ 140, 143; MISS. CODE ANN. § 7-3-5. The Secretary is also responsible for training election commissioners and receiving those commissioners' certified results after the conclusion of a statewide election. MISS. CONS. art. V, § 140; MISS. CODE ANN. § 23-15-211(4)–(6). At all times relevant to this action, the Secretary has acted, and will act, under color of state law.

27.     Defendant PHILIP GUNN (the "Speaker") is the Speaker and presiding officer of the Mississippi House of Representatives and is named as a Defendant in his official capacity. The

Challenged Provisions make the Speaker responsible for receiving the returns of elections for statewide offices from the Secretary, and, in the presence of the House, opening and publishing those returns. MISS. CONS. art. V, §§ 140, 143. Pursuant to the Challenged Provisions, the winner of any election for statewide office is determined based on the results published by the Speaker. *Id.* §§ 140, 141, 143. At all times relevant to this action, the Speaker has acted, and will act, under color of state law.

## STATEMENT OF FACTS AND LAW

### I.     The Challenged Provisions

28.     The Mississippi Constitution of 1890 adopted a multi-step process for counting votes and identifying the winner of elections for statewide office. Specifically, Article V, Section 140 of the Mississippi Constitution requires candidates for Governor to obtain both the majority of the popular vote statewide (the Popular-Vote Rule) and a plurality of votes in a majority of Mississippi House districts (the Electoral-Vote Rule) in order to be declared the winner of the election. MISS. CONST. art. V, § 140. These requirements are set forth in Article V, Section 140 of the Mississippi Constitution, which states:

> The Governor of the state shall be chosen in the following manner: On the first Tuesday after the first Monday of November of A.D. 1895, and on the first Tuesday after the first Monday of November in every fourth year thereafter, . . . an election shall be held in the several counties and districts created for the election of members of the House of Representatives in this state, for Governor, and the person receiving in any county or such legislative district the highest number of votes cast therein, for said office, shall be holden to have received as many votes as such county or district is entitled to members in the House of Representatives, which last named votes are hereby designated "electoral votes[.]" . . . *The person found to have received a majority of all the electoral votes, and also a majority of the popular vote, shall be declared elected.*

MISS. CONST. art. V, § 140 (emphasis added).[1]

29.     If no candidate satisfies both the Popular-Vote and Electoral-Vote Rules, then "the House of Representatives shall proceed to choose a governor from the two persons who shall have received the highest number of popular votes." MISS. CONST. art. V, § 141.

30.     Article V, Section 143 applies these same procedures to all elected statewide state-level offices. MISS. CONST. art. V, § 143 ("All other state officers shall be elected at the same time, and in the same manner as provided for election of Governor.").

31.     As set forth below, these Challenged Provisions were enacted with the goal, and have had the effect, of diluting African-American voting strength in Mississippi.

## II.     The Framers of the 1890 Constitution Enacted the Challenged Provisions with the Express Intent to Dilute African-American Voting Strength.

32.     The framers of the 1890 Constitution made no secret of their intentions. The Challenged Provisions are the result of a blatant, well-publicized campaign to minimize the political influence of African Americans in Mississippi.

33.     During the late 1860s and early 1870s, African-American political influence grew in Mississippi. The Fifteenth Amendment to the United States Constitution was ratified in 1870, guaranteeing that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." And with the franchise in hand, African-American men elected their preferred candidates to

---

[1] Section 140 has been amended just once since its enactment. In 1982, Mississippi made a non-substantive change regarding the timing under which statewide-election returns were published. 1982 Gen. Laws 96–97, S. Con. Res. 517 (Miss.). As amended, Section 140 now provides that the Secretary of State shall deliver statewide election returns to the Speaker of the House "on the first day of the next ensuing session of the Legislature," and that the Speaker shall publish those returns "on the same day he shall have received said returns." *Compare* MISS. CONST. art. V, § 140 (1890), *with* MISS. CONST. art. V, § 140 (2019).

Mississippi's elected offices, including over one hundred African-American candidates to serve in the House, and 13 to serve in the Mississippi Senate. Byron D'Andra Orey, *Black Legislative Politics in Mississippi*, 30 J. OF BLACK STUDIES 791, 793 (July 2000). They even elected African-American candidates to statewide office, including a Lieutenant Governor and Superintendent of Education. *See id.*; CHRISTOPHER SPAN, FROM COTTON FIELD TO SCHOOLHOUSE: AFRICAN AMERICAN EDUCATION IN MISSISSIPPI 167 (2009).

34.     Shortly thereafter, and in response to these successes, several states in the South, including Mississippi, began enacting policies and procedures designed to prevent African Americans from influencing and participating in the electoral process.

35.     Seeking to limit the Fifteenth Amendment's impact in the state, Mississippi convened a Constitutional Convention in 1890. The delegates to this convention openly expressed their desire to craft a new constitution that would disfranchise African-American voters and prevent them from electing their candidates of choice to public office.

36.     This discriminatory purpose was made clear on the first day of the Convention. President of the Convention and a member of the Committee on Franchise, Apportionment, and Elections (the "Franchise Committee"), Judge Solomon S. Calhoon, stated in his opening speech that "[t]here exists here in this State two distinct and opposite types of mankind." JOURNAL OF PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF MISSISSIPPI 10 (1890) (the "JOURNAL"). He posited that African Americans' control of the government had "always meant economic and moral ruin," compared with a government controlled by white men, which always resulted in "prosperity and happiness to all races." *Id.*; *accord* DOROTHY O. PRATT, SOWING THE WIND: THE MISSISSIPPI CONSTITUTIONAL CONVENTION OF 1890 11 (2018). Calhoon believed that

Mississippi "needed to deal with the issues of the franchise and the 'over generous' numbers of African American voters." PRATT, *supra* at 11 (quoting JOURNAL, *supra* at 10).

