IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LESLIE-BURL McLEMORE;                                   **PLAINTIFFS**
CHARLES HOLMES;
JIMMIE ROBINSON, SR.;
RODERICK WOULLARD;
BRENDA BOOTH;
JORDAN MALONE; and
TYLER YARBROUGH

VS.                                   **CIVIL ACTION NO. 3:19-cv-383-DPJ-FKB**

DELBERT HOSEMANN, in his official capacity                    **DEFENDANTS**
as the Mississippi Secretary of State; and PHILIP
GUNN, in his official capacity as the Speaker of the
Mississippi House of Representatives

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FOR LACK OF
JURISDICTION AND IMMUNITY FILED BY THE SPEAKER OF THE MISSISSIPPI
HOUSE OF REPRESENTATIVES AND THE MISSISSIPPI SECRETARY OF STATE**

---

William Trey Jones, III (MSB #99185)
Cody C. Bailey (MSB #103718)
Jacob A. Bradley (MSB #105541)
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902
Email: cbailey@brunini.com

*Counsel for Defendants Philip Gunn, in his
official capacity as the Speaker of the
Mississippi House of Representatives, and
Delbert Hosemann, in his official capacity as
the Mississippi Secretary of State*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL ALLEGATIONS ................................................................................................3

ARGUMENT ........................................................................................................................6

I.      The Court Should Dismiss this Action under Rule 12(b)(1) for Lack of Subject
        Matter Jurisdiction because there is No Justiciable Case or Controversy:
        Plaintiffs Lack Constitutional Standing; the Case is Not Ripe; and Plaintiffs Ask
        the Court to Resolve a Political Question. ..............................................................6

        A.      Plaintiffs Do Not Allege Facts to Establish Constitutional Standing. ..................7

                1.      Plaintiffs have not alleged facts to establish an injury in fact......................8

                2.      There is no causal connection between Plaintiffs' alleged injuries
                        and the Secretary's or Speaker's conduct. ................................................15

                3.      It is not likely that Plaintiffs' alleged injuries would be redressed
                        by the injunctive relief requested from the Court. .....................................17

        B.      The Court Should Dismiss this Action because it is Not Ripe. .............................18

        C.      Plaintiffs' Claims Should be Dismissed because they Amount to
                Nonjusticiable Political Questions. ........................................................................21

II.     The Court Should Dismiss Plaintiffs' Claims under Rule 12(b)(6) and the
        Doctrine of Prudential Standing. ...........................................................................23

        A.      Count I (14th and 15th Amendments) and Count III (Section 2 of VRA) ..............24

        B.      Count II (One-Person, One-Vote under 14th Amendment)....................................27

III.    The Court Should Dismiss the Action Under Rules 12(b)(1) and 12(b)(7) because
        the Speaker and Secretary are not Proper Defendants and are Immune, and
        because Plaintiffs Failed to Join the Attorney General or Governor as a Necessary
        Party; Alternatively, the Court Should Dismiss the Speaker and Secretary and join
        the Attorney General or Governor. .........................................................................30

CONCLUSION....................................................................................................................32

## INTRODUCTION

For the numerous reasons explained in Defendants' initial Motion to Dismiss [Doc. 18,

19] and Response to Plaintiffs' Motion for Preliminary Injunction [Doc. 22, 23], Plaintiffs'

allegations are legally deficient to confer jurisdiction and state a claim upon which relief can be

granted.  Recognizing that reality, Plaintiffs have attempted to salvage their lawsuit with an

Amended Complaint for Injunctive and Declaratory Relief (the "Complaint").  The new

Complaint, however, is equally flawed.  Plaintiffs' allegations remain insufficient to establish a

justiciable case or controversy to invoke this Court's jurisdiction and to state a claim upon which

relief can be granted.  Plaintiffs' broad allegations of injury rest entirely on generalized

grievances, remote hypotheticals, and speculation.  Plaintiffs do not allege facts to show they

have suffered an actual injury or that an injury is "certainly impending" to occur in the future, as

required by established Supreme Court precedent.  *See, e.g., Lujan v. Defenders of Wildlife*, 504

U.S. 555, 564 n.2 (1992).  In nearly 130 years, the constitutional provisions at issue have never

been applied to deprive an "African-American-preferred candidate" of statewide office.  And the

one time that all three provisions were implicated, their application benefitted the Democrat,

which Plaintiffs now allege is the "African-American-preferred candidate."[1]

Neither the Speaker nor the Secretary wish to defend the motivations behind these laws.

However, both the allegations in the Complaint and the timing of its filing demonstrate that this

lawsuit is not about race, and it is not about vindicating alleged wrongs to Plaintiffs' rights to

vote—it's about partisan politics.  As shown below, "the fundamental problem with the

---

[1] Plaintiffs use the term "African-American-preferred candidate" to refer to Democrats, contending that the "vast majority of African-American voters prefer[] Democratic candidates." *See* Doc. 26 at ¶¶41–45. In doing so, Plaintiffs have engaged in the very practice they purport to combat—an "offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. 900, 911–12 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)).

plaintiffs' case as presented" is that it "is a case about group political interests, not individual legal rights." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018).[2]  The federal courts are "not responsible for vindicating generalized partisan preferences" and are not concerned with the "fortunes of political parties." *Id.*  Rather, the "Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Id.*

Plaintiffs' claims attacking Mississippi's statewide election laws, at their core, amount to a partisan gerrymandering claim—a claim which has now been expressly rejected by the United States Supreme Court. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2491 (2019).  Plaintiffs essentially claim that the way the Mississippi House of Representatives districts are drawn makes it more difficult for Mississippi voters in general to elect Democrats over Republicans.  In *Rucho*, issued after Plaintiffs filed this lawsuit, the Supreme Court held that such partisan gerrymandering claims present nonjusticiable "political questions beyond the reach of the federal courts," as opposed to "claims of *legal* right, resolvable according to *legal* principals." *Id.* at 2506–07, 2494 (emphasis in original).

Defendants Philip Gunn, in his official capacity as the Speaker of the Mississippi House of Representatives (the "Speaker"), and Delbert Hosemann, in his official capacity as the Mississippi Secretary of State (the "Secretary"), file their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7).  The Court should dismiss this action under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs allege no facts to demonstrate a concrete, particularized, actual, and imminent injury to their individual voting

---

[2] It is widely reported that this lawsuit is supported by the National Redistricting Foundation, an affiliate of the National Democratic Redistricting Committee led by former Attorney General Eric Holder, Jr., which describes itself as a "centralized hub for executing a comprehensive redistricting strategy that shifts the redistricting power, creating fair districts where Democrats can compete." *See* https://democraticredistricting.com/about/; https://thedailybreakingnews.com/lawsuit-accuses-mississippi-election-system-of-diminishing-african-american-vote/.

rights, that is traceable to any actions of the Speaker and Secretary, and which is likely to be redressed by injunctive relief. Nor do Plaintiffs allege facts to show that the case is ripe for the Court's consideration. Instead, Plaintiffs ask the Court to resolve a political question. The Court should dismiss this action under Rule 12(b)(6) and the doctrine of prudential standing because the Complaint does not allege facts sufficient to state any claim for which relief can be granted, and Plaintiffs' claims are not within the "zone of interests" intended to be protected by the Voting Rights Act ("VRA"). The Complaint does not state facts to show how the Challenged Provisions have impacted Plaintiffs in a discriminatory manner. Finally, the Court should dismiss this action under Rules 12(b)(1) and 12(b)(7) because the Speaker and Secretary are not proper parties to defend Plaintiffs' claims, they are immune from this suit, and Plaintiffs failed to join the Attorney General or Governor as defendant. In the alternative, the Court should dismiss the Speaker and Secretary and join the Attorney General or Governor.

