# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| LESLIE-BURL McLEMORE;<br>CHARLES HOLMES;<br>JIMMIE ROBINSON, SR.;<br>RODERICK WOULLARD;<br>BRENDA BOOTH;<br>JORDAN MALONE; and<br>TYLER YARBROUGH,<br><br>    Plaintiffs,<br><br> v.<br><br>DELBERT HOSEMANN, in his official capacity as the Mississippi Secretary of State; and PHILIP GUNN, in his official capacity as the Speaker of the Mississippi House of Representatives,<br><br>    Defendants. | Civil Action<br><br>Case No. 3:19-cv-383-DPJ-FKB |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

Secretary Hosemann and Speaker Gunn have taken the remarkable position that an electoral system enacted to preserve a racial hierarchy and disadvantage African-American voters harms no one. Their argument erroneously assumes that the ensuing constitutional injury is measured solely by election results—but it is well established that the denial of an equal opportunity to elect one's preferred candidate is unconstitutional notwithstanding the electoral outcome. Defendants do not dispute that the Challenged Provisions[1] were enacted with discriminatory intent, nor do they dispute that African-American-preferred candidates—as identified through Dr. Jonathan Rodden's ecological inference analysis—must normally win at least 55 percent of the popular vote to be elected under the Challenged Provisions, while white-preferred candidates need not even win a majority of the vote. By relying on a flawed definition of constitutional harm and failing to address the demonstrable disadvantages imposed on African-American voters, Defendants fail to refute Plaintiffs' claims that the Challenged Provisions violate the Fourteenth and Fifteenth Amendments and the Voting Rights Act ("VRA").

Nor do Defendants identify any impediment to the Court providing relief before the November 5, 2019 general election. They have had more than ample time (60 days) to respond to Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs' requested relief affects only the method by which Mississippi declares the winner of each race for statewide, state office after all votes have been tallied. *See* ECF 12 at 2 (Defs.' Mot. for Extension of Time). Granting such relief would neither confuse voters nor change how the state administers its election.[2] African-American Mississippians should not have to await the results of another election governed by an avowedly discriminatory scheme to enforce their constitutional rights.

---

[1] All capitalized phrases should be given the same meaning as set forth in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, ECF No. 9 ("Pls.' Mot.").

[2] Mississippi already employs a plurality system for many of its elected offices. *See* MISS. CODE ANN. § 23-15-605.

A.  **Plaintiffs' Evidence of Discriminatory Intent and Effect Demonstrate a Straightforward Violation of the Fourteenth and Fifteenth Amendments.**

Rather than attempt to rebut clear evidence of discriminatory intent, or statistical analysis demonstrating that the Challenged Provisions disadvantage African-American voters,[3] Defendants misstate the applicable legal standards by insisting that claims of racial discrimination in voting can prevail only if the plaintiff proves that the law at issue has altered the outcome of an election—a point for which they offer no legal authority. *See* Defs.' Opp. at 10-11. This argument ignores that "[i]n decision after decision, [the Supreme Court] has made clear that a citizen has a constitutionally protected right to participate in elections *on an equal basis* with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (emphasis added); *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (holding that plaintiffs alleging unlawful discrimination in the administration of a benefit need not allege that they would have obtained the benefit but for the discrimination). Individuals who prove "that their right to vote was purposefully abridged because of their race, in violation of the Equal Protection Clause, need not show that the outcome of the election would have been different absent the violation." *Denis v. N.Y. City Bd. of Elections*, No. 94 Civ. 7077 (KMW), 1994 WL 613330, at *3 n.4 (S.D.N.Y. Nov. 7, 1994). As explained in detail in Plaintiffs' Opposition to Defendant's Motion to Dismiss, when it comes to the Constitution's prohibition of race discrimination in voting, there is no harmless error.[4] *See* ECF No. 25 at 8-19.

---

[3] Defendants refer to the authors of a 2008 law review article cited in Plaintiffs' memorandum as "Plaintiffs' experts" and proceed to criticize the article's methodology. Defs.' Opp. at 7. It should go without saying that those authors were not offered as experts in this case, and Defendants fail to rebut the proposition for which Plaintiffs cited the article. Pls.' Mot. at 6-7 (quoting the article's statement that "[i]t is generally believed that the motive for the adoption of majority requirements . . . was to reduce the ability of African-American candidates to win elections").

