**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

LESLIE-BURL McLEMORE;
CHARLES HOLMES;
JIMMIE ROBINSON, SR.;
RODERICK WOULLARD;
BRENDA BOOTH;
JORDAN MALONE; and
TYLER YARBROUGH,

                      Plaintiffs,

      v.

DELBERT HOSEMANN, in his official capacity
as the Mississippi Secretary of State; and PHILIP
GUNN, in his official capacity as the Speaker of the
Mississippi House of Representatives,

                  Defendants.

Civil Action

Case No. 3:19-cv-383-DPJ-FKB

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 5

ARGUMENT ....................................................................................................................... 6

    I.   Plaintiffs, as Individual African-American Voters, Have Standing to Challenge
        Discriminatory Laws That Disadvantage African-American Voters.................................... 6

        A.   Because the Challenged Provisions Deny Plaintiffs (and Other African-American
             Voters) an Equal Opportunity to Participate in the Political Process and Elect their
             Candidates of Choice, Plaintiffs Have Alleged a Cognizable and Imminent Injury.... 7

        B.   Plaintiffs' Injuries Are Sufficiently Concrete and Individualized to Satisfy Article
             III's Requirements. .................................................................................................. 12

        C.   In Accordance with Controlling Supreme Court Precedent, Plaintiffs Have Standing
             to Challenge the Unequal Weighting of Their Votes Which Violates the One-Person,
             One-Vote Principle. ................................................................................................. 15

        D.   Plaintiffs' Injuries are Imminent and Ripe for Adjudication Because, Absent
             Injunctive Relief, the Challenged Provisions Will Continue to Violate Plaintiffs'
             Constitutional Rights and Deny Plaintiffs an Equal Opportunity to Participate in the
             Political Process........................................................................................................ 16

    II.  Plaintiffs Possess Prudential Standing Because Their Concrete and Individualized Vote-
        Dilution Injuries Fall Within the Voting Rights Act's "Zone of Interests."..................... 20

    III. Plaintiffs' Intentional Discrimination and One-Person, One-Vote Claims Are Justiciable
         Under Longstanding Supreme Court Precedent. ............................................................ 24

    IV. Plaintiffs Have Stated Claims for Relief Under the Fourteenth Amendment, Fifteenth
        Amendment, and Voting Rights Act.................................................................................. 27

    V.  As the State Officers Responsible for Enforcing the Challenged Provisions, the Secretary
        and the Speaker Are Proper Defendants in this Lawsuit. ................................................. 29

        A.   The Secretary and the Speaker Enforce the Challenged Provisions, and an Injunction
             Against Those Actions Would Prevent the Dilution of Plaintiffs' Votes.................. 29

        B.   Neither the Governor nor the Attorney General Has Any Role in Implementing the
             Challenged Provisions, Thus Neither is a Necessary or Indispensable Party to this
             Litigation. ............................................................................................................... 31

## TABLE OF CONTENTS

**Page**

VI.  Under *Ex parte Young*, and Given the VRA's Abrogation of State Sovereign Immunity, the Eleventh Amendment Does Not Bar Any of Plaintiffs' Claims. .................................. 33

CONCLUSION ....................................................................................................................... 35

# INTRODUCTION

Plaintiffs' lawsuit challenges three state constitutional provisions that govern the election of candidates for statewide, state office (hereinafter, "statewide office"), despite the fact that they were enacted in 1890 with the specific intent to disrupt the political gains and diminish the voting strength of African Americans in Mississippi. *See generally* Am. Compl., ECF 26. These provisions require candidates for statewide office to win a majority of the popular vote and a majority of Mississippi House of Representatives ("House") districts in order to be elected—and if no candidate satisfies both conditions, the House, rather than voters, decides the election. *Id.* ¶¶ 1-3, 28-30; MISS. CONST. art. V, §§ 140, 141, 143 ("Challenged Provisions"). To this day, this electoral system operates as the framers intended: it minimizes African-American voting strength, and, most glaringly, it requires an African-American-preferred candidate, on average, to obtain at least 55 percent of the popular vote in order to win a majority of House districts, while a white-preferred candidate can accomplish the same feat with only 45 percent of the popular vote. *Id.* ¶¶ 6, 41.

Secretary Hosemann ("the Secretary") and Speaker Gunn ("the Speaker") do not dispute that the Challenged Provisions were enacted with discriminatory intent. Nor do they contest the fact that the Challenged Provisions allow white voters to elect their candidates of choice with significantly fewer total votes than would be required of African-American voters, thereby imposing a clear disadvantage on the ability of African Americans to participate in the political process and elect candidates of their choice. Their defense, and the crux of their Motion to Dismiss, is that the African-American-preferred candidates would have lost anyway (or that the candidates prevailed notwithstanding the discriminatory burden imposed by the State); that Plaintiffs, who are African-American voters in Mississippi, lack standing to challenge laws that diminish African-American voting strength; and that Plaintiffs' race-discrimination claims are foreclosed by the

Supreme Court's partisan gerrymandering decision in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). These arguments are groundless, among the other defenses they assert, because the United States Constitution and the Voting Rights Act ("VRA") ensure that all citizens have an equal opportunity to participate in the political process and elect candidates of their choice regardless of the electoral outcome; these protections have long been enforced by individual voters challenging laws that dilute African-American voting strength; and *Rucho* simply has nothing to do with claims that allege race discrimination in the electoral process, or violations of the one-person, one-vote principle.

Finally, the Court should reject Defendants' attempt to invoke Eleventh Amendment immunity or cast themselves as improper parties to this lawsuit because the Mississippi Constitution tasks the Secretary and the Speaker, and no one else, with the responsibility of enforcing the Challenged Provisions. Plaintiffs' constitutional claims plainly seek prospective injunctive relief to enjoin the Defendants from enforcing the Challenged Provisions—and thus fall under the exception set forth in *Ex parte Young*, 209 U.S. 123 (1908)—and Congress abrogated sovereign immunity in passing the VRA. Defendants' Motion thus presents no plausible basis for dismissal and should be denied.

## BACKGROUND

Plaintiffs—seven African-American voters in Mississippi, ECF 26, ¶¶ 19-25—challenge the State's multi-step process for electing candidates to statewide office set forth in Sections 140, 141, and 143 of the Mississippi Constitution. Section 140 provides that, to win an election, a gubernatorial candidate must obtain a majority of the popular vote (the "Popular-Vote Rule") and win at least a plurality of the vote in a majority of House districts (the "Electoral-Vote Rule"). MISS CONST. art. V, § 140; ECF 26 ¶ 28. Under Section 141, if no candidate satisfies the Popular-Vote and Electoral-Vote Rules, the Mississippi House of Representatives selects the winner among

the two candidates who received the most popular votes (the "House-Vote Rule"). *Id.* § 141; ECF 26 ¶ 29. Section 143 applies this same multi-step structure to all elections for statewide offices in Mississippi. *Id.* § 143; ECF 26 ¶ 30.

These Challenged Provisions were devised during Mississippi's 1890 post-Reconstruction Constitutional Convention, where delegates spoke freely and publicly about their discriminatory intent, and were enacted specifically to prevent African-American voters from electing their candidates of choice to statewide office. ECF 26 ¶¶ 32-40. Whereas the prior constitution only required statewide candidates to obtain a plurality of the vote to be elected, MISS. CONST. art. V, § 2 (1868), the success of African-American candidates in statewide elections—and of African-American voters in electing their candidates of choice, ECF 26 ¶ 33—drove the framers of the 1890 Constitution to adopt the current electoral scheme.

Today, the Challenged Provisions remain a prototypical dilutive device whereby votes cast by white Mississippians go farther in supporting their preferred candidates than votes cast by Plaintiffs and other African-American voters, and individual votes are assigned unequal weight depending on the district in which the voter resides. For instance, under the Electoral-Vote Rule, Plaintiffs Holmes, Robinson, Woullard, Booth, and Yarbrough, who live in majority-African-American districts, *id.* ¶¶ 20-23, 25, will see their voting strength diluted because the Rule assigns just one electoral vote to Plaintiffs and African Americans' preferred candidate in their respective districts, regardless of the candidate's margin of victory. And for Plaintiffs McLemore and Malone who live in districts heavily concentrated with white voters, *id.* ¶¶ 19, 24, the Rule discards their votes entirely by awarding one electoral vote to the candidate who carries that district—which is likely to be the white-preferred candidate—and giving nothing to McLemore and Malone's preferred candidate. *See*, *e.g.*, *id.* ¶¶ 54-58.

