UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LESLIE-BURL MCLEMORE, ET AL.                                         PLAINTIFFS

V.                                              CIVIL ACTION NO. 3:19-CV-383-DPJ-FKB

DELBERT HOSEMANN, IN HIS                                             DEFENDANTS
OFFICIAL CAPACITY AS THE
MISSISSIPPI SECRETARY OF
STATE, ET AL.

ORDER

Seven African-American Plaintiffs seek an order striking the voting laws found in sections 140, 141, and 143 of Article V of the Mississippi Constitution. For the following reasons, their Motion for Preliminary Injunction [8] is denied.

I.    Facts and Procedural History

Plaintiffs Leslie-Burl McLemore, Charles Holmes, Jimmie Robinson, Sr., Roderick Woullard, Brenda Booth, Jordan Malone, and Tyler Yarbrough are African-American Mississippi citizens who support candidates for statewide office "preferred by African Americans," which, they say, are Democrats. Am. Compl. [26] ¶¶ 19–25; *see id.* ¶ 42 ("Voting in Mississippi is highly racially polarized, with the vast majority of white voters preferring Republican candidates, and the vast majority of African-American voters preferring Democratic candidates.").

In their Complaint, Plaintiffs contend that three provisions of the Mississippi Constitution impair that choice. The provisions provide that successful candidates for state-level, statewide office must receive both the majority of the popular vote ("the Popular-Vote Rule") and a plurality of votes in a majority of Mississippi House districts ("the Electoral-Vote Rule"). Miss. Const. art. V, § 140. If no candidate satisfies both the Popular-Vote and the Electoral-Vote

Rules, then the "House-Vote Rule" applies, and "the House of Representatives shall proceed to choose [the winner] from the two persons who shall have received the highest number of popular votes." *Id.* § 141. By their terms, sections 140 and 141 control statewide elections for governor. Section 143 applies these same procedures to all other statewide-elected, state-level offices. *Id.* § 143.

To block these "Challenged Provisions" from applying in the November 2019 election, Plaintiffs sued Secretary of State Delbert Hosemann and Speaker of the Mississippi House of Representatives Philip Gunn. Count I of their Amended Complaint alleges an equal-protection claim as to the Challenged Provisions under the Fourteenth and Fifteenth Amendments to the United States Constitution. Count II asserts a one-person/one-vote claim as to the Electoral-Vote Rule. Finally, Count III says the Challenged Provisions violate § 2 of the Voting Rights Act ("VRA").

The case is now before the Court on Plaintiffs' motion for a preliminary injunction seeking an order enjoining enforcement of the Challenged Provisions and "requir[ing] Defendants to declare, as the winner of each contest for statewide, state-level office, the candidate who receives the highest number of votes." Pls.' Mot. [8] at 3. They seek this injunction before the November 5, 2019 election. Pls.' Mem. [9] at 3–4.

Defendants responded to Plaintiffs' Amended Complaint with a motion to dismiss, challenging their standing, the ripeness of their claims, and justiciability. They also argue that the Amended Complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).

The Court heard oral argument on October 11, 2019. Because Plaintiffs seek a ruling on the preliminary injunction before the rapidly approaching election, this Order focuses on that motion. Defendants' motion to dismiss will be addressed in a separate order.

II.  Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain this relief, Plaintiffs must demonstrate four familiar requirements:

> (1) [a] substantial likelihood of success on the merits; (2) [a] substantial threat that plaintiff[s] will suffer irreparable injury; (3) [that the] injury outweighs any harm the injunction might cause the defendant[s]; and (4) [that the] injunction is in the public interest.

*Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).

   A.  Substantial Likelihood of Success on the Merits

Count II of Plaintiffs' Amended Complaint arguably presents their strongest claim. In it, they attack section 140's Electoral-Vote Rule. Plaintiffs say this rule violates the one-person/one-vote doctrine and is "largely indistinguishable from the county-unit system invalidated in *Gray* [*v. Sanders*, 372 U.S. 368 (1963).]" Pls.' Mem. [29] at 7. They're right.