37.     There is "no doubt" that the Challenged Provisions were "inspired by [these] racial politics." JOHN W. WINKLE, III, THE OXFORD COMMENTARIES ON THE STATE CONSTITUTIONS OF THE UNITED STATES: THE MISSISSIPPI STATE CONSTITUTION 14 (2014). President Calhoon thus proposed "a system of electors in which a gerrymandering of counties would provide white governors and legislators." PRATT, *supra* at 83. And Senator James Z. George, an at-large delegate and one of the chief architects of the 1890 Constitution, suggested that the legislature, not the people, should elect the Governor to ensure "white control." PRATT, *supra* at 76.

38.     The Convention, therefore, apportioned the legislature such that white individuals, despite being a minority in the State, controlled the House. J.S. McNeilly, *History of the Measures Submitted to the Committee on elective Franchise, Apportionment, and Elections in the Constitutional Convention of 1890*, *in* Publications of Mississippi Historical Society, Vol. VI, 133 (1902) (referring to the legislative apportionment plan as "the legal basis and bulwark of the design of white supremacy in a State with an overwhelming and a growing negro majority").

39.     Having safeguarded the Mississippi House of Representatives "as the basis of white supremacy," the delegates extended the "value and advantages of the representative apportionment" to the executive branch by adopting a novel "electoral plan" giving the House the final decision in electing the Governor and other statewide officers. *Id.* at 135 (1902). In doing so, the delegates enacted the Challenged Provisions, which transformed the statewide electoral procedure from a simple plurality requirement, MISS. CONST., art. V, § 2 (1868), to a multi-step process, unlike any other state's, which required all statewide officials to receive a majority of both the popular vote and the electoral votes, the latter corresponding to the House of

Representatives' apportionment. MISS. CONST. art. V, § 140 (1890). If any statewide candidate failed to obtain both majorities, the election would then be decided by the apportioned House. *Id.* §§ 141, 143.

40.     The Mississippi Supreme Court has even acknowledged that the delegates planned to undermine African-American voting strength, and that the Challenged Provisions achieved that goal:

> If we look at the map of the state, and at the census reports, showing the racial distribution of our population, and consider these in connection with the apportionment of the constitution, it will at once appear that, unless there shall be a great shifting of population, *the control of the legislative department of the state is so fixed in the counties having majorities of whites* as to render exceedingly improbable that it can be changed in the near future by the ordinary flow of immigration, or by the growth by births among our own people. *The election of the chief executive of the state is also largely affected by the same means. It is in the highest degree improbable that there was not a consistent, controlling, directing purpose governing the convention by which these schemes were elaborated and fixed in the constitution.* Within the field of permissible action under the limitations imposed by the federal constitution, the convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race.

*Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896) (emphases added).

III.    **The Challenged Provisions Dilute African-American Voting Strength in Elections for Statewide Office.**

A.      **The Electoral-Vote Rule.**

41.     The Electoral-Vote Rule hinders African Americans' ability to elect candidates of their choice because it creates a system in which white-preferred candidates can win a majority of House districts with a smaller percentage of the statewide popular vote than would be required of an African-American-preferred candidate. Due to racially polarized voting and the geographic and electoral concentration of the racial groups among the House districts, a white-preferred candidate does not even need to win a majority of the popular vote to win a majority of the House districts,

while an African-American-preferred candidate must obtain at least 55 percent of the popular vote to win a majority of House districts and thus satisfy the Electoral-Vote Rule.

42.     Voting in Mississippi is highly racially polarized, with the vast majority of white voters preferring Republican candidates, and the vast majority of African-American voters preferring Democratic candidates. For example, in the two U.S. Senate elections in Mississippi in 2008, African-American voters supported the Democratic candidates by an estimated 90 percent, and white voters supported the Republican candidates by an estimated 81 percent to 90 percent. The results of the most recent gubernatorial race further demonstrate this division. There, Republican candidate Phil Bryant defeated Democratic candidate Robert Gray by prevailing in *every single one* of the 80 majority-white House districts.

43.     African-American voters are also highly concentrated in a small number of districts. In 42 of the 122 House districts, African Americans form a majority of the total and voting-age population, and in 37 of those districts, the African-American voting-age population is over 60 percent.

44.     Because white and African-American Mississippians overwhelmingly vote for different candidates, and because of the geographic and electoral concentration of the racial groups among the House districts, African Americans' candidates of choice must obtain a significantly larger share of the statewide population in order to win a majority of House districts, as compared to candidates preferred by white voters.

45.     In fact, the returns from the most recent gubernatorial election illustrate this point: while the white-preferred candidate did not even need a majority of the popular vote in order to win a majority of the House districts; the African-American-preferred candidate needed to obtain more than 58 percent of the popular vote to do so.

**B.      The Popular-Vote Rule and the House-Vote Rule.**

46.     The Popular-Vote Rule—which requires a candidate to win a majority of the popular vote to avoid the House's intervention in the election—ensures that, in the event that the candidate supported by African-American voters wins a plurality, but not a majority, of the vote, the election is decided by the House of Representatives, of which the vast majority of its members are elected from majority-white districts. The House members are not required to choose the candidate who won the most popular votes but instead can choose the runner-up in the popular vote and thereby thwart the popular vote and defeat the candidate of choice of African-American voters.