## FACTUAL ALLEGATIONS

Plaintiffs seek to declare unconstitutional and enjoin enforcement of Sections 140, 141, and 143 of the Mississippi Constitution of 1890 (the so-called "Challenged Provisions"), each of which relate to the State's procedures for electing governor and other statewide officers. Doc. 26 at 35. Plaintiffs request that the Court declare that in each future Mississippi race for statewide office, the candidate who receives the highest vote total will be the winner. *See also* Doc. 9 at 3, 24–25. Section 140 of the Mississippi Constitution provides: to be elected, a candidate for statewide office must win "a majority of the popular vote" (the "Popular Vote Rule"); and the candidate must also win "a majority of all the electoral votes" represented by the districts of the Mississippi House of Representatives (the "Electoral Vote Rule").[3] Section 141 states that if a

---

[3] Arizona, Georgia, and Vermont have a similar "Popular Vote Rule." And Vermont, like Mississippi, requires the legislature to elect the winner in absence of a candidate receiving the majority vote. Further,

candidate does not win both a majority of the popular vote and a majority of the electoral vote, the members of the House of Representatives "shall proceed to choose . . . from the two persons who shall have received the highest number of popular votes" (the "House Vote Rule").[4] Plaintiffs allege that the Challenged Provisions collectively violate the Fourteenth and Fifteenth Amendments (Count I) and Section 2 of the VRA (Count III) by generally diluting African-American votes, and Plaintiffs allege that the "Electoral Vote Rule" separately violates the one-person, one-vote principle (Count II). Doc. 26 at ¶¶99–118.

The Challenged Provisions have never been applied, through vote dilution or otherwise, to deprive an "African-American-preferred candidate" of office, and Plaintiffs have failed to allege facts to show there is an imminent threat that such will happen on November 5, 2019, or at any time in the future. In other words, Plaintiffs have not alleged, nor has there ever been, a circumstance where an "African-American-preferred candidate" obtained a plurality of the vote but did not take office due to the Challenged Provisions, which is the crux of Plaintiffs' claims. The Mississippi House of Representatives has, likewise, never deprived an "African-American-preferred candidate" of office using the "House Vote Rule." It cannot be disputed that the "House Vote Rule" has been used just once since the 1890 Mississippi Constitution was enacted.[5] In 1999, the Democrat-controlled House voted 86-36 along party lines to elect Ronnie

---

a majority of states require their legislatures to elect the winner in the event no candidate receives a plurality of the vote. Thus, there is nothing unusual, much less unconstitutional, about having a state legislature involved in deciding statewide elections. *See Fortson v. Morris*, 385 U.S. 231, 234–35 (1966).

[4] Sections 140 and 141 mention only election of the governor. Plaintiffs also challenge Section 143 because it applies Sections 140 and 141 to the elections of "all other state officers."

[5] In the other two occasions where a candidate for statewide office did not receive both a majority of the popular vote and a majority of the electoral districts, there was likewise no injury to any Mississippi voters as alleged in this case. In the 1991 and 1995 lieutenant governor races, the two candidates who received the plurality of the popular vote took office after the opposing candidates conceded the race. In fact, in 1995, the "African-American-preferred candidate" (i.e., the Democrat) took office.

Musgrove as Governor.  Plaintiffs do not allege that Governor Musgrove was not the "African-American-preferred candidate."  Nor did Plaintiffs file suit concerning the Challenged Provisions after that election or at any previous time.

In the Complaint, each Plaintiff identifies as an "African-American citizen of the United States" generally supporting election of "African-American-preferred candidates," as opposed to what Plaintiffs describe as "white-preferred candidates."  *See* Doc. 26 at ¶¶19–25, 41–58. Plaintiffs allege generally that the Challenged Provisions diluted their votes in past statewide elections and made it more difficult "to elect [their] candidate[s] of choice."  *Id.* at ¶¶19–23.[6] Plaintiffs allege generally that they have "consistently supported and voted for statewide candidates who have received the support of an overwhelming majority of African-American voters."  *Id.* at ¶¶19–25.  Plaintiffs still do not, however, allege facts to identify how they were injured in past elections or who their "candidates of choice" were in those elections; they do not identify whether they voted Democrat or Republican in those elections; and they do not plead facts to show how the Challenged Provisions made it more difficult for them to elect their preferred candidates.[7]

Regarding future elections, Plaintiffs fail to allege any facts to show how it is "imminent" or "certainly impending" that they will be injured by application of the Challenged Provisions. Rather, they state in conclusory fashion and without any factual support whatsoever that, "absent intervention by this Court, [they] will . . . have [their] vote diluted and [their] constitutional rights infringed."  *Id.* at ¶¶19–25.  While the focus of Plaintiffs' claims is clearly on the November

---

[6] The general allegations regarding past elections are not made by Plaintiffs Malone and Yarbrough, who have never before voted in a Mississippi statewide election. *Id.* at ¶¶24–25.

[7] Since 1890, Mississippi has elected 28 Democratic Governors but only 3 Republican Governors; 24 Democratic Lieutenant Governors but only 3 Republican Lieutenant Governors; 20 Democratic Attorneys General but no Republican Attorneys General; 8 Democratic Secretaries of State but only 1 Republican Secretary of State; and 29 Democratic State Treasurers, but only 2 Republican State Treasurers.

5, 2019 general statewide election in Mississippi, Plaintiffs do not state who their candidates of choice are for the election, to what political party their candidates of choice belong, or how their vote for those candidates will be diluted absent Court intervention. *See* Doc. 26 at ¶¶19–25, 58. Instead, Plaintiffs allege that "the vast majority of African-American voters prefer[] Democratic candidates" and in future elections they "intend[] to support statewide candidates preferred by African Americans." Doc. 26 at ¶42, 19–25.[8]

## ARGUMENT

**I.    The Court Should Dismiss this Action under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction because there is No Justiciable Case or Controversy:  Plaintiffs Lack Constitutional Standing; the Case is Not Ripe; and Plaintiffs Ask the Court to Resolve a Political Question.**

"The justiciability doctrines of standing, mootness, political question, and ripeness 'all originate in Article III's 'case' or 'controversy' language.'" *Choice, Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006) *DaimlerChrysler Corp.*, 547 U.S. at 341-42); *Shields v. Norton*, 289 F.3d 832, 834–35 (5th Cir. 2002).  Federal court jurisdiction is limited to "Cases" and "Controversies."  U.S. CONST. art. III, § 2.  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp.*, 547 U.S. at 341.  Plaintiffs "bear[] the burden of proof" to establish a justiciable case or controversy. *Choice*, 691 F.3d at 715.  "'Without jurisdiction the court cannot proceed at all in any cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 U.S. 506, 514 (1868)).  While Plaintiffs' Complaint may stir a desire to right the wrongs of history, it simply does not set forth facts necessary to establish a justiciable case or controversy.

---

[8] Courts do not have jurisdiction where, as here, the Court must guess how individuals might vote in the future based on partisan stereotypes and assumptions.  Notably, Plaintiffs cite the 2015 gubernatorial race involving relatively unknown Democratic candidate Robert Gray (who admitted he did not even vote for himself) to support their allegations of generalized injury and partisan voting stereotypes.

"'Failure of political will does not justify unconstitutional remedies.'" *Gill*, 138 S. Ct. at 1929

(quoting *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring)). "Our

power as judges to 'say what the law is,' rests not on the default of politically accountable

officers, but is instead grounded in and limited by the necessity of resolving, according to legal

principles, a plaintiff's particular claim of legal right." *Id.* (quoting *Marbury v. Madison*, 5 U.S.

137, 177 (1803)). Plaintiffs have failed to allege facts sufficient to establish standing and

ripeness. Moreover, Plaintiffs ask the Court to resolve a political question. Accordingly, there is

not a justiciable case or controversy over which this Court should exercise jurisdiction.

### A.     Plaintiffs Do Not Allege Facts to Establish Constitutional Standing.

The Supreme Court has established that "the irreducible constitutional minimum of

standing contains three elements." *Lujan*, 504 U.S. at 560–61.[9] Plaintiffs must show: (1) they

"have suffered an 'injury in fact,'" (2) there is a "causal connection between the injury and the

conduct complained of," and (3) it is "'likely,' as opposed to merely 'speculative,' that the injury

will be 'redressed by a favorable decision.'" *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*,

426 U.S. 26, 38 (1976)); *see also Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) (reiterating

standing requirements, reversing preliminary injunction, and dismissing plaintiffs' constitutional

claims for lack of jurisdiction without reaching the merits). "The party invoking federal

jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 560–61.[10]

"Where, as here, a case is at the pleading stage, the plaintiff must 'clearly allege facts

---

[9] The "issue of standing is one of subject matter jurisdiction." *Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006); *see Cannimore v. Disability Rights Miss., Inc.*, 2019 WL 136996, at *2 (S.D. Miss. Jan. 7, 2019) (Rule 12(b)(1) applies to constitutional standing, Rule 12(b)6) applies to prudential standing).