[4] Defendants' argument fares no better under Section 2. The statute's plain language states that "[a] violation . . . is established if, based on the totality of circumstances, it is shown that . . . members have *less*

Because Plaintiffs have offered undisputed evidence of discriminatory intent, they need only prove that the Challenged Provisions deny them an *equal opportunity* to elect their preferred candidates.[5] *N.A.A.C.P. v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982). And they have done so. Dr. Rodden's statistical analysis—which Defendants do not dispute[6]—demonstrates this effect in multiple ways, including by showing that voting is highly racially polarized, and candidates preferred by African-American voters must receive at least 55 percent of the vote, or beat their opponents by, on average, at least ten percentage points to be elected. *See* Pls.' Mot. at 7-9; ECF No. 8-7 (Rodden Decl.). Having established that the Challenged Provisions deliberately place a heavy thumb on the scale of Mississippi's statewide elections to make it easier for white voters to elect their candidates of choice than African-American Mississippians, Plaintiffs have shown a clear equal protection and Fifteenth Amendment violation.

That courts have upheld similar electoral structures says nothing about the legality of the Challenged Provisions because the cases Defendants cite, *see*, *e.g.*, Defs.' Opp. at 10-11, did not involve findings of discriminatory intent. *See City of Richmond v. United States*, 422 U.S. 358,

---

*opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added).

[5] Plaintiffs also need not show that the Challenged Provisions' dilutive effect has remained constant over time. When the discriminatory intent of a law is clearly proven, an equal protection challenge prevails so long as it is shown that the law continues to have some discriminatory impact. *See Hunter v. Underwood*, 471 U.S. 222, 232-33 (1985) (explaining that even if "events occurring" since 1901 had narrowed the discriminatory effect of Alabama's felon disenfranchisement provision, the provision remained unconstitutional because "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect").

[6] Contrary to Defendants' claims, Defs.' Opp. at 15 n.14, the Supreme Court did not reject Dr. Rodden's opinions in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), or any other case. *Rucho* merely held that partisan gerrymandering claims were nonjusticiable. *Id.* at 2498-2502. A ruling on standing or justiciability does not reflect the Court's assessment of an expert's analysis. And Defendants' attempt to invoke *Rucho* in this case is particularly puzzling given the Supreme Court's explicit assurances that its ruling does not limit vote-dilution claims based on racial discrimination or violations of the one-person, one-vote principle. *Id.* at 2496-98, 2501-02.

378-79 (1975) ("[A]cts generally lawful may become unlawful when done to accomplish an unlawful end."). The Challenged Provisions, on the other hand, were enacted with racial animus, and there can be no dispute that electoral structures that "tend to minimize the voting strength of minority groups" violate the Fourteenth and Fifteenth Amendments when they are "conceived or operated as a purposeful device[] to further racial discrimination." *Rogers v. Lodge*, 458 U.S. 613, 616-17 (1982) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)).[7]

Finally, the Court need not delay its ruling on the preliminary injunction to resolve erroneous jurisdictional objections because, contrary to Defendants' assertions, Defs.' Opp. at 1, the Secretary and the Speaker are explicitly tasked with carrying out the Challenged Provisions and, therefore, are the proper defendants in this suit. *See, e.g.*, *Keyes v. Gunn*, 230 F. Supp. 3d 588, 594-95 (S.D. Miss. 2017) (finding the Speaker a proper defendant in challenge to the House's role in election dispute), *rev'd on other grounds*, 890 F.3d 232 (5th Cir. 2018); ECF No. 25 at 26-29 (addressing issue in full). In fact, the last time a candidate failed to satisfy the Popular Vote and Electoral Vote Rules, the Speaker of the House declared the winner. H. JOURNAL, 115th Reg. Sess., at 33 (Miss. 2000) (attached as Exhibit 1).

### B. Plaintiffs' Undisputed Evidence of Discriminatory Intent and Effect Also Make Them Likely to Succeed in Their Voting Rights Act Claim.

Defendants similarly do not dispute much of Plaintiffs' VRA claim, and, in particular, fail to rebut Plaintiffs' evidence under the Senate Factors, which weigh heavily in favor of finding that African Americans do not enjoy an equal opportunity to elect their statewide candidates of choice.

---

[7] Defendants incorrectly argue, without explanation, that controlling case law invalidating discriminatory majority-vote requirements have no application here because those cases involved elections for multi-member districts or multi-member offices that were not statewide. Defs.' Opp. at 10-11. That is a distinction without a difference. It would make little sense if the Equal Protection Clause prohibited racially discriminatory vote dilution in elections for a state's legislators, but nonetheless permitted the same when the electorate selects its governor.