Furthermore, because voting in Mississippi remains severely racially polarized, and white voters continue to control the vast majority of House districts, the Electoral-Vote Rule requires Plaintiffs' preferred statewide candidates to obtain a significantly larger share of the popular vote than a candidate preferred by white voters. *Id.* ¶¶ 41-44. The most recent gubernatorial election in 2015 provides a clear example of this inequality. There, the candidate overwhelmingly preferred by white voters would have won a majority of House districts without even winning a majority of the popular vote; however, the African-American-preferred candidate needed to obtain *more than 58 percent of the popular vote* to achieve the same result. *Id.* ¶ 45.

The Popular-Vote and House-Vote Rules similarly dilute the strength of Plaintiffs' votes by making it harder for their candidate of choice to win a statewide election, even when that candidate wins the most votes. Because African Americans are a minority of the State's population, and because voting in Mississippi is severely racially polarized, the most likely scenario in which Plaintiffs' preferred candidate outperforms other candidates is one in which the candidate wins a plurality of votes. *Id.* ¶¶ 46-47. But even in that scenario, the Popular-Vote Rule ensures that Plaintiffs' preferred candidate would not be elected based on the election results alone; instead, the House-Vote Rule requires that the House—which has always been dominated by representatives from majority-white districts—declare the winner, just as the framers intended. *Id.* ¶¶ 46, 48-49.

As set forth in Plaintiffs' Amended Complaint, the Challenged Provisions are unconstitutional and violate Section 2 of the VRA. First, the Challenged Provisions collectively violate Plaintiffs' rights under the Fourteenth and Fifteenth Amendments because they intentionally dilute the strength of votes cast by Plaintiffs and other African-American Mississippians in statewide elections. *Id.* ¶¶ 99-107. Second, the Electoral-Vote Rule violates the

Equal Protection Clause's one-person, one-vote principle because, under directly controlling Supreme Court precedent, *Gray v. Sanders*, 372 U.S. 368 (1963), it impermissibly assigns different weights to votes in statewide elections based on the House district in which they are cast. ECF 26 ¶¶ 108-112. Third, the Challenged Provisions violate Section 2 of the VRA because they have the purpose and effect of diluting votes cast by Plaintiffs and other African-American Mississippians in statewide elections, thereby abridging their right to vote on account of race. *Id.* ¶¶ 113-18.

## LEGAL STANDARD

When a litigant mounts a facial attack to a court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), as Defendants do here, *see* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF 28 at 6-23, 31, "the court simply considers 'the sufficiency of the allegations in the complaint because they are presumed to be true.'" *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). Similarly, a motion to dismiss under Rule 12(b)(6), which Defendants also assert, *see* ECF 28 at 23-30, must be denied when the complaint at issue "contain[s] sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing the Amended Complaint, the Court "must accept the factual allegations by [Plaintiffs] as true and make reasonable inferences in [Plaintiffs'] favor." *Papin v. Univ. of Miss. Med. Ctr.*, 347 F. Supp. 3d 274, 277 (S.D. Miss. 2018). The Amended Complaint need not include "detailed factual allegations"; rather it must only "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

Defendants' argument that the Amended Complaint should be dismissed because it fails to join an indispensable party, *see* ECF 28 at 30-32, is governed by Rule 12(b)(7). A court may exercise its discretion to dismiss a claim under Rule 12(b)(7) only if: (1) the party whom the

movant wishes to be joined is necessary under Rule 19(a); and (2) it is not feasible to join that party. *See* Fed. R. Civ. P. 19(b). If, and only if, those two elements are satisfied, a court then "determine[s] whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* As set forth below, Defendants cannot meet any of these standards.

**ARGUMENT**

Defendants' Motion to Dismiss commits multiple legal errors and ignores or misreads controlling precedents that foreclose each of their stated grounds for relief. First, Plaintiffs have standing to assert their claims because they have suffered, and will continue to suffer, concrete vote-dilution injuries by being denied an equal opportunity to elect candidates of their choice. Second, this action is ripe, and Plaintiffs' injuries are imminent, as their constitutional rights will be violated in future elections regardless of the outcome. Third, Plaintiffs' claims are justiciable under long-standing Supreme Court precedent invalidating laws that intentionally dilute the voting strength of African Americans or violate the one-person, one-vote principle. Fourth, Plaintiffs' allegations plainly state claims of both intentional discriminatory vote dilution and violation of the one-person, one-vote principle. Fifth, the Speaker and the Secretary are proper defendants because they are responsible for carrying out the Challenged Provisions, and neither the Attorney General nor the Governor is a necessary party. And, finally, the Eleventh Amendment does not bar Plaintiffs' claims because they properly invoke the *Ex parte Young* exception, and Congress abrogated Mississippi's sovereign immunity in passing the VRA. Defendants' Motion to Dismiss should therefore be denied.

I.   **Plaintiffs, as Individual African-American Voters, Have Standing to Challenge Discriminatory Laws That Disadvantage African-American Voters.**

Plaintiffs are African-American voters from Mississippi who filed this lawsuit to eradicate

the effects of racially discriminatory voting laws. *See generally* ECF 26. They allege that the State's electoral system, designed with the specific intent of imposing a barrier to the election of African-American-preferred candidates, places African Americans in Mississippi—like Plaintiffs—at a disadvantage by making it more difficult for them to elect their candidates of choice. Plaintiffs' Amended Complaint clearly outlines the source of their injuries with concrete examples of the discriminatory burden that the Challenged Provisions impose on Plaintiffs and other African-American voters: for instance, an African-American-preferred candidate must secure, on average, at least 55 percent of the popular vote in order to win a majority of House districts, as is required to be elected without intervention from the House, while the candidates preferred by white voters need only obtain approximately 45 percent of the popular vote to achieve the same result. ECF 26 ¶¶ 6, 41. The disadvantages that these discriminatory laws impose are clear and will continue in each election until they are enjoined. *Id.* ¶¶ 19-25, 58.

### A. Because the Challenged Provisions Deny Plaintiffs (and Other African-American Voters) an Equal Opportunity to Participate in the Political Process and Elect their Candidates of Choice, Plaintiffs Have Alleged a Cognizable and Imminent Injury.

Defendants' various challenges to individual African-American voters' standing fundamentally misunderstand the constitutional injuries that result from State action—driven by discriminatory intent—that saddles a specific minority group with a demonstrable electoral disadvantage. While Defendants argue that the Challenged Provisions have never prevented a candidate from taking office,[1] *see* ECF 28 at 10-11, 14-15, they ignore controlling Supreme Court

---

[1] Defendants' apparent reliance on election results alone to reach this conclusion is shortsighted because the effects of electoral rules that disadvantage a minority group are not limited to the raw tally of votes on Election Day; they can also affect turnout, registration rates, and even a candidate's willingness to seek elective office. *See, e.g.*, *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1039 (E.D. Mo. 2016) (recognizing that African-American voters may believe their votes are futile in electing their candidates of choice and "registration and turnout rates often improve once a court finds

precedent that has already expelled this line of reasoning from the standing inquiry. It is well-settled that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (emphasis added) (hereinafter "*Associated Contractors*"). The Supreme Court further explained that the injury suffered by plaintiffs in equal protection cases is "the denial of equal treatment resulting from the imposition of the barrier, not the inability to obtain the benefit," *id*.; thus, in *Associated Contractors*, the plaintiff demonstrated standing by alleging that a discriminatory policy prevented it from bidding on contracts "on an equal basis," and whether the party would have obtained the contract in the absence of the discriminatory policy was irrelevant to the standing inquiry. *See id*.

The legal principles announced in *Associated Contractors* are not limited to the bidding process, nor are the constitutional injuries in that case distinguishable from those asserted by voting rights plaintiffs. Courts around the country have applied these same principles in various contexts, including in election law disputes, to reject the argument Defendants advance here: that a plaintiff challenging a government-imposed barrier to a benefit must allege that she would have obtained the benefit absent the discriminatory rule. *See*, *e.g.*, *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497 (7th Cir. 2005) (holding tribe had standing to challenge state action that placed it at a disadvantage in seeking state approval for off-reservation gaming, despite contingencies that purportedly prevented harm from materializing, because "the

---

and remedies the § 2 violation"). Notably, since the Challenged Provisions were adopted in 1890, not one African American has ever been elected to statewide office in Mississippi, even though Mississippi has the highest percentage of African Americans of any state in the country. ECF 26 ¶ 96.