In *Gray*, Georgia law apportioned representation in the Georgia House of the General Assembly "as follows: To the eight counties having the largest population, three representatives each; to the thirty counties having the next largest population, two representatives each; and to the remaining counties, one representative each." 372 U.S. at 371 n.1 (quoting 1945 Ga. Const., art. III, § III, ¶ I). In statewide primary elections, "[c]andidates for nominations who received the highest number of popular votes in a county were considered to have carried the county and to be entitled to two votes for each representative to which the county [wa]s entitled in the . . . House of General Assembly," with a majority of the county-unit vote nominating a candidate for statewide office. *Id.* at 371.

The use of the county-unit system weighted votes differently depending on where the voters resided:

> [T]he residents of Fulton County comprised 14.11% of Georgia's total population[,] but . . . under the county unit system, the six unit votes of Fulton County constitute 1.46% of the total of 410 unit votes . . . . Echols County, the least populous county in Georgia, had a population in 1960 of 1,876, or .05% of the State's population, but the unit vote of Echols County was .48% of the total unit vote of all counties in Georgia. . . . Thus, one resident in Echols County had an influence in the nomination of candidates equivalent to 99 residents of Fulton County.

*Id.* That disparity violated the Fourteen Amendment's one-person/one-vote doctrine. *Id.* at 379–80.

Defendants attempt to avoid *Gray* in various ways, but their arguments are not compelling. To begin, Hosemann and Gunn say the facts in *Gray* are distinguishable because the house seats in Mississippi are based on population, thus votes are not weighted differently. Had the *Gray* opinion stopped its analysis with the population-disparity issue, Defendants might have a better point. But during the *Gray* litigation, Georgia modified the county-unit system to more closely approximate population. *Id.* at 372. Though better, the Supreme Court held that the plan was still infirm and would remain so even if the unit populations were identical:

> The county unit system, even in its amended form . . . would allow the candidate winning the popular vote in the county to have the entire unit vote of that county. Hence the weighting of votes would continue, even if unit votes were allocated strictly in proportion to population. Thus if a candidate won 6,000 of 10,000 votes in a particular county, he would get the entire unit vote, the 4,000 other votes for a different candidate being worth nothing and being counted only for the purpose of being discarded.

*Id.* at 381 n.12. So even proportional units violate one-person/one-vote when votes are discarded. *Id.*; *see also Gordon v. Lance*, 403 U.S. 1, 4 (1971) ("[T]he county-unit system [in *Gray*] would have been defective even if unit votes were allocated strictly in proportion to population.").

Next, Defendants stated during oral argument that Plaintiffs never pled the discarded-votes theory. They did. *See* Am. Compl. [26] ¶¶ 53–58, 110 (asserting that votes were "discarded" and quoting *Gray*, 372 U.S. at 381 n.12).

Defendants also argued that the votes in *Gray* were based on county lines whereas the votes under the Electoral-Vote Rule are based on house districts. While that distinction is factually true, it fails to account for the Supreme Court's holding that a unit approach violates one-person/one-vote by systematically discarding all votes for the unsuccessful candidate in that voting unit. *Gray*, 372 U.S. at 381 n.12. The same thing happens in Mississippi in every statewide election for state office.

Defendants then suggested that the Supreme Court has limited *Gray*. Again, that is partially true. For example, in *Fortson v. Morris*, the plaintiffs challenged another aspect of Georgia's election system that allowed its legislature to elect the statewide winner if no candidate garnered a majority. 385 U.S. 231, 233 (1966). The lower court likened the plan to the unit-vote system in *Gray*, but the Supreme Court disagreed, noting that the United States Constitution does not prohibit states from electing their officers through representative votes. *Id.* at 233–34. And that is the difference between Mississippi's Electoral-Vote Rule and *Fortson*. As in *Gray*, the way Mississippi counts district votes disregards all votes for unsuccessful candidates. Thus, the present case is like *Gray*, not *Fortson*, and Defendants have not otherwise demonstrated that the Supreme Court has limited *Gray* in a material way.[1]

---

[1] The tie-breaker system in *Fortson* is the same as the now-disputed House-Vote Rule in this case. *See* Miss. Const. art. V, § 141. Section 141 would therefore survive a one-person/one-vote challenge, but Plaintiffs bring no such claim. They instead make race-discrimination and VRA claims as to section 141. *Fortson* did not address those issues, but the Court will explore them when it considers Defendants' Motion to Dismiss.