47.      The Popular-Vote Rule ensures that even when African-American-preferred candidates generate enough support to win a plurality of votes, they are unlikely to be elected. *See City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (requiring removal of a majority vote rule for preclearance under Section 5, recognizing that "[i]n the context of racial bloc voting prevalent in [a city in which African Americans constituted a minority of the population], the [majority-vote] rule would permanently foreclose a black candidate from being elected to an at-large seat"); *see also Jeffers v. Clinton*, 740 F. Supp. 585, 595 (E.D. Ark. 1990) (holding unconstitutional Arkansas laws imposing majority-vote rules in municipal and county elections as intentionally discriminatory and noting that the rules "replace[d] a system in which blacks could and did succeed, with one in which they almost certainly cannot").

48.     The House-Vote Rule—which is triggered when no candidate satisfies both the Electoral-Vote and Popular-Vote Rules—thwarts the election of an African-American-preferred candidate by removing the selection of candidates for statewide office from the hands of the electorate and places the decision with the House, where African Americans have little influence.

16

49.     Originally proposed as a failsafe to guarantee "white control," PRATT, *supra* at 83, the House-Vote Rule, when enforced, ensures that members of the Mississippi House of Representatives—the vast majority of whom are elected from majority-white districts—will select the winner. This provision gives the House the power to thwart the popular will and select a candidate who received fewer statewide votes than her opponent.

## IV.     The Electoral-Vote Rule Violates the One Person, One Vote Principle.

50.     The Electoral-Vote Rule also violates the Equal Protection Clause's one-person, one-vote principle by discarding votes in each House district and assigning unequal weight to individual votes in elections for statewide office, based solely on the House districts in which those votes were cast.

51.     Under the Electoral-Vote Rule, the influence of a person's vote in a statewide race is confined to the boundaries of her House district. If her preferred candidates wins, her vote contributes to that candidate receiving a single electoral vote. But if the voter's preferred candidate loses that House district, her vote is discarded.

52.     The Supreme Court has made clear that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). Thus, in a statewide election, a state must count all votes equally, regardless of where in the state they were cast.

53.     Under this principle, the Court held unconstitutional an electoral-vote system, which, like Mississippi's, discarded votes cast for candidates who lost individual counties, thereby cancelling the voting strength of a significant portion of the state's population. *Gray*, 372 U.S. at 381 n.12 ("[I]f a candidate won 6,000 of 10,000 votes in a particular county, he would get the

entire vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.").

54.     The results of the most recent gubernatorial election, in 2015, clearly demonstrate how the Electoral-Vote Rule discards and assigns unequal weight to votes cast for statewide office. There, Republican candidate Phil Bryant defeated Democratic candidate Robert Gray in House District 33 by a total-vote margin of 4,647 to 2,532. But the result of this vote was that Bryant received one electoral vote, and Gray received no electoral votes from that district, and the votes cast for Gray in District 33 made no contribution towards Gray's electoral-vote count. Thus, the votes of 2,532 District 33 residents who voted for Gray were simply discarded.

55.     Similarly, the Electoral-Vote Rule discards all votes cast for a candidate in a particular district *in excess* of the number of votes required to obtain the highest vote total in that district. If a candidate won 9,000 out of 10,000 votes in one district, for example, she would receive only one electoral vote, and all other marginal votes cast for the candidate—in excess of the number of votes required to win that district—would be discarded, since they would have no impact on the single electoral vote assigned for that district.

56.     Again, the most recent gubernatorial election offers an example of this effect. There, residents of House District 67 overwhelmingly supported Democratic candidate Robert Gray over Republican candidate Phil Bryant and Reform Party candidate Shawn O'Hara. In that District, Gray received 4,054 votes, while Bryant and O'Hara respectively received just 881 and 105. By contrast, in House District 30, Bryant received just 49 more votes than Gray: Bryant received 2,349 votes, and Gray received 2,300. Although Bryant obtained only slightly more than half of the number of votes in District 30 that Gray received in District 67, both candidates were awarded one electoral vote each for Districts 30 and 67. In producing this outcome, Mississippi's

Electoral-Vote Rule weighed the votes of Bryant's supporters in District 30 nearly twice as heavily as Gray's supporters in District 67.

57.    Notably, District 67 is a highly concentrated majority-African-American district. According to the 2010 census, 86 percent of its total population and 84 percent of its voting-age population is African American.

58.    Thus, in 2015, the Electoral-Vote Rule discarded all votes cast in support of Democratic candidate Robert Gray in each of the 80 majority-white House districts. And in a number of majority-African American districts, like District 67, the Electoral-Vote Rule discarded (and assigned unequal weight to) votes cast for Gray beyond those necessary for him to win those districts. If the Electoral-Vote Rule is not enjoined, the same will occur in the 2019 election.

**V.     The Challenged Provisions Violate Section 2 of the Voting Rights Act.**

59.    The Challenged Provisions, as noted above, were enacted with the intent, and have had the effect, of denying African Americans in Mississippi an equal opportunity to participate in the political process and elect their preferred candidates to statewide office. As the Senate factors below demonstrate, the Challenged Provisions, when reviewed under the totality of the circumstances, plainly violate Section 2 of the Voting Rights Act.