[10] "To cross the standing threshold, the litigant must explain how the elements essential to standing are met." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Standing "'in no way depends on the merits' of the claim." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "'[S]tanding is not dispensed in gross.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). "To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Id.*

"[A] plaintiff seeking relief in federal court must first demonstrate that he has standing to do so, including that he has 'a personal stake in the outcome,' distinct from a 'generally available grievance about government.'" *Gill*, 138 S. Ct. at 1923 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962) and *Lance v. Coffman*, 549 U.S. 437, 439 (2007)).  Here, Plaintiffs lack standing because they do not allege a personal stake in the outcome of the controversy; instead, their grievances are general and relate only to the alleged inability of Mississippi voters to elect "African-American-preferred candidates" (i.e., Democrats).  Plaintiffs have failed to allege facts to demonstrate standing for their three claims.

### 1.   Plaintiffs have not alleged facts to establish an injury in fact.

Foremost among the standing requirements is injury in fact.  "We have made it clear time and time again that an injury in fact must be both concrete and particularized." *Spokeo*, 136 S. Ct. at 1548 (citing, among others, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)).  To be concrete, the injury must be "'real,' and not 'abstract.'" *Id.* (citations to dictionaries omitted).  On the other hand, to be "particularized" the "injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.  "We have consistently held that a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the Constitution

8

and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.* at 573–74.

Next, the injury must be "actual or imminent, not conjectural or hypothetical." *Id.* at 560–61. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564. The threat of future injury "must be both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). In other words, "'plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Moore v. Bryant*, 205 F. Supp. 3d 834, 851 (S.D. Miss. 2016) (quoting *Lyons*, 461 U.S. at 101–02). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (quoting *Lujan*, 504 U.S. at 656 n.2).[11]

And "the 'injury in fact' test requires . . . that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)). This threshold question of injury "turns on effect, not intent, and requires a showing of a burden on the plaintiffs' votes that is 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Gill*, 138 S. Ct. at 1932 (quoting *Lujan*, 504 U.S. at 560). "The right to vote is 'individual and personal in nature,' and 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) and *Baker*, 369 U.S. at 206).

---

[11] The injury-in-fact prong "has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time." *Id.* "These are primarily future injuries, which 'may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Dept. of Commerce v. New York*, No. 18-966, 2019 WL 2619473, *7 (U.S. June 27, 2019) (quoting *Susan B. Anthony List*, 573 U. S. at 158).

In this case, Plaintiffs' allegations essentially posit that it is difficult for voters in Mississippi to elect Democrats over Republicans. Plaintiffs' claims are all based on their criticism of the districts drawn for the Mississippi House of Representatives as a whole. This is a partisan gerrymandering claim, which the United States Supreme Court has now held is not a justiciable case or controversy. *Rucho*, 139 S. Ct. at 2491. Plaintiffs simply do not allege facts to show that their individual votes have been harmed by the Challenged Provisions. Rather, Plaintiffs seek relief that "no more directly and tangibly benefits [them] than it does the public at large," which "does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573–74. Plaintiffs allege mere generalized grievances based on speculative, future events that are not "certainly impending." *Id.* at 564 n.2.

With regard to the "Popular Vote Rule," Plaintiffs allege it "ensures that, in the event that the candidate supported by African-American voters [the Democrat] wins a plurality, but not a majority, of the vote, the election is decided by the House of Representatives . . . ." *Id.* at ¶46.[12] Plaintiffs allege they might be injured if an African-American-preferred candidate receives a plurality of the popular vote but is excluded from office by the Challenged Provisions. Plaintiffs allege no facts to demonstrate such has ever happened in the past or might certainly happen in the immediate future. To the contrary, it is indisputable that neither the "Popular Vote Rule" nor any of the Challenged Provisions have ever prevented a statewide candidate for office who has received a plurality of the vote from actually taking office. *See, e.g.*, Emily Wagster Pettus and David A. Lieb, *Lawsuit calls Mississippi's way of choosing governors racist*, AP News, May 30, 2019 ("To date, no Mississippi candidate who won the most votes for a statewide office has been

---

[12] On its face, there is nothing extraordinary or unconstitutional about an election process which provides that the candidate who receives the majority of votes wins the election. *See Fortson*, 385 U.S. at 232 (upholding Georgia's version of the "Popular Vote Rule and "House Vote Rule"). To insist that the process is unconstitutional because it does not allow a particular party supported by a particular minority to win an election shows the purely partisan nature of this case.

prevented from taking office because of the other requirements.").[13]  Plaintiffs' insinuation that such might happen in 2019 is conjecture.  The conclusory allegation that the "Popular Vote Rule" "make[s] it more difficult for African-American-preferred candidates to win elections for statewide, state-level office" is wholly insufficient to demonstrate injury in fact.  Doc. 26 at ¶5.  Moreover, majority-vote requirements like the "Popular Vote Rule" are not unconstitutional.  *Bond v. Fortson*, 334 F. Supp. 1192, 1193 (N.D. Ga. 1971), *aff'd*, 404 U.S. 930 (1971).[14]

With regard to the "Electoral Vote Rule," Plaintiffs allege that it "creates such a significant disadvantage for candidates preferred by African Americans that they must obtain more than 55 percent of the popular vote to win a majority of House districts."  *Id.* at ¶6; *see also id.* at ¶41 ("Electoral-Vote Rule . . . creates a system in which white-preferred candidates can win a majority of House districts with a smaller percentage of the statewide popular vote than would be required of an African-American-preferred candidate").  That is yet another "generally available grievance" which seeks relief "that no more directly and tangibly benefits [Plaintiffs] than it does the public at large."  *Lujan*, 504 U.S. at 560 n.1.  Plaintiffs allege no facts to show that their votes in their particular Mississippi House of Representative districts were disadvantaged by the Challenged Provisions in past elections or that it is certainly impending that their votes in such districts will be disadvantaged in the future.  Plaintiffs fail to allege facts to

---

[13] "The district court . . . has the power to dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Choice*, 691 F.3d at 715.

[14] The allegation that "features of [an] electoral system, such as the majority vote requirement, tend naturally to disadvantage any voting minority[,] . . . are far from proof" that such schemes are unconstitutional or violations of the VRA. *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980).  The United States Supreme Court has upheld as constitutional an election system that required a gubernatorial candidate to receive "a majority of votes cast in a general election, <u>and</u> . . . if no candidate receives a majority of votes at such election, then a majority of members of the [legislature] shall elect the Governor 'from the two persons having the highest number of votes.'"  *Fortson*, 385 U.S. at 232 (emphasis added).

set forth any concrete, particularized, actual, and imminent injury to their individual voting rights.[15] Instead, Plaintiffs' allegations make clear that their claims in this case are nothing more than a partisan gerrymandering challenge to the districts drawn for the Mississippi House of Representatives as a whole, a challenge now expressly prohibited by the United States Supreme Court. *Rucho*, 139 S. Ct. at 2493–2502.

In *Gill v. Whitford*, prior to the United States Supreme Court's ruling in *Rucho*, twelve Wisconsin voters alleged the districting plan by which Wisconsin elected members of its legislature was unconstitutional. 138 S. Ct. at 1923–24.[16] Much like this case, plaintiffs there generally identified as "supporters of the public policies espoused by the Democratic Party and of Democratic Party candidates," that the challenged law "unfairly favor[ed] Republican voters and candidates," and that Democrats *statewide* "do not have the same opportunity provided to Republicans to elect representatives of their choice . . . ." *Id.* The Court ruled that plaintiffs did not have *standing* to bring a *statewide* claim that extended beyond the "makeup of the legislative districts in which they vote." *Id.* As in *Gill*, "[t]o the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is *district specific.*" *Id.* at 1930 (emphasis added); *see also Rucho*, 139 S. Ct. at 2492 (noting that in *Gill* the Court "held that a plaintiff asserting a partisan gerrymandering claim based on a theory of vote dilution must establish standing by showing he

---

[15] The Challenged Provisions, including the "Electoral Vote Rule," apply equally to all voters, regardless of color and regardless of political-party affiliation. Plaintiffs do not allege facts to show they have or will be treated differently than other voters under the Challenged Provisions or that there is a barrier to their equal participation in the voting process under the Challenged Provisions. In essence, Plaintiffs' claim is that the Challenged Provisions hinder Mississippi voters' ability to elect Democrats. But "voters who want to elect Democrats," or Republicans for that matter, are not a protected class. Political party affiliation is not one of the rare suspect classifications triggering strict scrutiny under the Equal Protection Clause. *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