Instead, Defendants invent new restrictions to VRA claims that have no basis in the law.

First, Defendants' assertion that Section 2 does not apply to statewide, single-member elections, Defs.' Opp. at 12, directly contradicts binding precedent. The Supreme Court has already rejected the proposition that an election for "single-member office" is "automatically exempt[ed] . . . from the coverage of § 2." *Houston Lawyers' Ass'n v. Atty. Gen.*, 501 U.S. 419, 426 (1991). That decision invalidated the reasoning in *League of United Latin American Citizens Council No. 4434 v. Clements*, 902 F.2d 293 (5th Cir. 1990), on which Defendants heavily rely. Defs.' Opp. at 12. And courts, including the Fifth Circuit, have repeatedly applied Section 2 in various contexts to all elections, including those for single-member, statewide offices. *Veasey v. Abbott*, 830 F.3d 216, 264-65 (5th Cir. 2016) (affirming the finding that Texas voter identification statute had "a discriminatory effect on minorities voting rights in violation of Section 2 of the Voting Rights Act"); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246-47 (4th Cir. 2014) (holding statewide election law "affecting same-day registration and out-of-precinct voting" likely violated Section 2).

Second, contrary to Defendants' claims, Defs.' Opp. at 14-15, the size of Mississippi's African-American population is "of no relevance" in a Section 2 claim outside of the redistricting context, *see Armstrong v. Allain*, 893 F. Supp. 1320, 1328 (S.D. Miss. 1994) (holding the first *Gingles* factor inapplicable in challenge to Mississippi's supermajority requirement for referenda); *Veasey*, 830 F.3d at 264-65 (skipping the first *Gingles* factor in Section 2 challenge to a statewide voter ID law), and Defendants do not point to a single authority that requires Plaintiffs to show that they are a majority of the electorate when they *do not* seek a redistricting remedy.[8] In any

---

[8] The cases Defendants rely on for this argument involve challenges to districting plans, and *Brooks v. Miller*, 158 F.3d 1230, 1236-37 (11th Cir. 1998), is easily distinguishable because there the court did not find any intentional discrimination. An otherwise lawful practice can violate constitutional rights when

event, even plaintiffs in redistricting cases need not satisfy the first *Gingles* precondition when, like here, the challenged law was enacted with discriminatory intent. *Perez v. Abbott*, 253 F. Supp. 3d 864, 942-44 (W.D. Tex. 2017), *abrogated on other grounds*, 138 S. Ct. 2305 (2018) ("[W]hen discriminatory purpose (intentional vote dilution) is shown, a plaintiff need not satisfy the first *Gingles* precondition to show discriminatory effects."); *see also Garza v. Cty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) (holding plaintiffs must prove the first *Gingles* precondition only where there is "no proof of intentional dilution of minority voting strength"); *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009) (stating that the Court's holding regarding the first *Gingles* precondition did not apply to claims asserting intentional discrimination, and citing *Garza*); *United States v. Brown*, 494 F. Supp. 2d 440, 483 n.67 (S.D. Miss. 2007) (holding "proof of the three *Gingles* preconditions" was not required in light of intentional discrimination).

### C. Directly Controlling Supreme Court Precedent Renders the Electoral-Vote Rule Unconstitutional.

The Electoral-Vote Rule is largely indistinguishable from the county-unit system invalidated in *Gray v. Sanders*, 372 U.S. 368 (1963), and the Court should reject Defendants' invitation to ignore controlling precedent. Both the Electoral-Vote Rule and the county-unit system in *Gray* determine an election outcome by identifying the candidate who wins a majority of a state's geographic subunits. And both systems violate the one-person, one-vote principle because, as the *Gray* Court explained, by counting the geographic subunits, the systems discard all votes for candidates who lose the district in which they were cast. *Id.* at 381 n.12.