'injury in fact' [was] the inability to compete on an equal footing"); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 813-14 (S.D. Ind. 2006) (citing *Associated Contractors* and holding voters "can assert an equal protection claim on the grounds that they have been disadvantaged relative to certain classes of voters who possess photo identification or are not required to present photo identification"); *Denis v. N.Y. City Bd. of Elections*, No. 94 Civ. 7077 (KMW), 1994 WL 613330, at *3 n.4 (S.D.N.Y. Nov. 7, 1994) ("Plaintiffs alleging that their right to vote was purposefully abridged because of their race, in violation of the Equal Protection Clause, need not show that the outcome of the election would have been different absent the violation . . . ."); *cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467 (1982) ("[T]he Fourteenth Amendment also reaches 'a political structure that treats all individuals as equals,' yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.") (citations omitted).

In fact, the specific injuries that Plaintiffs assert here—vote dilution and the denial of an equal opportunity to elect their preferred candidates—have been consistently recognized by courts to confer standing in voting rights cases, and arguments tying standing to electoral success, similar to the one Defendants raised, *see* ECF 28 at 10-11, 14-15, have been rejected. In *Rockefeller v. Powers*, for instance, registered Republicans in certain congressional districts challenged the ballot-access rules for the New York Republican presidential primary, which required delegate candidates to obtain signatures from the lesser of five percent or 1,250 enrolled Republicans in the delegate's congressional district in order to appear on the ballot. 74 F.3d 1367, 1369-70 (2d. Cir. 1995). Plaintiffs alleged that because fewer registered Republicans resided in their congressional districts, the ballot-access rules' upper limit (1,250) on the number of required signatures allowed candidates from more heavily Republican districts to secure a spot on the ballot with a smaller

percentage of signatures from eligible Republican voters in their districts, resulting in less choice for voters in districts with fewer registered Republicans. *See id.* at 1371. The defendants challenged the voters' standing, raising essentially the same argument that Defendants assert here: that a change in the rules would not have led to more delegates obtaining ballot access in the plaintiffs' districts. *See id.* at 1376. The Second Circuit, however, found the defendants' argument "insupportable in light of [*Associated Contractors*]" and held that the voters "need not establish, absent the current rule, they *necessarily* would see more candidates on their ballot." *Id.*

The Ninth Circuit rejected a similar argument in a lawsuit filed by Latino voters who argued that the boundaries of the Los Angeles County Board of Supervisors districts were drawn deliberately to minimize minority political power. *See Garza v. Cty. of L.A.*, 918 F.2d 763, 766 (9th Cir. 1990). There, the County argued that the districts were lawful because the minority group was not large enough to comprise a majority in a single-member district, and thus, the minority group could not show that it would have formed the requisite majority that would have allowed it to elect its candidate of choice under any alternative plan. *See id.* at 769. The Ninth Circuit reaffirmed that the minority voters were injured nonetheless because the districts' boundaries afforded them "less opportunity than did other county residents to participate in the political process and to elect legislators of their choice," and that such discrimination by itself "violated the Voting Rights Act and the Equal Protection Clause." *Id.* at 771.

Plaintiffs' injuries are even more pronounced here, where: (1) African-American-preferred candidates must obtain a disproportionately higher number (on average, at least 55 percent) of the popular vote to win a majority of House districts; (2) the Popular-Vote Rule makes it more difficult for African-American-preferred candidates to be elected with consolidated support from the African-American community, even when the white vote is splintered among multiple candidates;

and (3) African Americans have very little influence in the House, which decides the winner of any election for statewide office in which no candidate satisfies the Popular-Vote and Electoral-Vote Rules—all of which demonstrate that African-American voters are disadvantaged by the Challenged Provisions and have less opportunity than white voters to elect their preferred candidates. *See* ECF 26 ¶¶ 5, 6, 41, 47, 48.

Defendants do not dispute that these disadvantages exist, and thus have raised no plausible argument that a cognizable injury is lacking; rather, they contend that the Challenged Provisions *may* not ultimately decide the next election because candidates who win the popular vote usually win the majority of House districts. *E.g.*, ECF 28 at 15 n.20. But this argument misses the point of Plaintiffs' claims, which are grounded in the lack of equal opportunity, rather than predictions of electoral victory. *See Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994) ("[T]he ultimate right of § 2 [of the Voting Rights Act] is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."); *see also Associated Contractors*, 508 U.S. at 666. The success of an African-American-preferred candidate, for instance, does not demonstrate that African Americans have an equal opportunity to elect candidates of their choice; it could simply mean that the specific candidate was able to overcome the additional hurdles imposed by the Challenged Provisions. *See*, *e.g.*, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (citing *Associated Contractors* and holding "[a] plaintiff need not have the franchise wholly denied to suffer injury . . . [t]he inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting"). Likewise, Plaintiffs are no less injured by the denial of an equal opportunity to elect their preferred candidates simply because that candidate may not have prevailed in the end. *See Garza*, 918 F.2d at 766. In either scenario, African-American voters are subjected to an electoral scheme that intentionally places them at a

demonstrable disadvantage in terms of their ability to elect their candidates of choice—just as the framers of the Mississippi Constitution intended—which violates their constitutional rights.

### B. Plaintiffs' Injuries Are Sufficiently Concrete and Individualized to Satisfy Article III's Requirements.

Beyond their mischaracterizations of the relevant injuries, what remains of Defendants' objections to standing is their unprecedented assertion that individual African-American voters lack standing to challenge laws that disadvantage African-American voters, or that such voters suffer no individual injury. *See* ECF 28 at 10, 13-14. Once again, Defendants cite no legal authority that supports this proposition because courts have roundly rejected the notion that a claim alleging a disproportionate burden on a minority group is a "generalized grievance." *See*, *e.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 907 (S.D. Tex. 2014) (rejecting argument that claim alleging disproportionate burden of S.B. 14 on African-American voters was a generalized grievance or shared by all voters); *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 944 (E.D. Mich. 2016) (rejecting argument that plaintiffs asserted general grievance where African-American voters alleged disproportionate impact of voting law on African Americans); *Black v. McGuffage*, 209 F. Supp. 2d 889, 895 (N.D. Ill. 2002) (same).

To suggest that individual African-American voters lack standing to challenge laws that diminish African-American voting strength misunderstands the concept of vote dilution and the relevant legal authorities that have enforced the very rights Plaintiffs assert here. The Fourteenth and Fifteenth Amendments and the VRA protect the right to participate equally in the political process *and* ensure that voters have an equal opportunity to elect their candidates of choice. *See*, *e.g.*, *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 497 (5th Cir. 1987) ("At the heart of a § 2 vote dilution claim lies the issue of whether minorities have an equal opportunity to elect their candidates of choice."). But it goes without saying that "groups of voters elect

representatives, individual voters [by themselves] do not." *Davis v. Bandemer*, 478 U.S. 109, 167 (1986) (Powell, J., concurring in part and dissenting in part). An African American voter's right to an equal opportunity to elect her preferred candidate, for instance, entails more than just casting a ballot; it also includes the right to combine her votes with other politically-cohesive African Americans to elect their preferred candidate without electoral structures that dilute their collective voting power. *See Shaw v. Reno*, 509 U.S. 630, 641 (1993) (acknowledging that schemes that "reduce or nullify minority voters' ability, *as a group*, to elect the candidate of their choice" violate the Fourteenth Amendment) (emphasis added). That is why courts have recognized that plaintiffs who are registered voters in the affected region and are "members of a protected class whose electoral strength has been diluted" have standing to challenge the laws that caused the dilution. *Ala. State Conf. of NAACP v. Alabama*, 264 F. Supp. 3d 1280, 1290 (M.D. Ala. 2017).