Assuming *Gray* remains valid, Defendants nevertheless say the Court lacks a justiciable question. But the *Gray* Court addressed that issue too, affirming the lower court's holding that "it had jurisdiction" and that "a justiciable case was stated[.]" *Gray*, 372 U.S. at 373. Defendants criticize that finding as too cursory to follow and suggest that it cannot survive the Supreme Court's more recent holding in *Gill v. Whitford*. 138 S. Ct. 1916 (2018). *Gill* was a partisan-gerrymandering case where the plaintiffs claimed that vote dilution in their local voting districts created standing to assert a "statewide injury" because their political party of choice was underrepresented in the state legislature. *Id.* at 1930. The Supreme Court rejected that argument, noting that "[t]o the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Id.* The present case is different. Here, under the current regime, votes will be discarded in every district no matter how the lines are drawn. Moreover, the disputed votes are for statewide offices rather than district-specific representatives; it is a statewide dispute. Finally, *Gill* makes no reference to *Gray*, which addressed a factually distinguishable voting law. Because *Gill* does not "directly conflict[]" with *Gray*, *Gray* still controls. *Alvarez v. City of Brownsville*, 904 F.3d 382, 398 (5th Cir. 2018).

Defendants make three final arguments as to Count II that are somewhat related: (1) Plaintiffs lack standing to assert claims against Hosemann and Gunn; (2) the Eleventh Amendment bars claims against these state officers; and (3) Plaintiffs failed to join indispensable parties.

Starting with standing, Plaintiffs must demonstrate three elements: "(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable

decision will redress the injury." *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

As for the first element, Defendants say Plaintiffs will have no injury in fact until the Electoral-Vote Rule affects an election result—something that has never happened. That assumes the constitutional injury asserted in Count II is an altered election. But *Gray* holds in this same context that "any person whose right to vote is impaired . . . has standing to sue." 372 U.S. at 375. The plaintiff in *Gray* was a voter claiming vote dilution, *id.* at 370, and the Court found standing because the disputed rules might "govern future elections," *id.* at 376. In other words, the Court did not consider whether an election had been altered.[2]

Turning to causation and redressability, Hosemann and Gunn say Plaintiffs have sued the wrong defendants. Though distinct elements, causation and redressability overlap and are often considered in tandem. To show causation, a plaintiff must generally demonstrate that his or her injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). "The causation

---

[2] Although the Court rejects Defendants' injury argument, there may still be an issue. *Gray* affirmed the lower court's holding that the voter had standing to challenge a unit-voting system on one-person/one-vote grounds. But as originally pleaded, the plaintiff complained that the votes were weighted differently due to population. By the time the case reached decision before the Supreme Court, the units were amended, so when the Supreme Court announced that even proportional units would violate one-person/one-vote and might affect "future elections," it did not revisit whether the plaintiff had standing to make that claim. *Id.* Said differently, the Court never addressed whether the plaintiff's vote was, or would be, discarded. Here, it appears that some Plaintiffs reside in predominately African-American districts and will not have their votes discarded in the way *Gray* addressed. As to them, Plaintiffs say their votes will still be impaired because any votes over the number needed to carry a district are wasted. Whether that is enough can be decided later because only one Plaintiff with standing is needed. And here, Plaintiff Leslie-Burl McLemore resides in Mississippi House of Representatives District 25, which, according to the Amended Complaint, "is heavily concentrated with white voters" expected to vote Republican. Am. Compl. [26] ¶ 19. The Court finds that at least as to McLemore, he has a substantial likelihood of establishing standing.

element does not require a party to establish proximate causation, but only requires that the injury be 'fairly traceable' to the defendant." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997); *see also League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011). And to establish redressability, a plaintiff "need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (quoted in *K.P. v. LeBlanc*, 627 F.3d 115, 123–24 (5th Cir. 2010)).