**A.     Mississippi Has an Extensive History of Discrimination Against African Americans, the Effects of Which Persist Today.**

60.    Mississippi has a long, unbroken, and well-documented history of discriminating against African Americans in every aspect of its society, and it has imposed barriers to African-American political participation, the effects of which are still evident today.

61.    During Reconstruction, African Americans in Mississippi achieved steadily growing success in state and local elections, even electing African American candidates to statewide office. But after 1877—when the last federal soldiers left the South and Reconstruction

ended—African Americans in Mississippi "lost their political rights . . . through intimidation, fraud, and outright murder, and racial segregation became largely a matter of custom." David H. Jackson, *Segregation*, *in* Mississippi Encyclopedia (July 11, 2017), https://mississippiencyclopedia.org/entries/segregation. In fact, racial discrimination was so much a part of everyday life in post-Reconstruction Mississippi that Jim Crow laws were essentially unnecessary. *Id.*

62.    Federal courts have acknowledged Mississippi's history of discrimination in voting. *E.g.*, *United States v. Mississippi*, 380 U.S. 128, 131–36 (1965) (detailing the history of racially discriminatory election practices in Mississippi); *Miss. St. Chapter, Operation PUSH, Inc. v. Mabus*, 932 F.2d 400, 402 (5th Cir. 1991) ("Mississippi has a long history of using voter qualifications and registration procedures to impede black citizens' participation in the political process."); *Thomas v. Bryant*, 366 F. Supp. 3d 786, 807 (S.D. Miss. 2019) ("Mississippi plainly has a long history of official discrimination against African-Americans seeking to vote."); *Martin v. Allain*, 658 F. Supp. 1183, 1192 (S.D. Miss. 1987) ("Mississippi has a long history of official discrimination touching on the right of black citizens to vote and participate in the democratic process."); *Jordan v. Winter*, 604 F. Supp. 807, 811–12 (N.D. Miss. 1984) ("Mississippi has a long history of de jure and de facto race discrimination is not contested.").

63.    The State's history of discrimination against African Americans, however, extends well beyond voting restrictions: the use of violence and intimidation to subjugate African Americans is also well-documented. Between 1882 and 1968, for example, white Mississippians lynched 539 African Americans, the largest number in the nation. *See* Archives at Tuskegee Institute, *Lynching, Whites & Negros, 1882-1968* (2010). In 1955, two white Mississippians abducted and killed 14-year-old Emmitt Till for allegedly whistling at a white woman, after which

they tethered "his body [] to a cotton gin fan with barbed wire and then cast [it] into a river." Alan Blinder, *U.S. Reopens Emmett Till Investigation, Almost 63 Years After His Murder*, N.Y. TIMES (July 12, 2018), https://www.nytimes.com/2018/07/12/us/emmett-till-death-investigation.html.

64.    In 1963, the nation was stunned by the assassination of civil rights leader Medgar Evers, who was shot by a white supremacist while Evers stood in the driveway of his home in Jackson. Not long after, Klansmen abducted and murdered three civil rights workers who had organized successful boycotts and voter registration efforts in Mississippi. Claude Sitton, *N.A.A.C.P. Leader Slain in Jackson; Protests Mount*, N.Y. TIMES (June 13, 1963), at A1.

65.    Racially motivated violence remains ever-present in the State. In 2011, for example, two carloads of white teenagers went on a "mission" in Jackson to "find and hurt a black person." Drew Griffin, *Video Shows White Teens Driving Over, Killing Black Man, Says DA*, CNN.com (Aug. 8, 2011), http://www.cnn.com/2011/CRIME/08/06/mississippi.hate.crime. After encountering 49-year-old James Anderson in a parking lot, the teenagers beat Anderson repeatedly while yelling racial epithets. "[The] group of the teens then climbed into their large Ford F250 green pickup truck, floored the gas, and drove the truck right over Anderson, killing him instantly." *Id.* And, recently, Mississippi college students took pictures with guns in front of a memorial sign, riddled with bullet holes, detailing the brutal murder of Emmett Till. Nicole Chavez et al., *3 College Students Posed with Guns by the Emmett Till Memorial. The Justice Department May Investigate*, CNN (July 26, 2019), https://www.cnn.com/2019/07/25/us/emmett-till-marker-mississippi-students-suspended/index.html. In addition, this spring, a white woman threatened an African-American couple, who arrived at a campground without a reservation, with gun violence. Dan Cancian, *Raging White Woman with a Gun Tells Black Couple to Leave Mississippi*

*Campground: Racism is Alive and Well*, NEWSWEEK (May 29, 2019), https://www.newsweek.com/kampgrounds-america-racism-starkville-manager-fired-1437810.

66.     Mississippi also has an extensive history of discrimination and segregation in employment and economic opportunities. During Reconstruction, Mississippi was the first state to enact "Black Codes"—laws designed to limit the freedom of African Americans and ensure their availability as a cheap labor force after slavery was abolished. Mississippi's Black Codes required African Americans to provide the State with written evidence of employment for the coming year each January, the absence of which proved vagrancy and led to arrest. DANIEL A. NOVAK, THE WHEEL OF SERVITUDE: BLACK FORCED LABOR AFTER SLAVERY 2 (1978). If African Americans left before the end of their employment contract, they would be forced to forfeit earlier wages and, again, were subject to arrest. *See id.* at 2–3.