[16] In *Gill*, plaintiffs complained of "wasted" votes across all legislative districts due to "packing" and "cracking" districts through gerrymandering. *Id.* at 1924, 1932–33. That is essentially Plaintiffs' claim in this case. *See* Doc. 26 at ¶¶41–45, 50–58.

lives in an allegedly 'cracked' or 'packed' district"). Here, Plaintiffs' allegations relate only to generalized, statewide harm allegedly caused by voting districts drawn for the House of Representatives as a whole.  Plaintiffs allege no facts to show that they live in "cracked" or "packed" districts.  Thus, the Court should not allow Plaintiffs to pursue this "case about group political interests" because Plaintiffs do not allege the abridgment of any individual legal rights and the Court is "not responsible for vindicating generalized partisan preferences." *Id.*[17]

Finally, with regard to the "House Vote Rule," Plaintiffs allege it "thwarts the election of an African-American-preferred candidate by removing the selection of candidates for statewide office from the hands of the electorate and places the decision with the House, where African Americans have little influence."  Doc. 26 at ¶45.  It cannot be disputed that this "tiebreaker" provision has been used just once since the 1890 Mississippi Constitution was enacted—in 1999, when Democrat Ronnie Musgrove was elected Governor, as discussed above.  Again, Plaintiffs do not allege that Governor Musgrove was not the "African-American-preferred candidate;" nor did Plaintiffs file suit concerning the Challenged Provisions after that election.[18]  Plaintiffs do not allege any facts to establish an injury caused by the "House Vote Rule."  And as with the

_____

[17] Plaintiffs' claim that the Challenged Provisions require "African Americans' candidates of choice [Democrats] [to] obtain a significantly larger share of the statewide population in order to win a majority of House districts," Doc. 26 at ¶44, is a classic partisan gerrymandering claim—that the legislature drew the "legislative districts 'to favor Republican . . . candidates and to disadvantage Democratic voters,'" *Gill*, 138 S. Ct. at 1927 (quotation omitted).  The Court does not have jurisdiction over a partisan gerrymandering claim. *See Rucho*, 139 S. Ct. at 2493–2502.  Further, Plaintiffs' Complaint would be defective even as a racial gerrymandering claim because "Plaintiffs who complain generally of racial gerrymandering in their State," like Plaintiffs here, "cannot sue to invalidate the whole State's legislative districting map; such complaints must proceed 'district-by-district.'" *Gill*, 138 S. Ct. at 1930 (quoting *Ala. Legislative Black Caucus v. Ala.*, 135 S. Ct. 1257, 1265 (2015)).  As stated above, Plaintiffs have failed to allege "facts showing disadvantage to themselves as individuals." *Id.* at 1930 (quoting *Baker*, 369 U.S. at 206).  Thus, they do not have standing to proceed.

[18] According to the Complaint, the Challenged Provisions have been criticized in commentaries for years.  The fact that no one filed suit and claimed this process was unconstitutional when it put Governor Musgrove in office in 1999 shows again how this case is all about partisan politics and not about the Constitution or even race for that matter.

"Popular Vote Rule," Plaintiffs' insinuation that the "House Vote Rule" might be triggered to cause them future injury is nothing more than conjecture for which standing cannot be found. As previously noted, the Supreme Court upheld as constitutional an election system requiring a candidate for governor to receive "a majority of votes cast in a general election, and . . . if no candidate receives a majority of votes at such election, then a majority of members of the [legislature] shall elect the Governor 'from the two persons having the highest number of votes.'" *Fortson v. Morris*, 385 U.S. 231, 232 (1966) (upholding Georgia's version of the "Popular Vote Rule and "House Vote Rule" and citing Mississippi's laws) (emphasis added).[19]

In summary, Plaintiffs' allegations are the epitome of generalized grievances over which the Court lacks jurisdiction. Plaintiffs set forth zero factual allegations to support concrete, particularized injuries to Plaintiffs. The criticisms of the Challenged Provisions are rooted in Plaintiffs' partisan dissatisfaction with the way the Mississippi House of Representatives districts are currently drawn allegedly to favor Republicans. Plaintiffs' assertions are partisan gerrymandering claims which the United States Supreme Court has now rejected in *Rucho*. Plaintiffs do not allege facts to show how the Challenged Provisions have diluted or minimized *their* votes cast in any election for statewide office, denied *them* an equal opportunity to participate in the political process and elect *their* preferred candidates, or otherwise caused injury to *their* individual rights to vote.

Plaintiffs also have not alleged facts to show that an "African-American-preferred candidate" has been, or is likely to ever be, deprived of office by application of the Challenged Provisions. Whether the Challenged Provisions might somehow abridge or dilute Plaintiffs'

---

[19] The Court noted the "method [Georgia] chose for [electing its governor] was not unique, but was well known and frequently utilized before and since the Revolutionary War." *Fortson*, 385 U.S. at 234–35 (citing Mississippi Constitution §§ 140 and 141 as examples of majority-vote and legislative tie-breaker rules and also noting 38 other states provided, in case of a tie vote, the state legislature elects the winner).

voting rights in connection with the 2019 general election, or any future election, is purely

hypothetical and insufficient to confer standing. In fact, "Marvin King, an associate professor at

the University of Mississippi who focuses on African American politics, said that if the lawsuit

succeeds, it is unlikely to lead to more statewide victories by Democrats or black candidates."

Emily Wagster Pettus and David A. Lieb, *Lawsuit calls Mississippi's way of choosing governors

racist*, AP NEWS, May 30, 2019. It is undisputed that in nearly 130 years, the Challenged

Provisions have never prevented an "African-American-preferred candidate" who won the

popular vote from taking office. There is no basis upon which to predict, and certainly no facts

alleged in the Complaint to support, that in the 2019 election (or any future election) Plaintiffs

will suffer an imminent or certain injury from the Challenged Provisions.[20] Accordingly,

Plaintiffs have failed to allege facts to establish an injury in fact.

### .2.     There is no causal connection between Plaintiffs' alleged injuries and the Secretary's or Speaker's conduct.

The "irreducible constitutional minimum of standing" also requires "a causal connection

between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to

---

[20] For example, Plaintiffs contend that future injury might occur in the governor's race if: (1) the Independent and Constitutional Party candidates splinter a significant number of votes away from the Republican, as opposed to the Democrat, which is purely hypothetical; (2) as a result, the Democrat wins a plurality, but not a majority of the vote; and (3) the Democrat is thereafter prevented from taking office by the "House Vote Rule." That scenario has never happened in Mississippi in 130 years, and Plaintiffs allege no facts to show it is "certainly impending" in the 2019 general election or in the future. The only other conceivable scenario of harm would be if the Democrat won a majority of the popular vote but not a majority of the electoral vote, and the Democrat was thereafter prevented from taking office by the "House Vote Rule." That has also never happened in Mississippi, and Plaintiffs have not demonstrated any likelihood that it is going to happen on November 5, 2019, or in the future. It is exponentially more likely that, following conclusion of the 2019 general election, the candidate receiving the highest number of votes also wins the majority of the popular and electoral vote. As noted by the Court in *Gill*, however, Justice O'Connor long ago warned that allowing courts to "strike down apportionment plans on the basis of their prognostications as to the outcome of future elections or future apportionments invites 'findings' on matters as to which neither judges nor anyone else can have any confidence." 138 S. Ct. at 1927 (quoting *Davis v. Bandemer*, 478 U.S. 109, 158 (1986)). That is essentially what the Plaintiffs are asking for here—for the Court to strike down a provision of the Mississippi Constitution based on what "might happen" in the November 2019 election or in some other future election.

the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quotation marks and citations omitted). The Secretary and the Speaker were not responsible for enacting the Challenged Provisions, they are not responsible for enforcing the Challenged Provisions, and they are not responsible for defending the constitutionality of the Challenged Provisions.

There is a "long-standing rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute." *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001). When suing a state official for injunctive relief, a plaintiff lacks standing where the official does not have the power to enforce the complained-of provision because enjoining the official will not prevent the allegedly unconstitutional law from taking effect. *Greater Birmingham Ministries v. Merrill*, 2017 WL 782776, at *4 (N.D. Ala. Mar. 1, 2017).