Defendants' attempt to limit *Gray*'s holding to malapportioned counties or "discriminat[ion] between rural and urban counties," Defs.' Opp. at 16-17, squarely contradicts

---

motivated by race. *See, e.g.*, *Hunter*, 471 U.S. at 233 (noting that while states may disenfranchise individuals convicted of certain crimes, the Equal Protection Clause prohibits the same practice when it is motivated by "purposeful racial discrimination").

the opinion itself. After acknowledging the counties were malapportioned, the Court went on to explain that "*even if* unit votes were allocated strictly in proportion to population"—that is, even if the system did not discriminate between larger and smaller counties—the unconstitutional "weighting of votes would continue" because the system would "discard[]" all votes cast for candidates who lost a given county. *Gray*, 372 U.S. at 381 n.12 (emphasis added). Thus, the Court found that even the amended version of Georgia's county-unit system, which attempted to resolve the malapportionment issue, *still* violated the one-person, one-vote principle because it discarded votes for losing candidates. *Id.* In *Gordon v. Lance*, the Supreme Court reaffirmed that "the county-unit system [in *Gray*] would have been defective even if unit votes were allocated strictly in proportion to population" because "[v]otes for the losing candidates were discarded," and "votes for the winning candidate in a county were likewise devalued, because all marginal votes for him . . . would have no impact on the statewide total." 403 U.S. 1, 4-5 (1971). The Electoral-Vote Rule violates the one-person, one-vote principle in the same way: discarding votes cast for a candidate who does not receive the most votes in that district and discarding votes for candidates who win a district by a wide margin. And Defendants' reliance on *Fortson v. Morris* is misplaced given that *Fortson* did not involve any counting of votes by geographic subunits, and the opinion even reaffirmed that *Gray* requires the state "to eliminate the [geographic]-unit machinery from its election system," 385 U.S. 231, 235 (1966). The fact that the electoral system upheld in *Fortson* resembled the Popular-Vote and House-Vote Rules, Defs.' Opp. at 18, is inconsequential because, once again, the Court made no finding of intentional discrimination.

Finally, as Plaintiffs explain at length in their Opposition to Defendants' Motion to Dismiss, *see* ECF No. 25 at 23-36, Defendants' contention that the Supreme Court's decision in *Rucho* silently abrogated *Gray* and the one-person, one-vote principle, Defs.' Opp. at 14-15, is

groundless. The Court explicitly acknowledged that one-person, one-vote claims are justiciable, *see Rucho*, 139 S. Ct. at 2495-96, 2501, and this Court must continue to apply controlling precedent until the Supreme Court clearly indicates otherwise. *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

### D. The Balance of Equities and Public Interest Favors Injunctive Relief.

Notwithstanding Defendants' insistence that a statutory, Section 2 violation does not result in irreparable harm *per se*—which is a questionable proposition—"it is well-established that the deprivation of constitutional rights constitutes irreparable harm as a matter of law." *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 950 (S.D. Miss. 2014) (quotation marks omitted); *Hill ex rel. Hill v. Greene Cty. Sch. Dist.*, 848 F. Supp. 697, 706 (S.D. Miss. 1994) ("One who shows deprivation of a constitutional right need go no further in showing the requisite harm for injunctive relief."). As the Tenth Circuit recently explained, when a plaintiff demonstrates that a law "violates the Equal Protection Clause," she "need [] show no further irreparable harm." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 806 (10th Cir. 2019).

Similarly, this Court should reject Defendants' various conflicting complaints about the timing of the lawsuit or requested relief, as they provide no reason why Plaintiffs and other African-American voters must endure another election under a discriminatory scheme. Defendants first argue that this lawsuit was filed too late, despite obtaining extensions and taking 60 days to respond to Plaintiffs' motion for preliminary injunction (the typical response time is 14 days, *see* L. R. 7(b)(4)), and despite suggesting to the Court that their requested extension would not affect the resolution of this dispute because Plaintiffs' motion "is aimed solely at enjoining actions that will not occur until at least November 5, 2019." ECF 12 at 2. Yet, in the same brief, Defendants also suggest that the lawsuit is premature and that the parties should wait and see how the November election unfolds before addressing Plaintiffs' motion. Defs.' Opp. at 18-22. Not only does this argument conflict with Fifth Circuit case law, which "imposes the duty on parties having

- 8 -

grievances based on discriminatory practices to bring the grievances forward for pre-election adjudication," *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973), it would require the Court retroactively to assess the rules for selecting statewide officers *after* the election occurs and the likely winning candidates have been identified, all in a significantly compressed time frame that at best allows only a fraction of the time the Court has now.