Here, each Plaintiff is an African-American registered voter who votes (or in the case of Jordan Malone and Tyler Yarbrough, intends to vote) cohesively with other African Americans in Mississippi, and each has alleged that the Challenged Provisions make it more difficult for them to elect their candidates of choice. These injuries are personal and no less individualized than the harms alleged by voters who have challenged at large elections, *see*, *e.g.*, *Rogers v. Lodge*, 458 U.S. 613 (1982), majority vote requirements, *see*, *e.g.*, *Jeffers v. Clinton*, 740 F. Supp. 585, 595 (E.D. Ark. 1990), or any other dilutive electoral structure. Defendants cite no authority that has ever required plaintiffs to identify whom they intend to vote for in an upcoming election, or "whether they voted Democrat or Republican" in order to assert a constitutional or VRA claim, ECF 28 at 5. Nor do they explain why such allegations have any relevance to the inquiry before the Court, particularly given that Plaintiffs have already alleged—and demonstrated through Dr. Rodden's unrefuted expert analysis—that African Americans in Mississippi vote cohesively, and

that voting is racially polarized such that whites usually vote as a bloc to defeat the African American candidate of choice. ECF 26 ¶¶ 116; ECF 8-7 ¶¶ 19-45; *see also*, *e.g.*, *Ala. State Conf. of NAACP*, 264 F. Supp. 3d at 1290 ("Plaintiffs need not identify specific losing candidates in order to have standing."). And the suggestion that Plaintiffs have not plead facts to show how the Challenged Provisions make it more difficult to elect candidates of choice, ECF 28 at 5, should raise questions about whether Defendants have read the Complaint, which devotes an entire section to describing—and for the Electoral-Vote Rule, even goes as far as quantifying—the impact of the Challenged Provisions on the ability of African-American voters, including Plaintiffs, to elect their preferred candidates. *See* ECF 26 ¶¶ 41-58.

Many of the errors in Defendants' analysis stem from their failure to differentiate between gerrymandering claims, which are district specific, and Plaintiffs' causes of action, which are not. Quoting *Gill v. Whitford*, 138 S. Ct. 1916 (2018), Defendants argue that Plaintiffs' harm is "district specific" and that "Plaintiffs allege no facts to show that they live in 'cracked' or 'packed' districts." ECF 28 at 13. But beyond lifting select quotes from *Gill*, Defendants make no attempt to explain why Plaintiffs' claims or remedies should be limited to the specific legislative districts in which they reside when their lawsuit challenges elections for statewide office. In *Gill*, the Supreme Court explained that "the plaintiffs claim[ed] a constitutional right not to be placed in legislative districts deliberately designed to 'waste' their votes," and that in gerrymandering claims, the alleged harm arises from the composition of the voter's district. *See id*. at 1930-31. The Court imposed no such limitation on any other theories of harm, let alone claims that do not challenge district boundaries to begin with. *See id*. at 1931. Because "standing . . . turns on the nature and source of the claim asserted," "when the harm alleged is not district specific, the proof needed for standing should not be district specific either." *Id*. at 1938-39 (Kagan, J., concurring)

(quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Plaintiffs' lawsuit challenges the method by which Mississippi counts votes and determines the winner of *statewide* elections, and the fact that Mississippi adopted a system that counts district-based units does not convert Plaintiffs' lawsuit into a gerrymandering claim, nor do Defendants provide any legal basis to require Plaintiffs to allege that they live in "cracked" or "packed" districts.[2]

Finally, as the Supreme Court has made clear, the fact that other individuals (in this case, African-American voters) may share the same injury provides no basis to deny standing. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998). "This conclusion seems particularly obvious where . . . large numbers of individuals suffer the same common-law injury . . . or where large numbers of voters suffer interference with voting rights conferred by law." *Id*. Plaintiffs, all of whom are African-American voters, have each alleged that the Challenged Provisions have made it more difficult for them to elect their candidates of choice to statewide office. *See* ECF 26 ¶¶ 19-25. It is entirely unclear who Defendants believe would be better positioned to assert these claims than the very African-American voters whom the Challenged Provisions were intended to, and do, disadvantage. To hold that Plaintiffs lack standing under these circumstances would effectively insulate discriminatory voting laws from judicial review.

### C. In Accordance with Controlling Supreme Court Precedent, Plaintiffs Have Standing to Challenge the Unequal Weighting of Their Votes Which Violates the One-Person, One-Vote Principle.

Defendants' standing arguments completely unravel when applied to Plaintiffs' one-

---

[2] Plaintiffs do allege, however, that they live either in majority-white or majority African-American districts, ECF 26 ¶¶ 19-25. The Amended Complaint explains in detail how the Electoral Vote Rule assigns unequal weight to votes depending on the district in which the voter resides, ECF 26 ¶¶ 50-58, and further alleges that because of the geographic and electoral concentration of racial groups among the House districts, African American voters' candidates of choice must obtain a significantly larger share of the statewide population, as compared to candidates preferred by white voters, in order to win a majority of House districts, ECF 26 ¶ 44.

person, one-vote claim because there can be no dispute that the failure to count votes equally imposes an injury and violates the Constitution. *See Gray*, 372 U.S. at 379 ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit.") It makes little sense to argue that Plaintiffs' injury is only hypothetical, *e.g.*, ECF 28 at 15, because the Electoral-Vote Rule defines the method by which Plaintiffs' votes are counted in every election. It thus violates the Equal Protection Clause *every time* it is applied. Defendants' Motion neither addresses these allegations—other than to advance a misguided analogy to partisan gerrymandering—nor do they adequately distinguish controlling Supreme Court precedent, which found that a nearly identical electoral scheme violated the Equal Protection Clause. *See Gray*, 372 U.S. at 381. *Gray*, like this case, was filed by a voter seeking injunctive relief in advance of an election. *See id.* at 370. At no point did the Supreme Court suggest that the plaintiff's standing or entitlement to relief was dependent on the prior success of his preferred candidates or the likelihood that the constitutional violation would prevent his preferred candidate from taking office. Such inquiries were simply irrelevant to the Court's analysis in *Gray*, just as they are here.

    **D. Plaintiffs' Injuries are Imminent and Ripe for Adjudication Because, Absent Injunctive Relief, the Challenged Provisions Will Continue to Violate Plaintiffs' Constitutional Rights and Deny Plaintiffs an Equal Opportunity to Participate in the Political Process.**

The legal errors in Defendants' exceedingly narrow definition of "injury" spill over to their remaining jurisdictional challenges, including ripeness, causation, and redressability. They argue, for instance, that Plaintiffs' injuries are not redressable or ripe because enjoining the Challenged Provisions is "unlikely to lead to more statewide victories by Democrats or black candidates," and that an "African-American-preferred candidate must be deprived of statewide office because of . . . the Challenged Provisions" to confer standing. ECF 28 at 15, 20. Putting aside Defendants'

improper attempt to refute Plaintiffs' substantive allegations with other individuals' personal opinions as expressed in the media's coverage of this lawsuit, their argument once again erroneously conflates election outcomes with Plaintiffs' right to equal opportunity under the Constitution and the VRA. Just because Plaintiffs' preferred candidates *may* not win future elections does not give the State license to dilute their votes or impose structural barriers that make it harder for Plaintiffs to elect their candidates of choice. *See, e.g.*, *Avery v. Midland Cty., Tex.*, 390 U.S. 474, 481 n.6 (1968) ("[E]qual protection . . . includes an equal opportunity to influence the election of lawmakers, no matter how . . . small the minority who object to their mistreatment.").

Plaintiffs have alleged facts which demonstrate that their asserted injuries are concrete and highly likely to occur in the next election, including specifically that: voting is highly racially polarized in Mississippi, African Americans in Mississippi are politically cohesive, white voters vote as a bloc against African-American-preferred candidates, and the geographic and electoral concentration of the racial groups interact with the Challenged Provisions such that an African-American-preferred candidate must obtain, on average, at least 55 percent of the popular vote to be elected. *See* ECF 26 ¶¶ 41-49. Defendants' Motion does not dispute any of this, thus, their remaining jurisdictional arguments collapse under the weight of well-established precedent and Plaintiffs' specific allegations that not only explain the disadvantage suffered by African-American voters, but even go so far as to quantify the additional barrier that Mississippi's electoral system imposes on their voting power.