In the present case, Defendants say they did not enact section 140. That much is obviously true, but if standing was limited to suing state officers responsible for passing a disputed law, then no law over a certain age—in this case 129 years—could ever be challenged. More significantly, section 140's allegedly unconstitutional effect is "fairly traceable" to these specific Defendants. *Bennett*, 520 U.S. at 168–69. The Secretary of State and Speaker of the House are the only offices named in that provision, and numerous Mississippi election laws create duties for those offices relevant to counting and delivering the electoral votes. *See* Miss. Code Ann. §§ 23-15-601(2) (creating duty for Secretary of State to receive votes tabulated consistent with rules promulgated by the Secretary of State); 23-15-603(1) (stating that election commissioners must transmit general election results to the Secretary of State, who must deliver results of state officers' elections to Speaker of the House); 23-15-603(3) (noting that the Secretary of State tabulates certified statements from election commissioners); 23-15-603(5) (providing that results should be transmitted to the Secretary of State pursuant to rules and regulations promulgated by the Secretary of State). Finally, as Defendants acknowledge, the Speaker of the House receives the electoral votes and presides over the House vote if one is necessary. Either Defendant could be enjoined from performing his statutory or constitutional

duties regarding the electoral votes and thereby redress the injuries that would ensue; thus, standing exists as to these state officers.

For similar reasons, Eleventh Amendment immunity is no barrier in this case. Plaintiffs pursue their claims for equitable relief under the *Ex parte Young* exception to Eleventh Amendment immunity. 209 U.S. 123 (1908). This doctrine "represents an equitable exception to Eleventh Amendment sovereign immunity [that] allows the plaintiff to sue a state official, in his official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law." *Air Evac, Inc. v. Tex., Dep't of Ins., Division of Workers' Compensation*, 851 F.3d 507, 515 (5th Cir. 2017).

The exception applies when the defendant has "the requisite 'connection' to the statutory scheme to remove the Eleventh Amendment barrier to suits brought in federal court against the State." *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001). "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." *Ex Parte Young*, 209 U.S. at 157.

Such a connection exists in this case. As addressed above, the Secretary of State and Speaker of the House are the only officials named in section 140 and have specific statutory and procedural duties related to it. *See Air Evac EMS, Inc.*, 851 F.3d at 513–14 ("[T]here is significant overlap between standing and *Ex parte Young*'s applicability.").

Finally, the Court asked Defendants during oral argument who would be the proper party if not them. They offered the Attorney General and further argued that the case should be dismissed because Plaintiffs failed to join him. *See* Fed. R. Civ. P. 12(b)(7) (addressing dismissal for failure to join). According to Defendants, the Attorney General is an indispensable

party because he is the "chief legal officer and advisor for the state" whose "office has the duty to defend challenges to the Mississippi Constitution." Defs.' Mem. [28] at 32 (quoting Miss. Const. art. V, § 123).[3]

When assessing a motion under Rule 12(b)(7), "a court must determine whether a party should be added under the requirements of Federal Rule of Civil Procedure 19(a)." *August v. Boyd Gaming Corp.*, 135 F. App'x 731, 732 (5th Cir. 2005). Under that rule, "[a] person . . . must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among the existing parties." Fed. R. Civ. P. 19(a)(1)(A).