67.     State and local laws also separated white individuals and African Americans in housing, transportation, churches, playgrounds, and all other aspects of social life. *See* STEPHEN A. BERREY, THE JIM CROW ROUTINE: EVERYDAY PERFORMANCES OF RACE, CIVIL RIGHTS, AND SEGREGATION IN MISSISSIPPI 24–26, 223 (2015) ("At one end of the spectrum were the spaces of near-complete racial separation, where blacks and whites encountered each other only sporadically. Schools, churches, and the homes of African Americans, for example, tended to be racially exclusive."). These discriminatory policies meant that African Americans had the worst jobs, lowest pay, and harshest living conditions. NEIL R. MCMILLEN, DARK JOURNEY: BLACK MISSISSIPPIANS IN THE AGE OF JIM CROW 156–57 (1999) ("Black occupations [] were limited almost entirely to domestic and manual labor . . . [African Americans] could be worked harder under the most adverse conditions with fewer complaints.").

> **B.      African Americans in Mississippi Today Bear the Effects of Discrimination in Many Areas of Life, Including Education, Employment, and Health.**

68.      As a result of the discriminatory practices described above, among others, a disproportionate number of African Americans in Mississippi currently live in poverty. According to the most recent American Community Survey, the rate of African-American poverty in the State (33.8 percent) is almost 3 times that of white poverty (13.4 percent). This disparity is similarly observed among those under 18 years-old, as 46.9 percent of African-American children live in low-income families in Mississippi, as compared to 16.3 percent of white children.

69.      African Americans also earn significantly less than whites. Data from the American Community Survey from 2013 to 2017 show that the per capita income for white households in Mississippi is $27,973, which is almost double that of African-Americans households ($15,113).

70.      Data from the Bureau of Labor Statistics from 2017 show that the unemployment rate of African-American individuals in the State, 7.3 percent, is significantly higher than the rate of white individuals, which is 3.7 percent. African Americans are also underrepresented in government employment. As one recent newspaper article put it, "[t]he practice of nearly exclusive hiring whites, particularly white men, in top leadership positions is widespread in Mississippi government, which is composed 68 agencies of which blacks lead only six, a dismal 8.8 percent." Getty Israel, *Time to Close the Systemic Racism Gap in Mississippi Government*, CLARION-LEDGER (Sept. 16, 2018), https://www.clarionledger.com/story/opinion/columnists/2018/09/16/time-close-systemic-racism-gap-mississippi-government/1281330002/.      Further illustrating this point, almost 84 percent of administrators at the Mississippi Department of Health are white, while only 13 percent are African-American. *See id.* And over 99 percent of the Mississippi Board of Health's membership is white. *Id.*

71.     According to the most recent American Community Survey, property ownership among African Americans significantly lags that of whites, as 76.7 percent of all white Mississippians owned a home, compared to only around 54.2 percent of African Americans.

72.     Mississippi also has a long history of discrimination in education. After Reconstruction, Mississippi spent fewer resources on educating African-American children than any other state. In 1900, although African-American children accounted for 60 percent of Mississippi's school-age population, they received only 19 percent of the state's school funds. Jackson, *supra*. One county spent $22.23 to educate each white child, but only $2.00 on each African-American child. *Id.*

73.     Well after the Supreme Court declared segregation in public education unconstitutional in 1954, Mississippi dragged its feet in desegregating its schools. This resistance forced President John F. Kennedy to dispatch 300 federal marshals to Mississippi in 1962 to enforce a court order that James Meredith be allowed into the buildings of the University of Mississippi.

74.     Today, there remains a significant educational disparity between white individuals and African Americans in Mississippi. According to the latest American Community Survey, a greater percentage of African Americans (22.1 percent) lack a high school diploma in Mississippi than white individuals (13.1 percent).

75.     Great disparities also exist in higher education in Mississippi. According to the most recent American Community Survey, only 14.9 percent of African-American Mississippians obtained at least a college degree, whereas 24.8 percent of white individuals in the State did.

76.     In other areas, such as criminal justice and health care, racial disparities persist. The rate of insured individuals, for instance, in 2012, was almost 13 percent less for African Americans

than it was for white individuals. *See* Mississippi State Dep't of Health, *State of the State: Annual Mississippi Health Disparities and Inequalities Report* (October 2015), https://msdh.ms.gov/msdhsite/_static/resources/6414.pdf. And "infant mortality rates are 71 percent higher [for African-American Mississippians] than for whites." Bill Crawford, *Mississippi's Health is the Worst. State Leaders Don't Seem to Notice*, Sᴜɴ Hᴇʀᴀʟᴅ (Nov. 19, 2017), https://www.sunherald.com/opinion/other-voices/article185450363.html.

77.     African Americans in Mississippi are also incarcerated at disproportionately higher rates. According to the Mississippi Department of Corrections, in 2016 the State's prison population was over 65 percent African American. Further, the State's felon disenfranchisement scheme that disqualifies an individual with a felony from voting after serving time and completing probation—and disenfranchises the highest rate of its residents in the entire country— disproportionately impacts African Americans, who comprise 61 percent of those disenfranchised under the law. *See* Alex Rozier, *Racial Disparity Conspicuous Among Mississippi Banned from Voting*, Mɪssɪssɪᴘᴘɪ Tᴏᴅᴀʏ (Feb. 12, 2018), https://mississippitoday.org/2018/02/22/racial-disparity-conspicuous-among-mississippians-banned-voting/.