Here, the Speaker and Secretary do not have the duty or power to enforce Sections 140, 141, or 143 of the Mississippi Constitution. While the Secretary is on the State Board of Election Commissioners and is "designated as Mississippi's chief election officer," that is only "[f]or purposes of the National Voter Registration Act of 1993." Miss. Code Ann. § 23-15-211.1(1); *see* Doc. 26 at ¶23.[21] The statute outlining the Secretary's general duties states that the

---

[21] This Court recently entered a summary-judgment order in a case challenging convicted felons' being excluded from voter rolls and stated that "several courts have held that the designation of 'chief election officer' militates in favor of finding Article III standing in various election-law contexts." *Harness v. Hosemann*, No. 3:17-CV-791, Order (S.D. Miss. Aug. 7, 2019) (citing *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613–14 (5th Cir. 2017); *Scott v. Schedler*, 771 F.3d 831, 838–39 (5th Cir. 2014); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 828–29, 832 (S.D. Tex. 2012)). This action is readily distinguishable from *Harness* and the cited cases because it does not concern voters' ability to cast a ballot, to have their names listed on voting rolls, or other actual functions connected to the Secretary's role as "chief election officer . . . [f]or purposes of the National Voter Registration Act of 1993." Miss. Code Ann. § 23-15-211.1(1). The plaintiffs in *OCA-Greater Houston* alleged Texas's election code impermissibly prevented non-English-speaking voters from casting their ballots, and both *Scott* and *Voting for America* were National Voter Registration Act cases. In *Harness*, in addition to involving voter registration, the Court found it was important that the Secretary had the responsibility to administer the Statewide Elections Management System, which is unrelated to enforcement of the Challenged Provisions. *Harness*, Order, at 5. None of those elements are relevant to this case.

Secretary is to "keep in his office the returns of all elections by the people, and deliver as

received the returns of election of all state officers to the speaker of the house of representatives

on the first day of the next ensuing session of the legislature after the election." Miss. Code Ann.

§ 7-3-5. That process must take place regardless of whether the Challenged Provisions are in

effect—the number of votes that a candidate must receive to win an election has no bearing on

the Secretary's duty to gather and deliver the returns.[22] Likewise, the Speaker is also not bound

by any statutory or constitutional provision requiring enforcement of the Challenged Provisions.

*See* Miss. Code Ann. § 5-1-11. The Speaker receives the returns of elections for statewide

offices from the Secretary, and in the presence of the House, opens and publishes those returns.

MISS. CONST. art. V, § 140. Again, that process is required regardless of the rules in effect that

dictate how many votes the winner of the statewide election must receive. Accordingly, there is

no "causal connection" between Plaintiffs' alleged injuries and the obligations of the Speaker

and Secretary, and the Court should dismiss Plaintiffs' claims.

### 3. It is not likely that Plaintiffs' alleged injuries would be redressed by the injunctive relief requested from the Court.

Finally, the "irreducible constitutional minimum of standing" requires that "it must be

likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." *Lujan*, 504 U.S. at 560–61 (quotation marks and citations omitted). Redressability

requires "a likelihood that the requested relief will redress the alleged injury." *Steel Co.*, 523

---

[22] On the other hand, Attorney General Jim Hood is a proper defendant here because he has a number of duties relevant to constitutional challenges and enforcement of the Challenged Provisions. The Attorney General "shall intervene and argue the constitutionality" of the Challenged Provisions. Miss. Code Ann. § 7-5-1. Further, he is the "chief legal officer and advisor for the state." Miss. Code Ann. § 7-5-1. Governor Phil Bryant is also a proper defendant. The Constitution vests the Governor with "[t]he chief executive power of [Mississippi]," and he has the constitutional obligation to "see that the laws are faithfully executed." Miss. Const. art. V, §§ 116, 123. Likewise, statutes impose similar duties to enforce the state's laws: "[the Governor] is the supreme executive officer of the state[,] . . . . [h]e shall see that the laws are faithfully executed[,] [and] [h]e is to supervise the official conduct of all executive and ministerial officers." Miss. Code Ann. § 7-1-5(a), (c), & (d).

U.S. at 103, n.5 (1998) ("the point has always been the same:  whether a plaintiff 'personally would benefit in a tangible way from the court's intervention'") (quoting *Warth*, 422 U.S. at 508)).  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 138 S. Ct. at 1934.  Plaintiffs have alleged no facts to show that there is "a likelihood" that enjoining Sections 140, 141, and 143 of the Mississippi Constitution would redress the alleged injury.  Plaintiffs have alleged zero facts to demonstrate they would "personally benefit in a tangible way from the court's intervention."

To obtain injunctive relief, Plaintiffs must be "likely to suffer future injury." *Lyons*, 461 U.S. at 105.  "To obtain an injunction, Plaintiffs must show that they have sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Clay v. Garth*, 2012 WL 4470289, at *2 (N.D. Miss. Sept. 27, 2012) (quoting *Lyons*, 461 U.S. at 101–102) (quotation marks omitted)); *see also Hancock Cty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (redressability asks whether court's injunction is "likely" to redress alleged injuries posing "realistic danger").  Plaintiffs have not alleged facts to show they have sustained injuries, are in "immediate danger" of sustaining an injury, or that an injunction is likely to redress any future injury.  Moreover, the Speaker and Secretary are without authority to enact and implement another law in place of the Challenged Provisions or to act in a manner opposite the Mississippi Constitution. *In re Hooker*, 87 So. 3d 401, 411 (Miss. 2012) ("executive action must fall within the Constitution and laws of the State").  Accordingly, the Court should dismiss Plaintiffs' claims for failure to establish redressability.

## B.      The Court Should Dismiss this Action because it is Not Ripe.

This action is also not justiciable because Plaintiffs do not allege sufficient facts to demonstrate that the case is "ripe."  "'Justiciability concerns not only the standing of litigants to

assert particular claims, but also the appropriate timing of judicial intervention.'" *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (quoting *Renne v. Geary*, 501 U.S. 312, 320 (1991)). "A case or controversy must be ripe for decision, meaning that it must not be premature and speculative." *Shields*, 289 F.3d at 834–35; *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000). "'A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical.'" *Barbour*, 529 F.3d at 545 (quoting *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003)).[23] Plaintiffs seek relief from an injury that has not happened and might never happen—the action is based purely on speculation about future elections.

A claim is not ripe if it is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580–81 (1985). To determine whether a claim is ripe, courts evaluate: "(1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Lopez v. City of Houston*, 617 F.3d 336, 342 (5th Cir. 2003); *Choice*, 691 F.3d at 715. Courts also draw a distinction between cases where "any remaining questions are purely legal ones" and cases that require further factual development. *Lopez*, 617 F.3d at 342 (citation omitted). Here, Plaintiffs do not allege sufficient facts to show that their purported injury is fit for judicial resolution because it is contingent on the hypothetical occurrence of future events.

Plaintiffs' claims "sit[] atop a mountain of conjecture and speculation," and are, therefore, not ripe for review." *Foster*, 205 F.3d at 857. In deciding the issues in this case, the Court is left with no choice but to speculate as to "contingent future events that may not occur as

---

[23] "Ripeness often overlaps with standing, 'most notably in the shared requirement that the injury be imminent rather than conjectural or hypothetical.'" *Id.* (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006)). The question is "'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Id.* (quoting *Warth*, 422 U.S. at 499 n.10). Here, the injury is hypothetical only and does not warrant judicial intervention. *See Lopez v. City of Houston*, 617 F.3d 336, 341–42 (5th Cir. 2003) (quoting *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007)).

anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580–81.  For the alleged injury to occur, Plaintiffs' unnamed "African-American-preferred candidate" must be deprived of statewide office because of the application of the Challenged Provisions.  Such has never happened, and there are no factual allegations in the Complaint as to why or how it will happen in future elections (*see* fn. 20, *supra*).  This Court's translating such a hypothetical into the necessary "clean-cut and concrete form" is, therefore, rendered impossible without "engag[ing] in [a] form of legal forecasting [that] could only lead to ill-advised adjudication." *Renne*, 501 U.S. at 321–22.[24]  Further, because there is no concrete, particularized, actual, and imminent injury that is ripe for the Court's consideration, there is no "potential hardship to the parties" caused by the Court declining consideration of Plaintiffs' claims.  If the remote, unlikely hypothetical that Plaintiffs envision does actually occur, Plaintiffs can seek relief from the Court at that time.  There is nothing novel about seeking relief to challenge an election after it occurs.