The cases Defendants cite to support their timing arguments are inapposite because they involved requests for truly extraordinary relief—to *stop* an election, *e.g.*, *Chisom v. Roemer*, 853 F.2d 1186, 1189-90 (5th Cir. 1998)—and many were filed much closer to Election Day. *See, e.g.*, *Boddie v. City of Cleveland*, No. 4:01-CV-88-D-B, 2001 WL 1523854, at *3 (N.D. Miss. Apr. 24, 2001) (14 days before election).[9] Unlike *Chisom* and other cases upon which Defendants rely, Plaintiffs here seek to enjoin an unconstitutional and discriminatory electoral procedure, not the election itself, and their requested relief would cause no disruption to the voting process. Plaintiffs' filing of this lawsuit and motion for preliminary injunction on May 30, 2019, allows sufficient time to provide injunctive relief in advance of the November election. *See, e.g.*, *League of Women Voters of N.C.*, 769 F.3d at 248 (even though "North Carolina will have [a month] to implement the relief we grant," the relief "merely requires the revival of previous practices"); *Ga. State Conf. NAACP v. Georgia*, No. 1:17-CV-1397-TCB, 2017 WL 9435558, at *5 (N.D. Ga. May 4, 2017) (granting preliminary injunction altering voter registration restrictions less than two months before runoff); *Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976-77 (D. Nev. 2016) (granting preliminary injunction a month before Election Day); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) (issuing preliminary injunction three weeks before special election); *United*

---

[9] *See also Garza v. Dallas Indep. Sch. Dist.*, No. 3:01-CV-602-H, 2001 WL 492384, at *2 (N.D. Tex. May 4, 2001) (37 days before the election); *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 981 F. Supp. 751, 762-63 (E.D.N.Y. 1997) (less than two months); *Dillard v. Crenshaw Cty.*, 640 F. Supp. 1347, 1362 (M.D. Ala. 1986) (less than three months); *Neel v. Pippy*, 247 F. Supp. 2d 707, 713 (W.D. Pa. 2003) (eight days).

*States v. Berks Cty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) (granting preliminary injunction less than two months before primary election).

No public interest is served by enforcing a racially discriminatory electoral system simply for the sake of upholding laws. *See Campaign for S. Equal.*, 64 F. Supp. at 951; *see also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Once Plaintiffs establish "the violation of a constitutional or statutory right in the civil rights area, . . . court[s] ha[ve] broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016). And the Court need not wait for the legislature to craft a remedy, particularly when the failure to issue an injunction would ensure the continuation of a constitutional violation. *See Veasey*, 830 F.3d at 269-70 (affirming an injunction of a voter identification law in July 2016, without the involvement of the Texas Legislature); *Personal PAC v. McGuffage*, 858 F. Supp. 2d 963, 971 (N.D. Ill. 2012) (rejecting a "'wait and see' what the legislature might do" approach). Once plaintiffs have demonstrated irreparable harm, Defendants must present "powerful evidence of harm to its interests to prevent the scales from weighing in the movant's favor." *Campaign for S. Equal.*, 64 F. Supp. 3d at 950 (quotations marks omitted). No such interest in maintaining discriminatory laws exists here; rather, Defendants' desire to preserve the status quo must yield to the constitutional rights of its African-American citizens.

## CONCLUSION

For the reasons discussed above, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

August 12, 2019                              Respectfully submitted,

/s/ *Uzoma N. Nkwonta*
Marc E. Elias*
Email: MElias@perkinscoie.com
Uzoma N. Nkwonta*
Email: UNkwonta@perkinscoie.com
Jacki L. Anderson*
Email: JackiAnderson@perkinscoie.com
K'Shaani Smith*
Email: KShaaniSmith@perkinscoie.com
Daniel C. Osher*
Email: DOsher@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211

Robert B. McDuff, MSB 2532
Email: rbm@mcdufflaw.com
767 North Congress Street
Jackson, MS  39202-3009
Telephone: (601) 969-0802
Fax: (601) 969-0804

Beth L. Orlansky, MSB 3938
Email: borlansky@mscenterforjustice.org
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS  39205-1023
Telephone: (601) 352-2269
Fax: (601) 352-4769

*Counsel for Plaintiffs*

*Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I certify that on August 12, 2019, I filed the foregoing Plaintiffs' Reply in Support of Their Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

>*/s/ Uzoma N. Nkwonta*
>Uzoma N. Nkwonta
>PERKINS COIE LLP
>700 13th St. N.W., Suite 600
>Washington, D.C. 20005-3960
>Phone: (202) 654-3347
>Fax: (202) 654-6211
>Email: UNkwonta@perkinscoie.com