Moreover, the underlying premise of Defendants' standing arguments is also flawed because, even assuming prior electoral victories were relevant to the standing inquiry (though they are not), Defendants' suggestion that the Challenged Provisions have not prevented an African-

American-preferred candidate from being elected, *see* ECF 28 at 15, omits important historical context. It is true that candidates who have won the popular vote in the past have not been excluded from office, but this was only by happenstance, not due to any built-in practice or procedure that safeguards Plaintiffs' constitutional rights. In three consecutive general elections in the 1990s, for example, at least one statewide candidate won the largest share of the popular vote but failed to win either the majority of the popular vote or a majority of House districts. *See* Bobby Harrison, *Jim Hood Could Win the Governor's Race and Not Be Seated, or So Says the Constitution*, Miss. Today (Feb. 3, 2019). In the 1991 Lieutenant Governor race, no candidate satisfied the Popular-Vote and Electoral-Vote Rules, but incumbent Brad Dye voluntarily conceded to top vote-getter Eddie Briggs *before* the House could select the winner. *See id*. This occurred again in the 1995 Lieutenant Governor race, in which Ronnie Musgrove captured a majority of the popular vote but fell short of the necessary 62 House districts. *See id*. Incumbent Eddie Briggs, who lost the popular vote, conceded to Musgrove before the House decided the election. *See id*. And in the 1999 Governor's race, Ronnie Musgrove garnered the largest vote share but did not win a majority of the popular vote or House districts. *See id*. The House eventually elected Musgrove as the Governor, though it could just as easily have selected his opponent, Mike Parker, who received fewer votes than Musgrove. *See id*. While each candidate who won the popular vote in these examples was elected, to suggest that these events demonstrate the absence of any injury would subject African-American voters' constitutional rights to the unfettered discretion of candidates (who have no obligation to concede even when they lose the popular vote and have every incentive to seek election through the House) or members of the House (who have no obligation to elect the candidate who won the popular vote), leaving those voters with no protection at all. *See Stoner v. California*, 376 U.S. 483, 490 (1964) (holding that a "constitutional protection . . . would disappear

if it were left to depend on the unfettered discretion" of a third party).

The most recent general election further demonstrates that Plaintiffs' allegations regarding the House-Vote Rule are anything but conjectural. As noted in the Declaration of Dr. Jonathan Rodden, which accompanied Plaintiffs' Motion for Preliminary Injunction, Attorney General Jim Hood won a significant majority of the popular vote in 2015, yet he just barely secured a majority of House districts such that a swing of only two percentage points would have left him in the very position that Defendants claim is exponentially less likely to occur. ECF No. 8-7 ¶¶ 8-7, 10, 24, 66; *see also* ECF 28 at 15 n.20.[3] In any event, as explained above, Plaintiffs' injury does not depend on the outcome of any one election, but rather on the unfairness of an electoral process that imposes a disadvantage on African-American voters and denies them an equal opportunity to elect their preferred candidates. That injury is imminent, will recur absent injunctive relief, and can be remedied by enjoining the enforcement of the Challenged Provisions and declaring the candidate who receives the most votes the winner of each statewide race, as Mississippi did prior to enacting the Challenged Provisions, *see* MISS. CONST., art. V, § 2 (1868), and currently does for many other races, *see* MISS. CODE ANN. § 23-15-603.

Finally, this Court should reject Defendants' suggestion that this matter should be litigated *after* the election has occurred, *see* ECF 28 at 20, because it squarely contradicts Fifth Circuit precedent that "imposes the duty on parties having grievances based on discriminatory practices to bring the grievances forward for pre-election adjudication." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). Defendants appear to propose that Plaintiffs do precisely what the Fifth Circuit warned against: "lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Id*. (quotation marks omitted). The

---

[3] Notably, Defendants' Motion cites nothing to support their prediction. *See* ECF 28 at 15 n.20.

Motion cites no authority to support the claim that "courts are rightfully cautious in addressing pre-election challenges," ECF 28 at 20, nor does any legal doctrine or principle require Plaintiffs to endure another election under a discriminatory system that disadvantages African-American voters before seeking relief. Just as the court in *Gray* granted injunctive relief on the plaintiff's one-person, one-vote claim in advance of an election, *see id.* at 370, now is the time to resolve Plaintiffs' constitutional claims.

## II. Plaintiffs Possess Prudential Standing Because Their Concrete and Individualized Vote-Dilution Injuries Fall Within the Voting Rights Act's "Zone of Interests."

Defendants' attempt to invoke the doctrine of prudential standing rests on several inherently flawed legal propositions. First, Defendants again mischaracterize Plaintiffs' allegations, including claims that the Challenged Provisions disproportionately impact African-American voters, as generalized grievances. ECF 28 at 24. This argument fails as a matter of law in the Article III standing context, *see* Section I, *supra*, and fares no better here because it presents the exact same inquiry. As the Supreme Court recently observed, the previously-recognized "prong" of the prudential standing doctrine regarding generalized grievances is only a reiteration of Article III's standing requirement. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014) ("While we have at time grounded our reluctance to entertain [generalized grievances] in the 'counsels of prudence' . . . , we have since held that such suits do not present constitutional 'cases' or 'controversies.' They are barred for constitutional reasons, not 'prudential' ones.") (citation omitted). The Amended Complaint explains in detail how the Challenged Provisions cause votes cast by African Americans in statewide elections to be weighted less than those cast by white voters, *see* ECF 26 ¶¶ 41, 44-45, 50-51, 55, 58,[4] and how the State

---

[4] Defendants also wrongly suggest that "Plaintiffs are 'asserting the legal rights and interests of third parties' [sic] as opposed to their 'own legal rights and interest.'" ECF 28 at 24 (quoting *Logan v. Burgers Ozark*

intentionally adopted electoral rules that would make it harder for African Americans to elect candidates of their choice, *id.* ¶¶ 2, 4-10, 32-40. And as explained in Section I.B above, courts have repeatedly rejected the notion that African-American voters lack standing to challenge laws that disadvantage African-American voters.

Defendants next contend that Plaintiffs—African-American voters who have alleged unlawful voting discrimination—fall outside the "zone of interests" that Congress meant to protect in enacting the VRA. ECF 28 at 25. Yet, this argument is impossible to square with the language and stated purpose of the statute. *See Lexmark*, 572 U.S. at 128 (explaining that the zone-of-interests inquiry asks whether Plaintiffs "are within the class of plaintiffs whom Congress has authorized to sue under" Section 2, or, "[i]n other words, . . . whether [Plaintiffs] ha[ve] a cause of action under the statute"). In enacting and repeatedly renewing the VRA, Congress unquestionably intended to eliminate laws that dilute African-American voting power. *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986) (Section 2 prohibits "*not just* vote dilution," but "all forms of voting discrimination") (emphasis added); *City of Rome v. United States*, 446 U.S. 156, 181 (1980) (stating that in renewing the VRA, Congress intended to keep states from adopting measures "which would dilute increasing minority voting strength") (quoting H.R. Rep. No. 94-196, 10-11 (1975)). In pursuit of that goal, the VRA confers a private right of action to minority voters to challenge laws that dilute the strength of their vote. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) ("[T]he existence of the private right of action under Section 2 . . . has been clearly

---

*Country Cured Hams Inc.*, 263 F.3d 447, 460 n.9 (5th Cir. 2001)). But as explained above, Plaintiffs allege that the Challenged Provisions dilute the strength of *their* votes, making it more difficult for *them* to elect candidates of their choice to statewide office. It is unclear whose rights Defendants believe Plaintiffs have asserted beyond their own.

intended by Congress since 1965.") (quoting S. Rep. No. 97-417, pt. 1, p. 30 (1982)).[5] Indeed, "[t]he *essence* of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47 (emphasis added). That is precisely the claim Plaintiffs assert here. By imposing a system in which white voters can elect their candidates of choice with *significantly fewer total votes* than African-American voters can, the Challenged Provisions produce a clear inequality between the opportunity of Plaintiffs and other African Americans to elect their statewide candidates of choice, and white voters' ability to do the same. This is precisely what the VRA forbids.

Defendants also wrongly assert that Plaintiffs' challenge to the Popular-Vote Rule falls outside the VRA's zone of interests because "majority-vote requirements . . . are not 'a per se violation of Section 2.'" ECF 28 at 25 (quoting *Martin v. Allain*, 658 F. Supp. 1183, 1198 (S.D. Miss. 1987)). That argument confuses two entirely different legal concepts. A per se violation "is a violation '[of], in, or by itself, standing alone, without reference to additional facts.'" *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 441 n.12 (6th Cir. 2002); *see also* Black's Law Dictionary (11th ed. 2019). The question that the zone-of-interest inquiry seeks to address is "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302 (2017). That a majority-vote requirement is not unlawful *per se* says

---

[5] In fact, this long-recognized private right of action has led at least one court to conclude that prudential-standing limitations do not even apply to Section 2 claims. *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (explaining that because Section 3(a) of the VRA envisions suits by "an aggrieved person," 52 U.S.C. § 10302(a), and because "a 'party who fulfill[s] the injury-in-fact prong of the constitutional standing requirements would also be a "person aggrieved" and would therefore fulfill the plain language of the statute,' this Court need only examine the requirements of constitutional standing with respect to the Voting Rights Act claim") (quoting *Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 88 (3d Cir. 1999)); *cf. Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363-64 (5th Cir. 1999) (Congress intends to "eliminate[]" prudential standing limitations when it provides a private right of action to a "person aggrieved" by unlawful conduct).

nothing about whether the Popular-Vote Rule violates Section 2 under circumstances Plaintiffs allege, and it distorts the applicable legal standards beyond recognition to suggest that Plaintiffs' challenge to Mississippi's majority-vote requirement does not fall within the Voting Rights Act's zone of interests. *See*, *e.g.*, *Whitfield v. Democratic Party of Ark.*, 890 F.2d 1423, 1433 (8th Cir. 1989) (explaining that elimination of majority vote requirement was "mandated by section 2"); *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1212 (5th Cir. 1989) ("Congress clearly *did* conclude that [majority-vote requirements] could serve to further dilute the voting strength of minorities."); *Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir. 1984) ("The Lubbock majority vote requirement further submerges the political strength of minorities.").