Defendants have not demonstrated that the Attorney General is an indispensable party under Rule 19; in fact, he would likely receive immunity. Unlike the Secretary of State and Speaker of the House, section 140 does not mention the Attorney General, and his general duty to intervene and defend challenges to Mississippi laws does not establish that he has the requisite "connection" to that provision. *Okpalobi*, 244 F.3d at 411; *see also Campaign for S. Equality v. Miss. Dep't of Human Servs.*, 175 F. Supp. 3d 691, 701–03 (S.D. Miss. 2016) (concluding that Attorney General's duty to defend the state did not, by itself, create standing to sue over challenge to state law). Defendants cite no other state laws giving the Attorney General a role under section 140, so he would not be a proper party and is not indispensable. *Id.*

B.     Substantial Threat of Irreparable Injury

Count II may present a risk of irreparable injury if the Electoral-Vote Rule is eventually applied to the 2019 election. The Fifth Circuit has explained that "[a]n injury is 'irreparable'

---

[3] Defendants originally argued that Plaintiffs should also have sued the Governor, but during oral argument they focused on the Attorney General. The argument as to the Governor appears to have been abandoned, but even if not, Defendants have not shown that he would be a proper party, much less indispensable.

10

only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). Here, the harm at least some Plaintiffs will suffer if the Electoral-Vote Rule is applied is that their votes will be discarded. Indeed, votes will be discarded in every district. And, like a "loss of First Amendment freedoms for even minimal periods of time," a monetary remedy cannot rectify such an injury. *Id.*

That said, Plaintiffs want a ruling before election day to prevent irreparable injury from occurring at that time. Under Mississippi law, the votes are certified 10 days after the election. Even then, the ballots must be maintained. Miss. Code Ann. § 23-15-911. So, while there could be irreparable harm if the Electoral-Vote Rule is eventually applied, the potential injury is not irreparable before the election—i.e., the time at which Plaintiffs ask for an injunction.

C. Weighing of Harms and Public Interest

Individuals in every Mississippi House district will see their votes discarded following the November 2019 election because the Electoral-Vote Rule applies in every statewide contest. This is not merely a seldom utilized tie-breaker. On the other hand, the injury Plaintiffs assert has never altered a statewide election in the 129 years since the Challenged Provisions were adopted. And that begs the question whether the Court should enter a preliminary order striking the provisions before the November 2019 election. Defendants correctly say no, but not all their arguments are compelling.

For starters, courts have allowed elections to proceed under unconstitutional rules where it is simply too late to make a change. For example, "[u]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment

11

scheme was found invalid." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). Under those circumstances, courts often maintain the status quo to avoid the voter confusion that might follow if the precincts shifted or the voting rules changed. *See, e.g.*, *Boddie v. City of Cleveland*, No. 4:01-CV-88-D-B, 2001 WL 1523854, at *2 (N.D. Miss. Apr. 24, 2001).

But this case is different. Preliminarily enjoining the Electoral-Vote Rule or the other Challenged Provisions will not impact how or where a single voter exercises the franchise. No ballots need be reprinted, no districts redrawn, and no poll workers re-trained. Instead, an order enjoining the Challenged Provisions would merely change how the votes are counted after the fact.

The more troubling issue is whether the Court should address the discarded-vote injury before allowing Mississippi an opportunity to fix its problem. In *Chisom v. Roemer*, the plaintiffs contended that Louisiana's system of electing its supreme court justices violated § 2 of the VRA. 853 F.2d 1186, 1187 (5th Cir. 1988). The district court agreed and granted a preliminary injunction blocking an upcoming election. *Id.* Relying primarily on apportionment cases, the Fifth Circuit concluded that the district court erred. *Id.* at 1189–92. The Fifth Circuit first noted that courts should proceed with "caution" when exercising "injunctive powers before trial on the merits." *Id.* at 1192. It then explained that states should be given an opportunity to fix defective voting laws:

> It is now established beyond challenge that upon finding a particular standard, practice, or procedure to be contrary to either a federal constitutional or statutory requirement, the federal court must grant the appropriate state or local authorities an opportunity to correct the deficiencies. In *Reynolds v. Sims* the Supreme Court commended the district court for refraining from enjoining an impending election until the Alabama Legislature had been given an opportunity to remedy the defects in their legislative apportionment scheme. 377 U.S. at 586 . . . . Further, after trial on the merits, and a declaration that an existing election scheme is unlawful, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional [or federal statutory]