78.     And intentional racial discrimination is still ever-present in the criminal justice system. For example, just a few weeks ago, the United States Supreme Court recognized that a white elected prosecutor in Winona engaged in racially discriminatory activity against an African-American defendant, who was tried six times for the same crime by the same prosecutor, with the first three convictions having been reversed due to prosecutorial misconduct involving racial discrimination. *Flowers v. Mississippi*, 139 S. Ct. 2228, 2235 (2019). The Court found that the prosecutor continued to engage in racially discriminatory behavior in the sixth trial by striking

African-American prospective jurors on the basis of race and by asking dramatically different questions of African-American and white prospective jurors. *See id.*

>C. **Candidates in Mississippi Have Attempted to Capitalize on Racial Divisions by Invoking Racial Appeals to Win Elections.**

79.    Because voting in Mississippi is highly racially polarized, and white and African-American Mississippians prefer different candidates, white candidates for elected office in the State have often resorted to racial appeals, both subtle and overt.

80.    The recent 2018 general election provides many examples of such racial appeals. For instance, a white Republican primary candidate for U.S. Senate, Chris McDaniel, stated that African Americans in Mississippi should stop "begging for federal government scraps." Geoff Pender, *GOP Senate Candidate Tells African-Americans: Stop 'Begging for Federal Government Scraps,*' USA TODAY (Sept. 14, 2018), https://www.usatoday.com/story/news/ politics/2018/09/14/gop-candidate-blacks-stop-begging-government-scraps/1303501002/.

81.    The eventual white Republican Senate nominee, Cindy Hyde-Smith, also resorted to overt racial appeals when running against African-American Democratic candidate, Mike Espy. Hyde-Smith even stated that "[i]f [a friend] invited me to a public hanging, I'd be on the front row." Caleb Debillion, *Hyde-Smith Deflects Questions About 'Public Hanging' Comments*, DAILY JOURNAL (Nov. 12, 2018), https://www.djournal.com/news/hyde-smith-deflects-questions-about-public-hanging-comments/article_0fbc4316-b8ab-5dd2-aa1a-24b3ad9bd703.html.          Given Mississippi's long history of lynching, this comment was widely interpreted to reference racial violence and received national backlash. *See* Matthew Haag, *Mississippi Senator's 'Public Hanging' Remark Draws Backlash Before Runoff*, N.Y. TIMES (Nov. 12, 2018), https://www.nytimes.com/2018/11/12/us/politics/public-hanging-cindy-hyde-smith.html;       Eric

Etheridge, *Judge Carlton Reeves: Resurrecting the Nightmarish Specter of Lynchings in Mississippi*, Breach of Peace (Feb. 11, 2015), https://breachofpeace.com/blog/?p=612.

82.     During the same campaign, Hyde-Smith also stated that "[m]aybe we want to make it just a little more difficult" to vote. Allan Smith, *Mississippi GOP Sen. Hyde-Smith Calls Voter Suppression 'Great Idea.' Campaign: 'Obviously' Joking*, NBC NEWS (Nov. 15, 2018), https://www.nbcnews.com/politics/elections/mississippi-gop-sen-hyde-smith-calls-voter-suppression-great-idea-n936946. Her statement was interpreted to advocate for the suppression of student voters at Mississippi's historically African-American colleges. *See* Eugene Scott, *Cindy Hyde-Smith's Campaign is Dredging up Stereotypes Some Mississippians Would Rather Forget*, WASH. POST (Nov. 21, 2018), https://www.washingtonpost.com/politics/2018/11/21/cindy-hyde-smiths-campaign-is-dredging-up-stereotypes-some-mississippians-would-rather-forget/?utm_term=.9ede4b297301.

83.     In the same Senate election, President Donald Trump stumped for Hyde-Smith in Mississippi and stated of Espy: "How does he fit in with Mississippi? I mean, how does he fit in?" Megan Keller, *Ex-Kasich Aide Accuses Trump of 'Racist' Language About Black Dem Candidate*, THE HILL (Nov. 27, 2018), https://thehill.com/homenews/media/418395-ex-kasich-aide-accuses-trump-of-racist-language-about-black-dem-candidate. This statement had racial undertones given that Espy's family's ties to Mississippi date back several generations. *See id.*

84.     Further evidencing the use of racial appeals, the Mississippi Republican Party distributed campaign literature falsely calling Espy a "corrupt" criminal. *See* Ashton Pittman, *GOP Mailers Misleadingly Paint Espy as a Criminal*, JACKSON FREE PRESS (Nov. 2, 2018), http://www.jacksonfreepress.com/news/2018/nov/02/gop-mailers-misleadingly-paint-espy-

criminal/. One piece of literature even contained a photoshopped picture of Espy with police light images and prison bars, along with the term "indicted." *Id.*

85.     Racial appeals are, unfortunately, a recurring theme in Mississippi and these recent examples from 2018 are consistent with prior elections. In 1982, a campaign commercial supporting white congressional candidate Webb Franklin contained the slogan "He's one of us" and ended with a view of a Confederate monument, stating:

> You know, there's something about Mississippi that outsiders will never, ever understand. The way we feel about our family and God, and the traditions that we have. There is a new Mississippi, a Mississippi of new jobs and new opportunity for all our citizens. [video pan of black factory workers] We welcome the new, but we must never, ever forget what has gone before. [video pan of Confederate monuments] We cannot forget a heritage that has been sacred through our generations.

*Jordan v. Winter*, 604 F. Supp. 807, 813, n.8 (N.D. Miss. 1984). In 2004, a white candidate running for Supreme Court Justice, Samac Richardson, used the same campaign slogan—"one of us"—in running against African-American Mississippi Supreme Court Justice James Graves.