Indeed, one of the many reasons courts are rightfully cautious in addressing pre-election challenges to state election schemes is that such challenges necessary rely on guesses as to the actions of individuals based on stereotypes and assumptions.  Plaintiffs place Mississippi voters into boxes, assuming most black people will vote Democrat, white people will vote Republican, and the state House of Representatives will summarily oust any Democrat that receives a plurality of the popular vote.  Plaintiffs' theory even assumes Plaintiffs will vote for the Democratic candidate, even though they make no such express allegation in the Complaint.  *See Renne*, 501 U.S. at 321–22 (challenge to state constitution provision prohibiting political parties

---

[24] In addressing constitutional challenges to state voting procedures, courts must be guided by past events. *See Barbour*, 529 F.3d at 547; *Rucho*, 139 S.Ct. at 2492-2504 (relying on history to determine partisan gerrymandering claims are political questions, beyond the reach of federal courts).  The Challenged Provisions have *never* before been applied to deprive an "African-American-preferred candidate" a statewide office.  Without a pattern of past Constitutional violations with regard to these specific provisions, there is no basis for the Court to hypothesize that such an eventuality may occur.

from endorsing non-partisan candidates was not ripe in part because "Respondents [did] not

allege an intention to endorse any particular [non-partisan] candidate"); *Barbour*, 529 F.3d at

545–46 (Democratic party's challenge was not ripe in part because they were required to "show

that they intend to hold closed primaries" in violation of Mississippi law but they had "taken no

steps" to do so).  The Supreme Court has cautioned against such broad assumptions, explaining

that it is impossible to predict how and why voters act:

> [Courts] cannot reliably account for some of the reasons voters prefer one
> candidate over another, or why their preferences may change. Voters elect
> individual candidates [based on] issues that matter to them, the quality of the
> candidates, the tone of the candidates' campaigns, the performance of an
> incumbent, national events or local issues that drive voter turnout, and other
> considerations. Many voters split their tickets. Others never register with a
> political party, and vote for candidates from both major parties at different points
> during their lifetimes. For all of those reasons, asking judges to predict how a
> particular districting map will perform in future elections risks basing
> constitutional holdings on unstable ground outside judicial expertise.

*Rucho*, 139 S. Ct. 2503.  Without allegations of past instances where the Challenged Provisions

were applied in a constitutionally impermissible manner (there are none here), and given the

variable and diverse nature of individual voting practices, Plaintiffs claims are hypothetical and

abstract at best and are not ripe for judicial determination.

## C.    Plaintiffs' Claims Should be Dismissed because they Amount to Nonjusticiable Political Questions.

Plaintiffs allege that "because of the geographic and electoral concentration of the racial

groups among the House districts, African Americans' candidates of choice must obtain a

significantly larger share of the statewide population in order to win a majority of House

districts, as compared to candidates preferred by white voters."  *Id.* at ¶44.  Plaintiffs allege the

"influence of a person's vote in a statewide race is confined to the boundaries of her House

district."  *Id.* at ¶51.  Plaintiffs fail to set forth any allegations regarding difficulties, denials, or

abridgments of their votes in their own House districts.  In other words, Plaintiffs' claims are

21

general grievances about how "fairly" the House districts are apportioned from a political

standpoint. Plaintiffs argue that the way the House districts are drawn makes it more difficult to

elect "African-American-preferred candidates" (i.e., Democrats according to Plaintiffs) than it

does to elect "white-preferred candidates" (i.e., Republicans according to Plaintiffs). *See* Doc.

26 at ¶¶41–45, 50–58. Therefore, Plaintiffs' claims are nonjusticiable, partisan gerrymandering

claims. *Rucho*, 139 S. Ct. at 2493–2502, 2506–07.[25] "In such a case the claim is said to present

a 'political question' and to be nonjusticiable—outside the courts' competence and therefore

beyond the courts' jurisdiction." *Id.* at 2494 (citing *Baker*, 369 U.S. at 217).[26]

   "Any judicial decision on what is 'fair' in this context would be an 'unmoored

determination' of the sort characteristic of a political question beyond the competence of the

federal courts." *Id.* at 2500 (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012)). "Partisan

gerrymandering claims invariably sound in a desire for proportional representation." *Id.* at 2499.

"'Our cases, however, clearly foreclose any claim that the Constitution requires proportional

representation or that legislatures in reapportioning must draw district lines to come as near as

possible to allocating seats to the contending parties in proportion to what their anticipated

statewide vote will be.'" *Id.* (quoting *Davis v. Bandemer*, 478 U.S. 109, 130 (1986) (plurality

opinion) and citing *City of Mobile v. Bolden*, 446 U.S. 55, 75–76 (1980) (plurality opinion)

---

[25] "Unlike partisan gerrymandering claims, a racial gerrymandering claim does not ask for a fair share of political power and influence, with all the justiciability conundrums that entails." *Rucho*, 139 S. Ct. at 2502. "It asks instead for the elimination of a racial classification. A partisan gerrymandering claim cannot ask for the elimination of partisanship." *Id.* Plaintiffs' claims are clearly of partisan nature.

[26] "We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts." *Id.* "Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions." *Id.* "'[J]udicial action must be governed by standard, by rule,' and must be 'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws." *Id.* (quoting *Vieth*, 541 U.S. at 278, 279 (plurality opinion)). "Judicial review of partisan gerrymandering does not meet those basic requirements." *Id.*

("The Equal Protection Clause of the Fourteenth Amendment does not require proportional representation as an imperative of political organization.")). Accordingly, the Court should dismiss all of Plaintiffs' claims because they are nonjusticiable, partisan gerrymandering claims. *See Rucho*, 139 S. Ct. at 2493–2502, 2506–07.

## II.   The Court Should Dismiss Plaintiffs' Claims under Rule 12(b)(6) and the Doctrine of Prudential Standing.

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the Complaint must "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Complaint must set forth "'enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "Prudential standing requirements exist in addition to the immutable requirements of Article III as an integral part of judicial self-government." *Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (quotation marks and citation omitted).[27] Prudential standing encompasses "at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests

---

[27] Unlike Article III constitutional standing, which is viewed under Rule 12(b)(1), prudential standing is viewed under Rule 12(b)(6). *Cannimore*, 2019 WL 136996, at *2 (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011). Under Rule 12(b)(6), the "'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Id.* (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). "But 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).

In this case, as explained below, the Court should dismiss Plaintiffs' claims under Rule 12(b)(6) for failure to state a claim upon which relief could be granted because Plaintiffs have not pled facts necessary to establish any discriminatory effect or impact from the Challenged Provisions on their voting rights. In addition, the Complaint "raises abstract questions or a generalized grievance more properly addressed by the legislative branch," and Plaintiffs are "asserting the legal rights and interests of third parties" as opposed to their "own legal rights and interests." *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 460 n.9 (5th Cir. 2001).

A.    **Count I (14th and 15th Amendments) and Count III (Section 2 of VRA)**

With regard to Plaintiffs' vote-dilution claims in Counts I and III, two elements must be satisfied: discriminatory intent *and* discriminatory effect. *See, e.g., Davis*, 478 U.S. at 127 ("plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group"). Vote-dilution claims under Section 2 of the VRA specifically require a "qualification or prerequisite to voting" that "<u>results</u> in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). Plaintiffs allege that the Challenged Provisions were enacted with discriminatory intent; however, that is not enough for a vote-dilution claim under the Fourteenth and Fifteenth Amendments or Section 2 of the VRA. *See* Doc. 23 at 9-14. Instead, it is well established that Plaintiffs must set forth facts sufficient to demonstrate discriminatory impact, i.e. "actionable vote dilution" as distinguishable from "political defeat at the polls." *LULAC No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). Plaintiffs have set forth zero facts to establish that the Challenged Provisions negatively impacted their

24

individual voting rights. And Plaintiffs have not alleged facts to show that the Challenged

Provisions have ever been, or will likely ever be, applied to deprive an "African-American

preferred candidate" of office.

Additionally, the Court should dismiss Plaintiffs' claims in Count III under Section 2 of

the VRA because Plaintiffs' claims do not "fall within the zone of interests protected by the"

VRA. *Lexmark*, 572 U.S. at 126; *Logan*, 263 F.3d at 460 n.9. This is so for several reasons.