Here, Plaintiffs do not challenge the Popular-Vote Rule under the VRA simply because it is a majority-vote requirement. Rather, they allege that under the totality of the circumstances of Mississippi's statewide elections, the Popular-Vote Rule, in conjunction with the other Challenged Provisions, dilutes the strength of their votes and denies African-American voters an equal opportunity to participate in the political process and elect their preferred candidates. To that end, Plaintiffs' Amended Complaint highlights the pronounced and sustained racial polarization in Mississippi's statewide elections; racial appeals that are recurrent in Mississippi politics; the disproportionate barriers to voting that African-American Mississippians encounter; the persistent socioeconomic disparities between African-American and white Mississippians; Mississippi's notorious history of official discrimination; and the significant underrepresentation of African Americans in Mississippi's government, ECF 26 ¶¶ 59-98, all of which courts have considered when determining whether a particular majority-vote requirement violates Section 2 of the VRA. *See*, *e.g.*, *Whitfield*, 890 F.2d at 1432.

III.    **Plaintiffs' Intentional Discrimination and One-Person, One-Vote Claims Are Justiciable Under Longstanding Supreme Court Precedent.**

Defendants attempt to side-step binding Supreme Court precedent that rejected a nearly identical electoral structure as violative of the Equal Protection Clause, *see Gray*, 372 U.S. 368, and assert instead that the Supreme Court's recent partisan gerrymandering decision, *Rucho*, 139 S. Ct. at 2484, somehow forecloses lawsuits challenging racial discriminatory voting laws, along with one-person, one-vote claims. *See* ECF 28 at 21-23. This argument should be rejected outright because even the Court in *Rucho* acknowledged that racial discrimination and one-person, one-vote claims are justiciable. Moreover, to accept Defendants' interpretation of *Rucho* would mean that the Supreme Court silently overruled *Gray* and all other decisions enforcing the claims that Plaintiffs have advanced here, and would require the Court to disregard the racially discriminatory intent and effect of the Challenged Provisions simply because African Americans supported Democratic candidates. None of these theories have any merit.

Although Defendants make a conscious attempt to frame this case in strictly partisan terms—and in the process minimize the racial injustice that the Challenged Provisions impose on African-American Mississippians—the United States Constitution and the Voting Rights Act confer upon African Americans the right to an equal opportunity to elect their preferred candidates regardless of their political beliefs. In identifying the African-American candidates of choice, Plaintiffs rely not on "stereotypes and assumptions" as Defendants erroneously suggest, ECF 28 at 1 n.1, but rather on Dr. Jonathan Rodden's expert analysis, which includes ecological inference—a statistical method generally accepted by courts around the country that is often used to provide estimates of the rates at which African Americans and whites have voted for specific candidates. ECF 8-7 ¶¶ 19-38; ECF 26 ¶ 42; *see also Thomas v. Bryant*, 366 F. Supp. 3d 786, 793 (S.D. Miss. 2019) (noting that ecological inference "is generally accepted in voting cases in [the

Fifth] Circuit"). The fact that previous African-American-preferred candidates were Democrats does not entitle African-American voters in Mississippi to any less protection; a racially discriminatory electoral scheme is unconstitutional notwithstanding its partisan implications. *Cf. Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) (noting that "sorting voters on the grounds of race remains suspect even if race is meant to function as a proxy for other (including political) characteristics").

Because Plaintiffs have plainly asserted race discrimination claims under the Fourteenth and Fifteenth Amendments and the VRA, along with a one-person, one-vote claim, *Rucho* has nothing to do with this case. There, the Supreme Court found partisan gerrymandering claims nonjusticiable due to the absence of "judicially discoverable and manageable standards for resolving" such claims. *See Rucho*, 139 S. Ct. at 2494, 2491. But that reasoning cannot be applied Plaintiffs' causes of action, for which longstanding precedent sets forth established standards. *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (invalidating districting plan under Section 2's prohibition of laws that, "based on the totality of the circumstances," provide members of a racial group "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice") (quoting 42 U.S.C. § 10301(b)); *Rogers v. Lodge*, 458 U.S. 613, 622 (1982) (holding Fifteenth Amendment prohibited county's at-large voting system "maintained for the invidious purpose of diluting the voting strength of the black population"); *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (plurality opinion) (explaining that the Fourteenth Amendment prohibits systems purposefully enacted to dilute a racial group's voting power); *Gray*, 372 U.S. at 381 ("Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit.")

Yet, even if Defendants' interpretation of *Rucho* had any merit (and it does not), the long line of Supreme Court precedents enforcing one-person, one-vote and racial discrimination claims are still binding on this Court. The Supreme Court instructs that: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Determining which case controls here is not even a close call because the Court in *Rucho* expressly acknowledged that one-person, one-vote and intentional racial discrimination claims are justiciable, *see* 139 S. Ct. at 2495-96 (explaining that in "one-person, one-vote and racial gerrymandering . . . there is a role for the courts"), and "relatively easy to administer," *id*. at 2498, 2501. And this conclusion is in line with well-established Supreme Court rulings. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 237 (1962) (concluding that malapportionment claims "present a justiciable constitutional cause of action"); *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (holding justiciable a claim that a city's boundaries were redrawn to exclude black voters from the city).

Plaintiffs' one-person, one-vote claim simply demands that "each vote must carry equal weight," which is "a matter of [simple] math," *Rucho*, 139 S. Ct. at 2501, and their racial discrimination claims ask for the elimination of racial considerations, *see id.* at 2502. The Challenged Provisions (and the Electoral-Vote Rule in particular) were enacted with the intent to discriminate against African Americans and result in the unequal weighting of votes cast for the same office, which renders those provisions unconstitutional. *See id.* at 2497 (while "'a jurisdiction may engage in constitutional political gerrymandering,'" "it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting"). In contrast, a partisan gerrymandering claim "ask[s] for the elimination of partisanship," which the

Supreme Court found to be either inseparable from redistricting or permissible at some level. *Id.* at 2502. Plaintiffs' claims raise no such concerns because an electoral system can be stripped of discriminatory procedures and a court can easily eliminate the unequal weighting of votes by enjoining the dilutive practices.

To read *Rucho* as Defendants suggest would render virtually all election laws unreviewable, even in the presence of explicit, racially-discriminatory intent, and would wipe away half a century's worth of Supreme Court precedent. The Court should reject such an expansive interpretation of a narrow ruling that would do away with *stare decisis* and, in any event, contradicts the Supreme Court's holding in *Rucho*.

## IV.    Plaintiffs Have Stated Claims for Relief Under the Fourteenth Amendment, Fifteenth Amendment, and Voting Rights Act.

Plaintiffs have sufficiently stated claims for relief under the Fourteenth Amendment, Fifteenth Amendment, and the VRA because their allegations demonstrate that the Challenged Provisions were enacted with intent to dilute African-American voting strength, ECF 26 ¶¶ 4, 32-40, and they have that effect, *id.* ¶¶ 5-7, 14-49. Plaintiffs have also demonstrated that the Electoral-Vote Rule assigns unequal weight to individuals' votes in violation of the Equal Protection Clause's one-person, one-vote principle. Defendants' Rule 12(b)(6) motion misapplies the relevant legal standards, ignores controlling precedent, and sets forth no legitimate basis for dismissal.