12

> requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 . . . (1978). *See also McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 . . . (1981) ("Moreover, even after a federal court has found a districting plan unconstitutional, 'redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt,'" quoting *Wise v. Lipscomb*). The court goes on to cite authorities for the proposition that the legislatures should first be given a chance, and quoting *Reynolds v. Sims*, the *Sanchez* court noted that "judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." 452 U.S. at 150 n.30 . . . ; *Connor v. Finch*, 431 U.S. 407 . . . (1977) . . . .
>
> . . . .
>
> We understand these precedents to *mandate* that the responsible state or local authorities *must* be first given an opportunity to correct any constitutional or statutory defect before the court attempts to draft a remedial plan. In the case at bar, that means that should the court rule on the merits that a statutory or constitutional violation exists the Louisiana Legislature should be allowed a reasonable opportunity to address the problem.

*Id.* (emphasis added).

In the present case, the Challenged Provisions are not merely statutes that can be revised in one legislative session; they are constitutional provisions that require amendment. That process cannot occur before the November 2019 votes are counted or within a short time after the election. Indeed it was already too late when this suit was filed. But based on Plaintiffs' argument during the hearing, it appears the process could be attempted before the next statewide election cycle. If not, then by that time there would presumably have been a trial on the merits, and the Court could craft its own "remedial plan" if necessary. *Id.*

That would not be an entirely satisfying result. Though at the preliminary stage, the Court has grave concern that at least the Electoral-Vote Rule is unconstitutional. That said, it has been so since at least 1963 when the Supreme Court decided *Gray*. So claims like these could

13

have been brought at any point over the last 56 years. As it is, Plaintiffs seek a remedial plan on the eve of the election.

Moreover—and perhaps more significantly—what would the remedial plan look like? Plaintiffs ask the Court to declare that the candidate who wins the plurality of the popular vote wins the election. Pls.' Mem. [9] at 4. That would mean tossing all Challenged Provisions, including the Popular-Vote Rule, which says winning candidates must obtain a majority of the popular vote. Yet according to the United States Supreme Court, "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem" by, "for example, . . . sever[ing the] problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006). Plaintiffs have not demonstrated that electing officials by majority vote is unconstitutional.

Whether the Popular-Vote Rule is constitutional or not, Mississippi could choose—in its own judgment—to scrap it if the Electoral Vote or House Vote Rules are invalidated. Or it could keep it with a different mechanism for deciding the winner if no candidate receives a majority. Indeed, there are numerous methods for electing statewide officials. *Fortson*, 385 U.S. at 236. Federal courts are simply ill-equipped to make such policy decisions and "should jealously guard and sparingly use [their] awesome powers to ignore or brush aside long-standing state constitutional provisions, statutes, and practices." *Chisom*, 853 F.2d at 1189.[4]

For these reasons, the third and fourth factors for granting a preliminary injunction weigh against Plaintiffs' motion. Absent some impact on the election results, the constitutional injury

---

[4] The Court must determine later whether the Popular-Vote Rule violates equal protection when paired with the House-Vote Rule. But even if it does, the state could potentially "overcome its odious origin" by amending the Challenged Provisions for non-racial reasons. *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). At that point, the system would resemble *Fortson*.

caused by discarded votes is outweighed by the harm a preliminary injunction would cause when the Court attempts to craft a new method for electing statewide officers on the eve of the election. So too, the public interest would not favor such intervention at this preliminary stage.[5]

IV.     Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction [8] is denied.

**SO ORDERED AND ADJUDGED** this the 1st day of November, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] It is hard to ignore the impact the upcoming election may have on these issues. If the vote produces a split result under section 140 and is destined for a House vote under section 141, then a far more tangible injury could become imminent: the candidate with the majority vote could lose the election because votes were discarded under the Electoral-Vote Rule. The Court will not prejudge those issues, but under those circumstances the case would likely proceed to an expedited trial on the merits at least as to the Electoral-Vote Rule.