86.     Also in 1982, white Republican senatorial candidate Haley Barbour reprimanded an aide who made racist comments by stating that if the aide "persisted in racist remarks, he would be reincarnated as a watermelon and placed at the mercy of blacks." Tim Mak, *Barbour's 10 Most Barbed Quotes,* Politico (Sept. 4, 2012), https://www.politico.com/story/2012/09/barbours-10-most-barbed-quotes-080668.

87.     The Southern District of Mississippi has also acknowledged the presence of "more subtle" racial appeals in Mississippi campaigns, namely in Webb Franklin's 1986 congressional campaign, when running against an African-American opponent, *see Martin v. Allain*, 658 F. Supp. 1183, 1195 (S.D. Miss. 1987), and what it referred to as an "overt" appeal by white Mississippi Supreme Court Justice candidate Richard Barrett in that same year. *Id*. at 1195.

88.     In 2003, Barbour—this time running for governor—sent campaign literature tying the white Democratic candidate with the African-American candidate for Lieutenant Governor, even though candidates for the two offices do not run together, which included photos of the two candidates.

89.     Racial appeals have not been limited to candidates on the campaign trail; elected officials have often made racially-charged statements as well. For example, Hyde-Smith, while serving in the Mississippi Senate, cosponsored a resolution that referred to the Civil War as "The War Between the States" and praised a confederate soldier for fighting "to defend his homeland." Eric Bradner & Andrew Kaczynski, *Mississippi Sen. Cindy Hyde-Smith Pushed Resolution Praising Confederate Soldier's Effort to 'Defend His Homeland*," CNN (Nov. 26, 2018), https://www.cnn.com/2018/11/24/politics/cindy-hyde-smith-confederacy-mississippi-senate-race/index.html.

90.     In 2002, Senator Trent Lott praised former Senator Strom Thurmond, a notorious segregationist. Lott stated: "And if the rest of the country had followed our lead [in voting for Thurmond for president], we wouldn't have had all these problems over all these years, either." Jim Lehrer, *GOP Leader Under Fire: Senator Trent Lott*, PBS (Dec. 12, 2002), https://www.pbs.org/newshour/show/gop-leader-under-fire-senator-trent-lott. This comment was widely interpreted to advocate for racial segregation. *Id.*

91.     In 2009, white State Senator Lydia Chassaniol spoke at a conference of a white supremacist organization. *See* Ward Schaefer, *Minister Blasts Mississippi Senator's Connections*, JACKSON FREE PRESS (July 10, 2009), http://www.jacksonfreepress.com/news/2009/jul/10/minister-blasts-mississippi-senators-connections/.

92.     In 2010, then-Governor Barbour made a series of statements that appealed to racial divisions. First, he described the state's Jim Crow era as not "that bad." Tim Mak, *Barbour's 10 Most Barbed Quotes*, POLITICO (Sept. 4, 2012), https://www.politico.com/story/2012/09/barbours-10-most-barbed-quotes-080668. Second, he described another state's proclamation praising Confederate History Month, and failure to reference slavery at all, as "something that doesn't matter for diddly." Ronni Mott, *Barbour: Slavery Omission 'Doesn't Matter for Diddly*,' JACKSON FREE PRESS (Apr. 12, 2010), http://www.jacksonfreepress.com/news/2010/apr/12/barbour-slavery-omission-doesnt-matter-for-diddly/. Third, he described a widely recognized racist group, the Citizens Council, as "an organization of town leaders." *See* Frank James, *Haley Barbour's Praise for Racist Group Gets Noticed*, NPR (Dec. 21, 2010), https://www.npr.org/sections/itsallpolitics/2010/12/21/132228034/haley-barbours-praise-for-racist-group-gets-plenty-notice.

93.     A few years later, in 2015, State Representative Bubba Carpenter further appealed to racial divisions for political ends, stating that "[i]f [Initiative] 42 passes in its form, a judge in Hinds County, Mississippi, predominantly black—it's going to be a black judge—they're going to tell us where the state education money goes." Sam R. Hall, *Rep. Carpenter Injects Race into Initiative 42*, CLARION-LEDGER (Oct. 18, 2015), https://www.clarionledger.com/story/news/local/dailyledes/2015/10/18/rep-bubba-carpenter-black-judge-and-initiative-42/74196426/.

94.     And in 2017, a member of the Mississippi House of Representatives, Karl Oliver, suggested that those removing monuments related to the Civil War "should be lynched." *See* Bobby Harrison, *State Representative Calls for Lynchings, Then Apologizes*, DAILY JOURNAL (May 22, 2017), https://www.djournal.com/news/state-representative-calls-for-lynchings-then-apologizes/article_12157aab-b10f-5758-b6b8-ca655d1e1636.html.

### D.     African Americans in Mississippi Remain Underrepresented in Elected Office.

95.     The Challenged Provisions, interacting with the socioeconomic disparities stemming from the Mississippi's history of discrimination, have succeeded in ensuring that African Americans are not adequately represented in statewide offices.

96.     Not a single African American has been elected Governor, Lieutenant Governor, Secretary of State, Treasurer, Attorney General, Auditor, Insurance Commissioner, or Agriculture Commissioner in over 130 years, despite the fact that the State has the highest percentage of African Americans in the United States.

97.     Even outside of statewide office, African Americans are underrepresented as compared to their percentage of the population (and voting population) in both the State Senate and the House. And there are disparities in political power even among elected officials in the State Legislature, as only two African Americans served as chairmen of state house committees in 2017.