First, Section 2 of the VRA protects only those who have been injured by the law at issue, and

Plaintiffs allege no facts to show that Challenged Provisions have injured them. Section 2 of the

VRA protects only the opportunity but "not the right to vote for the winning candidate." *Nevett

v. Sides*, 571 F.2d 209, 236 (5th Cir. 1978).[28] Second, majority-vote requirements, such as the

"Popular Vote Rule," are not "a per se violation of Section 2 of the Voting Rights Act of 1965."

*Martin v. Allain*, 658 F. Supp. 1183, 1198 (S.D. Miss. 1987); *see also Butts v. City of New York*,

779 F.2d 141, 149 (2d Cir. 1985) (VRA does not "prevent any governmental unit from deciding

that the winner must have not merely a plurality of the votes, but an absolute majority"); *Bond*,

334 F. Supp. at 1193 (no standing to challenge majority-vote requirement). "Electoral devices"

identified in the Senate Report on the VRA, such as majority-vote requirements, "may not be

considered *per se* violat[ions] of § 2." *Thornburg v. Gingles*, 478 U.S. 30, 46 (1986) (citing S.

Rep. No. 97-417, 27–28 (1982)). Finally, although the "'single-member office' theory [does not]

automatically exempt[] certain elections from the coverage of § 2" of the VRA, *Houston

Lawyers' Ass'n v. Att'y Gen. of Texas*, 501 U.S. 419, 426–27 (1991), Plaintiffs' challenges here

---

[28] The Supreme Court has expressly stated that "the ultimate right of § 2 is equality of opportunity, not a
guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De
Grandy*, 512 U.S. 997, 1014 n.11 (1994). "The right to vote does not entail the right to have a minority
candidate elected." *Smith v. Winter*, 717 F.2d 191, 198 (5th Cir. 1983); *see also* 52 U.S.C. § 10301(b)
("nothing in this section establishes a right to have members of a protected class elected in numbers equal
to their proportion in the population").

relate to single-member, *statewide* offices that are not intended to be subject to Section 2 vote-dilution challenges. *See, e.g, Butts*, 779 F.2d at 141, 143, 148–49 (VRA applicable in cases where "electoral arrangements . . . diminish a class's opportunity *to elect representatives in proportion to its numbers*") (emphasis added) (citing *City of Port Arthur v. United States*, 459 U.S. 159 (1982)). In single-member offices, "[t]he concept of vote dilution is effectively rendered meaningless and such offices are inappropriate for section 2 vote dilution challenges." *LULAC No. 4434 v. Clements*, 902 F.2d 293, 313 (5th Cir. 1990) (quoting *S. Christian Leadership Conf. v. Siegelman*, 714 F. Supp. 511, 519 (M.D. Ala. 1989)).[29] The "totality of the circumstances" test under the VRA is unworkable for, and was not intended to be applied to, true single-member, *statewide* offices where there is no possibility that minority voters will elect a disproportionate "share" of representatives. *See Gingles*, 478 U.S. at 49–51. Instead, that test is aimed at discriminatory effects caused by the election of representatives to offices that do not encompass the entire state.

Further, Plaintiffs' VRA claim in Count III should be dismissed under Rule 12(b)(6) for failure to state a claim because Plaintiffs have failed to allege facts to establish that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50–51; *Bartlett v. Strickland*, 556 U.S. 1, 11–12 (2009).[30]

---

[29] The Supreme Court dismissed a similar "single-member office" theory in *Houston Lawyers Assoc. v. Attorney General of Texas*, 501 U.S. 419, 426–27 (1991), but that case did not involve single-member offices in *statewide* elections. Rather, it involved judges elected to various districts within the state. *Id.*

[30] The remaining two *Gingles* prerequisites are: (2) "the minority group must be able to show that it is politically cohesive;" and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed." *Id.* at 51. All three factors must be proven. Because neither the Fifth Circuit nor the Supreme Court have analyzed whether *Gingles* applies to majority-vote requirements for statewide elections, this Court should follow guidance of the Eleventh Circuit that plaintiffs challenging majority-vote requirements for non-legislative positions must meet the *Gingles* prerequisites. *Brooks v. Miller*, 158 F.3d 1230, 1238–39 (11th Cir. 1998) ("the three prerequisites for the results test set out in *Gingles* are applicable to this case").

The purpose of *Gingles* is to "establish that 'the minority [group] *has the potential to elect a representative of its own choice*' . . . but that racially polarized voting prevents it from doing so . . . because it is 'submerg[ed] in a larger white voting population.'" *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)) (emphasis added). "Conversely, where the minority group is either too small or insufficiently compact or cohesive to have any real opportunity to elect a candidate of its choice . . . there has been no violation of § 2." *Harding v. City of Dallas*, 336 F. Supp. 3d 677, 694 (N.D. Tex. 2018); *Gingles*, 478 U.S. at 50 n.17; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (plaintiffs must establish that they could prevail under "alternative" voting scheme). In short, Plaintiffs have not alleged any facts to show that an alternative voting scheme would "enhance [their] ability . . . to elect the candidates of their choice." To the extent the Court finds that the VRA applies to Plaintiffs' claims, which it should not, Plaintiffs have not, and cannot, allege facts to show African-Americans "constitute a majority" in Mississippi (the alleged "single-member district").[31]

## B.   Count II (One-Person, One-Vote under 14th Amendment)

Plaintiffs' separate vote dilution challenge to the "Electoral Vote Rule" in Count II should be dismissed under Rule 12(b)(6) and prudential standing because district-based voting in statewide elections is not *per se* unconstitutional, the Challenged Provisions apply equally to all

---

[31] African-American voters in Mississippi are not "sufficiently large and geographically compact to constitute a majority in [Mississippi]." *Gingles*, 478 U.S. at 50. The Supreme Court has held that minorities may not rely on cross-over votes to establish this first prong. *Bartlett*, 556 U.S. at 10–25 ("because they form only 39 percent of the voting-age population . . . African–Americans standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength," therefore, they could not establish a VRA claim under *Gingles*). The Court in *Bartlett* explained that the first *Gingles* requirement is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district," and "[w]ithout such a showing, there neither has been a wrong nor can be a remedy." *Id.* at 15 (quotations omitted). Because the African-American voters could not rely on cross-over white voters to establish that they had the potential to win an election under an alternative system, they could not bring a viable VRA claim. Similarly, Plaintiffs' claims rely on cross-over white votes to establish that minorities might have the potential to elect African-American preferred candidates in Mississippi statewide elections. Because *Bartlett* precludes such reliance, Plaintiffs have failed to establish a viable VRA claim as a matter of law.

voters regardless of race and partisanship, and Plaintiffs set forth zero facts to show that their votes, in their districts, have been abridged. "The 'one person, one vote' system is the doctrine of equal representation, a constitutional requirement under the Fourteenth Amendment[, which] requires that each person's vote count the same as any other person's." Francis C. Amendola, *et al.*, 16B C.J.S. Constitutional Law § 1428 (2019). "In other words, each representative must be accountable to (approximately) the same number of constituents," but "[t]hat requirement does not extend to political parties." *Rucho*, 139 S. Ct. at 2502 ("'The court has not accepted the argument that an 'asserted entitlement to group representation . . . can be traced to the one person, one vote principle.'") (quoting *Bandemer*, 478 U.S. at 150). Because the Challenged Provisions, including the "Electoral Vote Rule," apply equally to all political parties, and because Plaintiffs' claims are not individualized but instead are based on alleged generalized deprivations to voters who want to elect Democrats, Plaintiffs' claims fail.

Additionally, none of the cases cited by Plaintiffs establish a *per se* prohibition of district-based voting in statewide elections. Doc. 26 at ¶¶52–53, 109. Plaintiffs lean heavily on *Gray v. Sanders*, 372 U.S. 368 (1963), but *Gray* held that Georgia's county-unit system violated the Constitution because it "weights the rural vote more heavily than the urban vote and weights some small rural counties heavier than other larger rural counties." 372 U.S. at 378. In *Gray*, "the result [of the county-unit system] was that the number of votes of persons living in large counties was given no more weight in electing state officers than was given to a far fewer number of votes of persons residing in small counties." *Fortson*, 385 U.S. at 233. In sum, *Gray* was concerned with prohibiting geographic discrimination between rural and urban counties and did not hold that electing statewide officers on the basis of legislative districts is unconstitutional. 372 U.S. at 379.