As explained at length above, *see* Section I.A, *supra*, Defendants' insistence that the Challenged Provisions have never previously deprived an African-American-preferred candidate from being elected, ECF 28 at 24-25 has no legal relevance. *See also* ECF 29 at 2-4. Having alleged discriminatory intent, Plaintiffs need only allege facts showing that they "have *less opportunity* than other members of the electorate" to elect their candidates of choice. 52 U.S.C. § 10301(b) (emphasis added); *see also Garza*, 918 F.2d at 766. Accepting Defendants' argument would give

the State license to discriminate openly against minority groups and dilute their voting power as long as it does not change the outcome of an election. The Fourteenth and Fifteenth Amendments and the VRA plainly foreclose such reasoning. *See*, *e.g.*, *Associated Contractors*, 508 U.S. 656, 666 (1993); *Garza*, 918 F.2d at 766; *Rockefeller*, 74 F.3d at 1369-70.

Defendants also misstate the applicable VRA standards in arguing that Plaintiffs "fail" to satisfy the first *Gingles* factor—which asks whether a racial minority is "sufficiently large and geographically compact to constitute a majority in a single-member district." ECF 28 at 26 (quoting *Gingles*, 478 U.S. at 50). This factor has no relevance outside of the redistricting context. *Armstrong v. Allain*, 893 F. Supp. 1230, 1328 (S.D. Miss. 1994) (explaining that this factor is "of no relevance" in a challenge to a law governing statewide referenda). Nor does it apply where Plaintiffs have alleged discriminatory intent. *Perez v. Abbott*, 253 F. Supp. 3d 864, 942-44 (W.D. Tex. 2017) (noting plaintiffs alleging discriminatory intent "need not satisfy the first *Gingles* precondition"), *abrogated on other grounds*, 138 S. Ct. 2305 (2018); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) (same); *United States v. Brown*, 494 F. Supp. 2d 440, 483 n.67 (S.D. Miss. 2007) (same); *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009) (stating that the Court's holding regarding the first *Gingles* precondition did not apply to claims asserting intentional discrimination, and citing *Garza*).

Finally, the Electoral-Vote Rule shares the same characteristics that rendered the county-unit system unconstitutional in *Gray*. *See* ECF 6-8. Both systems are unlawful because they discard votes for candidates who (1) do not win the geographic subunit in which the vote is cast, or (2) win the subunit by a large margin. *Gray*, 372 U.S. at 381 n.12; *Gordon v. Lance*, 403 U.S. 1, 4-5 (1971). And Defendants' assertion that *Gray*'s holding should be limited to malapportioned systems ignores the Court's explanation that the county-unit system would violate the one-person,

one-vote principle even if the counties were perfectly apportioned.[6] 372 U.S. at 381 n.12. As the

Court explained in *Gordon*, "the county-unit system [in *Gray*] would have been defective even if

unit votes were allocated strictly in proportion to population" because "[v]otes for the losing

candidates were discarded," and "votes for the winning candidate in a county were likewise

devalued, because all marginal votes for him . . . would have no impact on the statewide total."

403 U.S. at 4-5. Because the Electoral-Vote Rule discards and assigns unequal weight to individual

votes for statewide office and is substantively indistinguishable from the county-unit system that

the Supreme Court struck down in *Gray*, it violates the one-person, one-vote principle. Plaintiffs

have thus stated claims under the Fourteenth and Fifteenth Amendments as well as the VRA.

## V.   As the State Officers Responsible for Enforcing the Challenged Provisions, the Secretary and the Speaker Are Proper Defendants in this Lawsuit.

The Challenged Provisions explicitly call for the Secretary and the Speaker (and no one

else) to implement their procedures. Thus, the Court should reject Defendants' contentions that

they are not "proper defendants," ECF 28 at 15-17, 30, or that the Governor and the Attorney

General are necessary parties, because the Court can provide Plaintiffs the relief they seek without

the Governor's or Attorney General's involvement.

### A.   The Secretary and the Speaker Enforce the Challenged Provisions, and an Injunction Against Those Actions Would Prevent the Dilution of Plaintiffs' Votes.

Sections 140 and 143 of the Mississippi Constitution instruct that, rather than declaring the

winner of each election based on a plurality-vote rule as he does for other elections, *see* MISS.

CODE ANN. § 23-15-603, the Secretary must instead deliver statewide election results to the

---

[6] *Fortson v. Morris*, 385 U.S. 231 (1966), did not limit *Gray*'s application as Defendants suggest, *see* ECF 28 at 9, but rather explained that *Gray* precludes "[geographic]-unit machinery [in state] election system[s]." *Id.* at 235. *Fortson* also has no application to Plaintiffs' claims against the Challenged Provisions as a whole because that case did not involve any finding of intentional discrimination.

Speaker, who then publishes them before the House to determine whether a candidate satisfied the Electoral-Vote and Popular-Vote Rules. Miss. Const. art. V, §§ 140, 143. The Speaker presides over the House as it "ascertain[s] and counts the vote of each county," and if no candidate satisfies both rules, it is the Speaker who calls a vote in the House and declares the winner according to the results of that vote. *Id.* § 141; *see also* H. Journal, 115th Reg. Sess., at 32-33 (Miss. 2000) (attached as Exhibit 1) (explaining that, after calling for a vote in the House to decide the 1999 gubernatorial election, "[t]he Speaker declared Ronnie Musgrove duly and constitutionally elected Governor"). Each of these actions produce the injuries alleged in Plaintiffs' Amended Complaint.

Because the Speaker and the Secretary are charged with carrying out the Challenged Provisions, they are proper defendants and Plaintiffs' claims against them easily satisfy the "causation" and "redressability" elements of Article III's standing requirements. The causation element asks whether there is "a 'fairly traceable' causal connection 'between the injury and the conduct complained of.'" *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507, 515 (5th Cir. 2017) (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). And the redressability element requires a plaintiff to show "a 'favorable decision will relieve a discrete injury to himself,' but not necessarily 'that a favorable decision will relieve his *every* injury.'" *Id.* (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Here, Plaintiffs meet both requirements by suing the state officials responsible for the law's implementation. *See id.* at 514-15 (holding Commissioner of Insurance and Commissioner of Workers' Compensation were proper defendants in challenge to law limiting payments to emergency care provider); *Campaign for S. Equal. v. Miss. Dep't of Human Servs.*, 175 F. Supp. 3d 691, 703-07 (S.D. Miss. 2016) (finding, in challenge to law banning same-sex adoption, that officer whose department was "charged with responsibilities affecting the adoption process" was a proper defendant); *Greater Birmingham Ministries v. Alabama*, No. 2:15-CV-

02193-LSC, 2017 WL 782776, at *4 (N.D. Ala. Mar. 1, 2017) (explaining that, in challenge to voter ID law, Secretary of State was a proper defendant because he was responsible for implementing that law).

Furthermore, the Court can "structure relief to redress plaintiff[s'] injur[ies]" by issuing injunctions against the actions just described. *Air Evac EMS*, 851 F.3d at 514. To prevent the dilution of Plaintiffs' votes, the Court need only enjoin the Speaker from declaring the winner of statewide elections in the manner described above; enjoin the Secretary from delivering the results pertinent to the Electoral-Vote Rule (i.e. any results that set forth the number of House districts won by each candidate), and order the Secretary or the Speaker to declare the winner of statewide elections pursuant to the same standards applicable to other offices: whoever receives the most votes. *See* MISS. CODE ANN. § 23-15-605. In sum, the Amended Complaint demonstrates that Plaintiffs' injuries are caused by Defendants' actions pursuant to the Challenged Provisions, and because an injunction against those actions will relieve such injuries, Plaintiffs have identified the proper defendants and have satisfied the causation and redressability elements of the Article III standing inquiry.

### B. Neither the Governor nor the Attorney General Has Any Role in Implementing the Challenged Provisions, Thus Neither is a Necessary or Indispensable Party to this Litigation.

Defendants argue that the Governor and the Attorney General are indispensable parties to this lawsuit, but, tellingly, fail to explain what role those officials play in the enforcement of the Challenged Provisions. While Defendants point out that the Governor is generally responsible for executing the laws of State, ECF 28 at 30 (citing MISS. CONST. art. V, §§ 116, 123; MISS. CODE ANN. § 7-1-5), and that Mississippi law calls for the Attorney General to "intervene and argue the constitutionality of any statute when notified of a challenge thereto, pursuant to the Mississippi Rules of Civil Procedure," *id.* (citing MISS. CODE. ANN. § 7-5-1), nothing about these general

duties suggest that Plaintiffs cannot obtain relief in this suit without the Governor's or Attorney General's involvement, or that they are necessary or indispensable parties here.