98.     Based on the totality of the circumstances, as described above, the Challenged Provisions interact with the social and historical conditions in Mississippi to deny African Americans an equal opportunity to participate in the political process and elect their preferred candidates.

### CLAIMS FOR RELIEF

### COUNT I

**Intentional Racial Discrimination, Vote Dilution, and Denial or Abridgement of the Right to Vote on Account of Race in Violation of the Fourteenth and Fifteenth Amendments, U.S. Const. Amend. XIV, XV; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**

99.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Amended Complaint and the paragraphs in the count below as though fully set forth herein.

100.    The Equal Protection Clause of the Fourteenth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. It applies to the right to vote in state elections and protects the state electoral franchise. *See Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

101.    The Fourteenth Amendment further invalidates any state law "'conceived or operated as [a] *purposeful* device[] to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)) (emphasis added).

102.    The Fifteenth Amendment prohibits the denial or abridgement of the right to vote "on account of race." U.S. CONST. amend. XV, § 1.

103.    Here, the Challenged Provisions were enacted with the express intention of diluting the strength of votes cast by African Americans in Mississippi. The historical background of the Challenged Provisions, the sequence of events leading up to their enactment, and their legislative history show that race was the motivating factor in the provisions' enactment.

104.    The House-Vote Rule, moreover, was enacted with the intent to cancel out the African-American vote entirely when no candidate wins both a majority of the popular vote and a majority of House districts. It produces that result by denying voters the ability to select the candidate elected for statewide office.

105.    The Challenged Provisions have effectively diluted African-American votes and ensured that African Americans have less opportunity to elect their preferred candidates.

106.     Defendants, in implementing and enforcing the Challenged Provisions, are acting under the color of state law.

107.     Absent injunctive relief, Defendants, by implementing and enforcing the Challenged Provisions, will continue to violate Plaintiffs' rights under the Fourteenth and Fifteenth Amendments to the United States Constitution.

## COUNT II

**Violation of the Equal Protection Clause's One Person, One Vote Principle, U.S. Const. Amend. XIV, § 1, 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202**

108.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Amended Complaint and the paragraphs in the count below as though fully set forth herein.

109.     The Equal Protection Clause requires states to adhere to a principle of "one person, one vote," such that no vote can be weighted differently than another cast in the same election. *Gray*, 372 U.S. at 381.

110.     The Electoral-Vote Rule challenged here violates the one-person, one-vote principle by discarding all votes cast in each legislative district for candidates who fail to obtain a majority of votes in that district; by diluting the votes cast in each legislative district for candidates who obtain the majority of votes in that district; and by assigning unequal weight to the votes of Mississippians depending on the legislative district in which they reside.

111.     Defendants, in implementing and enforcing the Challenged Provisions, are acting under the color of state law.

112.     Absent injunctive relief, Defendants, by implementing and enforcing the Challenged Provisions, will continue to violate the one person, one vote principle and infringe upon Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

33

## COUNT III

### Violation of Section 2 of the Voting Rights Act,
### 52 U.S.C. § 10301(a)

113.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Amended Complaint and the paragraphs in the count below as though fully set forth herein.

114.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any "standard, practice, or procedure" that has either the purpose or result of denying or abridging the right to vote on account of race.

115.    The Challenged Provisions dilute votes cast by African Americans and minimize the influence of African-American votes in elections for statewide offices, all of which denies African Americans an equal opportunity to participate in the political process and elect their preferred candidates.

116.    African-American voters in Mississippi are politically cohesive, and white voters usually vote as a bloc to defeat African Americans' preferred candidates, thus preventing African Americans in Mississippi from electing candidates of their choice to statewide office.

117.    In the context of the totality of the circumstances of Mississippi's statewide elections, the Challenged Provisions interact with historic and social conditions to deny African Americans an equal opportunity to elect candidates of their choice.

118.    By enforcing the Challenged Provisions, Defendants have acted to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act. Absent injunctive relief, Defendants will continue to violate those rights.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

(a)     Declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that Sections 140, 141 and 143 of the Mississippi Constitution violate the Fourteenth and Fifteenth Amendments to the United States Constitution, as well as Section 2 of the Voting Rights Act;

(b)     Preliminarily and permanently enjoining Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to Sections 140, 141, and 143 of Article V of the Mississippi Constitution under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

(c)     Awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(d)     Granting such other and further relief as the Court deems just and proper.

July 29, 2019

Respectfully submitted,

/s/ *Uzoma N. Nkwonta*

Marc E. Elias*
Email: MElias@perkinscoie.com
Uzoma N. Nkwonta*
Email: UNkwonta@perkinscoie.com
Jacki L. Anderson*
Email: JackiAnderson@perkinscoie.com
K'Shaani Smith*
Email: KShaaniSmith@perkinscoie.com
Daniel C. Osher*
Email: DOsher@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Robert B. McDuff, MSB 2532
Email: rbm@mcdufflaw.com
767 North Congress Street
Jackson, MS  39202-3009
Telephone: (601) 969-0802
Fax: (601) 969-0804

Beth L. Orlansky, MSB 3938
Email: borlansky@mscenterforjustice.org
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS  39205-1023
Telephone: (601) 352-2269
Fax: (601) 352-4769

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that on July 29, 2019, I filed the foregoing Amended Complaint with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Uzoma N. Nkwonta
Uzoma N. Nkwonta
PERKINS COIE LLP
700 13th St. N.W., Suite 600
Washington, D.C.  20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
Email: UNkwonta@perkinscoie.com