Further, Supreme Court decisions after *Gray* establish that a state is not required to decide elections based on popular vote. *See Fortson*, 385 U.S. at 233. *Gray*'s admonition against geographic discrimination applies only to the extent the "state . . . decides to select persons by popular election." *Hadley v. Junior College Dist. of Metro. Kansas City*, 397 U.S. 50, 56 (1970). Under *Gray*, "whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause . . . requires that each qualified voter must be given an equal opportunity to participate in that election." *Id.* (emphasis added). But *Gray* does not foreclose the state's ability to choose its statewide officers by means other than popular vote. In *Fortson*, the Court upheld Georgia's version of the "Popular Vote Rule" and "House Vote Rule," stating that district court "erroneously relied on *Gray*." 385 U.S. at 233.[32] The Court explained that the constitutional violation in *Gray* resulted from geographic discrimination and not the method the state chose to elect its statewide officers. *Id.* Nothing in *Gray* prohibits a state from deciding an election in a manner other than popular vote:

> Not a word in the Court's opinion indicated that it was intended to compel a State
> to elect its governors or any other state officers or agents through elections of the
> people rather than through selections by appointment or elections by the State
> Assembly. It is wrongly cited as having either expressly or impliedly decided that
> a State cannot, if it wishes, permit its legislative body to elect its Governor.

*Id.* In fact, "[t]here is no provision of the United States Constitution or any of its amendments which either expressly or impliedly dictates the method a State must use to select its Governor." *Id.* at 234 (recognizing that Mississippi also uses a version of the "House Vote Rule" and citing MISS CONST. art. V, §§ 140 & 141). Accordingly, and because the Challenged Provisions apply

---

[32] The Court dismissed plaintiffs' argument that this system of selecting a governor in a manner other than by popular vote "cannot jibe with a one-person, one-vote concept of democratic self-government," because *Gray* required that "[o]n the state level the electoral college principle cannot be used." Brief of Appellees, *Fortson v. Morris*, 1966 WL 100436 (U.S. Nov. 25, 1966).

equally to all voters and Plaintiffs set forth zero facts to show that their votes, in their districts, have been abridged, the Court should dismiss Plaintiffs' "Electoral Vote Rule" claims.

**III.     The Court Should Dismiss the Action Under Rules 12(b)(1) and 12(b)(7) because the Speaker and Secretary are not Proper Defendants and are Immune, and because Plaintiffs Failed to Join the Attorney General or Governor as a Necessary Party; Alternatively, the Court Should Dismiss the Speaker and Secretary and join the Attorney General or Governor.**

As an initial matter, the Court should find that the Speaker and Secretary are not proper Defendants in this case and dismiss the claims against them for the same reasons already discussed under the causation prong of the above standing analysis—the Speaker and Secretary do not have sufficient connection with enforcement of the Challenged Provisions. *See Greater Birmingham Ministries*, 2017 WL 782776, at *4, 14; *Okpalobi*, 244 F.3d at 426.  Plaintiffs assert that the Challenged Provisions are illegal and that the candidate who garners a plurality of votes should be the winner of statewide elections.  That claim has nothing to do with the functions of the Speaker or Secretary.  Instead, the Attorney General is a proper defendant on all claims because that office has the duty to defend challenges to the Mississippi Constitution.  Miss. Code Ann. § 7-5-1. (Attorney General "shall intervene" and argue constitutionality when notified of a challenge).  Also, the Attorney General is the "chief legal officer and advisor for the state." *Id.*

The Governor is also a proper defendant.  The Constitution  vests the Governor with "[t]he chief executive power of [Mississippi]," and he has the constitutional obligation to "see that the laws are faithfully executed." Miss. Const. art. V, §§ 116, 123.  Likewise, statutes impose similar duties to enforce the state's laws: "[the Governor] is the supreme executive officer of the state[,] . . . . [h]e shall see that the laws are faithfully executed[,] [and] [h]e is to supervise the official conduct of all executive and ministerial officers." Miss. Code Ann. § 7-1-5(a), (c), & (d).

For the same reason, the Eleventh Amendment bars Plaintiffs' claims against the Speaker and Secretary, but not against the Attorney General or Governor.[33] *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124 (1984). To overcome Eleventh Amendment immunity, Plaintiffs will argue their claims fit within a narrow exception derived from *Ex parte Young*, 209 U.S. 123 (1908). But the *Ex parte Young* exception applies only if the defendant has sufficient connection with enforcement of the act in question or is "specifically charged with the duty to enforce the statute' and [is] threatening to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414–16). "The required 'connection' is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* As shown above, the Speaker and Secretary do not have an obligation to enforce the Challenged Provisions. Indeed, as stated above, they have no "connection" with enforcement of the Challenged Provisions. In addition, to the extent *OCA-Greater Houston*, 867 F.3d at 614, held that the VRA "validly abrogated state sovereign immunity," Plaintiffs' VRA claims in Count III should be directed at the State of Mississippi, not the Speaker or Secretary.

Moreover, the Court should dismiss this action under Rule 12(b)(7) for Plaintiffs' failure to join a necessary and indispensable party as required by Rule 19. "Determining whether to dismiss a case for failure to join an indispensable party requires a two-step inquiry." *Hood ex. rel. Mississippi v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009). "First the district court must determine whether the party should be added under the requirements of Rule 19(a)." *Id.* Rule 19(a) provides in relevant part that joining a party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A).

---

[33] Generally, courts have treated dismissals based on sovereign immunity as jurisdictional under Fed. Rule Civ. Proc. 12(b)(1), despite "the uniquely ambiguous character of Eleventh Amendment immunity." *Cantu Services, Inc. v. Roberie*, 2013 WL 3420524, *4 n.3 (5th Cir. 2013) (citations omitted).

Second, the court must determine whether the necessary party can be joined. *Hood*, 570 F.3d at 629. First, the Attorney General or the Governor is a necessary party under Rule 19(a)(1)(A) because the Court "cannot accord complete relief" in their absence. *See Barbour*, 529 F.3d at 542.[34] Second, if the Court determines that the Attorney General or Governor cannot be joined as a defendant, then the entire action should be dismissed.

Alternatively, if the Attorney General or Governor is deemed to be a necessary party under Rule 19 and can be joined as a defendant, then the Speaker and Secretary request that he be so joined and be required to carry out his statutory obligations to defend and enforce the Mississippi Constitution.[35] Regardless of whether the Attorney General or Governor is ultimately joined as a defendant, however, the Court should dismiss the Speaker and Secretary from this action because they do not have the duty or power to enforce the Challenged Provisions.[36]

## CONCLUSION

For the reasons discussed above, the Speaker and Secretary respectfully request that the Court dismiss the Complaint with prejudice. The Speaker and Secretary request such other and further relief as the Court deems appropriate under the circumstances.

Date: August 12, 2019.

---

[34] The Attorney General was held to be a proper defendant in *Dupree v. Mabus* as "the chief legal officer and advisor for the state." 776 F. Supp. 290, 296 (S.D. Miss. 1991) (citing Miss. Code Ann. § 7-5-1).

[35] *See also* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party.")

[36] The Court does not even need to reach the determination of whether the Speaker, Secretary, Attorney General, Governor or State of Mississippi are proper defendants because, as stated above, the Court does not have jurisdiction and Plaintiffs have failed to state a claim for which relief could be granted.

Respectfully submitted,

**PHILIP GUNN, IN HIS OFFICIAL CAPACITY
AS THE SPEAKER OF THE MISSISSIPPI
HOUSE OF REPRESENTATIVES, AND
DELBERT HOSEMANN, IN HIS OFFICIAL
CAPACITY AS THE MISSISSIPPI
SECRETARY OF STATE**

*/s/ Trey Jones*
Trey Jones
One of Their Attorneys
William Trey Jones, III (MSB #99185)
tjones@brunini.com
Cody C. Bailey (MSB #103718)
cbailey@brunini.com
Jacob A. Bradley (MSB #105541)
jbradley@brunini.com
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
The Pinnacle Building, Suite 100
190 East Capitol Street (39201)
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone: (601) 948-3101
Facsimile: (601) 960-6902

## CERTIFICATE OF SERVICE

I, Trey Jones, hereby certify that on August 12, 2019, I caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record and registered participants.

*/s/ Trey Jones*
Trey Jones
One of the Attorneys for the Defendants

33