As this Court recently explained, the Attorney General's "duty to defend the state in litigation is not the same thing as the power to enforce" that may render him a necessary party. *Campaign for S. Equal.*, 175 F. Supp. 3d at 702. The same applies to the Governor's general duty to execute the State's laws faithfully. *Okpalobi v. Foster*, 244 F.3d 405, 426-29 (5th Cir. 2001) (en banc) (holding neither the Governor nor the Attorney General implemented the challenged law); *Advanced Auto Transp. v. Pawlenty*, No. 10-159 (DWF/AJB), 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (holding "the mere fact that an attorney general has a duty to prosecute all actions in which a state is interested" does not mean he must be named as a defendant) (quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)); *see also City of Greensboro v. Guilford Cty. Bd. of Elections*, No. 1:15-cv-559, 2016 WL 6810965, at *1 (M.D.N.C. Mar. 23, 2016) (finding, in challenge to state law reforming the City of Greensboro's elections, that the Governor was not a necessary party because he had "no particular responsibilities . . . which relate to elections in the City of Greensboro"). And this makes sense; otherwise, the Governor and Attorney General would be necessary defendants in every single challenge to Mississippi law.[7] "Courts have allowed a federal claim for an injunction against a state law to proceed against *only* the official who is responsible for enforcing the law not additional state officers who merely have a responsibility to enforce state laws more generally." *Greater Birmingham Ministries*, 2017 WL 782776, at *5.

---

[7] Defendants cite *Dupree v. Mabus*, 776 F. Supp. 290 (S.D. Miss. 1991), noting that the Attorney General was found to be a proper party as "the chief legal officer and advisor of the state." ECF 28 at 32 n.34. But *Dupree* involved a claim under Section 5 of the VRA, which required changes to state voting laws to be submitted by the state's chief legal officer for preclearance. Because Section 5 made the Mississippi Attorney General responsible for enforcement (i.e., seeking preclearance), the court found that he was a proper defendant. The court never suggested that the Attorney General's status as the State's chief legal officer renders him a necessary party in all cases challenging state laws.

Because neither the Governor nor the Attorney General plays any role in the operation of the Challenged Provisions, neither is a necessary or indispensable party in this case.

Finally, even if the Governor or Attorney General was a necessary defendant, that fact would not require the dismissal of the Amended Complaint. An action can be dismissed under Rule 19(b) only if a necessary party cannot be feasibly joined in the litigation. *See* Fed. R. Civ. P. 19(b); *Foster v. Dilger*, No. CIV.A. 3:10-41-DCR, 2010 WL 4320388, at *3 (E.D. Ky. Oct. 22, 2010) (denying Rule 12(b)(7) motion because, even assuming the Attorney General was a necessary party, he could be joined). If the Court determines that either the Governor or Attorney General is sufficiently involved in the implementation of the Challenged Provisions to make him a necessary party, there is no reason to believe either could not be joined.[8]

## VI.   Under *Ex parte Young*, and Given the VRA's Abrogation of State Sovereign Immunity, the Eleventh Amendment Does Not Bar Any of Plaintiffs' Claims.

The Court should reject Defendants' attempt to invoke the Eleventh Amendment immunity to bar Plaintiffs' claims, *see* ECF 28 at 31, because the exception to Mississippi's sovereign immunity under *Ex parte Young* plainly applies, and Congress abrogated sovereign immunity in enacting the VRA.

Under the *Ex parte Young* doctrine, the Court "may enjoin a state official in his official capacity from taking future actions in furtherance of a state law that offends federal law or the federal Constitution." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 964 (5th Cir. 2014). To determine whether the *Ex parte Young* exception applies, courts conduct "a

---

[8] Like the claims against Defendants, a suit against the Governor or Attorney General—if it were determined that either was necessary—would not be barred by sovereign immunity. *See Ex parte Young*, 209 U.S. at 157; *Greater Birmingham Ministries*, 2017 WL 782776, at *4 n.9 (explaining that generally "the same inquiry" governs whether an officer is a proper defendant and whether that officer can be sued under *Ex parte Young*). Therefore, while there is no basis to join the Governor or Attorney General, if the Court finds that they are necessary parties, there is no reason to dismiss this action because they can easily be joined.

straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted). There can be no dispute that, here, Plaintiffs seek prospective injunctive relief against state officials whose actions, according to the Amended Complaint, will continue to violate Plaintiffs' federal constitutional and statutory rights unless enjoined. *See id.* at 646 (*Ex parte Young*'s applicability "does not include an analysis of the merits of the claim"); *see also* ECF 26 at 35.

Plaintiffs may specifically seek prospective injunctive relief against the Secretary and the Speaker because those officials are "connect[ed] to the enforcement" of the Challenged Provisions. *Air Evac EMS*, 851 F.3d at 519. "Enforcement" in this context is not limited to "threatened civil and criminal prosecution," *id.*; rather, it refers to whether the official being sued has "responsibilities" in implementing the challenged law, *K.P. v. LeBlanc*, 627 F.3d 115, 125 (5th Cir. 2010) (holding that a state board's denial of liability protection to an abortion provider, for purposes of *Ex parte Young*, was "enforcement" of the law being challenged). As explained above, Section V.A, *supra*, the Secretary and the Speaker are solely responsible for implementing the Challenged Provisions, and the injunction Plaintiffs seek would prevent the injuries alleged in the Amended Complaint. As a result, *Ex parte Young* clearly permits Plaintiffs' claims against these officers. *See Keyes v. Gunn*, 230 F. Supp. 3d 588, 594-95 (S.D. Miss. 2017) (finding, in challenge to Mississippi House's determination of election dispute, that *Ex parte Young* permitted suit again Speaker Gunn), *rev'd on other grounds*, 890 F.3d 232 (5th Cir. 2018); *see also Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (holding *Ex parte Young* applied to suit against official who denied plaintiff access to documents because the injunction the plaintiff sought "would prospectively abate the alleged violation of federal law").

Finally, the Eleventh Amendment "has no role to play" in Plaintiffs' VRA claim because Congress "validly abrogated state sovereign immunity" in enacting the VRA. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). "The immunity from suit that [Mississippi] and its officials otherwise enjoy in federal court offers it no shield here." *Id.*; *see also Hall v. Louisiana*, 974 F. Supp. 2d 944, 953 (M.D. La. 2013); *Mixon v. State of Ohio*, 193 F.3d 389, 398 (6th Cir. 1999).[9] As a result, the Eleventh Amendment does not bar any of Plaintiffs' claims.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion to Dismiss.

---

[9] Defendants are wrong to assert, *see* ECF 28 at 31, that Plaintiffs must sue the State directly to take advantage of the VRA's immunity abrogation: by suing Defendants in their official capacities, Plaintiffs are suing the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 81 (1989) ("[A] suit against a state official in his or her official capacity is . . . no different from a suit against the State itself.") (citation omitted).

August 19, 2019                                 Respectfully submitted,

                                                /s/ *Uzoma N. Nkwonta*
                                                Marc E. Elias*
                                                Email: MElias@perkinscoie.com
                                                Uzoma N. Nkwonta*
                                                Email: UNkwonta@perkinscoie.com
                                                Jacki L. Anderson*
                                                Email: JackiAnderson@perkinscoie.com
                                                K'Shaani Smith*
                                                Email: KShaaniSmith@perkinscoie.com
                                                Daniel C. Osher*
                                                Email: DOsher@perkinscoie.com
                                                PERKINS COIE LLP
                                                700 Thirteenth Street, N.W., Suite 600
                                                Washington, D.C. 20005-3960
                                                Telephone: (202) 654-6200
                                                Facsimile: (202) 654-6211

                                                Robert B. McDuff, MSB 2532
                                                Email: rbm@mcdufflaw.com
                                                767 North Congress Street
                                                Jackson, MS  39202-3009
                                                Telephone: (601) 969-0802
                                                Fax: (601) 969-0804

                                                Beth L. Orlansky, MSB 3938
                                                Email: borlansky@mscenterforjustice.org
                                                MISSISSIPPI CENTER FOR JUSTICE
                                                P.O. Box 1023
                                                Jackson, MS  39205-1023
                                                Telephone: (601) 352-2269
                                                Fax: (601) 352-4769

                                                *Counsel for Plaintiffs*

                                                *Admitted Pro Hac Vice*

- 36 -

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on August 19, 2019, I filed the foregoing Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
PERKINS COIE LLP
700 13th St. N.W., Suite 600
Washington, D.C.  20005-3960
Phone: (202) 654-3347
Fax: (202) 624-9547
Email: UNkwonta@perkinscoie.com
